UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


SHAUN LEE SMITH                    CIVIL ACTION NO. 04-27
                                  NEW ORLEANS, LOUISIANA
     VS.                          TUESDAY, OCTOBER 12, 2004
                                  10:45 A.M.
HARRAH'S NEW ORLEANS              SECTION "A"
CASINO, ET AL.


**TRIAL  -  DAY 1**
BEFORE THE HONORABLE JAY C. ZAINEY
UNITED STATES DISTRICT COURT JUDGE, and THE JURY


A P P E A R A N C E S:

FOR THE PLAINTIFF,                S. MICHAEL CASHIO, ESQ.
SHAUN LEE SMITH:                  Attorney at Law
                                  2107 31st Court
                                  Kenner, Louisiana 70065
                                  (504) 443-3737


FOR THE DEFENDANT,                HELLER, DRAPER, HAYDEN, PATRICK
HARRAH'S NEW ORLEANS              & HORN, L.L.C.
CASINO, ET AL.:                   By: Drew R. Ballina, Esq.
                                  2500 Poydras Center
                                  650 Poydras Street
                                  New Orleans, Louisiana 70130
                                  (594) 568-1888


REPORTED BY:                      VICTOR D. Di GIORGIO, CCR
                                  OFFICIAL COURT REPORTER
                                  501 Magazine St., Room 406
                                  New Orleans, Louisiana  70130
                                  (504) 589-7782


Proceedings recorded by mechanical stenography.
Transcript produced by computer aided transcription.

I-N-D-E-X


WITNESS                                                    PAGE



RUDOLF V. HAMSA, M.D.

    By Mr. Cashio............................45/69

    By Mr. Ballina..............................54




STACEY DORSEY

    By Mr. Cashio............................80/136

    By Mr. Ballina.............................105

**P-R-O-C-E-E-D-I-N-G-S**

(10:45 A.M.  -  MORNING SESSION)

(TUESDAY, OCTOBER 12, 2004)

(COURT CALLED TO ORDER)

(JURY SELECTED AND SWORN TO HEAR THE CASE)

(JURY INSTRUCTED BY THE COURT)

(1:45 P.M.  -  AFTERNOON SESSION)

THE CLERK:   All rise.

Court's in session.

THE COURT:   Out of the presence of the jury, let's address three issues that -- well, two of which have been raised by counsel, and then one that I want to go into.

The first issue is the tax preparer's, what, Mr. Cashio?

MR. CASHIO:   That was just a bill, Your Honor.

THE COURT:   Oh, the tax preparer's bill?

MR. CASHIO:   Right.

THE COURT:   Okay.  I thought it was some --

MR. CASHIO:   The issue was that the tax preparer wouldn't sign the documents until his bill was paid, so we wanted to prove that through the bill.

Secondly, he signed and mailed those off, and we have a document on certified mailed, and a copy of the signed 1040 form.

THE COURT:   That's admissible of course.  Mr. Ballina

1    can certainly go into the date that it was mailed and all that.

2        MR. CASHIO:    Right.    I want to add that to my witness

3    list, the signature.

4        THE COURT:    But what is the relevance of the bill of

5    the tax preparer, just to show that it's legitimate?

6        MR. CASHIO:    Well, no, it's not an item of damage

7    unless he tells me he's not going to ask him why he didn't send

8    off his taxes earlier.    My clients' going to respond with the

9    tax preparer would not sign his thing, and I thought he had his

10    part on the tax form until I paid him, and so I didn't think I

11    could send it off, and then when I checked with my attorney I

12    found out that I could sign it myself and send it off, and

13    that's what I did.

14        THE COURT:    So what relevance does this bill of the

15    tax preparer have now?

16        MR. CASHIO:    To prove what he's saying that that's the

17    reason he didn't send off.

18        If Mr. Ballina doesn't go into that area on why he

19    didn't send off his taxes before October 8th, then I have no

20    problem.    That's just a defense to his expected question, Your

21    Honor.

22        THE COURT:    Mr. Ballina.

23        MR. BALLINA:    Your Honor, I think the Court has gotten

24    right on the appropriate issue.    There is no relevance to the

25    paid tax preparer's bill concerning tax returns.    It's not an

1    item of damage.  It certainly can't be argued that my client is

2    responsible for paying tax returns that he's not --

3            THE COURT:    Well, he's not suggesting that he is, but

4    what Mr. Cashio's saying is the relevance of that is to

5    substantiate his client's statement that --

6            MR. CASHIO:    Delayed until October 8th to mail his

7    return.

8            MR. BALLINA:    I'm not sure if that meets the

9    definition of relevance, that is, it shows that the existence or

10   nonexistence or something that's determinative of this case is

11   most probable or less probable.  I think he wants to use it to

12   buttress what his client is going to -- what the plaintiff's

13   going to testify to as to why he didn't mail the tax returns and

14   why the preparer didn't sign the returns.

15           MR. CASHIO:    Exactly.  And if you're going to make an

16   issue out of that, I need to show the documents.

17           THE COURT:    Well, what return are we talking about?

18           MR. CASHIO:     The 2002 and 2003 returns.

19           Your Honor, what happened was --

20           THE COURT:    Yeah, but this bill was August of 2004.

21           MR. CASHIO:    Right.  And he just was sending in those

22   returns in 2004.  He had an extension until October 15th,

23   according to him.

24           THE COURT:    I hear you.  They're irrelevant.  They're

25   not going to be included.  I'll note your objection to that, Mr.

1    Cashio.   However, what I want to address in light of this.   Mr.

2    Ballina, your questioning of the plaintiff as it relates to this

3    issue is going to be very limited.   You're not going to go into

4    any -- if you're suggesting that the man violated the law by

5    being late, or subject to fines, or anything penal in nature,

6    you are not going to go into that.

7            MR. BALLINA:   Yes, sir.

8            THE COURT:   I'm going to allow you, certainly, because

9    I think it's very relevant, to question him as it relates to the

10   non-filing of tax returns over the past couple of years or the

11   late filing as it was it.   I think that's very relevant.   I'm

12   going to allow that.   But, you know, in your advocating on

13   behalf of your client, I'm not going to allow you to take the

14   extra step of by saying by the way, sir, didn't you know that --

15   you know, we're not going to do anything to prejudice this jury.

16           MR. BALLINA:   Your Honor, your warning is understood,

17   and I certainly have no intention to go into --

18           THE COURT:   I've known you for a long time, I didn't

19   think you would, but I just want to make absolutely sure that in

20   the heat of battle we don't get a little carried away and say

21   something like that.

22           MR. BALLINA:   But I would like, Your Honor, to ask --

23   I want to make sure that I understand, that the last page of his

24   tax returns that he did sign last Friday is going to be part of

25   the exhibit of the tax returns themselves, because I have an

1 objection to that because they weren't part of what was

2 submitted with the exhibits, and, you know, he signs them last

3 Friday and purportedly puts them in the mail, and I have a trial

4 on Tuesday.

5    MR. CASHIO: He didn't have to sign it until October

6 the 15th, according to what he knew, but I've got the

7 documentation here, and the Court's already ruled he signed --

8 if he's defrauding anybody, I'm sure the IRS would like to look

9 into that if he didn't actually send it.

10    THE COURT: Actually if he signed it and he dated it,

11 and we're talking about dated whatever date he dated it and it's

12 for returns of 2002, 2003, whatever.  You know, certainly you

13 can make that observation, and then he can explain it away.

14 However, Mr. Cashio, he is not allowed to make hearsay

15 statements, you know --

16    MR. CASHIO: Right.

17    THE COURT: -- to substantiate why he may or may not

18 have been late.

19    MR. CASHIO: Right.

20    THE COURT: We need to get that cleared upfront.

21    MR. BALLINA: And just so I'm clear on everything.

22 The copy of the purported envelope and the certified mail return

23 receipt is going to be admissible as well?

24    THE COURT: You want it admitted?

25    MR. CASHIO: Yes, sir.

1          THE COURT:    To the extent that Mr. Cashio wants it

2    admitted, I'm to allow that but subject to your

3    cross-examination as to the date, but again, I don't want it to

4    go beyond limited examination of, you know, of the tardiness of

5    the filing of it.

6          MR. BALLINA:    I would like just like my objections to

7    be noted to that.

8          THE COURT:    What are you objecting to?  I thought we

9    were on the same page.  What specifically are you objecting to?

10          MR. BALLINA:    I just want my objections noted for the

11    record that I object.

12          THE COURT:    Object to what?

13          MR. BALLINA:    The signed tax return that he signed

14    Friday.

15          THE COURT:    Oh, you're objecting to it.  I thought

16    that you weren't objecting to that.

17          Well, let's talk about it if you're objecting to it

18    because your objection might have merit then, okay.

19          Go ahead, specify what your objection is and let's

20    address it.  You're objecting to what?

21          MR. BALLINA:    The tax returns that were signed on

22    Friday.

23          THE COURT:    Okay.  Now, you have seen those tax

24    returns prior to Friday, yes or no?

25          MR. BALLINA:    Yes, sir.

1          THE COURT:   Okay.  So the only thing that you have not

2    seen prior to Friday, because they apparently did not exist, is

3    the signed document stating that he did send them off.

4          MR. BALLINA:   That he signed it and dated it.

5          THE COURT:   Well, we can do this one of two ways.  I

6    mean, I can sustain your objection, but I've got to be honest

7    with you, if you're going to then ask him if he did it, and he

8    if he says, well, I did it, but I did it Friday, I certainly

9    will allow him then to substantiate his statement to you.  So if

10   you choose not to open up that door, then I will not admit it

11   into evidence, but if you're going to open that up that door,

12   which is what I think you plan to do, the fact that it hadn't

13   been done but it wasn't done until Friday until Friday.

14         MR. BALLINA:   Yes, sir.

15         THE COURT:   Then that's going to substantiate his

16   statement that it was done.  So are you still objecting to that

17   document?

18         MR. BALLINA:   I'll withdraw that objection.

19         THE COURT:   I thought you'd do want to do that.

20         What other objections do you have, Mr. Ballina, or is

21   that it?

22         MR. BALLINA:   No other objections, Your Honor.  I have

23   perhaps may be a couple of issues that we should address.

24         THE COURT:   Do we need to address them now, or can we

25   address them at the break, so that this jury can hear opening

1   statement and let's get started with this trial?

2        MR. CASHIO:   I've got a couple of issues concerning

3   evidence, but I don't think they have to be addressed now, Your

4   Honor.

5        THE COURT:   Then do not refer to them in your opening

6   statement, obviously, number one.  And number two, before these

7   witnesses are called, we'll address these issues.

8        MR. CASHIO:   Okay.  Secondly, Your Honor -- I didn't

9   hear the ruling.  Am I entitled to put in his signed statement?

10        THE COURT:   Yes.

11        How would you handle this?

12        MR. CASHIO:   Just --

13        THE COURT:   Well, wait a minute.

14        No, no, that's not his job to do that.  You're going to

15   have to have it done.

16        MR. CASHIO:   I can do that, Your Honor.

17        I don't know if he's going to try to introduce these

18   videos that the Court has already said were not complete enough.

19   He's made another copy and they're still not complete enough,

20   Your Honor.  They don't show one of the terminal issues here;

21   that is, Mr. Dorsey walking away from the accident, not

22   attending to Mr. Smith.

23        THE COURT:   Were they on the original tape?

24        MR. CASHIO:   They were, yes, Your Honor.  They're not

25   on there.

1    MR. BALLINA:    Your Honor, if I understood the Court's

2  previous ruling, counsel is referring to the highlighted and

3  zoomed video tapes --

4    MR. CASHIO:    Correct.

5    MR. BALLINA:    -- which are segments of the images that

6  were on the tape provided to plaintiff's counsel with our

7  initial disclosures.

8    THE COURT:    Okay.

9    MR. BALLINA:    The Court's previous ruling on that was

10  that a highlighted or zoomed taped could not be used unless it

11  showed the entire accident and showed Mr. Smith rolling on the

12  ground.  I had the highlighted and the zoomed revised to show

13  the entire accident with Mr. Smith rolling on the ground.

14    THE COURT:    So what's the issue then?

15    MR. CASHIO:    The issue is -- one of the main issues in

16  the case is that he cuts it off right when his people are still

17  there, they don't leave the scene, especially Mr. Dorsey,

18  showing they gave him no aid after the terrible accident, and it

19  gives the jury the impression, if they start reviewing that

20  tape, because it's bigger, and it's easier to see it, that there

21  was no failure to aid after that.

22    MR. BALLINA:    Again, Your Honor, the jurors are going

23  to have the entire tape and they can look at all the images.

24  Again, I think it's part of -- and again, if I understood the

25  Court's previous ruling to show the entire accident, Mr. Smith

1    rolling on the ground, I certainly think that as part of my

2    function as an attorney and to be an advocate to highlight those

3    images about that part of the evidence that I want the jurors to

4    see.

5           THE COURT:    I understand that, and I've already ruled

6    that you can do that so long as the tape that is going in front

7    of the jury does not cut off any point.  Now, Mr. Cashio tells

8    me that it does cut off the end of what should be included in

9    the tape.

10          MR. CASHIO:    Yeah.  This is one of my big issues,

11   whether or not they walked away and just left my him grabbling

12   on the ground in pain.

13          MR. BALLINA:    Judge, that's not part of the accident.

14          What he's doing or trying to do is, and prevent me from

15   using any type of highlighted or zoom, is that if you carry his

16   arguments to logical conclusion, everything would be important

17   and I would have to zoom everything, or I would have to

18   highlight everything.  The Court that ruled that I needed to

19   show the entire accident, and what it shows is from when the

20   truck pulls up and it moves, it stops, it moves it, it stops,

21   and he gets rolled over and he rolls on the ground and people

22   are standing there.

23          THE COURT:    We're not going to argue.

24          Here's the bottom line.  This jury gets to hear

25   everything that I believe is relevant.  I believe what Mr.

1  Cashio wants is relevant.  If you want to go up to that point,
2  you can do that and it's going to look awful bad on you,
3  counsel, if that point is left off when I allow Mr. Cashio to
4  the continue it to the end of when this man is on tape with
5  these people.  That's all relevant as far as I'm concerned.
6  Every --
7          MR. BALLINA:    But I --
8          THE COURT:    Please don't interrupt me.  We're going to
9  have two more days of this and we're never going to get through
10 if there's going to be interruptions.
11         Now, the bottom line is this:  This jury is entitled to
12 the tape from beginning to end as it relates to whenever Mr.
13 Smith is on that tape.  Okay.  We're not going to argue about
14 that.  They are entitled to that.  And my ruling previously was
15 you can highlight whatever you want to highlight to, what you
16 ever want to highlight, but I want to make absolutely sure that
17 this jury is not misled and that they see the entire tape.
18 Okay.  Now, we're not going to have a play on words that they're
19 only entitled to see up to the time of the accident.  They're
20 going to see the tape as long as Mr. Smith is on that tape.
21         Now, if that's not included in your video, Mr. Ballina,
22 and we have already started this trial, I want it to be on that.
23 However, I will tell you this, that if it's not, we're not going
24 to delay this trial for you to have to redo a whole new copy,
25 but Mr. Cashio is going to be able to take it from that point

1  forward with another tape if you don't have this on your

2  original tape and it's going to look very bad for the defendant

3  if it looks like -- and I know you're not trying to hide

4  anything, you know, I know better than that, but that's why I

5  hope that that entire scene is on that one tape.  Now, Mr.

6  Cashio, tells me that it's not, is it?

7        MR. CASHIO:    Your Honor --

8        THE COURT:    No, Mr. Cashio, I'm asking Mr. Ballina.

9        Is it on the tape or is it not?

10       MR. BALLINA:    The tape does -- I stopped the tape at

11  some point.  After he was rolled over --

12       THE COURT:    Right.

13       MR. BALLINA:    -- and is lying on the ground and people

14  walk around, and it goes on for, you know, minutes and minutes

15  and minutes, and people are going to get emergency medical care,

16  and then the EMTs come, and all that's on the tape, and, yes,

17  it's -- did I -- you know.

18       THE COURT:    You don't have to highlight it, but that

19  is going to be shown to the jury, though.  I don't have a

20  problem with that, and I don't care if you highlight what is in

21  your client's best interest to highlight, you're the advocate,

22  and I understand that, but the jury is going to have the benefit

23  of seeing the entire tape.

24       MR. BALLINA:    And the entire tape, which was given to

25  Mr. Cashio is going to be admitted, that's the videotape that's

 1   being admitted into evidence.  I want to use --

 2            THE COURT:   So what's the problem, Mr. Cashio?

 3            MR. CASHIO:   Your Honor, as a matter of compromise I'm

 4   trying to solve this, and if you just extend this tape one more

 5   minute, then I'm fine tonight.  You can play it, tomorrow.

 6   That's what I wanted to say originally.

 7            THE COURT:   Well, wait, wait.

 8            MR. CASHIO:   But I'm saying --

 9            THE COURT:   Wait, wait.

10            MR. CASHIO:   I'm sorry.

11            THE COURT:   That tape that you just referred to, is

12   that the tape that's going to be in evidence?

13            MR. CASHIO:   That's the one he wants to put into

14   evidence and I'm objecting to it.  The original long tape is

15   much smaller than this.  It's divided into four parts, and the

16   jury will probably will look at this one big part.

17            THE COURT:   Okay.  The only tape that's going to be

18   admitted into evidence is the tape -- I will repeat for the last

19   time, then we're going to bring this jury in and we're going to

20   get started -- is the tape that shows it for that extra minute

21   that you're talking about that goes to the end of Mr. Smith

22   being on the video tape, is that what you're saying?

23            MR. CASHIO:   No, Your Honor.  He's on it much longer

24   than this.  I'm trying to make a compromise by him just

25   extending this tape one more minute, I will not object to it.

1      THE COURT:   If they're not willing to do that, then
2  we're going to have the tape until the very end for the jury to
3  see.

4      MR. CASHIO:   Right.

5      THE COURT:   So what are you willing to do, Mr.
6  Ballina?

7      MR. BALLINA:   If the tape is extended, those two, the
8  zoomed and the highlight are extended for another minute, we
9  have no objection to their admissibility.

10      MR. CASHIO:   That's correct.

11      MR. BALLINA:   That's fine, Your Honor.

12      MR. CASHIO:   That's what I was trying to work out.

13      THE COURT:   Okay.  Ya'll are going to have to decide
14  where the end is though.

15      MR. CASHIO:   I'm going to have to play it for him,
16  Your Honor, and get where this stops if he has a time on it.  I
17  assume he didn't take the time out, but any way, then I'll tell
18  them one more minute and that will be fine.

19      THE COURT:   We'll see if ya'll can agree to that, but
20  obviously you're not going to show those tapes now.  You're
21  going to be doing that during the trial.

22      MR. CASHIO:   But I'm going to show the original tape
23  now, the long one that has everything in it, Your Honor.  This
24  is part of his case.

25      THE COURT:   Wait.  You're going to show the original

1  tape to this jury which is not going to be admitted into

2  evidence?

3          MR. CASHIO:    No, that's the one that's admitted.

4  We've all agreed on that one, Your Honor.

5          He's taking the original tape and splicing parts of it

6  for his presentation.  My point is this, I don't think he should

7  be able to do anything.  I think the original tape he presented

8  me is the only one that the jury should see, because it's

9  smaller than this tape and the jury will give too much credence

10 to this tape.

11         THE COURT:    All right.  Well, then there's definitely

12 been a miscommunication amongst all of us, then.

13         The tape that's admitted to evidence is the original

14 un-highlighted tape?

15         MR. CASHIO:    Yes, Your Honor.

16         THE COURT:    That's evidence.

17         MR. CASHIO:    That's evidence.

18         THE COURT:    Okay.  Now, if Mr. Ballina has another

19 tape which is an accurate depiction that is highlighted, I don't

20 have a problem with that, okay.  But the only one that's going

21 to be shown to the jury in any type of argument is going to be

22 the one that is the original tape.  Not one of these other tapes

23 that are out there, okay.  Just like Mr. Ballina can, in his

24 argument if he wants to -- but this isn't opening, this is going

25 to be for close, I'm telling you guys, okay -- that if he wants

1    to put on the tape whatever is highlighted, I don't have a

2    problem with that because the un-highlighted original is in

3    evidence.  I don't have a problem with you doing that, that's

4    for your argument in doing it, but for opening statement --

5            MR. CASHIO:    No, no, we're not going to do it in

6    opening statement.

7            THE COURT:    -- no, you're not going to be showing the

8    tape in opening statement.

9            MR. BALLINA:    No evidence can be referred to in

10   opening statement to be used?

11           MR. CASHIO:    It can refered to it, but we can't play

12   tapes in opening statement.

13           THE COURT:    You can refer to evidence, certainly.  You

14   know opening statement is what you plan to prove at the trial.

15   We already know what documents we're allowing to be introduced

16   into, that's the advantage of the federal system.  So, no, you

17   can certainly refer to them, but remember you're not going to be

18   arguing your position in opening statement, but certainly you

19   can refer to them.

20           MR. CASHIO:    We don't play tapes in opening statement.

21           THE COURT:    Well, it's limited to 15 minutes.

22           MR. CASHIO:    I can say I can bring this evidence.

23           THE COURT:    And then they will be seeing during the

24   course of the trial the tape, but I think you're wasting your

25   valuable 15 minutes to show a tape.

1        MR. CASHIO:    I agree with you.  But we can't do that

2   you're saying, right?

3        THE COURT:    The only tape that I'm going to allow --

4   if you want to show in opening statement, you're not going to

5   show the highlighted one because that's argument.  You know,

6   since the tape itself will be admitted into evidence, if you

7   want to show that in opening fine, but that's going to take up

8   your 15 minutes, but it will be shown in its entirety.

9        MR. CASHIO:    Oh, it's entirety?  I want just to show

10  the actual accident.

11       THE COURT:    No, because that's going to be argument,

12  and that's going to be for your close.

13       MR. CASHIO:    Okay.  So I won't show any tapes.  It

14  last at least 20 minutes, so it can't possibly be shown.

15       THE COURT:    Then you can't do it.

16       MR. BALLINA:    Your Honor, I think another issue has

17  come up.

18       My understanding of the Court's previous orders in the

19  submission of the witness lists, that the parties were to submit

20  witnesses list in the order in which the witnesses will be

21  called.

22       THE COURT:    As best as they could.  As best as they

23  could.  We're never held to that because you can't control

24  witnesses, and as I told you in conferences, as I tell

25  everybody, I do this as a courtesy to the lawyers because I

1    don't care what order you do it in, but when you have a trial

2    that's going to be in excess of a day, out of courtesy to the

3    lawyers, I ask that you try to give them in as good an order as

4    possible, however we're not going to delay this trial by a

5    witness not being ready.

6            MR. CASHIO:    My witnesses are here, my experts, Your

7    Honor.    I had some five-minute witnesses of his, his own

8    witnesses, his adverse witnesses, five five-minute witnesses

9    that we're going to be taken up between the experts or in front

10   of them if we have the time, but because of the time delay my

11   experts are waiting now.    They've been waiting since 1:00

12   o'clock outside the courtroom, so I don't want to delay them any

13   longer for witnesses that he's going to call again tomorrow and

14   they're only five minutes long.

15           THE COURT:    Okay.

16           MR. BALLINA:    Judge, my understanding when we had the

17   conference and were supposed to submit witness list in the best

18   way possible the order that they were going to be called, and I

19   believe the Court's comment was and nobody's surprised and, you

20   know, what.    Now, his expert witnesses at the end of his witness

21   list is now being called today.    He's got all my fact witnesses

22   listed first that he's going to call them under cross.    We spoke

23   about making sure that they were here because I had them under

24   subpoena and I had them here, and now I'm being told that his

25   experts' testifying today, and I'm expecting his expert to

1 | tomorrow.

2 |      MR. CASHIO:  No, they never were going to testify

3 | tomorrow, because -- can I say something, Your Honor?

4 |      THE COURT:  How are you prejudiced?

5 |      MR. BALLINA:  I'm prejudiced because I relied on the

6 | witness list that he submitted in compliance with the Court's

7 | order and knowing the speed of a trial, and certainly did not

8 | anticipate that an expert witness was going to testify today.

9 |      THE COURT:  How are you prejudiced?  You're not

10 | prepared?

11 |      MR. BALLINA:  I am prepared.  What I prefer to examine

12 | his expert witness when based upon his witness list I thought he

13 | was going to testify --

14 |      THE COURT:  Drew, I hear all that, but besides the

15 | point.  If you're prepared and you're prejudiced -- and I know

16 | you're prepared, okay.  I'm not worried about that, but because

17 | testimony has to go a certain way that you relied on your

18 | defense that it go a certain way, then, quite frankly, he's

19 | going to have to come back, but you haven't told me how you're

20 | prejudiced at all.  You haven't told me that.  Tell me how

21 | you're prejudiced.  Not because he put it under a certain list,

22 | because we've said that this is an accomodation to all counsel

23 | and I want you guys to live with it, but you know as well as I

24 | do that sometimes you get jammed up when you have experts and

25 | experts are sitting around all day and the meter is running,

1    okay.  And I'm very sensitive about that.  However if you're

2    prejudiced then I'm not going to allow the economist to testify

3    today, but you haven't told me how you're prejudiced yet.

4            MR. BALLINA:    Honestly, Judge, am I prejudiced in the

5    defense of my client?

6            THE COURT:    Yeah.  Is your client prejudiced?  I do

7    not want Harrah's to be prejudiced, just I like I don't want Mr.

8    Smith to be prejudiced.

9            Tell me how Harrah is prejudiced.  How is Harrah's

10    prejudiced, and if they're prejudiced I'm going to accommodate

11    you, but you've got to convince me that they're going to be

12    prejudiced.

13            MR. BALLINA:    I believe they're prejudiced, Your

14    Honor, because their attorney is not going to be as well

15    prepared to examine an expert witness today that based upon the

16    witness list we feel that he's going to be testifying tomorrow.

17            THE COURT:    What do you need to learn -- and again,

18    I'm not asking you how you prepared, that's none of business,

19    and it's certainly none of counsel's for the plaintiff's

20    business, but do you need to wait to see how with -- is your

21    cross-examination of this expert going to be based on what other

22    testimony is said prior and that's why you need to have the

23    other witnesses testify?

24            MR. BALLINA:    No.

25            THE COURT:    Do you have an economic expert?

1        MR. BALLINA:    I have an economist and I have a voc

2    rehab, and certainly I generally prefer to have my rehab present

3    when plaintiff's counsel --

4        THE COURT:    So that's how you're prejudiced then?

5        MR. BALLINA:    Right, sir.

6        THE COURT:    So in other words, you have a right to

7    have your experts present when his experts testify?

8        MR. BALLINA:    Yes, sir.

9        THE COURT:    We all know that you have that right, and

10    you're saying that because of this --

11        MR. BALLINA:    Yes, sir.

12        THE COURT:    -- they're not available now?

13        MR. BALLINA:    Yes, sir.

14        THE COURT:    That's all, I need to hear something.

15        MR. BALLINA:    I apologize.

16        THE COURT:    That's all that I need to do.  I know

17    you're prepared but I need to hear what you're trying to get at.

18        MR. CASHIO:    There was never the slightest intimation

19    that they would be brought the second day.

20        I had five of his witnesses five minutes each under

21    cross and then my experts, Your Honor.

22        THE COURT:    Here's what we're going to do.  It's very

23    simple.

24        Mr. Cashio, go down your list the way that you have

25    presented it, okay.  If it's an undue hardship to get your

1    economist tomorrow, we're going to get to him today.

2         Mr. Ballina, get on the phone and tell your people to

3    be here.  And listen, that's all that we're going to do, because

4    as I told you guys, we don't know how late we're going to go in

5    the evening, okay.  We're not going to delay the trial because

6    Mr. Ballina's people are not here to sit and listen to your

7    economic expert.

8         Now, Mr. Ballina, instead of him having to run the

9    meter and relying on the way that your witness list went and the

10   order they went, that he wants to have them available.

11        MR. CASHIO:    I don't have an economic expert, Your

12   Honor.

13        Number two, there wasn't the slightest thought they

14   were going to be here the second day.  I booked these doctors on

15   the first day because the other witnesses were very short.

16        THE COURT:    Who's witnesses are Kenneth Boudreaux and

17   Cliffe and Wood?

18        MR. CASHIO:    Those are his witnesses.

19        THE COURT:    Okay.  Mr. Ballina, who are you referring

20   to?

21        MR. BALLINA:    Bobby Roberts is a vocational evaluation

22   specialist.  Based upon the witness list that was provided to me

23   --

24        THE COURT:    Who does Mr. Roberts or Ms. Roberts have

25   to be here to listen to testify?

 1          MR. BALLINA:   Bobby Roberts is plaintiff's expert

 2   vocational evaluation specialist.   My expert, Larry Stokes --

 3          THE COURT:   Well, wait.   Where is Bobby Roberts' name.

 4          MR. CASHIO:   It's on there, Your Honor.

 5          THE COURT:   And you have Bobby Roberts listed as the

 6   sixth person to be called.

 7          MR. CASHIO:   Five quick witnesses of his, and then

 8   there's no possible way he could have testified on the second

 9   day, Your Honor.

10          THE COURT:   Well, wait.   I don't know the problem.

11          MR. CASHIO:   I don't either.

12          THE COURT:   So you plan to go in this order then?

13          MR. CASHIO:   I can go in that order and make my

14   experts wait, that's fine.   We'll do that if we have to.   I was

15   just going to try to get the experts first and then take those

16   five quick witnesses.   It'll be the same thing.

17          THE COURT:   Well, you know what, had we not argued

18   this, you would have had your five quick witnesses gone and over

19   with and you'd be starting with your expert.

20          MR. CASHIO:   I know.   He's the one that's arguing.

21          THE COURT:   Okay, we're going to go with the

22   plaintiff's witness list as it is listed.   So you're going to

23   have to go with your five people, but if Roberts is going to

24   testify today, then you have your voc person today so that your

25   voc person can listen to Roberts testify, because we want to at

1    least get through Roberts today no matter how late we go.

2         MR. CASHIO:    Your Honor, Mr. Roberts has waiting since

3    1:00 o'clock.  Dr. Hamsa is no backed up behind him.  He was

4    supposed to come at 2:00.

5         THE COURT:    Counsel, we're going to the do best we can

6    do.  We're going to go in this order.

7         Let's call in the jury.

8         MR. BALLINA:    Well, judge, with the fact witnesses, my

9    witnesses that he's calling, my intention was while they were on

10   the stand to conduct my examination of them rather than call

11   them later.

12        THE COURT:    Great.  Do it.

13        MR. BALLINA:    Okay.

14        THE COURT:    No, he has that right to that, and I hope

15   that you do because that saves everybody time, but the bottom

16   line is we're going to have Mr. Roberts testify today no matter

17   what time it is.

18        MR. CASHIO:    Your Honor, he's told me on his witness

19   list that his people were going to be going after mine,

20   therefore I'm prejudiced.

21        THE COURT:    You've listed these people, these five

22   people you're calling as adverse witnesses.

23        MR. CASHIO:    Yes, Your Honor.

24        THE COURT:    What I always do, counsel, is I say can

25   you take these people now to get it resolved instead of making

1    everybody have to come back another day, that's not how we

2    operate here.

3              MR. CASHIO:   Can we do his witnesses tomorrow and let

4    me call my experts today?

5              THE COURT:   No, we're going in this order.

6              MR. CASHIO:   Then my experts will never get --

7              THE COURT:   It's going in this order.

8              Call in the jury.

9              And limit your opening statements to 15 minutes.

10                  (2:30 P.M.  -  AFTER RECESS)

11       *         *         *         *         *         *         *

12                     P-R-O-C-E-E-D-I-N-G-S

13              THE MARSHAL:   All rise.

14                  (THE JURY ENTERED THE COURTROOM)

15              THE COURT:   So that you don't think we've been loafing

16    out of your presence, we have to address various legal issues so

17    the trial will go as smoothly as possible, so we didn't forget

18    you.

19              All right.  Mr. Cashio.

20              And ladies and gentlemen, as I stated earlier, the

21    opening statements are going to be limited to 15 minute a piece,

22    and then the plaintiff will present it's case.

23              MR. CASHIO:   Can I move to sequester any witnesses at

24    this point, Your Honor?

25              THE COURT:   Yes.  Anybody that is not an expert in

1   this case is ordered sequestered, but I don't see any witnesses

2   here.

3           MR. CASHIO:   Yeah, they are outside.  Can you just

4   instruct them not to speak to each other about the case or to

5   anyone other than the attorneys?

6           THE COURT:   Yes, why don't you call them all in.

7           Could I see the witnesses.

8           Would you all please step forward.

9           Let's so see who we have here.

10          Stacey Dorsey, Roosevelt Turner.

11          MR. TURNER:   Here.

12          THE COURT:   Jessica Wilson.

13          MS. WILSON:   Here.

14          THE COURT:   Chehalis Waugh.

15          MS. WAUGH:   Here.

16          THE COURT:   And Christopher Stevenson.

17          MR. STEVENSON:   Here.

18          THE COURT:   I'm going to address you, but I'm also

19  going to let the ladies and gentlemen of the jury know what this

20  is all about.

21          Under the law the party requests that witnesses be

22  sequestered.  What that means is no one is suggesting anything

23  untoward one way or the other, but what that basically means is

24  that you are to remain outside during the trial, but just stay

25  out right out in the hallway.  You'll be called upon as quickly

1    as possible and you are not to discuss the testimony with

2    anybody, including yourselves.  Then when you are finished your

3    testimony, if neither party has any further need of your

4    testimony you can either stay in court or you can leave, but

5    again, at no time until this trial is completely over with, are

6    you to discuss your testimony with anybody, you understand?

7             Now, Mr. Dorsey, you are the representative from

8    Harrah's right?

9             MR. DORSEY:    Correct.

10            THE COURT:    So Mr. Dorsey can remain in court, but

11   again, he is not be allowed to talk to you all about the case

12   either, and that will go for any other witnesses that plaintiff

13   might have or any other witnesses that defendant might have.

14            MR. CASHIO:    I have an expert, but he's exempted from

15   that.

16            THE COURT:    Under the Rule of Evidence and under the

17   Rules of Law, under the Rules of Procedure expert witnesses are

18   not bound by the sequestration order.

19            MR. CASHIO:    Thank you, Your Honor.

20            THE COURT:    So just remain outside, we'll get to you

21   as soon as we can.

22            Thank you for coming.

23            All right, counsel, go ahead and proceed with your

24   opening statement.

25                    (OPENING STATEMENT BY MR. CAHSIO)

1          MR. CASHIO:    Ladies and gentlemen, Shaun and I would

2    like to thank you for giving up your valuable time to come here

3    to federal court on a case which is extremely important to

4    Shaun.  His whole life really depends on it, his future.  It's

5    going to decide the quality of life that he's going to have for

6    the remainder of his life.  He's 25 years old.  When this

7    accident happened last December he was 24, and what I'm going to

8    tell you know now is what we're going to show you in our

9    evidence what I think we're going to show you.  And I use the

10   word show on purpose because this is not a criminal case where

11   we have to prove our case beyond a reasonable doubt.  This is a

12   case where you have to prove it by a preponderance of the

13   evidence and all that means is if you take a scale --

14          MR. BALLINA:    Your Honor, I would object to counsel

15   instructing the jurors I believe that's the Court's duty.

16          THE COURT:    The objection's sustained.

17          MR. CASHIO:    Your Honor --

18          THE COURT:    You can give a brief overview of what your

19   burden of proof is, that's not argument.

20          MR. CASHIO:    Okay.  My burden of proof, or Shaun's

21   burden of proof is two scales.

22          This is Harrah's, this is Shaun.  If you put a feather

23   in Shaun's scale, he is entitled to the verdict.

24          MR. BALLINA:    Your Honor, I object to that.

25          THE COURT:    Objection sustained.

1          Move on, counsel.

2          MR. CASHIO:    Okay.    And the judge is going to tell you

3   that at the end of the case about that, and I'll speak to you

4   more but that's what they call a preponderance of the evidence.

5          Well, anyway last December 10th, Shaun had gone to

6   Harrah's Casino in New Orleans and he had his Dad's large diesel

7   truck.   It had a running board, and he went to valet parking.

8   This is the first time he had ever parked his car at Harrah's.

9   He had been to some casino's in the Shreveport area, and he

10  worked as an exercise and gallop, a young man at the racetrack,

11  the thoroughbred tracks, Louisiana Downs and the Fair Grounds

12  where he work out horses and everything and he worked there.

13         Unfortunately Shaun had played blackjack, I think, for

14  one of the first times in his life and he had lost all of money.

15  When he came out to get his car, he presented his ticket to

16  them.   He had no idea that there was going to be a charge

17  because in all of the other casino's he had ever been to in his

18  life there's no other charge.   In fact, we're going to show that

19  no casino's that I know of in the New Orleans area or anywhere

20  ever charged for valet parking except for Harrah's.   So anyway,

21  he didn't have any idea, he had lost all his money, 3 to $400.

22  He comes out and he presents his ticket, and you're going to see

23  a videotape of everything that happened from the time he

24  presented his ticket.   They didn't even pay attention to him.

25  He sits there patiently and waits for 20, 25 minutes.   Twenty or

1    more people are getting there cars, and he's not getting his.

2    So finally, he keeps asking, "Well, where's my Dad's truck?"

3    You know what they say, "You didn't give my the ticket".  But

4    you'll see on the videotape he gave them the ticket, so he

5    thinks somebody's playing a trick on him or something.  He's

6    very upset, he lost all his money.  He's the only one not

7    getting his car.  So finally after a while, he starts getting a

8    little irate.  "Where's my car?"  One of the guys comes up, a

9    Mr. Turner, and says, "You ain't getting your car unless you pay

10   $10".  He said, "What do you mean, $10?  I've never heard of

11   paying.  I don't know anything about paying for that.  I've lost

12   all my money".  He says, "You ain't getting your car".  So they

13   get in an argument and one of the guys calls him a little racial

14   name and he responds.  And anyway, the truck -- we're going to

15   show you everything they did was against their own policies.

16        They bring his truck down so he expects to get the

17   truck.  He goes out to the truck and tries to hold onto the

18   truck.  "Give me my Dad's truck".  And the driver keeps inching

19   up.  "Give my Dad's truck".  He's holding on.  Finally, the man

20   who he got in the argument with comes up behind him.  You'll see

21   that on tape, and says, "Drive off".  He drives off.  While he's

22   reaching for the truck again, spins him around and roles over

23   his leg.

24        We're going to show you he's got a rod and screws in

25   his leg for the rest of his life, the whole leg, and it's

1    impacted his whole life, all because Harrah's wanted 10 more
2    dollars out of this man.  They had taken all his money.

3          Now, they're going to show you, and we don't think the
4    proof is going to be there that he was drunk.  Look at the tape.
5    If you think he's drunk, I can't believe that they could even
6    bring this up, because he's dialing the phone with one finger.
7    He's walking around patiently for 20 or 25 minute, yet they're
8    saying he's drunk, but as the testimony will come out, that is
9    not the reason they told him he couldn't have his car, it was
10   for the $10, and guess what?  They do this all the time, but
11   they could have comped him.  They could have said, "Look, go in
12   there.  You gambled.  You lost all your money.  Just go back in
13   there and they'll just write you out a free ticket, but, no,
14   they didn't do that.  They brought the car down and while he was
15   on the car his leg was crushed, and they said, "Drive off".  It
16   was a spiteful thing and you'll see it.

17         Anyway, he was making about 30, 40 thousand dollars a
18   year, sometimes a little more, a little less, but you'll see
19   from all the evidence that he can't hardly do anything now.  The
20   man has only like a fourth or fifth grade reading level.  He
21   only went to the eighth grade in school.  That's all he ever
22   knew was hard work his whole life.  Now, he's stuck with no
23   possibility of a job.  We're going to show that he's on food
24   stamps and having all kinds of problems today.

25         We're also going to show that Harrah's asked him to

1    give them a statement.  And when he called them and asked about

2    his prescriptions. "Can you pay for my prescriptions, plus I'm

3    getting bills from the hospital, can you pay for that?" "Oh,

4    give us a statement".  He gives them a statement, guess what?

5    "We're not paying".  They wouldn't even pay for his

6    prescriptions or his bills, so he has to get an attorney.

7          When I get through at the end of the case showing you

8    all the rules these people violated of Harrah's, all their rules

9    were violated in this whole procedure.  It should have never

10   happened.  I mean, for $10 this man's life is ruined.

11   Especially when they took all his money.  So Harrah's is a big

12   firm, a big company, obviously, everybody knows about Harrah's

13   all over the country.

14         Harrah's hires a top law firm.  Mr. Ballina is one of

15   the best lawyers in town, and they're going to come up with all

16   kinds of little legal maneuvers to try to say, "Shaun, you don't

17   get anything.  You don't get anything.  We're not even going to

18   pay for your medical bills".  But they got a top firm.

19         On the video you're going to see Shaun waiting

20   patiently for a long time before he finally gets a little upset.

21   We're going to prove that these rods and screws are going to

22   remain -- and we're going to show you X-rays, etcetera, they are

23   going to remain in his leg for the rest of his life and all of

24   the problems that caused.  And we're going to show you that

25   despite all of this Shaun didn't sue any of the Harrah's

1    employees, he just sued Harrah's.  He didn't sue any of the

2    people who caused the problem.

3            And you're going to find out a lot of things in

4    evidence I'm not going to talk about now because I'm going to

5    rely on your skills to find out a lot of things that are really

6    strange about the way Harrah's handled the thing.  And at the

7    end of the case, we're going to be asking you for a lot of

8    money, and the reason is because Shaun can never come back to

9    court for the rest of his life.  You have an extremely difficult

10   and important duty because you have to compensate him for the

11   next 50 to 55 years of his life.  He can't come back next year

12   and say, "I had terrible year in pain.  When the weather changes

13   my leg is killing me", and all the problems he has.  He can't

14   come back and say, "Well, give me 30, 40,000 this year".  No,

15   you've got to prorate that out for his whole right life, and

16   that's where that feather comes in, because all you have to be

17   convinced is a preponderance of the evidence that that's going

18   to happen.  You don't have to be sure.  You don't have to know

19   the future.  You don't have to be a Nostradamus to predict

20   what's going to happen.  You just have to just use just the

21   slightest bit of evidence in our favor to prove that, and it's

22   going to be lot of money, but for 55 years of pain, and 55 years

23   of problems.  55 years of not having a job that he had been

24   trained for his whole life, I think the money won't even come

25   close to compensating him for the loss he's had.

1       And again, there's a whole bunch of information we're

2    going to go through that I haven't talked to you about.  This is

3    just a general overview, as the judge told you, about what's

4    going to happen in the case and I've got a lot more things to

5    tell you now and in closing arguments.

6       And please, pay attention to this video, it's extremely

7    important.  It's Harrah's own video, they made it themselves, we

8    didn't make it, and I think they'll be indited by their own

9    video and their own actions, so thank you in advance.

10           THE COURT:   Thank you, Mr. Cashio.

11           Mr. Ballina.

12               (OPENING STATEMENT BY MR. BALLINA)

13           MR. BALLINA:   Good afternoon, ladies and gentlemen.   I

14   agree with one thing Mr. Cashio told you, that he's going to ask

15   you for a lot of money.  He will do that.

16       And I submit to you all after the evidence that you

17   hear from the witnesses who are going to testify in that chair

18   right over there and the videotape evidence that you're going o

19   see and the documentary evidence that you're going to see, I

20   submit to you that what you will find is that Mr. Smith's left

21   leg was rolled over and broken because of what Mr. Smith did and

22   Mr. Smith's fault.  Not what Harrah's did, not Harrah's fault,

23   not the fault of any of its employees.

24       And what did Mr. Smith do to cause his own injuries?

25   He grabbed and jumped onto a moving truck.  Why did he do that?

1    Because was mad.  He was upset.  He had been drinking.  Why was

2    he mad and upset?  He lost over $300 in the casino, and then he

3    refused to pay a $10 parking fee.

4         Mr. Smith, will admit or won't deny that he was mad.

5    That he was upset.  That he had been drinking.  That he lost

6    over $300 in the casino.  That he refused to pay the $10 parking

7    fee, and that he grabbed and jumped onto a moving truck.

8         Mr. Dorsey, is a customer safety manager at Harrah's,

9    will testify he dealt with Mr. Smith during part of this

10   transaction.  He will testify that Mr. Smith was mad, upset,

11   smelled of alcohol, cursed him and called him racial slurs.

12   Refused to pay.  And right here let me make the distinction

13   between cannot pay; that is, you don't have the ability to pay

14   because you don't have money and refusing to pay, because you

15   don't think you should pay the parking fee, and Mr. Smith

16   refused to pay it.  And finally, what Mr. Dorsey is also going

17   to testify to is that Mr. Smith grabbed onto a moving truck.

18        Ms. Jessica Wilson, who you may have seen for a moment

19   when she stepped in, is the cashier at Harrah's, she dealt with

20   Mr. Smith.  She's going to testify that Mr. Smith was mad, that

21   he was upset, that he cursed everybody.  He cursed Mr. Drosey,

22   called him racial slurs, refused to pay and that he grabbed onto

23   a moving truck.

24        Chris Stevenson, who also walked in a moment ago was a

25   valet driver at Harrah's and he was near Mr. Smith at the time

1    of the accident.  He's going to testify that he smelled alcohol

2    on Mr. Smith.  He's going to testify that Mr. Smith was cursing

3    and yelling, demanding his truck, and he's going to testify that

4    Mr. Smith grabbed and jumped onto a moving truck.

5         Mr. Roosevelt Turner, who also was in here a moment

6    ago, is the lead valet at Harrah's.  He was also nearby when the

7    accident happened.  He's going to testify that Mr. Smith was

8    cursing and yelling and demanding his car, his truck, rather,

9    and he's also going to testify that Mr. Smith grabbed and jumped

10   onto a moving truck.

11        Chehalis Waugh, who also was in here a moment ago, was

12   a report writer at Harrah's, who tried to help give aid, medical

13   aid to Mr. Smith after the accident.  She's going to testify

14   that Mr. Smith was slurring his speech, was being repetitive, he

15   had bloodshot eyes.  He was cursing.  He was cursing those

16   people who were trying to give him medical aid and he was

17   uncooperative.

18        Mr. Blair Easton, who was the emergency medical

19   personnel at Harrah's, who gave medical attention to Mr. Smith,

20   is going to testify that he smelled alcohol on Mr. Smith, that

21   Mr. Smith cursed him while he was trying to help Mr. Smith, and

22   that Mr. Smith was uncooperative.

23        In addition, to the testimony of the witnesses that

24   you're going to hear from that witness stand, you're also going

25   to see casino surveillance of the events that happened.  Those

1    are the events when Mr. Smith is encountering the personnel at

2    the valet booth with the cashier and Mr. Dorsey, and you're

3    also going to see casino surveillance footage of the accident

4    itself, and what I submit to you you're going to see on that

5    tape was that Mr. Smith was mad.  He was upset.  He appeared to

6    have been drinking, and then he grabbed and jumped onto a moving

7    truck.

8         Mr. Smith hopes that you ignore the evidence that

9    you're going to hear and see, and he hopes, as his lawyer just

10   told you, that you give him a lot of money.  A lot of money,

11   and he said it right after, he said he's going to ask you for a

12   lot of money, and why he is going to do that?  Harrah's is a big

13   company, it's Harrah's Casino.  They're a big company, and

14   that's what he's continuing on that you're going to give him a

15   lot of money because Harrah's is a big company, and he hopes

16   that you ignore that Mr. Smith had been drinking.  That Mr.

17   Smith was so upset that he had lost over $300, and so upset that

18   he had to pay a $10 parking fee, that he was going to do

19   whatever he had to do to get that truck back without paying the

20   parking fee, and that includes trying to grab and jump onto a

21   moving truck.

22        He's hoping that you give him a lot of money for loss

23   of earnings.  You heard his attorney talk about he's not going

24   to make money.  You know, you've got to do this for the next 50

25   years, 55 years.  He hopes you give him a lot of money for loss

1  of earnings, although he's going to admit that he's never filed

2  a tax return.

3      Although, the only records of earnings that this

4  gentleman is going to show you, with the exception of one

5  record, are 2002, and 2003 1099s from his father, that his

6  father just gave him a couple months ago after he filed this

7  lawsuit.

8      The other record he's going to show you are checks,

9  canceled checks from his father that he just got a couple of

10  months ago after he filed this lawsuit, checks that are clearly

11  marked NSF.  Do not present again for payment.  Payable to cash.

12  Payable to third parties other than Mr. Smith.  He hopes that

13  you ignore that.

14      He also wants you to give him a lot of money for loss

15  of earnings, although the only records of earnings that the

16  government has are the records of the Social Security

17  Administration, which you will see, which show Mr. Smith had

18  earnings for only two years..  2000 where he earned a little

19  over $5,000, and 2001, where he earned a little over 11,000, and

20  then the kicker on this is, is he's going to ask you for a lot

21  of money for loss of earnings, although his 2002, and 2003 tax

22  returns he had prepared after he filed this lawsuit.  He had

23  them prepared in August of 2004.  He didn't sign those returns

24  until last Friday, October 7th.  He didn't mail them until,

25  guess when?  Last Friday, October 7th.  And, oh, by the way, he

1    mailed them to the wrong address.

2            Harrah's has confidence that you all won't be fooled or

3    deceived by Mr. Smith, that you'll listen to the evidence that

4    you hear and see, and after you've done that you will come to

5    the conclusion that Mr. Smith's left leg got rolled over and

6    broken because of what Mr. Smith did, his fault, and not what

7    Harrah's did.

8            Thank you all.

9            THE COURT:   Mr. Cashio, call your first witness, sir.

10           MR. CASHIO:   Call Mr. Stacey Dorsey as an adverse

11   witness under cross-examination, Your Honor.

12           THE COURT:   All right.

13           MR. CASHIO:   Can I approach the Bench, Your Honor.

14           THE COURT:   Yes.

15           Off-the-record or on the record?

16           MR. CASHIO:   We can put it on.

17                   (BENCH CONFERENCE, AS FOLLOWS):

18           MR. CASHIO:   Mr. Ballina says Dr. Hamsa's here.  I

19   want him to come at 5:00.  He said he can come back tomorrow.

20           THE COURT:   He can come back tomorrow if he's sick.

21           MR. CASHIO:   Brad, tell him to come back tomorrow.

22           THE COURT:   Wait.  Wait.  Is this your co-counsel?

23   He's not a lawyer?

24           MR. CASHIO:   No, he's a lawyer, but he's not approved

25   in federal court.

1        THE COURT:    We've got to approve him.

2        MR. CASHIO:    Yeah, a little later after the case is

3   over.

4        THE COURT:    You can approve him now if you want.

5        MR. CASHIO:    No, I'd rather after.

6        THE COURT:    Is Dr. Hamsa here?

7        MR. BALLINA:    He's here he's outside.  He's pretty

8   sick.  He's pretty much saying he needs to go now.  He needs to

9   get to bed.

10       THE COURT:    No problem if he comes on now.  Is Hamsa

11   your witness?

12       MR. BALLINA:    He's their witness.

13       THE COURT:    Why don't you let Dr. Hamsa testify now.

14       MR. BALLINA:    If I want to?  He's the one doing all

15   the objecting.

16       THE COURT:    Do you have any objection to Dr. Hamsa

17   testifying now?  The man is ill, so he doesn't have to come back

18   tomorrow morning.  He's a medical witness.

19       MR. BALLINA:    Again let me go back to my rehab

20   counselor.

21       MR. CASHIO:    He's a medical witness.

22       THE COURT:    The man is sick.

23       MR. CASHIO:    He doesn't have a medical witness.

24       MR. BALLINA:    The man is sick.  I'm not going to

25   inconvenience the man, if he's sick.  He says he can come back

1    tomorrow.

2            THE COURT:    Is your client prejudiced if he testifies

3    now?  The man is sick.

4            MR. BALLINA:    The fact that he's sick, I'm not saying

5    my client's prejudiced, no.

6            THE COURT:    Thank you.

7                    (BENCH CONFERENCE CONCLUDED)

8            THE COURT:    All right.  Sir, why don't you step down.

9            We're going the call Dr. Hamsa.  I say we're going to

10   call.  The plaintiff counsel, I'm going to allow you to call Dr.

11   Hamsa out of turn because of the issue that has just been

12   raised.

13           MR. BALLINA:    Your Honor, may I approach the bench?  I

14   apologize.

15                   (BENCH CONFERENCE, AS FOLLOWS):

16           MR. BALLINA:    I just received a note from my office

17   that Dr. Stokes, Larry Stokes, my rehab expert is in Houston

18   today.

19           MR. CASHIO:    My point, Your Honor, is exactly that.

20   My expert was always going on the first day.  He never even had

21   him available.

22           THE COURT:    The bottom line is, fellows, what goes

23   around comes around.  That's why I asked you guys to work with

24   each other.  We're not going to get to Dr. Stokes today anyway.

25           MR. CASHIO:    He wants to use Stokes here for Bobby

1   Roberts, Your Honor.  That was his ploy to say why he wanted an

2   objection to Roberts testifying, an expert who's been waiting

3   for two hours, he said because he said he wanted Mr. Stokes to

4   be here when he never had any intention, Mr. Stokes is in

5   Houston.

6            THE COURT:    Okay.  We are taking Dr. Hamsa out of

7   turn.  I don't know how long Dr. Hamsa is going to be.  We're

8   going to see where we go at the end of the day to see to if

9   whether or not we're going to call Roberts today or not.  That's

10  all that we're going to do.  We're going to see where we are.

11                    (BENCH CONFERENCE CONCLUDED)

12           THE COURT:    I will say this for the benefit of the

13  jury, Dr. Hamsa, I understand is not feeling well, and that's

14  why he's being taken out of turn right now.  So do you need some

15  water, doctor?

16           THE WITNESS:    There's some here.

17           THE COURT:    You have some up there.  All right.

18  Thank you.

19           THE CLERK:    Raise your right hand, please.

20                    DR. RUDLOF V. HAMSA

21       After having been first duly sworn, did testify under

22  oath, as follows:

23           THE CLERK:    State your name for the record, please.

24           THE WITNESS:    Rudolf V. Hamsa, H-A-M-S-A.  3800 Houma

25  Boulevard, Metairie, Louisiana 7006.

1        MR. CASHIO:    Your Honor, we've already stipulated Dr.

2   Hamsa is an expert in the field of Orthopedic Surgery.

3        THE COURT:    Is that correct, Mr. Ballina?

4        MR. BALLINA:    Yes, Your Honor.

5        THE COURT:    Thank you.  Go ahead and proceed, counsel.

6                    DIRECT-EXAMINATION

7   BY MR. CASHIO:

8   Q.   Dr. Hamsa, have you been treating Shaun Smith?

9   A.   Yes, sir.

10  Q.   Okay.  And have you given him a disability rating of 20

11  percent?

12  A.   Yes, sir.

13  Q.   Okay.  And, doctor, I want to show you a photograph of the

14  accident, and I want you to tell me if you think that --

15  A.   Correction.  We've gone through this in deposition.  I

16  didn't do disability, I do impairment.

17  Q.   Impairment.  Is 20 percent impairment?

18  A.   Impairment of the leg.

19  Q.   Doctor, I want to show you a video of the accident in

20  question and ask you if you think that that accident is related

21  causally to Mr. Smith's injury today?

22        THE COURT:    Let me see counsel.  Let me see both

23  counsel.

24                (BENCH CONFERENCE, AS FOLLOWS):

25        THE COURT:    I'm not going to interfere on how you

1    examine your witnesses, nor am I going to interfere in how you

2    examine your witnesses, but we're not going to show this --

3            MR. CASHIO:   No, I'm just showing the accident.

4    Sorry, judge, excuse me.

5            THE COURT:   We're not going to show this a number of

6    times.

7            Is there really an issue as to causal relationship

8    between this accident?  I mean, if there is, show it.

9            MR. CASHIO:   It takes one minute to show the accident.

10           THE COURT:   I thought you were going to go through the

11   whole tape?

12           MR. CASHIO:   I've got it right on the accident.

13           MR. BALLINA:   Judge, so plaintiff's going to be

14   allowed to show us just that segment of the tape?

15           THE COURT:   Yes, this is a medical expert.

16           MR. BALLINA:   Okay.

17           THE COURT:   And he's going to show the accident

18   itself, but he's not going to go through the whole tape.

19           MR. CASHIO:   I have it set up.

20                   (BENCH CONFERENCE CONCLUDED)

21                     (COUNSEL PLAYS TAPE)

22           THE COURT:   Now, can everybody see this screen.

23                    (AFFIRMATIVE RESPONSE)

24           THE COURT:   All right.  Thank you.

25           MR. CASHIO:   If I'm blocking anyone, let me know,

1  please.

2          THE COURT:    How about the podium?

3                  (AFFIRMATIVE RESPONSE)

4          THE COURT:    All right.  Go ahead.

5                          EXAMINATION

6  BY MR. CASHIO:

7  Q.    Doctor, you see where this is?  In a few seconds Mr. Smith

8  is going to come out walking in this area, this area right there

9  (indicating).

10          Now, I want you to assume this is the accident that

11  happened.  He goes out, you see him right there.  Do you see the

12  truck stopping?  The truck's stopping again, that's him.

13          THE COURT:    Counsel, don't narrate, please.

14          MR. CASHIO:    Okay.

15                          EXAMINATION

16  BY MR. CASHIO:

17  Q.    Do you see him on the ground, Dr. Hamsa?

18  A.    Yeah.  Yes, sir.

19  Q.    Okay.  Now, assuming that that's the accident that Shaun

20  Smith was in, is it your medical opinion that that accident was

21  the causation for his problems?

22  A.    If there's nothing else.

23  Q.    Okay.  Doctor, he had to have a surgery here done on him.

24  Are you familiar with the surgery that was done on Shaun?

25  A.    Yes, sir.

1   Q.    And can you tell the jury, first of all, were there any

2   risks to this type of surgery?

3   A.    The usual.

4   Q.    Okay.  Is there a risk of death in a surgery like that?

5   A.    Or such things as a clot formation phlebitis.  This is a

6   spiral displaced fracture, so it's a surgery of necessity.

7   Limb-saving, if you will.  It's got to be fixed or immediately

8   treated.  He can have compartment syndrome, swelling.  The nerve

9   artery and vein go in that area.  Also when I said 20 percent,

10  it was of leg, not a person, 20 percent of the leg.

11  Q.    So you said it was a limb, L-I-M-B, saving surgery?

12  A.    Yes, sir.

13  Q.    In order to save his leg that surgery had to be done right

14  a way?

15  A.    Well, or admit him to the hospital and watch him for about

16  four or five days and then consider a compartment syndrome when

17  you have to open up the compartments to swell in and around the

18  area of the injury.

19  Q.    This was a spiral fracture.  What is that, doctor?

20  A.    Well, instead of it being clean straight across, there's an

21  angle to it.  Also it's interesting, you'll hear, if there are

22  other witnesses, called the butterfly.  So the fracture occurs

23  in the spiral, and they almost have, and before I even saw his

24  X-rays from the onset, there's a small triangular shape.  We

25  call it a butterfly because it always occurs, and you want to

1  treat it so you don't displace or have this thing get away from

2  you.  So the doctors at the Charity hospital did a good job of

3  putting an intramedullary, which is down the marrow canal, a

4  fixation device.  Years ago it was the Swedish V-nail and then a

5  Country Rod and now it's a lock, where we put screws below and

6  screws above.

7  Q.    Doctor, are these X-rays showing the rod that is placed in

8  his leg and his ankle and the screws that are placed there?

9  A.    This is a good view showing -- this is an ankle mortis, and

10  the fracture is at this area.  You can see there's some spiral

11  components.

12       The fragment is well aligned and there are screws above

13  and screws below to keep it from spreading apart.  This is a

14  newer innovation in the last 10 years.  So you can see the

15  fracture sites at an angle here, and there will be an angle

16  there and then little butterfly fragments sits in.  This is

17  looking from the front (indicating).

18       MR. CASHIO:   Could I show this to the jury now?

19       THE COURT:   Is this admitted into evidence already?

20       THE CLERK:   Nothing's been admitted yet.

21       MR. CASHIO:   Exhibit Number 9.

22       THE COURT:   Hold on one second.  We need to handle a

23  procedural matter.  We need to get the exhibit books handed to

24  the jury right.

25       Ladies and gentlemen of the Jury, the lawyers have

1  gotten together prior to the trial so that we could save you

2  time and they have agreed on certain exhibits to be allowed or

3  they both agreed that certain exhibits will be admitted into

4  evidence.  We're going to go ahead and hand out the books to you

5  right now.  However, I'm going to ask that you not refer to the

6  books unless a particular attorney refers to a specific exhibit.

7        So why don't you go ahead, Mr. Cashio, and/or James and

8  hand the books out to the jurors, please.

9        THE CLERK:   The whole book?

10       THE COURT:   Yes.

11       And, counsel, for the plaintiff and defendant, you both

12 agree that we can file and introduce in evidence all of the

13 exhibits that are contained in that book, Mr. Cashio?

14       MR. CASHIO:   Your Honor, there just needs to be an

15 additional signed tax return placed in there that we spoke of.

16       THE COURT:   All right.  Well, we can supplement this

17 book, but as far as the book that is being and to the jury now,

18 you agree that this will be allowed and introduced into

19 evidence, sir?

20       MR. CASHIO:   Yes, Your Honor.

21       THE COURT:   Mr. Ballina?

22       MR. BALLINA:   Yes, Your Honor.

23       MR. CASHIO:   Can I give the jury each one page?

24       THE COURT:   Not yet.  Not yet.  We'll do that later.

25       And again, I'm going to ask you that you not review

1  that book until a specific attorney refers to a specific

2  document in that book.  All right.  Go ahead, Mr. Cashio?

3          And for the record this will be Exhibits Number 1

4  through 14.

5          THE CLERK:    Judge, I would like to point out the

6  index does not list a Number 5.

7          MR. CASHIO:    Yeah, we have agreed on that.

8          THE CLERK:    And there is a number 5 in the book.

9          MR. CASHIO:    There is?  We'll remove that.

10         Can we get take the books back?

11                              EXAMINATION

12  BY MR. CASHIO:

13  Q.    Dr. Hamsa, is that an X-ray of his whole leg from the knee

14  to the ankle?

15  A.    Yes.

16  Q.    That's his left leg, is that correct?

17  A.    Yes.

18  Q.    Okay.  And will these rods and screws ever be removed for

19  his whole life?

20  A.    No, they don't need to be.  They usually are kept.

21  Q.    And is there usually any problems associated with this

22  especially in climatic conditions.

23  A.    Well, the doctors have taken a good view of the ankle below

24  and the knee above for focus to show that fixation does not

25  aggravate the ankle joint here and the knee joint above

1  (indicating).

2  Q.    Okay.  But my question was on weather changes, can that

3  aggravate the leg of Mr. Smith?

4  A.    Well, a person like this who usually have an ache with

5  weather change, an ache with heavy activity of some such, are

6  probably indefinitely.

7  Q.    And at the present time you've been treating Mr. Smith with

8  Elavil, which is an antidepressant, is that correct?

9  A.    Well, it's a central muscle relaxant, a sleep management

10  and antidepressant.

11  Q.    And you're also treating him with morphine, is that

12  correct?

13  A.    Well, it's a long acting morphine derivative.  Instead of

14  giving him routine doses every four to six hours, he has one

15  that goes to the 24.

16  Q.    Okay.  Doctor, getting back to the type of risk that this

17  surgery has, is there -- I'm reading from a list right here, and

18  tell me if I'm wrong on there.  There's risk of blindness.

19  There's risk of cardiac arrest.  There's risk of brain damage.

20  There's risk of convulsions and seizures.  There's risk of loss

21  of the bowl and bladder function.  There's risk of loss of

22  function of organs in the part of the body.  There's risk of

23  loss or damage to sexual function.  There's blood clot risk, and

24  there's also the risk of just the normal hospital environment

25  with the bacterial situation, is that correct, doctor?

1  A.    I would check out the thrombophlebitis clot that I referred

2  to.   The risk and infection, and all these other things that are

3  taken care of only by anesthesia or lumbar spine, because we

4  don't routinely go through the entire list you have with

5  exception from out standpoint of the clot, and add the procedure

6  might not go right.   Failure of procedure, clot formation,

7  phlebitis, infection, that's it.   All the others go along with

8  the problem of being put to sleep or having a spinal anesthesia.

9  Q.    But does risks do go along with the surgery.   The cardiac

10  arrest, the blindness, the paralysis, is that correct?

11  A.    Those are consents that the anesthesia department has them

12  do for their anesthesia work.

13  Q.    Right.   But it's still a risk of the total surgery, is that

14  correct?

15  A.    Well, they have to sign a consent for it, yes.

16  Q.    Doctor, did you bring your charges today?

17  A.    As you had wanted to have it broken down, the sheet was a

18  couple of hours ago done.   I have this for October 12th, 2004.

19  Q.    And how much were your total charges?

20  A.    Your total charges are 2,002.00.

21  Q.    And how much is there a balance remaining?

22  A.    $280.

23  Q.    Okay.   Doctor, is Shaun having problems with balance

24  especially in his ankle?

25  A.    Well, the ankle is ended up with some stiffness.   We're

1  happy  fractures healed but he has knee stiffness and ankle

2  stiffness.

3  Q.    And does that affect his balance?

4  A.    Yes, somewhat.

5  Q.    Okay.  Now, you think Shaun can do a job where he has to

6  stand up six to eight hours?

7  A.    Not at this time.

8  Q.    Doctor, I mean Mr. Roberts the vocational expert, didn't

9  you defer to him and his opinions concerning Shaun's ability to

10  work?

11  A.    Work and disability.

12         MR. CASHIO:    Okay.   That's all I have now, Your

13  Honor.

14         Doctor, would you answer Mr. Ballina's questions.

15         THE COURT:    Thank you.

16         Mr. Ballina, your witness under cross-examination.

17                     CROSS-EXAMINATION

18  BY MR. BALLINA:

19  Q.    Good afternoon, Dr. Hamsa, how are you?

20  A.    Good afternoon.

21  Q.    You don't think Mr. Smith's condition is going to keep him

22  from working for the rest of his life, do you?

23  A.    I do not.

24  Q.    It's my understanding that Mr. Cashio, Mr. Smith's

25  attorney, referred Mr. Smith to you, is that correct?

1    A.    Yes, apparently?

2    Q.    And I believe you stated this on direct examination, the

3    device that's in Mr. Smith's leg right now you don't see any

4    problem with that fixation device in his leg, do you?

5    A.    No.

6    Q.    You don't think it needs to be removed, do you?

7    A.    No.

8    Q.    You don't think it's a problem, do you?

9    A.    No.

10   Q.    And you do believe that Mr. Smith does have a good chance

11   of returning to some activity level?

12   A.    Yes, early on in treatment I tried to explain the fracture

13   occurs along a long area below the knee.  It's a spiral, so we

14   have all of the extensor muscles that work the foot up and down

15   and it stabilize the ankle hook along the bone, so the word

16   adhesion pretty much everybody understands, and he'll have a

17   certain amount of time to work out the adhesions.  He really

18   hasn't had a full course of physical therapy yet.

19   Q.    So you think Mr. Smith will get better with time, don't

20   you?

21   A.    There's no question he'll get better but we don't know to

22   what extent.  That's why it's easy to give -- like I said, I

23   separated myself from impairment, in which I compare every other

24   human being, and you're going to hear this, they changed the

25   books.  Years ago we'd say impairment, and they'd say no, he got

1  a disability.  If, I'm myself, and my neighbor's a brick layer.

2  We can both have a BK amputation, and he's totally disable from

3  laying bricks.  I am not disabled from being an Orthopedic

4  surgeon but we have the same impairment.  We lost the leg below

5  the knee, so that's the percent we gave for this.

6  Q.    Right.  And while we're on impairment, I think you

7  clarified Mr. Cashio's question concerning the 20 percent

8  impairment, and you clarified that it's 20 percent of just his

9  leg, is that correct?

10  A.    Yes, that includes, of course, the infirment for ankle and

11  knee.

12  Q.    And you also believe that Mr. Smith will get better with

13  certain treatment that you've suggested that he undergo, isn't

14  that correct?

15  A.    Yes.

16  Q.    And that treatment would be physical therapy, is that

17  correct?

18  A.    We use that term.

19  Q.    You've recommended that, correct?

20  A.    Yes.

21  Q.    Has he undergone that?

22  A.    Well, at this point in time he has not.  He's in an area

23  where we've tested four or five places here or there, and the

24  expense was beyond that which he could come up with over a

25  period of time.

1    Q.    So he hasn't done it?

2    A.    On the basis of expense.

3    Q.    I believe you've also recommended some hydrotherapy,

4    water therapy?

5    A.    Yes.  I work a lot with the thoroughbred industry.  I'm

6    quite familiar with that.  That's one of the reasons he was

7    referred to me.  Coincidentally, Hot Springs, Arkansas, so, you

8    know, you think somebody can get some hydrotherapy in Hot

9    Spring, Arkansas, so we contacted several units in that area,

10   and it's still beyond expense, so, I mean, it's -- whether it's

11   expense for the tourist to go get in the bath, or have a

12   physical therapist supervise hydrotherapy with exercises under

13   warm mineral waters, it's an expense that they have told me

14   cannot become -- put up.

15   Q.    So the hydrotherapy that you've recommended to Mr. Smith,

16   he hasn't done that as far as you know, is that correct?

17   A.    Yes.

18   Q.    And you do believe that the surgery that was done at

19   Charity Hospital was successful, don't you?

20   A.    Excellent.  It's the state of the art.

21   Q.    And you do expect that Mr. Smith's condition will improve

22   as he increases his activity levels, don't you?

23   A.    Yes, but we don't know about the knee with the patella

24   femoral.  We don't know about ankle joint with the adhesions.

25   We don't know about the muscle tendon units.  Three areas of

1  concern.

2  Q.    You don't know yet?  You don't know now?

3  A.    We can see people from this point of time have some degree

4  of gate change or limp indefinitely, weather change.  We see

5  people recover completely enough, except probably can't run.  In

6  his stage, he'd probably have extreme difficulty with

7  horsemanship, being able to lock his leg around a horse.  I

8  don't need to explain, I don't think, the aspects of

9  horsemanship.

10 Q.    Mr. Cashio went through some risks involved with a

11 procedure that Mr. Smith underwent.  Have you seen any records

12 or evidence that Mr. Smith, in fact, suffered any of those

13 things?

14 A.    I have seen none that he did.

15 Q.    And it's my understanding that you have seen Mr. Smith --

16 do you recall offhand the number of occasions that you've seen

17 him?

18 A.    Three.

19 Q.    March 8th, 2004; 4-20-04; 5-25-04; 6-3-04; and 8-30-04.

20 A.    And 10-7-04.  Six times.

21 Q.    Oh, you saw him Friday?

22 A.    Yes, sir.

23 Q.    October 7th?

24 A.    Yes, sir.  It's on there.

25 Q.    Did you generate a report in connection with that October

1  7th, visit?

2  A.  Well, this is a three-part visit.  I took a demand

3  insurance from Farmer's Insurance of -- there's a sheet in the

4  chart, and another carrier and another, and everybody asked the

5  same thing, so I took my hand written notes and I wrote on it

6  "Weren't able to actually state or determine his return-to-work

7  status.  He remains rather serious with left knee, left ankle

8  problems.  We can't release him to his full scope of work.  The

9  diagnosis:  Comminuted fracture of left tibia and fibula.  The

10 treatment is stable", etcetera.  Everything we've said here

11 today -- well, we haven't talked about reflex dystrophy which

12 he's coming out of, but I wrote it all on one sheet of paper and

13 forwarded this to everybody.  There's CCS to his attorney, to

14 three insurance groups, and I don't know, I think there's one

15 other person.

16 Q.  Let me make sure I'm clear.  Did you see Mr. Smith on

17 October 7th?

18 A.  Yes, this is authored with him sitting next to me.

19 Q.  Did Mr. Smith bring that into you?

20 A.  No.  It was mailed on the 30th of September, and we

21 received this -- well, sometime before the 7th.  I don't fill

22 these out until I can sit and talk to the patient with it.

23        MR. BALLINA:   Your Honor, may I approach the witness?

24 I have not seen this.

25        THE WITNESS:   You can make copies of it if you want.

1      MR. CASHIO:   Your Honor, can we approach the bench?

2      THE COURT:   Yes.

3           (BENCH CONFERENCE, AS FOLLOWS)

4      MR. CASHIO:   I haven't seen this.  This is a

5 collateral source situation.  That's not supposed to be in

6 evidence, Your Honor.

7      Can you advise the doctor not to speak about the

8 insurance from now on?

9      MR. BALLINA:   I didn't.  I'm asking him because I

10 don't know if he's seen Mr. Smith on October 7th.  I haven't

11 hasn't been provided with a report.  I have no knowledge

12 until --

13      MR. CAHSIO:   You know --

14      THE COURT:   You know, fellows, you guys have been

15 doing this for a long time.  Vic is one human being.  He can't

16 take everything down.

17      MR. CASHIO:   I'm sorry.

18      THE COURT:   When two people are speaking at the same

19 time.

20      All right.  Go ahead, Mr. Ballina.

21      MR. BALLINA:   Judge, I have just discovered during the

22 course of cross-examining Dr. Hamsa that he saw Mr. Smith on

23 October 7th, that's why I'm asking him the question if he

24 generated a report, because I have not been provided with a

25 report, nor was I advised that Dr. Hamsa was seeing him on that

1    date.  That's why I asked if I can approach the witness and take

2    a look at what it was that he was referring to.

3          MR. CASHIO:   That's fine, Your Honor.  You've already

4    ruled, that there is an ongoing treatment here with Mr. Smith,

5    and I don't have a copy of the report.  He doesn't even have to

6    talk about the report if doesn't want to.  All I'm saying is

7    that the insurance issue is a collateral source benefit that

8    should not have got in.  Can you admonish the doctor not to talk

9    about that, out of the presence of the jury, Your Honor?

10         THE COURT:   Well, two things.  Number one, again, Mr.

11   Ballina has not even seen, nor have you, counsel, even seen this

12   document, so Mr. Ballina is certainly in cross-examining this

13   doctor learns for the first time of this document, although I

14   heard this doctor said he merely wrote down what he's already

15   testified to, but, again Mr. Ballina certainly has every

16   opportunity to review that?

17         MR. CAHSIO:   I don't have any objection to it.

18         THE COURT:   I hope you don't, because I'll certainly

19   do it in spite of your objection.  Now, the question then comes

20   in.  Mr. Ballina knows better than to go into insurance

21   coverage's or things like that so I have no doubt that he's not,

22   so I don't think we need to admonish this witness.  I don't want

23   to send the jury out.  If it becomes an issue, we'll do that.

24         But, Mr. Ballina, what I will ask you to do is when you

25   ask a question if he mentions insurance one more time, sir,

1    that's really not an issue before us, I just want to know what's

2    included in this report, and you're correct, I think that will

3    be cleaner for everybody.

4         MR. BALLINA:    And if I would have known he was going

5    to say that I would never have asked because I have no clue what

6    it is he's looking at, and I have no intention of asking him any

7    questions about insurance or any coverage.

8         THE COURT:    Mr. Cashio, did you know that your client

9    went to the doctor on October 7th?

10        MR. CASHIO:    I knew he went, but I didn't have any

11   report or anything, and I thought it was just another checkup.

12   There was nothing different about it.  You can ask him about it.

13                  (BENCH CONFERENCE CONCLUDED)

14        THE COURT:    Doctor, are there any other reports or

15   records or generated from your October 7th besides your

16   handwritten notes on that piece of paper?

17        THE WITNESS:    No, it speaks for itself, res ipsa.  The

18   things is, you know, this was mailed out --

19        THE COURT:    No, we don't need to go into that all

20   that.

21        THE WITNESS:    Okay.  Sir.

22        THE COURT:    Thank you.

23        We're not interested doctor in knowing where the

24   document came from but where it went to.  All right, sir.  So

25   let's just --

1          THE WITNESS:   You want to copy it?

2          THE COURT:   No, that copy, of course, will not be

3    introduced into evidence.

4          Let's take a five mintue break so that both lawyers can

5    review the document, since neither of you have seen it up to

6    this point.  And, doctor, just remain seated on the witness

7    stand.

8          Take is a five minute recess.

9          THE CLERK:   All rise.

10         The jury can step out.

11                    (FIVE MINUTE RECESS)

12       (THE JURY IN RECESS, AND THE PROCEEDINGS WERE HELD, AS

13      FOLLOWS):

14         THE COURT:   Doctor, the jury is out now, do not, sir,

15   make anymore reference to insurance companies or anything like

16   that, that issue will not be appropriate before this jury.

17         THE WITNESS:   Well, they asked me about the visit.

18   And the reason is everybody demanded "When's he go back?  When's

19   he go back?"  The same questions we have here, you know, it's

20   indefinite.

21         THE COURT:   I understand that, but it's of no legal

22   significance to this jury who asked what, and so, please,

23   refrain from referring in anyway to any insurance.

24         THE WITNESS:   I will, but this is in response to the

25   question what did I do on that date.

1       THE COURT:   Well, he hadn't seen the document before,

2   so --

3       THE WITNESS:   Well, he can't, in the mail, you know.

4   We had a holiday yesterday.   It was mailed -- today is what, the

5   13th?

6       THE COURT:   No problem.

7       MR. CASHIO:   I just want to reiterate my objection to

8   Dr. Hamsa bringing up insurance in the case.

9       THE COURT:   Okay.   Mr. Cashio, you can state that for

10  the record, but I will state also that Dr. Hamsa made that

11  statement and Dr. Hamsa is your witness, and Mr. Ballina had

12  absolutely no idea what he was going to state, because he, like

13  you, Mr. Cashio, had not even seen that document before.   I note

14  your objection.   But, Mr. Cashio, I'll do one of two things.

15  I'm going to leave this up to you since you've objected.   Either

16  let it go, Dr. Hamsa is not going to mention it again, or I will

17  bring it up to the jury and order that it be stricken from the

18  record, but I don't know that you want me to remind the jury of

19  this, but you tell me what you would like for me to do.

20      MR. CASHIO:   We'll just let it go, Your Honor.

21      THE COURT:   Is that okay, Mr. Ballina?

22      MR. BALLINA:   That's fine with me, Your Honor.   Thank

23  you.

24      THE COURT:   So are you withdrawing your objection

25  then, Mr. Cashio?   Because if you maintain your objection, I

1  will admonish the jury.

2          MR. CASHIO:   I'll withdraw it.

3          THE COURT:    Thank you.

4          We'll take a five minute recess.

5          THE COURT:   Court's in recess.

6                  (3:30 P.M.  -  AFTER RECESS)

7                  **P-R-O-C-E-E-D-I-N-G-S**

8          THE CLERK:   All rise.

9          THE COURT:   Call in the jury, please.

10         THE MARSHAL:   All rise.

11             (THE JURY ENTERED THE COURTROOM)

12         THE COURT:   Thank you.

13         Please be seated.

14         THE COURT:   All right.  Please continue.

15         All right, Mr. Ballina.

16                      EXAMINATION

17 BY MR. BALLINA:

18 Q.   Dr. Hamsa, I think we have left off, I was trying to get

19 out of you, how many times you've seen Mr. Smith, and I believe

20 I was counting, we got to October 7th, last Friday, which you've

21 seen him six times, is that right?

22 A.   Yes.  And I think once informally in the clinic in

23 Mandeville, so totally eight.

24 Q.   You think Mr. Smith's going to go back to work, correct?

25 A.   In some capacity, yes, I do.

1   Q.    And you can't say what capacity that is, correct?

2   A.    That's correct.

3   Q.    And today you testified though that you don't think he can

4   work six to eight hours standing up, is that right?

5   A.    At this time he cannot.

6   Q.    He can work less than six or eight hours, can't he?

7   A.    Yes.

8   Q.    How long do you think he can work?

9   A.    From employer standpoint, I'd say half a day if you're

10  talking about five days a week.

11  Q.    So you, as his treating doctor, wouldn't have a problem

12  with Mr. Smith doing that?

13  A.    At some adjustment to activity restrictions.

14  Q.    Okay.  All right.  Can you explain to us what a functional

15  capacity evaluation is?

16  A.    They called them FCE.  The stepwise procedure widely

17  excepted and quite reliable is to put a person through an entire

18  series of carefully planned activity such as lifting grasping,

19  bending, stooping, measuring the strength in one arm compared to

20  the other.  One leg compared to the other.  That type of thing

21  and recording the response.

22        In keeping with the pretesting interview and the post

23  testing interview, during that particular time there's a

24  separate section worth of pain appreciation where the patient is

25  asked to give his score pain from one to 10, and then the person

1    supervising the FCE then records about the response to pain

2    that's observed, for example, with grasping, squeezing, lifting,

3    and then it graduates from 10 pound, 20 pounds if you talk about

4    lifting.  Basically, that's a good cover over everything, and

5    then they will see about the response.  If there's a poor

6    attempt.  If there's a good attempt and pain noted.  All these

7    little things go into it with the desired anticipated, and

8    they're pretty much universal.  So if you run an FCE here in the

9    city or do one at the edge of town or do one in Arkansas,

10   they're pretty much of the same scope.

11   Q.    And it's my understanding that you've suggested that Mr.

12   Smith have an FCE?

13   A.    At some time?

14   Q.    At some point, is that correct?

15   A.    Yes.

16   Q.    He has not had that FCE yet, is that correct?

17   A.    No, because most in my field would not do it if they know

18   the outcome.  You know, if a guy's got a bum leg and a hurting

19   leg, then you tell him to start climbing and he's not going to

20   do well, so why waste the test?  That's the whole attitude

21   really.

22   Q.    So would it be a fair statement that you don't think he

23   should have one now because he hasn't undergone the treatment

24   that you suggested to him to do, and therefore is not at his

25   maximum medical recovery or improvement, is that a fair

1  statement?

2  A.   Everything you've said backwards, the same way.  He's not

3  at that point.  He hasn't been there, exactly.

4  Q.   And that is, he's not going to get to that point where he's

5  the best until he does what you suggested that he do, the

6  therapy, physical therapy, hydrotherapy, increase his

7  activities, correct?

8  A.   Yes, sir.

9  Q.   You don't believe that Mr. Smith would be physically

10  restricted or prevented from attending school?

11  A.   No.

12  Q.   You don't believe that he's physically restricted from

13  attending vocational training?

14  A.   Well, in what?  You know, he couldn't train in climbing,

15  prolonged standing, that type of thing.  We have to take some

16  consideration, vocational programs would be open with the

17  restrictions in order.

18  Q.   So you do believe that he could undergo some vocational

19  training?

20  A.   Yes, sir,

21       MR. BALLINA:   Doctor, I thank you for your time.

22       THE COURT:  Thank you.

23       Redirect, Mr. Cashio?

24       MR. CASHIO:   Yes, Your Honor.

25                     REDIRECT EXAMINATION

BY MR. CASHIO:

Q.    Doctor, that 20 percent impairment of his left leg, that's a lifetime impairment, isn't that correct?

A.    Yes, it is.

Q.    I'm sorry, you said, yes, it is?

A.    Yes, it is.

Q.    And because of the problems in his left leg, do you think he could handle the stress in the future of getting on thousand pound race horses and taking that kind of pressure?

        MR. BALLINA:    Objection, Your Honor.  I think that may go beyond the doctor's expertise.

        THE COURT:    Sustained.

                        EXAMINATION

BY MR. CASHIO:

Q.    Okay.  You told us before that on vocational evaluations you would defer to the evaluator on what type of activities and jobs he could and couldn't do, is that correct, doctor?

A.    Yes.

Q.    So if Mr. Roberts says that he doesn't think Mr. Smith can ever do anything other than sedentary work, you would defer to him, wouldn't you?

        MR. BALLINA:    Your Honor, objection.

        THE COURT:    Beyond the scope of cross-examination.  Objection sustained.

        MR. CASHIO:    Okay.

1                         EXAMINATION

2   BY MR CASHIO:

3   Q.    Now, you made a comment about a pianist who's fingers, I

4   think you said that are cutoff and a lawyer, or something to

5   that nature, have different disabilities, is that correct?  One

6   can't play the piano any more but the lawyer still could

7   function in court.

8               MR. BALLINA:    Objection, Your Honor.  I don't believe

9   the witness testified to that?

10              THE COURT:    Objection sustained.

11                        EXAMINATION

12  BY MR. CASHIO:

13  Q.    What did you tell us -- doctor, what did you tell us about

14  the difference between functional impairment and impairment

15  ratings?  You made an analogy, do you remember that?

16  A.    Myself and my neighbor that might be brick layer.

17  Q.    Okay.  And what was that?

18  A.    Well, if we have --

19              MR. BALLINA:    Your Honor, let me enter an objection.

20  I think that's beyond the scope of my cross-examination.

21              MR. CASHIO:    That was on his cross.

22              THE COURT:    That was your cross, counsel, as I recall.

23  Overruled.

24              THE WITNESS:    Well, I think it's a good point, because

25  I think the confusion is right now ended between impairment and

disability, and that includes physicians and work injury and

all that.  But if my neighbor is a brick layer and he has a BK

amputation, and I do also, we loose our leg below the knee.

He's totally disabled from brick laying, and I'm not disabled

from prosthesis and doing orthopedic surgery, but we have the

same impairment.  The percent of our body and our leg, it has to

be part, you know, finger for arm or leg.

Q.   Now, take Shaun Smith who was a 20 percent impairment of

the left leg.  He's got a rod and screws in there for his

lifetime, and take a lawyer.  Is Shaun Smith totally his

previous occupation as an exercise rider?

          MR. BALLINA:   Objection, Your Honor.

          THE COURT:   Sustained.

          MR. BALLINA:   I believe that's beyond the scope of his

expertise.

          THE COURT:   The objection's sustained.

          MR. CASHIO:   I think he was talking about that, Your

Honor.

          THE COURT:   He didn't mention the word lawyer to me.

          MR. CASHIO:   Not lawyer.  I'm talking ing about Shaun.

The law has nothing to do --

          THE COURT:   Rephrase your question, counsel.

          MR. CASHIO:   Okay.

                         EXAMINATION

BY MR. CASHIO:

Q.    Is Shaun Smith totally disabled from pursuing his previous
occupation as an exercise rider of thousand pound thoroughbreds?

        MR. BALLINA:    Objection.  I believe that's beyond the
admitted expertise of the doctor.

        THE COURT:    Lay a better foundation, counsel.

                            EXAMINATION

BY MR. CASHIO:

Q.    Do you defer that question to Mr. Roberts, the vocational
evaluator?

A.    Not that one.  I'm a Nebraska kid that grew up in horses.
I've taken care of thoroughbred horse people my whole life.  I
can name familles here and racetracks all over the country.

Q.    Can you give us your opinion on that, doctor?

        MR. BALLINA:    Objection, Your Honor.  Beyond the
scope.

        THE COURT:    Approach the bench.

                (BENCH CONFERENCE, AS FOLLOWS):

        THE COURT:    Did his medical reports indicate any
percentage of permanent disability?

        MR. CASHIO:    Yes.

        MR. BALLINA:    They talk about the 20 percent.

        THE COURT:    What he's going into, that's not a
question that Mr. Cashio is asking now?

        MR. CASHIO:    That's functional disability, Your Honor.
He asked him all that in the deposition, the very --

1    THE COURT:   Let's talk about whether or not this is

2  beyond the scope of cross-examination.

3    What's your objection based on?

4    MR. BALLINA:   My last objection was it's beyond the

5  scope of the expertise that he's been tendered for.  Now, he's

6  talking about horsemen, racing horses, and you just sustained an

7  objection regarding a question about could he handle a thousand

8  pound horse.

9    MR. CASHIO:   Can I speak, Your Honor?

10    He asked him can he get any jobs in the future.  That

11  covers that exactly on his cross.  He's asking him all about

12  jobs.  This is the most relevant job that he was doing his whole

13  life.

14    MR. BALLINA:   It's beyond the scope.

15    MR. CASHIO:   It's not.

16    MR. BALLINA:   It's beyond the scope of what this

17  witness has been tendered for.  He's an Orthopedist.  Now, he

18  wants to ask him questions about horses, and can he do this --

19    MR. CASHIO:   Your Honor, I'm asking him --

20    THE COURT:   Counsel, come on, man.

21    MR. CASHIO:   I'm sorry, Judge.

22    I was going to respond.

23    THE COURT:   I'm the Judge, so let me respond.  Let me

24  ask the question.

25    MR. CASHIO:   Okay.

1        THE COURT:    Don't argue.

2        MR. CASHIO:    Okay.  Go ahead.

3        THE COURT:    Especially when I'm ready to rule in your

4   favor, so quit while you're ahead.

5        It seems to me, as I recall Mr. Ballina, and correct

6   me if I'm wrong, but you did ask him what he can do and what can

7   he not do, and so all Mr. Cashio is asking is a specific

8   question about what he can do on a certain area of employment.

9        MR. BALLINA:    My questions concern what he can and

10  can't do were limited to do you think he can work?  Do you think

11  if you testified that he can't work, that he can stand up for

12  more than six to eight hours.  Can he do it for less than that,

13  a half a day.  I was limited.  I didn't ask him what specific

14  jobs that he could and could not do the until -- can I speak?

15       THE COURT:    Go ahead.

16       MR. CASHIO:    When you said he could work, that

17  included all the work.  You covered the whole gamut of

18  everything, so I can ask him a question what kind of work?

19       THE COURT:    Okay.  Objection overruled.  I'll let you

20  ask the question.

21            (BENCH CONFERENCE CONCLUDED)

22       THE COURT:    Go ahead.

23                  EXAMINATION

24  BY MR. CASHIO:

25  Q.   Dr. Hamsa, do you think that Shaun Smith can go back to

1  exercising and galloping thousand pound thoroughbred race

2  horses, the job he had been doing all his life before his

3  injury?

4  A.    Not as a full-time, I said in deposition, I say now.   Scope

5  of previous work activity, not as full time.

6            MR. CASHIO:    That's all that I have.

7            THE COURT:    Thank you.

8            You can step down.

9            Any further need for this witness, Mr. Cashio?

10           MR. CASHIO:   No, Your Honor.   Thanks.

11           THE COURT:    Mr. Ballina.

12           MR. BALLINA:   No, Your Honor.

13           THE COURT:    Thank you, sir.

14           You're excused from your subpoena.

15           Call your next witness, Mr. Cashio.

16           MR. CASHIO:   I'd like to call Mr. Stacey Dorsey.

17           Your Honor, you ruled that I couldn't call Mr. Roberts,

18 is that correct?

19              THE COURT:    Approach the bench.

20                 (BENCH CONFERENCE, AS FOLLOWS):

21           THE COURT:    I did not rule that you could not call him

22 now, but I did rule that you're going to take these other

23 witnesses first is what I ruled.

24           What I said was I didn't know how far we were going to

25 get today.   I will note, however, that Mr. Roberts is here.

1          MR. CASHIO:   He's been here for three hours.

2          THE COURT:   I understand that.

3          It's 10 minute to 4:00.  Quite frankly, I do not see

4  how you're going to be able to get through five fact witnesses

5  plus play that 20-minute tape.

6          MR. CASHIO:   I wasn't playing the 20-minute tape, Your

7  Honor.

8          THE COURT:   You're not going to play the tape in your

9  direct examination?

10         MR. CASHIO:   Not now, no.

11         THE COURT:   Not now?

12         MR. CASHIO:   Your Honor, my original plan was this.  I

13  was going to take these five witnesses under cross for five

14  minutes each, and since the Court was starting at 10:00, I

15  thought I would be through at 1:00 with Mr. Roberts.  The expert

16  came in at 1:00.  He's been waiting all this, and Dr. Hamsa came

17  in.

18         THE COURT:   We've gone over all this already, and I

19  understand, and I tell you one thing.  I'm changing my standing

20  order from now on.  I tried to do this to accommodate you guys

21  and you're throwing it back in my face, so I'm going to change

22  that as far the order that people goes.  I do that to

23  accommodate counsel and it's not working out at this.  However,

24  with that said, Mr. Ballina indicated to me that it would be

25  prejudicial to his client to take Mr. Roberts out of the order

1    that was set, and since I'm not trying to run anybody's case for

2    them, I'm taking Mr. Ballina at what he said.  All these other

3    witnesses are here, and since they're here, let's go with these

4    other witnesses.  I would like to accommodate you, Mr. Cashio,

5    but I can't do that.

6         MR. CASHIO:  So I'm going to have to tell Mr. Roberts

7    to come back tomorrow?

8         THE COURT:  Yes, unless ---

9         MR. CASHIO:  Because I was always under the impression

10   every time I tried cases that when an expert comes in the lay

11   witnesses on, they defer to them.

12        THE COURT:  I hear what you're saying, and it's not

13   going to happen in this case because it's been objected to by

14   defense counsel.  Now, you can do one of two things.  I don't

15   know what time we're going to get through with these five

16   witnesses.  I'm not going to make you keep this guy here, but I

17   tell you this, though, if we get through these five witnesses

18   and the time is still relatively early, I want you to proceed

19   and even though Mr. Roberts won't here, then you'll have to call

20   your witness.

21        MR. CASHIO:  I will.  I'll call Shaun Smith.

22        THE COURT:  You know, if these guys aren't going to

23   take to long if you want Mr. Roberts to testify, he'll testify

24   today.

25        MR. CASHIO:  But he's now come up with something

1    saying that he wants him now in the middle of my case, Your

2    Honor, and that's why I couldn't possibly plan that.

3        THE COURT:    Counsel, I understand that, but this is

4    how I do it, and this saves everybody's time.  It's silly for it

5    not to happen this way.  Okay, so I'm going to allow that.  I

6    will tell you this.  If Mr. Roberts stays, you can call him

7    today.  We'll get through these five witnesses, unless it's too

8    late, but I will accommodate you.

9        MR. CASHIO:    He might take a long time.

10       THE COURT:    We don't know what it's going to take, but

11   he might, he might.

12       MR. CASHIO:    I'm going to spend thousands of dollars

13   making him sit there, when I might not even call him tomorrow.

14   I've already spent a lot of money.

15       THE COURT:    Okay.  I understand that.  Well, let's go

16   ahead then, and you can whisper to Mr. Roberts that he'll be the

17   first person tomorrow.

18       MR. CASHIO:    I can take him first?

19       THE COURT:    We're going to get through these five

20   people today.

21       MR. CASHIO:    Yeah, but if we don't get through them?

22       THE COURT:    We will get through them today, okay.

23       MR. CASHIO:    I told them we'll get through them.

24       We'll take him first thing in the morning.

25       THE COURT:    Well, his phone number.  I don't know how

1  long Mr. Ballina is going to be.  You know, you hold me to every

2  word that I say.  All I can tell you is my intention is to get

3  through these five witnesses today.  However, if we're too late

4  and we can't get through these five witnesses, then we're not

5  going to be able to do that, so maybe what you can do is get Mr.

6  Roberts phone number to see if, you know, to give him a head's

7  up tonight as to what time he can come tomorrow.

8           MR. CASHIO:   Okay.  We'll have to do that today, Your

9  Honor.

10                (BENCH CONFERENCE CONCLUDED)

11           THE COURT:   Call Stacey Dorsey.

12           THE CLERK:   Raise your right hand, please.

13                     STACEY DORSEY

14           After having been first duly sworn, did testify under

15  oath, as follows:

16           THE COURT:   State your name for the record, please.

17           THE WITNESS:   Stacey Dorsey.

18           THE COURT:   Proceed, Mr. Cashio.

19           MR. CASHIO:   Your Honor, as I appreciate it, I can

20  call him under cross when.  When plaintiff brings him on direct,

21  I still get to recross him, is that correct?

22           THE COURT:   Absolutely.

23           MR. CASHIO:   Okay.

24           THE COURT:   Absolutely.

25

```
 1                         CROSS-EXAMINATION
 2    BY MR. CASHIO:
 3    Q.    Would you state your name, please, sir?
 4    A.    Stacey Dorsey.
 5    Q.    And you're the representative of Harrah's?
 6    A.    Correct.
 7    Q.    And what's your job title at Harrah's?
 8    A.    Security manager.
 9    Q.    I'm sorry?
10    A.    Security manager.
11    Q.    Didn't you tell me something under oath in your deposition
12    something different?
13             MR. BALLINA:    Objection.
14             THE COURT:    Sustained.  Lay a better foundation,
15    counsel.
16             MR. CAHSIO:    Okay.
17                            EXAMINATION
18    BY MR. CASHIO:
19    Q.    You're saying you're the security manager now.  When I
20    asked you your job title on -- well, first of all, you remember
21    me taking your deposition under oath?
22    A.    Yes.
23    Q.    Okay.  And when I asked you your job title on July the 6th
24    of this year, line 9, "What is your job title at Harrah's
25    Casino?" What did you tell me then?
```

1  A.    Customer Safety Manager.

2  Q.    Oh, and now, you're the security manager today?

3  A.    Excuse me.  Customer safety and security are the same, sir.

4  Q.    Did you change jobs?

5  A.    No.

6  Q.    So you're the Customer Safety Manager, right, that's what

7  you told me under oath?

8  A.    Which is also security.

9  Q.    Okay.  Do you remember Shaun Smith's truck being brought

10 down right before the accident?

11 A.    Yes.

12 Q.    Okay.  And that was a large diesel truck that made a lot of

13 noise?

14 A.    I didn't hear it, I just saw the vehicle.

15 Q.    You couldn't hear any of the sound from the truck?

16 A.    I saw the vehicle.

17 Q.    How far were you from it at your closest point?

18 A.    At the closest point, maybe four, five feet tops.

19 Q.    And you couldn't hear the sound of it?

20 A.    Yes, at that point.  That's not what you asked me.  You

21 asked me did I see it and could I hear it then.

22 Q.    No, I said did you hear the sound of the vehicle?

23 A.    Yes, I heard the sound of the vehicle.

24 Q.    And did it make a lot of noise?

25 A.    It had a diesel engine.

1   Q.   Did it make a lot of noise?

2   A.   It had a diesel engine.

3          THE COURT:   Sir, answer the question.

4          We don't know if a diesel engine makes a lot of noise

5   or not.

6          Did it make a lot noise as far as you were concerned?

7          THE WITNESS:   Beyond that of a normal truck, yes, sir.

8          THE COURT:   All right.  Thank you.

9                      EXAMINATION

10  BY MR. CASHIO:

11  Q.   Isn't it true that it's standard operating procedure that

12  the vehicle ticket has to be paid for before the vehicle is

13  ordered to be brought from the parking area to the valet area?

14  A.   I'm not familiar with that.

15  Q.   Okay.  I asked you that exact question under oath, and you

16  tell me you're not familiar with it today, but what did you say

17  under oath in July when I said at line 11 of page 19: "Is it

18  standard operating procedure that the vehicle ticket be paid for

19  before the vehicle is ordered to be brought from the parking

20  area to the valet area?" What was your answer?

21  A.   Yes.

22  Q.   And now today you don't know?

23  A.   I'm not familiar with that standard operating procedure.

24  Q.   Well, why did you answer yes understand oath?

25          THE COURT:   When, counsel?

1                              EXAMINATION

2    BY MR. CASHIO:

3    Q.    In July when I took your deposition?

4    A.    In July, I probably misunderstood the question.  I'm not

5    familiar with the standard operating procedures.

6    Q.    And you're not familiar but you were the head of customer

7    mere safety on that particular night, is that correct?

8    A.    You're asking me a valet question, that's a difference.

9    Q.    So you weren't really familiar with the valet procedures?

10   A.    I'm not real familiar with them, correct.

11   Q.    Even though you told me you were under oath, is that

12   correct?

13             MR. BALLINA:    Objection, Your Honor.

14             THE COURT:    Sustained.

15                             EXAMINATION

16   BY MR. CASHIO:

17   Q.    Although you're not very familiar with the valet

18   procedures, on that particular night, you were the person who

19   ordered the truck to take off when Shaun Smith was right at the

20   front of the truck right before the accident, isn't that

21   correct?

22   A.    That's incorrect.

23   Q.    You didn't order the truck to take off?

24   A.    No, sir.

25   Q.    You didn't tell anyone to take off with the truck?

1  A.    I did not.

2  Q.    You didn't tell anybody, or you didn't communicate to

3  anyone that they were to take that truck back to where it came

4  from?

5  A.    I instructed Roosevelt to re-park the truck.  I never spoke

6  to anybody saying take off in the truck.

7  Q.    So you said, "said re-park the truck" instead of the words

8  take off, is that you're saying?

9  A.    I spoke to Roosevelt.

10  Q.    And were you close to the scene when the accident happened?

11  A.    Yes.

12  Q.    And were you saying anything to any of your people there

13  right near the scene?

14  A.    I don't think that I was.

15  Q.    Okay.  You weren't saying anything?

16  A.    No.

17  Q.    Okay.  Now, do you know the name of the driver?

18  A.    Yes.

19  Q.    Who was that?

20  A.    Kevin Augustine, I believe his name is.

21  Q.    Is he working at Harrah's any more?

22  A.    No.

23  Q.    You know where he is?

24  A.    No.

25  Q.    Did you think that Shaun Smith was drunk that night?

1    A.    I knew that he had been drinking.

2    Q.    I asked you did you think he was drunk?

3    A.    No.

4    Q.    You didn't think he was drunk.  And Harrah's gives free

5    drinks to the customers inside the casino, is that correct?

6    A.    Yes.

7    Q.    And waitresses come around all the time giving free drinks?

8    A.    Yes.

9    Q.    Now, did Mr. Shaun Smith present his valet ticket to the

10    valet booth when he got there, when he first got there?

11    A.    I'm not sure I understand what do you mean by "to the valet

12    booth?

13    Q.    When Mr. Shaun Smith first got to the valet booth, did

14    Shaun Smith give that ticket to Jessica Wilson, the lady who was

15    there at the valet booth?

16    A.    No, he didn't.

17    Q.    Did he ever give her a ticket?

18    A.    No, he didn't.

19    Q.    How did this his truck get brought down from where it was

20    stored without a ticket being given?

21    A.    He never presented the ticket to Jessica.  He walked up,

22    set the ticket on the counter and walked away.

23    Q.    Did Jessica ever take the ticket?

24    A.    No

25    Q.    She never got the ticket, is that correct?

1  A.    No.

2  Q.    What happed to the ticket?  Did Harrah's bring the ticket

3  here today to court?

4  A.    I don't know.

5  Q.    Do you know what happened to it?

6  A.    I can't -- no, I personally don't.

7  Q.    Harrah's keeps those tickets, don't they?

8  A.    Yes.

9  Q.    Okay.  But you don't know if the actual ticket is here in

10  court?

11  A.    I don't.

12  Q.    Okay.  Now, you were with Jessica Wilson, the other

13  cashier, in the cashier's booth in the valet parking area at the

14  time Shaun Smith came up to present his ticket?

15  A.    Yes.

16  Q.    Okay.  And are you saying that Shaun Smith never actually

17  gave the ticket to Jessica Wilson and she never received it?

18        MR. BALLINA:    Objection.  Asked and answered, Your

19  Honor.

20        THE COURT:    Three times, counsel.  Objection

21  sustained.

22        Move on.

23        MR. CASHIO:    No -- I'm sorry.

24                          EXAMINATION

25  BY MR. CASHIO:

1   Q.    Did Jessica Wilson ever get ahold of that ticket at any

2   time that Shaun Smith's dad's truck came back down?

3   A.    Could you ask that question again?

4   Q.    Okay.  Did Jessica Wilson ever get the ticket, Mr. Shaun

5   Smith's ticket for his Dad's truck at any time before that truck

6   came down to be brought to Shaun Smith?

7   A.    Yes.

8   Q.    Okay.  Where did she get that ticket from?

9   A.    I want to say it was on the desk somewhere in the area.

10  Q.    Okay.  And how do you know that?

11  A.    I don't know that.

12  Q.    But why did you want to say it?

13  A.    Because it had to be some where.  He walked up on the

14  videotape and set it on the counter.  I still to this day don't

15  know where the ticket came from.

16  Q.    Okay.  But you know the ticket was gotten by Jessica

17  Wilson.  Who called for the truck to come down?

18  A.    I want to say Jessica.

19  Q.    Okay.  And you told me under oath before that it's standard

20  operating procedure that the vehicle ticket has to be paid for

21  before the vehicle it is ordered to be brought from the parking

22  area to the valet area, is that correct?

23  A.    Yes.

24  Q.    So that was a violation of the standard operating

25  procedure?

1   A.    Some what.

2   Q.    Okay.  Do you know if Mr. Smith had to wait a long time

3   while 20 or 25 people were getting their cars?

4   A.    Yes.

5   Q.    Okay.  Did you ever apologize to Mr. Smith for the long

6   wait?

7   A.    Mr. Smith never mentioned a long wait.

8   Q.    How did you know he had to wait a long time?

9   A.    I saw the videotape.

10  Q.    Did at any time you ordered Mr. Smith's vehicle to be

11  re-parked and not given to him?

12  A.    Yes.

13  Q.    And what was your reason for that?

14  A.    Mr. Smith refused to pay.

15  Q.    And how much was the payment for that vehicle?

16  A.    $10.

17  Q.    Okay.  And for how long a period is that?

18  A.    Zero to two hours.

19  Q.    And after two hours it's how much?

20  A.    I don't know.

21  Q.    You don't know what the parking charges are?

22  A.    I don't know.

23  Q.    Okay.  What are the charges if you lose your ticket?

24  A.    30 bucks.

25  Q.    But you don't know anything, but the 30 bucks and the zero

1  to two hours, you don't know the other parking charges, right?

2  A.    Correct.

3  Q.    Was the vehicle -- and I'm talking about Mr. Smith's dad's

4  big diesel truck -- stopped at the time Mr. Smith was trying to

5  grab the vehicle?

6  A.    He made several attempts to grab it.

7  Q.    Okay.

8  A.    And each time the vehicle was -- the first time the vehicle

9  was not stopped, which was initially when he walked out, and

10  after viewing the tape the second time when he attempted to grab

11  hold, it was moving as well.

12  Q.    Okay.  Again under oath I asked you the question on line

13  14 of page 34.  "Okay.  And was the vehicle stopped at the time

14  he was -- Mr. Smith was trying to grab the vehicle?"  What was

15  your answer?

16  A.    Yes.

17          MR. BALLINA:    Your Honor, let me enter an objection.

18          There's been no temporal time established of when this

19  happened.

20          THE COURT:    Objection sustained.  Objection sustained.

21          Rephrase your question, counsel.

22                          EXAMINATION

23  BY MR. CASHIO:

24  Q.    So at one point in time at least Mr. Shaun was trying to

25  grab the vehicle while it was stopped, right?

```
 1   A.    Yes, sir.

 2   Q.    And that was before the accident?

 3   A.    That was the first time.

 4   Q.    I'm sorry?

 5   A.    That was the first time he made several attempts.

 6   Q.    And so you knew Mr. Smith was trying to ask for his vehicle

 7   to be given to him?

 8   A.    He had made that reference several times before the vehicle

 9   even got there.

10   Q.    And you refused to give it to him because you wanted the

11   $10, is that correct?

12   A.    I refused to give it to him because he refused to pay.

13   Q.    And you wanted the $10?

14         MR. BALLINA:    Objection.    Asked and answered.

15         THE COURT:    Sustained.

16                            EXAMINATION

17   BY MR. CASHIO:

18   Q.    Did you ever tell Mr. Smith that he could go inside and

19   talk to one of the pit bosses and he would give him a free

20   parking ticket?

21   A.    No.

22   Q.    You didn't inform him of that?

23   A.    No.

24         MR. BALLINA:    Objection.    Asked and answered.

25         THE COURT:    Just ask the questions one time, counsel.
```

1                                    EXAMINATION

2     BY MR. CASHIO:

3     Q.    And isn't it true, that many, many people get valet

4     parking free at Harrah's?

5     A.    There's a procedure as to free parking.  That's no such

6     thing as free parking.  It just depends on who pays for the

7     parking.

8     Q.    Okay.  Is it normal procedure at the valet both -- excuse

9     me, is it normal procedure when a peson is first coming into

10    Harrah's for the first time parking his vehicle and he gets out,

11    that the person who is opening the door for him, the Harrah's

12    employee says, if you have a special card, your parking will be

13    free.  Do you all tell them that?

14    A.    No.

15    Q.    Do you tell them anything about how they can get free

16    parking and not have to pay the parking?

17    A.    Not on the way in.

18    Q.    Okay.  And do you tell them that on the way out?

19    A.    Yes.

20    Q.    So you told Mr. Smith, Shaun, that he could get free

21    parking there some time?

22          MR. BALLINA:   Objection.  That's asked and answered, I

23    believe.

24          THE COURT:   Overruled.

25          THE WITNESS:   No.

```
1                         EXAMINATION
2   BY MR. CASHIO:
3   Q.    So you didn't tell him?
4   A.    No.
5   Q.    Do you know if anybody told him he could get the parking
6   free?
7   A.    I personally didn't.  I don't know if anybody else did.
8   Q.    Did you hear anybody tell him?
9   A.    No, I didn't hear anybody.
10  Q.    That booth that ya'll were in that's going to show on the
11  videotape, that booth is no longer there at Harrah's, correct?
12  A.    Correct.
13  Q.    You moved it?
14  A.    Yes.
15  Q.    It's inside now, is that correct?
16  A.    The booth's not inside, the workers are.
17  Q.    The workers are now inside.  They're not outside in that
18  booth any more?
19  A.    Correct?
20  Q.    And is it difficult to see the cars now from the inside
21  place that the workers and valet work in?
22          MR. BALLINA:   Objection.  Irrelevant.
23          THE COURT:   Sustained.
24                         EXAMINATION
25  BY MR. CASHIO:
```

1  Q.    You could see the cars owning up in the valet booth at the

2  time of the accident, is that correct?

3  A.    Yes.

4  Q.    You can no longer see that, is that correct?

5          MR. BALLINA:    Objection.    Irrelevant.

6          THE COURT:    Sustained.

7                              EXAMINATION

8  BY MR. CASHIO:

9  Q.    Is Jessica Wilson still working in the valet area?

10 A.    No.

11 Q.    And where is she working now?

12 A.    I think it's VIP Services as just a general department.

13 Q.    Now, did Kevin Augustine, the driver of the truck, maintain

14 a straight course when he was driving the vehicle?

15 A.    You can't maintain a straight course.

16 Q.    And why is that?

17 A.    Because of the design of the valet driveway.  It's a

18 crescent.  It's a semicircle, so you have to at some point

19 follow that circle out there.

20 Q.    Did you see the collision between Mr. Smith and the

21 vehicle?

22 A.    I didn't see Mr. Smith get struck by the vehicle.

23 Q.    Okay.  Page 63 under oath I asked you the same exact

24 question at line 3.  "Did you see any collision between Mr.

25 Smith and the vehicle?"  What did you say under oath?

1          MR. BALLINA:    Your Honor, I submit that that's not the

2     same exact question that he asked.

3          MR. CASHIO:    That's the exact question, Judge.

4          THE COURT:    The objection's sustained.

5          Read the exact question, counsel.

6          MR. CASHIO:    My question under oath or now?

7          THE COURT:    At his deposition.

8          MR. CASHIO:    Okay.

9                              EXAMINATION

10    BY MR. CASHIO:

11    Q.    "Okay.  Did you see any collision between in Mr. Smith and

12    the vehicle?"  Is that the exact question?

13    A.    Yes, it is.

14    Q.    And what was your answer then?

15    A.    "Yes".

16    Q.    But that wasn't your answer today, right?

17    A.    I said I didn't see him get struck by the vehicle.  That

18    was my answer --

19    Q.    You saw the collision between him and the --

20          THE COURT:    Wait.  Counsel, let him finish his answer,

21    please.

22          MR. CAHSIO:    Okay.  Go ahead.

23          THE WITNESS:    My answer today was I didn't see him get

24    struck by the vehicle.

25                              EXAMINATION

1  BY MR. CASHIO:

2  Q.    You saw a collison between him and the vehicle, but you

3  didn't see him get struck?

4  A.    Yes.  Actually run over is what I mean by struck?

5  Q.    Did you see him get run over on the videotape?

6  A.    Have I seen the videotape and seen that?

7  Q.    Yes.

8  A.    Yes, I have.

9  Q.    Okay.  When Mr. Smith walked out to get his car, you didn't

10  remain in the valet booth and just give orders to re-park it,

11  you actually trailed him out there, isn't that true?

12  A.    Yes.

13  Q.    And why did you do that?

14  A.    Because he walked in front of the vehicle, so based on Mr.

15  Smith's behavior, prior to that point, I had reason to believe

16  that he was going to be as uncooperative as he had been up to

17  that point.

18  Q.    So when you got out there and Mr. Smith was touching the

19  car trying to get his vehicle you said before -- and correct me

20  if I'm wrong -- that you didn't communicate at all with any of

21  your people out there as to what to do?

22  A.    That's correct.

23  Q.    You just sat there and watched?

24  A.    No, I was on the walkie-talkie.

25  Q.    You were on a walkie-talkie at the time he was on the

1  vehiclem and who were you calling?

2  A.    NOPD.

3  Q.    Okay.  Now, you were real close.  Did you ever hear Mr.

4  Roosevelt Turner communicating with Shaun Smith at any time from

5  the time you got out on the valet drive until the time he

6  allegedly fell off of the truck?

7  A.    No.

8  Q.    Was Shaun Smith screaming after the accident?

9  A.    Yes.  He was on the ground and he was yelling some

10  obscenities and some other stuff.

11  Q.    Okay.  When a situation comes up when a patron cannot pay

12  for his vehicle in valet, have you yourself ever ordered the

13  vehicle to be re-parked as you did that night?

14  A.    No.

15  Q.    So that was the only time you've ever done that?

16  A.    Yes.

17  Q.    And who has the authority to give a comp for valet parking?

18  A.    There's several people inside the casino that have what we

19  term comp authorization numbers, and anybody with one of those

20  numbers.

21  Q.    And you never communicated to Mr. Smith or Shaun that he

22  could go in there and get a comp, right?

23  A.    Mr. Smith refused to pay.  There's a difference between

24  refusing to pay and can't pay.  Can't pay, we offer those

25  options.  Refusing to pay is a totally different set of

1   circumstances.

2   Q.   And you don't recall Mr. Smith telling you he had lost all

3   of his money and he didn't have any money to pay?

4   A.   Mr. Smith never mentioned that.

5   Q.   You don't recall Mr. Smith telling you he might have $10 in

6   the console of his car if he could find that to pay for it so

7   he can get in his car?

8   A.   He never said that to me.

9   Q.   Okay.  Was Mr. Smith shocked when he was told that he had

10  to pay $10?

11       MR. BALLINA:    Objection.  I think that calls for

12  speculation.

13       THE COURT:    Sustained.

14       Rephrase your question, counsel.

15       MR. CASHIO:    Yes.

16                          EXAMINATION

17  BY MR. CASHIO:

18  Q.   What was Mr. Smith's reaction after he was told he had to

19  pay $10?

20  A.   He said that he was only in for an hour and he wasn't

21  going to pay any F-ing $10.

22  Q.   Did he ever say what the F are you talking about?

23  A.   Not to me.

24  Q.   You didn't make an incident report where you said he asked

25  Mr. Turner "What the F are you talking about" when he was

1  telling him that he wanted $10?

2  A.    As I said, he didn't say that to me.

3  Q.    But did you hear that?

4  A.    Yeah, he asked Mr. Turner that.

5  Q.    So I asked you if he expressed shock when he was told about

6  the bill?

7          MR. BALLINA:    Objection.

8          THE COURT:    Sustained.

9          MR. CASHIO:    Your Honor, I have him under cross, I

10  can't lead him?

11          THE COURT:    Sir, you can lead him, but you can't put

12  words in his mouth.  You can ask him what it appeared to him,

13  but you can't have him characterize it like that, sir, you know

14  that.

15          MR. CASHIO:    Okay, Your Honor.

16          THE COURT:    Rephrase your question.

17          MR. CASHIO:    Okay, Your Honor, that's fine.

18                              EXAMINATION

19  BY MR. CASHIO:

20  Q.    Did you ever apologize to Shaun Smith for the accident that

21  the Harrah's driver was involved with him when he rolled over

22  his leg?

23  A.    Say that again for me?

24  Q.    I said, did you ever apologize to Shaun Smith after the

25  accident about him being rolled over -- about the truck rolling

1  over his leg when driven by a Harrah's employee?

2  A.    I never spoke to Mr. Smith after he left the valet booth.

3  Q.    You saw him when he had fallen down and was screaming

4  right after the accident, right?

5  A.    Yes.

6  Q.    And you never spoke to him?

7  A.    No.

8  Q.    You didn't ask him how he was doing?

9  A.    Mr. Smith was yelling obscenities towards me and racial

10  slurs, so, no, I didn't go over and ask how was he.

11  Q.    Okay.  And, in fact, you just left the scene, right?

12  A.    I did not leave the scene.  I walked to the valet booth to

13  use the phone.

14  Q.    Okay.  Didn't everybody, all the employees of Harrah's

15  that were there, didn't they all leave the scene when Mr. Smith

16  was rolled over by the truck and was screaming in agony?

17  A.    No, they didn't leave the scene, they were all in the area.

18  Q.    I want to show you a videotape of what happened after the

19  accident.

20         MR. CASHIO:    Can I have the tape?

21         THE COURT:    Now, are you going to show the entire

22  tape?

23         MR. CASHIO:    No, just the part about leaving the

24  scene.  That's what I'm asking him, Your Honor.

25         THE COURT:    All right.

1          (WHEREUPON, THE TAPE WAS PLAYED)

2                      EXAMINATION

3  BY MR. CASHIO:

4  Q.   Is this Mr. Smith on the ground?  Let me rewind it a bit.

5  It takes about 10 seconds.   Okay.

6          Now, is this Mr. Smith on his vehicle?

7  A.   It appears so.

8  Q.   You've scene this tape before?

9  A.   Yes, I have.

10 Q.   How many times?

11 A.   More than once.  Three or four times maybe.

12 Q.   Okay.  Is this you right here (indicating)?

13 A.   Yes, it is.

14 Q.   This is Mr. Smith right here, correct (indicating)?

15 A.   Yes.

16 Q.   Now, Mr. Smith is rolled over right here (indicating).

17 Here's the three employees of Harrah's.  Did they stay and help

18 him, or did they leave?

19 A.   They don't stay to help him.

20 Q.   I thought you told me they didn't leave the scene.

21          MR. BALLINA:   Objection.

22          THE COURT:   Objection sustained.  Argumentative.

23          Rephrase your question, counsel.

24                      EXAMINATION

25 BY MR. CASHIO:

1    Q.   Did leave the scene?

2    A.   Those employees that --

3            MR. BALLINA:   Objection.  Asked and answered.

4                        EXANIMATION

5    BY MR. CASHIO:

6    Q.   Did you leave the scene?

7    A.   I did not.

8            MR. BALLINA:   Objection.  Just asked and answered.

9                        EXAMINATION

10   BY MR. CASHIO:

11   Q.   Did you leave the scene and leave him laying in traffic

12   right here while traffic was running all through the valet area

13   (indicating)?

14           MR. BALLINA:   Objection.

15           THE COURT:   Objection overruled.

16                        EXAMINATION

17   BY MR. CASHIO:

18   Q.   Did you leave the scene when he was laying in traffic and

19   traffic was in the valet area and him all by himself?

20   A.   Once again, I'm over at the valet booth using the phone.

21   Q.   Please answer my question.  Did you leave the scene?

22   A.   No.

23           MR. CASHIO:   I think that's all I have for now.

24           Thank you.

25           THE COURT:   All right.  Mr. Ballina, your witness

1    under direct examination.

2        MR. BALLINA:    Thank you, Your Honor.

3        THE COURT:    I want counsel to approach the bench just

4    a second.

5                (BENCH CONFERENCE, AS FOLLOWS):

6        THE COURT:    While we're outside the presence of the

7    jury I wanted to know specifically the racial statements that

8    were made allegedly by this plaintiff.

9        I want to ask Mr. Ballina, because he's the one that

10   wanted me to allow them to be introduced into evidence.

11       MR. CASHIO:    Okay.

12       THE COURT:    So what specifically did he say?

13       MR. BALLINA:    He called him a nigger.  He said, "I own

14   you nigger".  He used the word nigger.  I do not intend in my

15   questioning to use that word.

16       THE COURT:    Okay.

17       MR. BALLINA:    I only intend to ask him if he used

18   racial slurs.

19       MR. CASHIO:    That's good.

20       THE COURT:    Let's limit it to not use specific words

21   but the overall statement of racial slurs.

22       MR. CASHIO:    Racial slurs.

23       MR. BALLINA:    Can I ask him, did he call you -- I hate

24   to come back to argue, did you use that N word.

25       MR. CASHIO:    I thought you said you weren't going to

1  use hearsay?

2       THE COURT:   Counsel, you're trying my patience,

3  please.

4       You're doing a great job but direct your questions to

5  me and not to the other counsel, please.

6       MR. CASHIO:   I'm sorry, Your Honor.

7       THE COURT:   You know better.  You're a good lawyer.

8       MR. CASHIO:   I have the same problem on jeopardy.

9       THE COURT:   You're on jeopardy?

10      MR. CASHIO:   I say when I play.

11      THE COURT:   Okay.  You can refer to the N word, but

12  not say the word, okay.  Just like you will refer to the F word.

13  You can refer to the N word, and that is included -- let me tell

14  you something, counsel for plaintiff, I'm giving you a break

15  here because I have been listening to this, and I reread my

16  minute entry, and my minute entry said that you can go into it

17  word by word, but I'm changing that now, so quit while you're

18  ahead, but I will allow you to refer to the N word, and not

19  saying the word, and you can refer to overall racial statements

20  as it was brought on under cross-examination by counsel for

21  plaintiff.

22      MR. BALLINA:   And, Judge, in light of your ruling, I

23  have no intention to breach that.

24      THE COURT:   I appreciate that.

25      MR. BALLINA:   I have advised my witnesses, if they

1  can, don't use those terms.

2         THE COURT:   Okay.  That's why, after listening to

3  this, I thought it would be more appropriate to not go into the

4  gory detail, and you said that you weren't, which I appreciate.

5         MR. CASHIO:   Can I say something?

6         My client claims that he called him a racial slur

7  first, a "cracker".

8         THE COURT:   A what?

9         MR. CASHIO:   A "cracker".  A cracker is a redneck, so

10  what do I say, the C word?

11         THE COURT:   I'm telling you this:  If you open the

12  door -- I think you're getting a big break here.

13         MR. CASHIO:   I understand, Your Honor.

14         THE COURT:   If you open the door, I'm going to allow

15  Mr. Ballina to rebut or to recall these witnesses and go into

16  it, and you don't want him to do that, so you can use a term.

17         MR. CASHIO:   Can I say insulted heritage or something,

18  can I say that?

19         THE COURT:   Insulting heritage?

20         MR. CASHIO:   Yes.

21         THE COURT:   I don't have a problem with that, but I'm

22  telling you you use --

23         MR. CASHIO:   I don't --

24         THE COURT:   -- whatever the word is, then he's going

25  to come back, and he's going to use the words.

1    MR. CASHIO:   I don't want to use any of them, Your

2  Honor.   I'll use insulted heritage only.

3    THE COURT:   That's fine.

4    (BENCH CONFERENCE CONCLUDED)

5    THE COURT:   All right.   Mr. Ballina, under direct

6  examination, sir.

7    DIRECT EXAMINATION

8  BY MR. BALLINA:

9  Q.   Mr. Dorsey, how long have worked with Harrah's?

10  A.   Since '99.

11  Q.   And can you describe to us what your duties are as their

12  customer safety manager, or a -- what did you call yourself?

13  A.   Security.

14  Q.   Security?

15  A.   Security manager.  Actually my responsibilities are just to

16  insure the safety of the patrons, the employees as well as the

17  company's asset, so that covers a wide array of things, be it

18  customer disputes.

19    THE COURT:   Speak into the microphone, please.

20    THE WITNESS:   I'm sorry.  Be it customer disputes,

21  disputes between the customers and the employees, table fills

22  and jackpots, just a wide array of things.

23    EXAMINATION

24  BY MR. BALLINA:

25  Q.   Is a customer safety manager and a safety security manager

1  the same thing?

2  A.   Yes, I use the term security, because customer safety is

3  more of an in-house term.  It's a decision that was made by the

4  company to soften security to take it away from the perception

5  of security, so I use the term security so that everyone would

6  understand what it was that I was speaking about.

7  Q.   And what department is your job in?

8  A.   Primarily security.  Customer safety.

9  Q.   And the department is called Security?

10  A.   Customer Safety.

11  Q.   The night of this accident, you were helping out in the

12  cashier booth, is that right?

13  A.   Correct.

14  Q.   What department is valet parking in?

15  A.   Valet parking falls under transportation, and both security

16  and transportation answer to the same director.

17  Q.   And does your job in security require you to help or assist

18  in transportation?

19  A.   If the need arises, definitely.

20  Q.   And had that need arisen previous to the night of December

21  10, 2003 that you had helped in the cashier's booth in the valet

22  parking area?

23  A.   Yes, sir.

24  Q.   At that time in December 2003, when the accident happened,

25  where was the valet booth?

1  A.    It was actually outside on the valet drive, just adjacent

2  to the valet drive.

3  Q.    And has the location of that valet booth changed over the

4  years?

5  A.    Yes, it has.

6  Q.    In December of 2003, where were cars parked, the customers

7  cars parked that were parked in valet?

8  A.    Back at that time we had several locations.  One location

9  was actually for the vehicles to remain atop, which we had an

10  area off to the side that some vehicles remained up top.  We had

11  the bus barn which was off property about a block and a half,

12  two blocks away.  We had the actual valet garage which was

13  located under the casino, and we had the loading dock receiving

14  area as well.

15  Q.    And what determined in December of 2003 where a car was

16  parked?

17  A.    There were several determining factors.  One, is if the

18  vehicle was what we considered to be oversized.  By that I mean,

19  could not go to the valet parking area downstairs, or based on

20  the patron's level of place some of their vehicles remained up

21  top on the actual drive.

22  Q.    And what cars would be parked in the bus barn?

23  A.    Anything too large to fit downstairs in the actual garage.

24  Q.    And you've testified that Mr. Smith had a truck?

25  A.    Yes.

1    Q.    Was or were trucks, the vehicles, the type of vehicles in

2    December of 2003 that would be parked in the bus barn?

3    A.    Yes, trucks.  Turtle top vans, normal 15-passenger vans.

4    Anything too large to go in those before mentioned areas.

5    Q.    And how far is the bus barn from the casino?

6    A.    A black and a half, two blocks.

7    Q.    And specifically from the valet parking area?

8    A.    About the same, about two blocks maximum.

9    Q.    I'm going to show you a parking valet ticket, a copy of

10   which has been admitted into evidence?

11            MR. BALLINA:    May I approach, Your Honor?

12            THE COURT:    Yes.  You want to give the books out so

13   that the jury can look at the book.

14            Are they in the book?  Is a copy in the book?

15            MR. BALLINA:    A copy of it is in the book, Your Honor.

16            THE COURT:    Okay.

17            MR. BALLINA:    And I think for right now --

18            THE COURT:    No problem.

19            MR. BALLINA:    I think it's fine.  I think I'm just

20   going to have him maybe point out some things.

21            THE COURT:    That's fine.

22            MR. BALLINA:    Could I stand here and ask him

23   questions, Your Honor?

24            THE COURT:    Yes.

25                         EXAMINATION

1  BY MR. BALLINA:

2  Q.   Does that appear to be the parking valet ticket that was in

3  use at Harrah's in December of 2003?

4  A.   Yes.

5  Q.   Does the ticket have various parts to it?

6  A.   Yes.

7  Q.   Can you tell us, and describe to us what happens with that

8  ticket when a customer pulls into the parking valet area at

9  Harrah's Casino in December of 2003?

10  A.   Am I allowed to detach it?

11  Q.   I would prefer that you don't, if you can point.

12  A.   Okay.  Well, the bottom half, which is perforated, it comes

13  off.  It's two pieces.  This goes to the actual driver of the

14  vehicle, the patron in this case.  The top half, which has the

15  hang tag, stays with the vehicle.  The middle portion, which we

16  call the car description piece remains with the person's keys.

17  So this actual top piece is in the vehicle.  This middle piece

18  is maintained by the cashier.  This bottom piece is for the

19  patron.

20  Q.   And in December of 2003, cars or trucks like Mr. Smith's

21  vehicle that were parked down at the bus barn, where were those

22  keys kept for those vehicles?

23  A.   Those keys were up top meaning right with the valet booth.

24  Q.   That is the valet booth that was located outside

25  (indicating)?

1  A.    Outside, correct.

2  Q.    Now, if you could explain to us, again showing the ticket,

3  when a customer goes to leave valet parking, what would the

4  customer do?

5  A.    The customer would present the bottom half that's

6  perforated and that goes to the cashier.  This allows the

7  cashier to know exactly what set of keys to pull and have the

8  drivers to bring up which vehicle.

9  Q.    And let me direct your attention to -- and to make sure I

10  understand your testimony, the customer when he first arrives,

11  gets this entire lower portion?

12  A.    Exactly.

13  Q.    And then when the customer wants to leave he gives that

14  lower portion to the cashier?

15  A.    Correct.

16  Q.    Such as Jessica Wilson?

17  A.    Yes.

18  Q.    And he gives that to the cashier in the booth outside?

19  A.    Yes.

20  Q.    And then -- let me direct your attention to a portion of

21  the bottom, and if you could, if you could read to us what it

22  says concerning, to the customer "To claim your vehicle"?

23  A.    "To claim your vehicle, please present this stub to the

24  valet cashier located in the porte cochere".

25  Q.    And the porte cochere, what is that?

1  A.    That's actually the french terminology for valet, if I'm

2  not mistaken.

3  Q.    That would be the valet area?

4  A.    Yes.

5  Q.    And is there anything else on that card regarding or

6  advising the customer as to the time that he may have to wait?

7  A.    Yes, it says, "Please allow 15 minutes for the retrieval

8  of your vehicle.  And that piece of it is actually always

9  maintained by the patron, because even after they submit the two

10  bottom halves, the cashier maintains one piece, gives that other

11  piece back to the patron to present to the driver?

12  Q.    Why don't you go ahead and let me ask you about that.  The

13  bottom portion that the customer got when he wants to leave, he

14  brings it to the cashier?

15  A.    Yes, sir.

16  Q.    What does the cashier then do with that bottom portion?

17  A.    She'll separate the two.  Actually, it's perforated down

18  the center as well, so she'll separate the two pieces.  She

19  maintains one piece, and she attaches it to the receipt that's

20  printed out from the transaction, gives the owner of the

21  vehicle, or the driver of the vehicle this left portion to

22  present to the driver, so that the driver knows that the person

23  that's presenting this piece gets the vehicle that has this

24  number on it as well.

25  Q.    That is the valet driver, when he brings the vehicle and

1  I'm the customer and I've been given this little portion, I give

2  that to the valet driver, the valet driver knows that he's

3  giving the car to the right person?

4  A.    To the right person.

5  Q.    And with the portion that the cashier keeps, what does she

6  do?

7  A.    She staples that to the receipt that's generated.

8  Q.    And does she ring up the charge for the parking?

9  A.    Yes.

10 Q.    And while we're speaking of charge, let me ask you a few

11 questions.

12        In December of 2003, Harrah's charged for parking

13 valet, correct?

14 A.    Correct.

15 Q.    Does Harrah's -- strike that.  In December of 2003, did

16 Harrah's have any signs in the parking valet area concerning

17 parking charges or parking rates?

18 A.    Yes.

19        MR. CASHIO:    Excuse me, can we approach the bench,

20 Your Honor?

21        THE COURT:    Yes.

22            (BENCH CONFERENCE, AS FOLLOWS):

23        MR. CASHIO:    Judge, can I say -- okay.  He's intending

24 to use -- you've told him that he can't use Exhibit Number 5

25 unless he can prove that it was the same signs on the exact

1    same -- I think you said night.  This was taken in the daytime.

2    Obviously the accident happened at night.  If he knows exactly

3    that the signs where in the same exact place, that's your exact

4    ruling.

5        THE COURT:   I'm going to read my ruling to you.  The

6    still photographs containing the valet parking rates shall only

7    be admitted if defendant provides a live witness that is already

8    included on the witness list to verify the photographs, identify

9    the signs in the exact same location as they were on December

10   10, 2003 and with the exact same information?

11       MR. CASHIO:   Now, that's my point, Your Honor, the

12   exact same information.  It happened at night.  Those

13   photographs are distorted, because they were taken during the

14   day.  He can't tell how good, you could see those.

15       THE COURT:   Well, then your client can testify to that

16   if he didn't see it, but the bottom line is as long as they were

17   in the same location and the same information, obviously, then

18   the same amount of -- same charges $10, $20, $30, whatever it

19   is.

20       MR. CASHIO:   I just wanted to note my objection.

21       THE COURT:   Okay.  So noted.

22       MR. CASHIO:   Thank you.

23       MR. BALLINA:   That was my understanding of the

24   Court's ruling.

25       THE COURT:   That is what is consistent with my minute

1  entry ruling.

2                  (BENCH CONFERENCE CONCLUDED)

3                          EXAMINATION

4  BY MR. CASHIO:

5  Q.    Mr. Dorsey, I'm going to show you a photograph, which for

6  purposes right now I have marked as Defendant's Exhibit 5,

7  that's in line with a photograph, and ask if that is one of the

8  signs located at Harrah's parking valet area in December of 2003

9  in that location that is shown in that picture?

10              THE COURT:    Hold on one second.

11              Let me take a look at this, please.

12              All right.

13              THE WITNESS:    Yes, it is.

14                          EXAMINATION

15  BY MR. CASHIO:

16  Q.    And this is a sign regarding the parking rates?

17  A.    Yes, it is.

18  Q.    I'm going to show you the next photograph which is a

19  close-up of that, and ask you does this photograph, rather the

20  sign that's depicted in that photograph, accurately show the

21  parking valet rates at Harrah's in December 2003?

22  A.    Yes.

23  Q.    Now, the first photograph I showed you, where is that sign

24  located -- or strike that.  Where was that sign located in

25  December of 2003?

1    A.    Actually, this sign's always maintained down at the base of

2    the valet entranceway.  This is actually Canal Street, so you

3    physically pass by this sign to enter into the valet drive.

4    Q.    And again that sign was located there in December of 2003?

5    A.    Yes, sir.

6    Q.    In addition to that sign that you have just identified, did

7    Harrah's have any other signs in place in December of 2003

8    concerning the valet parking rates?

9    A.    Yes, sir.

10   Q.    I'm going to show you another photograph and ask you if

11   that photograph shows the location of the sign in December of

12   2003?

13   A.    Yes.

14   Q.    And where is that located?

15   A.    That's just prior to entering the casino.  That's after you

16   get out of your vehicle and you're headed into the casino you

17   walk by that sign.

18   Q.    And these, the doors that are shown in that photograph,

19   those are the doors into the casino?

20   A.    Correct.

21   Q.    So a customer parking in valet would walk pass the sign

22   walking into the casino?

23   A.    Correct.

24   Q.    I show you the next picture which is a close-up of the one

25   I just showed you and ask you if that shows the rates, the

1   parking rates in December of 2003.

2   A.   Yes.

3   Q.   And could you read to us what the parking valet parking

4   charges were in December 2003?

5   A.   "Zero to two hours is $10.  Two to four hours is $15.  Four

6   to six hours is $20.  Six to 24 hours is $25.  There's a loss

7   ticket fee of $30", and it goes on to say "Total Diamond members

8   are free subject to availability".

9           MR. BALLINA:   Your Honor, in connection with the

10  witness' testimony, I'd like to offer, file and introduce into

11  evidence Defendant's Exhibit 5.

12          THE COURT:   Any objection, counsel?

13          MR. CASHIO:   The same one I made before.

14          THE COURT:   Overruled.

15      Let the documents be filed into the record subject to

16  cross-examination by plaintiff's counsel.

17                              EXAMINATION

18  BY MR. BALLINA:

19  Q.   Let me ask you to explain to us comps, or what is a comp at

20  Harrah's Casino?

21  A.   Actually, the terminology comp is used loosely but the

22  actual comp is -- the best where they describe it is like an

23  in-house checking system.  It's based on how much money you

24  play.  A certain percentage of that money is given back to you,

25  so to speak, and through that you accumulate credits, a comp

1    worth, which gives it a dollar value, and a comp draws on the

2    comp worth.

3    Q.    The sign that you just made reference to, or we just looked

4    at, it talks about total Diamond members?

5    A.    Yes.

6    Q.    What is that?

7    A.    Actually, we -- I say we -- Harrah's has a total reward

8    system, that's Players Card System.  It's broken down into

9    several tiers.  The first one is a Gold Member.  That's just for

10   anyone that walks in and that wants a player's card.  The second

11   one is a Platinum member.  That's just an elevated level of a

12   Gold member.  Certain other perks that you get that a Gold

13   member can't.  The third stage is the Diamond member.  That's

14   someone who frequently visits the property and plays money, a

15   substantial amount of money, so parking, valet parking for those

16   folks is always free.

17   Q.    And when you say "For those folks", that is, customers that

18   hold a certain type of card, is that right?

19   A.    Exactly.  Exactly.

20   Q.    What cards are free parking at Harrah's?

21   A.    Diamond members are always free.  Platinum members are free

22   based on spaces.  If we have enough space that time day,

23   Platinum and Diamond, Platinum members get that service free as

24   well.  Based on our spaces, if we start to fill up, we restrict

25   it to Diamonds only because we guarantee the Diamond members

1    free valet parking.

2    Q.    And are these cards, these reward cards a benefit that the

3    casino provides to the patrons or the customers who patronize

4    the casino?

5    A.    Yes,

6              MR. CASHIO:    Your Honor, leading.

7              THE COURT:    Sustained.

8                                EXAMINATION

9    BY MR. BALLINA:

10    Q.    If a customer who parks in valet parking is a Platinum

11    cardholder and they go to leave, is there a charge for the

12    parking?

13    A.    There is always a charge.  As I stated earlier, it's just

14    strictly about who pays.  If we're at a stage where we allow

15    both the Diamond and the Platinum members in, the same charge

16    that I just read is actually rang up, but it's then charged

17    in-house to the casino, to the table games department or the

18    slots department.

19    Q.    That is for these cardholder's, there's a charge but the

20    casino does not require them to pay it, is that right?

21    A.    Exactly.

22    Q.    And if I were a cash customer leaving the casino, and I

23    went to the cashier and did my transaction, and I was there for

24    an hour and they charged me $10, and I paid my $10, and right

25    behind me was a card holder, Diamond, Platinum, and that person

1  just told they would not have to pay the $10.  We were there the

2  same amount of time, right?

3  A.    Yes.

4  Q.    They wouldn't have the pay that $10?

5  A.    No.

6  Q.    Would the receipt, my receipt and the person right behind

7  me who had with the card read a $10 charge?

8  A.    Yes.  The Platinum Card members or the Diamond Card members

9  will reflect that it was then absorbed into the casino.

10  Q.    Are there things at the casino known as complimentary

11  vouchers?

12  A.    Yes.

13  Q.    Is a complimentary voucher the same thing as a rewards card

14  that you were just describing?

15  A.    The complimentary voucher is a result of the rewards card.

16  Q.    And could you explain to us how that works?

17  A.    You actually have to have a card, be it Gold, Platinum or

18  Diamond to get a complimentary voucher.  The complimentary

19  voucher is, once again, like an in-house check.  It draws on

20  whatever comp worth you may have.  Say you have $20 of comp

21  worth and you go inside to get a comp for parking, in Mr.

22  Smith's case the $10 would have been deducted from that $20

23  worth, so he still would have paid for it, but it just would

24  have come from his in-house system.

25  Q.    And who has the authority in the casino to issue

1   complimentary vouchers?

2   A.   That's anyone with a comp authorization number.

3   Q.   Are those people in the casino?

4   A.   Yes.

5   Q.   Do you have authority to issue a complimentary voucher?

6   A.   No.

7   Q.   And just so we're clear on this, is a complimentary voucher

8   a piece of paper?

9   A.   Yes.

10  Q.   That's given to the customer?

11  A.   Yes.

12  Q.   And the reward program that you've described, can a

13  customer by patronizing the casino acquire certain benefits by

14  the amount of their play or the amount of their gambling at the

15  casino?

16  A.   Yes.

17  Q.   Can you describe to us how that works?

18  A.   Once again, it's strictly based on the level of your play

19  as to how much comp worth you accrue, and from that you get

20  several benefits, be it free buffets or discounted hotel stays,

21  items from the gift shop, promotional items, various items that

22  the casino puts on.

23  Q.   Regarding the procedure when a customer wants to retrieve

24  their car, is the cashier supposed to ring up the transaction

25  and have the customer pay before the car is requested?

1   A.    Technically, yes.

2   Q.    Okay.  Everyday there at valet, does it sometimes or does

3   it often happen that the keys go out before the customer has

4   actually paid?

5   A.    Yes.  And that's because of the logistics of the valet

6   operation.  I mean, we have a certain amount of built in time to

7   allow for the cash transaction before the vehicle gets there.

8   So we'll initiate the car being brought up, because what happens

9   is the valet will -- the cashier will call out the valet ticket

10  number, say 120, and that sets that vehicle in motion, and that

11  reduces the wait time for the patron to have that vehicle

12  actually enroute while we're handling the transaction as opposed

13  to waiting on the back end to call the vehicle up.  We even

14  offer a service now the valet call up where the vehicle is

15  actually -- you can call to have your vehicle brought up top and

16  it's waiting before you even come out.

17  Q.    Let's talk about in December of 2003, and we talked about

18  that the cars or the trucks parked down at the bus barn, the

19  keys were kept in that valet booth outside?

20  A.    Yes.

21  Q.    And when a customer comes to get his truck, does the

22  cashier first have to find out where the vehicle is; that is, is

23  it parked downstairs, or is it down the street at the bus barn.

24  What does the cashier have to do?

25  A.    She would get the valet ticket and then she would call to

1    the valet cashier, which is located downstairs, to say ticket

2    Number 120, and that cashier downstairs will give her a time.

3    If she has the keys downstairs, she'll give her a time, say he

4    came in at 10:00 o'clock, or she also has it logged in as being

5    in the bus barn, so then she would tell the valet cashier up

6    top, Jessica Wilson in this case, that it's a bus barn key, and

7    from there Jessica knows that she has that key up top with her.

8    Q.    And up top in the valet booth in December of 2003, where

9    physically were those keys kept from the bus barn?

10    A.    There was a key cabinet located behind the cashier.

11    Q.    And what would the cashier do when the customer had given

12    her the ticket regarding the keys?

13    A.    She would retrieve the keys right out on it, and if there

14    was a valet driver around she would give it to the valet driver

15    or she would radio the transportation lead, Roosevelt Turner in

16    this case, to let him know that she had -- well, we call it

17    Valet 1 or Valet 2.  The number behind it simply means how many

18    keys she has.  In that case she would have said Valet 1.  Do you

19    have someone come over to go to get the vehicle.

20    Q.    That is to get a valet driver to go get the car and bring

21    it to the customer?

22    A.    Yes.

23    Q.    And again, the cashier may do that before the customer's

24    actually paid?

25    A.    Yes, and that done, once again, in an effort to expedite

1  the service and reduce the customer's wait time.

2  Q.   Is that for the customer's convenience, so the customer --

3  A.   Absolutely.

4  Q.   -- is not waiting?

5  A.   Absolutely.

6  Q.   And do, in fact, most customers pay?

7       MR. CASHIO:   Your Honor, he's been leading for about

8  15 minutes.

9       THE COURT:   Objection sustained.

10      MR. CASHIO:   I don't want to object, but I have to.

11  He's violating the rules.

12      MR. BALLINA:   Okay.

13                      EXAMINATION

14  BY MR. BALLINA:

15  Q.   Do most customers pay?

16  A.   Yes.

17  Q.   Do many customers refuse to pay?

18  A.   No.  And as I stated, that was the only time I've ever had

19  to deal with a re-park?

20  Q.   Let's go to the night of this incident, December 10, 2003.

21  Were you helping Jessica Wilson in the valet booth?

22  A.   Yes, I was.

23  Q.   What were you doing there?

24  A.   In all of those tickets that I described before, we have to

25  remarry.  At some point bring all of that stuff back together

1  for the in-house accounting system, so Jessica had a backlog of

2  tickets that needed to be rejoined and I was assisting in that

3  task.

4  Q.   At some point in the evening did you notice Mr. Smith?

5  A.   Yes.

6  Q.   And what brought your attention to Mr. Smith?

7  A.   He used vulgarity, and that's actually what drew my

8  attention to him, the fact that he used the vulgarity.

9  Q.   Was he speaking to someone else at the time that he used

10  that vulgarity?

11  A.   Roosevelt Turner.

12  Q.   And do you know what he said to Mr. Turner, and not the

13  exact words?  Strike that.  I withdraw that question.

14          Without using the vulgar term that Mr. Smith may have

15  used, did you overhear anything else that Mr. Smith said?

16  A.   Yes.

17  Q.   At that point to Mr. Turner?

18  A.   At that point.  Yeah, I heard the initial exchange between

19  Mr. Turner and Mr. Smith.

20  Q.   And what was that?

21  A.   That was Mr. Smith with the vulgarity as Mr. Turner was

22  trying to explain to him why, in fact, there was a $10 charge?

23  Q.   And what did Mr. Smith say to Mr. Turner?

24  A.   Something along the lines of what are you talking about, or

25  something like that.  I'm not paying any F-ing $10.

Q.   And at that point, did you get involved with Mr. Smith?

A.   Mr. Turner attempted again to further explain the procedure to him, and because of Mr. Smith's being uncooperative and using the vulgarity, Roosevelt Turner turned to me at that time and said, you know, "Stacey, can you handle this one, or speak to this guest", or something like that.

Q.   And did you at that time?

A.   Yes.  And Mr. Smith, by his own admission, stated that he had only been in the casino for an hour, and as I explained to him, "Well, Mr. Smith, by your own admission if you've been here for an hour, the $10 charge is an accurate charge", and he went on to say that he wasn't going to pay any F-ing $10.

Q.   Did Mr. Smith tell you that he didn't have any money to pay the $10?

A.   Never once.

Q.   Did Mr. Smith refuse to pay the $10?

A.   Right from the onset.

Q.   Did Mr. Smith appear to be angry?

A.   Yes.

Q.   Did he appear to be upset?

A.   Yes.

Q.   Mad?

A.   Yes.  As it progressed, he grew progressively worse?

Q.   At some point or any point, did you smell alcohol on Mr. Smith?

1   A.    Yes.

2   Q.    At any point, did Mr. Smith direct any vulgarities towards

3   you?

4   A.    Yes, he did.  After I made the decision to have Roosevelt

5   Turner park the vehicle, I started about remarrying the tickets

6   again and Mr. Smith walked away, walked back and forth from the

7   valet area back and forth to the cashier on several occasions

8   using the M word and telling me he owned me and he owned my

9   grandfather.

10          MR. CASHIO:    Can we approach?

11          THE COURT:    Yes.

12              (BENCH CONFERENCE, AS FOLLOWS):

13          MR. CASHIO:    Your Honor, he was supposed to tell

14   his witness not to say anything about he owned him or owned his

15   grandfather or anything like that.  We made that agreement.

16   He's completely violated that.  He should have warned him not to

17   say that, but he led him into it.  This is completely in

18   derogation of our agreement and your order, Your Honor.

19          MR. BALLINA:    Judge, I wasn't going to use the N term.

20   I certainly hoped Mr. Dorsey didn't.  I had a conference with

21   Mr. Dorsey after we left this bench.

22          MR. CASHIO:    Your Honor, I ask you to tell the jury

23   that I didn't know he was going to use those words.  We agreed

24   that neither of those words were to be spoken.  They're not

25   relevant to this accident.

1    THE COURT:   We did not take a break, and I guess we

2  should have taken a break after I made this ruling, which was

3  different from the ruling that I had made in the pretrial minute

4  entry, so this witness would have had know knowledge that he

5  should not have said that.   To be quite frank with you, counsel,

6  my biggest concern was use of the N word as opposed to any other

7  statements that might have been made by this person.

8    What I will do, sir, if you would like, I will remind

9  the jury of the question that I had posed to them in the voir

10  dire; that is, that this case is about an accident and not about

11  any statements that were made.

12    MR. CASHIO:   That's right.

13    THE COURT:   However, quite frankly, I still find it

14  irrelevant, but there was an understanding by counsel, but I

15  did not find that counsel violated the understanding whatsoever,

16  but if you would like for me to give a cautionary instruction

17  that would be to the extent of my cautionary instruction.   If

18  you would like for me to give that now, I would be more than

19  glad to do that.

20    MR. CASHIO:   Yes, Your Honor, I'd like for you to do

21  that.

22    THE COURT:   But again, I do not want this jury to be

23  prejudiced at all, but by the same token this was part of what

24  was done.   You've gone into, you know, how this man acted, how

25  this man reacted, and I think it's fair game, to be quite frank

1    with you, so that's consistent with what I previously said.   To

2    me the offensive language was the use of the N word which

3    counsel said that they weren't going to do from the outset.

4         MR. CASHIO:   Your Honor, he admits, he just admitted

5    right here with you that he had had told him not to use the N

6    word.

7         THE COURT:   Counsel, do you want me to grant a

8    mistrial?  Do you want to start over again?

9         MR. CASHIO:   No, but I would like for you to give that

10   cautionary instruction that you just told us about, Your Honor.

11        THE COURT:   Okay.  The cautionary instruction that I'm

12   going to give is that I told the jury at the beginning that the

13   there could be some racial statements, and actually I kept my

14   notes, so I would be consistent if this arose.

15        The statement that I'll make, the cautionary

16   instruction that I'll make right now is, ladies and gentlemen, I

17   told you at the beginning of the trial in voir dire that there

18   might be statements made of a racial nature.  I will remind you

19   that you're not to hold it against anyone in this automobile

20   accident case.

21        MR. CASHIO:   That's fine judge.

22        THE COURT:   Do you have any objections to that?

23        MR. BALLINA:   No, Your Honor.

24        And again, so I'm clear, I think I was.  I wasn't going

25   to use, and I talked to my witnesses about not using vulgarity,

1  they use the F word, and I told this Court that I had no

2  intentions, and I'll the quit.  Did he call you --

3          MR. CASHIO:   You said "own your family", which is more

4  offensive.

5          THE COURT:   Counsel, counsel, you might not want him

6  to say that, but the facts are the facts.

7          MR. CASHIO:   Right, Your Honor.

8          THE COURT:   All right.

9                  (BENCH CONFERENCE CONCLUDED)

10          THE COURT:   Ladies and gentlemen, at the beginning of

11  the trial I had told you that there could be some racial

12  statements that were made, and I want to remind you that you

13  cannot hold that against anybody since this is an automobile

14  accident case.

15          Thank you.

16          Go ahead and proceed, Mr. Ballina.

17          MR. BALLINA:   Thank you, Your Honor.

18                          EXAMINATION

19  BY MR. BALLINA:

20  Q.   Did Mr. Smith direct racial slurs towards you?

21  A.   Yes, he did.

22  Q.   Did he direct obscenities towards you?

23  A.   Yes, he did.  On more than one occasion.  He went on, like

24  I said to tell me that he owned me, and he made reference to how

25  powerful he was at the fairgrounds and what all he could do, and

1    slam cards on the valet desk to try to attest to the fact that

2    how much power he had, and he even went on to tell me that he'd

3    get into my A-S-S.

4    Q.    Did Mr. Smith become angry or direct anger at you after you

5    told him that he had to pay the $10 parking fee?

6    A.    Yes.

7    Q.    Did you direct any type of racial slurs or epitaphs to Mr.

8    Smith?

9    A.    Never.

10   Q.    Did you ever overhear Mr. Smith say to anyone that he

11   didn't have the money to pay?

12   A.    Never once.  That was never mentioned.  He always, right

13   from the very beginning, refused to pay the charge.  He never

14   once said that he didn't have the money to pay the charge.

15   Q.    Have situations occurred at the casino where a customer

16   doesn't have the money to pay?

17   A.    Yes.

18   Q.    And in that situation is -- in those situations, did the

19   customer tell whoever at valet that they didn't have the money

20   to pay?

21   A.    Yes.

22   Q.    Did they tell anyone in valet that they refused to pay?

23   A.    No.

24   Q.    Does the casino attempt to the help or accommodate a

25   customer who says they don't have the money to pay for their

1  parking valet?

2  A.    Yes.

3  Q.    What does the casino do?

4  A.    That's where the complimentary voucher kicks in, and as is

5  procedure, if Mr. Smith would have said he could not pay -- and

6  today in open court is the first time I ever heard that he lost

7  3 or $400 -- and had he stated back then that he could not pay

8  because he had lost, that would have trigged that go inside to

9  wherever you lost the 3 or $400 bucks.  Explain to them that you

10  have a $10 valet charge and see if there's anything that they

11  can do for you.

12  Q.    Mr. Smith refused to pay?

13  A.    Right from the onset.

14  Q.    But explain to us, and I understand you just said, "Well,

15  that's where the complimentary voucher comes in for a customer

16  to who can't afford to pay".  Can you explain that please in a

17  little more detail.  What do we do or what do you do to try to

18  accommodate the customer?

19  A.    Once again, we send them back inside, back inside the

20  casino to if it's slot player to speak to a slot supervisor.  If

21  it's a table came player, to speak to someone in table games,

22  and explain to them that they've lost all their money and from

23  there those folks are the ones that are capable of issuing the

24  complimentary vouchers.

25  Q.    In your inner actions with Mr. Smith, was his ability or

1  inability to pay ever at issue?

2  A.   No, it was just the fact that he refused to pay.

3        THE COURT:   Move on, counsel.

4        Asked and answered a few times, please.

5        MR. BALLINA:    Yes, sir.

6                        EXAMINATION

7  BY MR. BALLINA:

8  Q.   Did Mr. Smith ever tell you that he may have $10 in the

9  console of his truck?

10 A.   I never heard that.

11 Q.   Did you overhear him say it to anyone else?

12 A.   I never heard that directly to me or I never overheard it

13 either.

14 Q.   When Mr. Smith refused to pay, what did you do?

15 A.   I ordered the vehicle to be re-parked.

16 Q.   And who did you tell to have the truck re-parked?

17 A.   Roosevelt Turner.

18 Q.   And where with you when you told Mr. Turner that?

19 A.   Still inside the valet booth.

20 Q.   After you ordered the truck to be re-parked, what did Mr.

21 Smith say or do?

22 A.   That's what brought about the whole onset of the racial

23 slurs and the vulgarity to the extent and nature.  That was

24 after the order to re-park the car had already been made.

25 Q.   After you told Mr. Turner to have the car re-parked, what

1  did you see Mr. Turner do?

2  A.    He returned out to the valet drive, because at this time

3  there was still valet business going on.

4  Q.    And did he speak to someone, Mr. Turner?

5  A.    I want to say yes.  He stopped the vehicle up top so he --

6  I'm assuming, because I didn't actually hear -- that he spoke to

7  the driver at that point and then informed the driver.

8           THE COURT:   Don't assume, sir, if you didn't hear it

9  yourself.

10          THE WITNESS:   I didn't hear it.

11                          EXAMINATION

12  BY MR. BALLINA:

13  Q.    My question is, you know, what did you see Mr. Turner do?

14  Did you see Mr. Turner walk towards Mr. Smith's truck?

15  A.    Yes.

16  Q.    Okay.  Did the truck stop?

17  A.    Yes.

18  Q.    And did you see Mr. Turner standing by the truck?

19          MR. CASHIO:   Your Honor, he's leading.

20          THE COURT:   Quit leading.  You've been leading.  He

21  hasn't been objecting, but I'll object for him.

22          Move on.

23                          EXAMINATION

24  BY MR. BALLINA:

25  Q.    Who did you see standing by the truck?

1   A.    Roosevelt Turner and Chris Stevenson.

2   Q.    And who's Mr. Stevenson?

3   A.    Mr. Stevenson is a valet driver.

4   Q.    And I'm not sure I asked you this:  Who's Mr. Turner?  What

5   is his position or was his position?

6   A.    Mr. Turner's a transportation lead.  He, in essence, is an

7   assistant supervisor, but instead of assistant supervisor, we

8   call them transportation leads.

9   Q.    When Mr. Turner and Mr. Stevenson was standing by the

10  stopped truck, where was Mr. Smith?

11  A.    Mr. Smith was still near the valet booth, and then he

12  started to walk towards his truck when he realized that that

13  would impact his truck.

14  Q.    When Mr. Smith started to walk towards his truck, was the

15  truck stopped or moving?

16  A.    It was stopped, because Roosevelt and Chris were talking to

17  the driver.

18  Q.    And did Mr. Smith walk towards his truck?

19  A.    Yes, he did.

20  Q.    Did he walk towards the front, the --

21        MR. CASHIO:    Leading, Your Honor.

22        THE COURT:    Sustained.

23                          EXAMINATION

24  BY MR. BALLINA:

25  Q.    What portion of the truck did Mr. Smith walk toward?

1   A.   He walked out in front of the vehicle.

2   Q.   After Mr. Smith walked out in front of the truck, what did

3   you see?

4   A.   That's when the truck initially stopped for Roosevelt and

5   Chris to speak to the driver.  It started moving again.  Mr.

6   Smith was walking out in of it, that drew me out of the valet

7   booth and they stopped a short distance away from me, and Mr.

8   Smith tried to grab the vehicle, then it starred to move again

9   and he went behind it, and what was all said, I really don't

10  recall, because as I stated earlier I was attempting to get

11  NOPD.

12  Q.   And why were you trying to get NOPD?

13  A.   Because Mr. Smith was being unruly and attempting to grab

14  the moving vehicle.

15  Q.   After the accident, why didn't you go help Mr. Smith?

16  A.   Mr. Smith was still on the ground yelling obscenities and

17  vulgarities and racial slurs, and I had no reason to believe

18  that he would accept any help.

19  Q.   And after the accident happened, what did you do?

20  A.   I called for the EMTs.

21  Q.   And where are those people located that you called?

22  A.   Actually we -- I say we -- Harrah's has in-house first

23  responders, EMTs, and I called for those guys -- well, that guy

24  to come out.

25  Q.   And you recall who that was?

1   A.   Blair Easton.

2           MR. BALLINA:    Thank you, Mr. Dorsey.

3           I don't have any on the questions.

4           THE COURT:    All right.   Mr. Cashio, you're allowed to

5   recross, but limit it to what was brought out on direct

6   examination, sir.

7           MR. CASHIO:    Yes.

8                           RECROSS-EXAMINATON

9   BY MR. CASHIO:

10  Q.   Let's see, you told us before, I think when I asked you a

11  question about the standard operating procedure, that you

12  weren't that familiar with all the things in the valet area, but

13  is that correct?

14  A.   Yes, that is correct.

15  Q.   Okay.  Well, I saw you testifying for about 30 minutes in

16  great detail about all of these valet things.  When did you

17  acquire that knowledge?

18          MR. BALLINA:    Objection, Your Honor, that's an

19  argumentative question.

20          THE COURT:    Overruled.

21          MR. CASHIO:    Go ahead.

22          THE WITNESS:    Actually, I spoke about the valet

23  ticket.  I've assisted the valet area before so I have a working

24  knowledge of valet, but I'm not overly familiar with all of the

25  SOPs.

```
1                        EXAMINATION

2    BY MR. CASHIO:

3    Q.   But you spoke a lot more than just a valet ticket, you were

4    talking about everything to do with valet from what I

5    understood.

6              THE COURT:   That's argumentative, counsel.

7                        EXAMINATION

8    BY MR. CASHIO:

9    Q.    Okay.  You know a lot more than just valet tickets about

10   valet, right?

11   A.   Yes.

12             MR. BALLINA:   Objection.  That's argumentative.

13             THE COURT:   Sustained.

14                       EXAMINATION

15   BY MR. CASHIO:

16   Q.   Did you know the standard operating procedure for vehicles

17   to be brought down before the vehicle is paid for?

18   A.   Once again, the way that we operate the operation is to

19   have the vehicles in motion even before that transaction is

20   occurred.

21   Q.   You said that in answer to Mr. Ballina, the attorney for

22   Harrah's, but when I asked you under oath is it standard

23   operating procedure that the vehicle ticket be paid for before

24   the vehicle is ordered to be brought from the parking area to

25   the valet area under oath you said, "Yes"?
```

1  A.    Yes.

2  Q.    Which one is correct?  Which one is --

3              MR. BALLINA:    Objection.  Asked and answered.

4              THE COURT:    Wait.  Counsel, I've warned you twice not

5  to talk at the same time.  This poor man can't take both of you

6  down.

7              MR. CASHIO:    I wasn't through with my question, Your

8  Honor.

9              THE COURT:    Objection sustained.

10                                EXAMINATION

11 BY MR. CASHIO:

12 Q.    If you had known that Mr. Smith had lost all of his money,

13 3 or $400 at blackjack, would you have told him that he could

14 have parking free?

15             MR. BALLINA:    Objection.  Irrelevant.

16             MR. CASHIO:    That's exactly what he went into.

17             THE COURT:    Overruled.  Overruled.

18             MR. CASHIO:    Okay.  Go ahead.

19             THE WITNESS:    Yes, I would have.

20                                EXAMINATION

21 BY MR. CASHIO:

22 Q.    Did you know that Harrah's in this case has admitted, it's

23 an uncontested material fact, that he lost all of his money?

24 A.    Say that gain for me.

25 Q.    Did you know that Harrah's in this case, and I'm going to

1    ask Your Honor to read the uncontested material facts to the

2    jury, that they have admitted that he lost all of his money?

3    A.    No, I didn't.

4    Q.    Okay.  And had you known that you would have given him the

5    valet parking free, is that correct?

6    A.    I would not have given it to him free.  I would have

7    redirected him to someone who could have quite possibly given

8    him a complimentary voucher.

9    Q.    Now, isn't it true that after Shaun came up and had been

10   waiting for a long time for his vehicle, he was getting mad?

11   A.    Yes.

12   Q.    And isn't it true that when he said to you "I want my F-ing

13   vehicle, you responded to him "You're not getting your vehicle,

14   Cracker"?

15   A.    That's not correct, I never said that.

16   Q.    Okay.  And isn't it true that after you said that's that

17   when he responded with a racial term?

18   A.    I never said that.

19   Q.    Did you everybody see him look in his wallet for money to

20   pay you?

21   A.    No.  I saw him look in his wallet to retrieve cards to show

22   to -- try to corroborate the fact that he was powerful at the

23   fairgrounds.

24   Q.    Okay.  How many times did you see him look in his wallet?

25   A.    Actually, he pulled out cards, so he never actually looked

1  in it.  He just opened it and went about trying to show me

2  cards.

3  Q.   So he never actually looked in his wallet.

4        Now, Roosevelt Turner, the guy he was originally

5  talking to about the ticket is an assistant supervisor, and he

6  could have immediately given Shaun a comp for his Dad's truck,

7  is that correct?

8        MR. BALLINA:   Objection, Your Honor, I think that goes

9  beyond my cross.

10        MR. CASHIO:   But, Your Honor, he was talking about

11  comps.

12        THE COURT:   Objection sustained.  Move on, counsel.

13        MR. CASHIO:   Okay.

14        Let me see those photographs.

15        THE WITNESS:   I think they're out front.

16                        EXAMINATION

17  BY MR. CASHIO:

18  Q.   Now, you said this is the same information in these

19  photographs and on the signs that were there on the night of

20  December 10th, 2003?

21  A.   Yes, I did.

22  Q.   Were these photographs taken at night?

23  A.   No, that's daytime photos.

24  Q.   So that doesn't really accurately represent what it was

25  like at night, is that correct?

1          MR. BALLINA:    Objection.

2          THE COURT:    Sustained.

3          MR. CASHIO:    Okay.

4                          EXAMINATION

5    BY MR. CASHIO:

6    Q.   Mr. Dorsey, the information on these signs was the same as

7    it was in December of 2003?

8    A.   Yes.

9          MR BALLINA:    Objection.  Asked and answered.

10         THE COURT:    Overruled.

11         MR. CASHIO:    How can you possibly know that?  When I

12   asked you a question: "How much were the rates between two and

13   four hours, four and six hours, and six and 24 hours", and you

14   didn't know, how can you possibly tell us those signs are the

15   same as they were a year ago?

16   A.   Because I know that the rates have not changed.  I don't

17   know what they were, but I know they haven't changed.

18   Q.   How can you possibly know what they were if they haven't

19   changed?

20         MR. BALLINA:    Objection.

21         THE COURT:    Sustained.

22                          EXAMINATION

23   BY MR. CASHIO:

24   Q.   How many times did Kevin Augustine stop with Shaun's Dad's

25   truck?

1  A.    Two, maybe three times.

2  Q.    Now, you were calling the police on Shaun for a $10 ticket,

3  parking ticket, is that correct?

4  A.    I was calling the police on Shaun because of his unruly

5  behavior.

6  Q.    That unruly behavior was prompted by the fact that you

7  wouldn't give him his Dad's truck, is that correct?

8              MR. BALLINA:    Objection.  Argumentative.

9              THE COURT:    Overruled.

10             THE WITNESS:    I can't say what caused it.

11                          EXAMINATION

12  BY MR. CASHIO:

13  Q.    It was also prompted by the fact that you called him a

14  racial name, too?

15  A.    As I stated, I never called him Mr. Smith a racial term.

16             THE COURT:    Objection sustained.

17             Move on.

18                          EXAMINATION

19  BY MR. CASHIO:

20  Q.    Now, were there other signs on the night of December the

21  10th, 2003 at Harrah's except for these valet signs?

22             THE COURT:    Be more specific, counsel.  That's an

23  open and broad question.

24                          EXAMINATION

25  BY MR. CASHIO:

1    Q.    Were there other signs that had a similar size and color

2    out in the valet area at any point in the valet area in December

3    10th, 2003?

4    A.    I know that there was no other signs down front.

5    Q.    Okay.  How about right here, the one under the plant

6    (indicating)?

7    A.    I don't know.

8    Q.    You don't know if there were other signs?

9    A.    I don't have reason to believe that there was?

10   Q.    Okay.  Are there any other signs there today near this

11   plant that had the same color as the one under the plant?

12            MR. BALLINA:    Objection, irrelevant.

13            THE COURT:    Overruled.

14            MR. CASHIO:    Go ahead.

15            THE WITNESS:    No, I don't think that there is.

16                          EXANIMATION

17   BY MR. CASHIO:

18   Q.    If I were to tell you they have an exact same sign like

19   that on the side and it says something about gambling chips

20   cannot be redeemed for cash, would I be wrong?

21            MR. BALLINA:    Objection, Your Honor.

22            THE COURT:    Sustained.

23                          EXAMINATION

24   BY MR. CASHIO:

25   Q.    Now, you talked all about that valet ticket that you have.

1    Where is the original valet ticket that proved how long Shaun

2    was there, and the charges on the ticket?

3            MR. BALLINA:   Objection, Your Honor, that was asked

4    and answered, and it wasn't part of my cross.

5            MR. CASHIO:   That was part of his cross.  He was

6    talking about a --

7            THE COURT:   Counsel, I've ruled in your favor.  Move

8    on.

9            MR. CASHIO:   Okay, Your Honor.

10                            EXAMINATION

11   BY MR. CASHIO:

12   Q.   Where is that original valet ticket?

13   A.   I don't know.

14   Q.   You know if it's been lost?

15   A.   I don't know where the ticket is.

16   Q.   Do you know why it wasn't brought to court?

17   A.   No.

18   Q.   Do you know what happened to the -- let me rephrase.

19   You're the Customer Safety Manager, correct?

20   A.   Correct.

21   Q.   Do you know what happened to that vehicle after Shaun was

22   taken by ambulance to the hospital?

23   A.   The vehicle was re-parked.

24   Q.   Okay.

25   A.   So it was re-parked.

1  Q.    Was it ever given back to Shaun?

2  A.    I don't know.

3          THE COURT:    Beyond the scope of the examination.

4          Move on, counsel.

5          MR. CASHIO:    Okay.

6                         EXAMINATION

7  Q.    Now, you said one of your jobs as Customer Safety Manager

8  is to ensure the safety of the patrons at Harrah's, is that

9  correct?

10 A.    Absolutely.

11 Q.    And do you think your actions that night insured the safety

12 of Harrah's patrons?

13         MR. BALLINA:    Objection.  Argumentative.

14         THE COURT:    Sustained.

15                        EXAMINATION

16 BY MR. CASHIO:

17 Q.    Do you believe in the adage that the customer's always

18 right?

19         MR. BALLINA:    Objection.  Argumentative.  Irrelevant.

20         THE COURT:    Overruled.

21         MR. CASHIO:    Go ahead.

22         THE COURT:    Answer that if you can.

23         THE WITNESS:    No.

24                        EXAMINATION

25 BY MR. CASHIO:

1  Q.   You don't believe in that?

2        And this was the only time you'd ever had a car

3  re-parked -- a car or a truck re-parked, right?

4  A.   Personally.

5        MR. BALLINA:   Objection.  Asked and answered.

6        THE COURT:   Asked and answered three times, counsel.

7                        EXAMINATION

8  BY MR. CASHIO:

9  Q.   Was this the only time you were involved in a racial

10 argument?

11 A.   No.

12 Q.   You've been in other racial arguments?

13 A.   Before and since.

14 Q.   Okay.  And you didn't order those cars re-parked?

15       MR. BALLINA:   Objection, Your Honor.

16       THE COURT:   Sustained.

17                        EXAMINATION

18 BY MR. CASHIO:

19 Q.   Would the original ticket have told us what time the

20 vehicle was parked?

21 A.   Quite possibly.  Sometimes it's written on and sometimes

22 the valet cashier will log it into a log.

23 Q.   Would it have told us what time and date that the truck was

24 eventually redeemed?

25 A.   No, it won't tell you what time it actually went out.

1  Q.   But Harrah's keeps the tickets not the customers, is that

2  correct?

3  A.   Yes.

4  Q.   Why did you make such a big deal over a mere $10 parking

5  ticket instead of inquiring with Shaun about how he could get a

6  comp for that parking ticket?

7           MR. BALLINA:   Objection, Your Honor.

8           THE COURT:   Sustained.

9                        EXAMINATION

10 BY MR. CASHIO:

11 Q.   If you would have allowed him to have his truck, would

12 there have been any problem that night?

13          MR. BALLINA:   Objection.

14          THE COURT:   Sustained.

15                       EXAMINATION

16 BY MR. CASHIO:

17 Q.   Do you know what kind of training the valet drivers are

18 given at Harrah's?

19          MR. BALLINA:   Objection.  Beyond the scope.

20          THE COURT:   Sustained.  Beyond the scope.

21          MR. CASHIO:   That's all I have.

22          Thank you, Your Honor.

23          THE COURT:   All right, counsel, you're allowed to

24 redirect, but limited to the scope of his recross.

25          Do you have any questions?

1          MR. BALLINA:    I have no questions, Your Honor.

2          THE COURT:    Thank you, sir.

3          You can step down.

4          Ladies and gentlemen, we're going to call it an

5     evening, it's 5:25.  I've been watching very closely.  I do

6     appreciate the close attention that you've been giving to this

7     case.  You've had a long day, and I think it's time to break for

8     the evening.

9          As I stated earlier, we're going to go ahead and resume

10    tomorrow morning at 10:30 in the morning.  If you want to get

11    here for about 10:15, we'll have some crispy creme doughnuts for

12    you to give you your charge in the morning, your sugar charge in

13    the morning.

14         I want to remind you of the instructions I gave you

15    earlier.

16         Until the trial is over you're not to discuss this case

17    with anyone, including your fellow jurors, members of your

18    family, people involved in the trial, or anyone else.  If anyone

19    approaches you and tries to talk to you about the case, do not

20    tell your fellow jurors but advise me about this immediately.

21         And finally, remember to keep an open mind until all

22    the evidence has been received and you've heard the views of

23    your fellow jurors.

24         I don't know if it's dark outside or not.  If any of

25    you ladies would like to be escorted to your car just let the

1   marshal know and he'll be more than happy to accommodate you.

2           We'll see you tomorrow morning for 10:30 sharp.

3                   (THE JURY THANKED THE COURT)

4           THE COURT:    Thank you.

5           THE CLERK:    All rise.

6           The jury can step out.

7           (AT 5:20 P.M. THE JURY WAS EXCUSED, AND THE PROCEEDINGS

8       WERE HAD, AS FOLLOWS):

9           THE COURT:    Okay.   The jury is now out of the

10   courtroom.   Do we need to put anything on the record, Mr.

11   Cashio, before we adjourn for the day?

12           MR. CASHIO:    I wanted to put Number 5, Joint Number 5.

13           THE CLERK:    5 has not been admitted yet.

14           MR. CASHIO:    The Springer report.   There was a -- we

15   want to take the exhibit -- you're going to do that yourself if

16   I introduce it?

17           THE CLERK:    It's in there.

18           MR. CASHIO:    It's in there already, so I'd just like

19   to introduce Joint Number 5.

20           THE COURT:    Any objection?

21           MR. BALLINA:    I'm assuming it was in the exhibit book

22   that was provided to me in connection with this trial last week.

23   No, I don't have any objection.

24           THE COURT:    Okay.

25           MR. CASHIO:    Your Honor, also -- I guess, it's too

1    early -- I wanted to proffer some things.  Actually, I hadn't

2    even discussed this matter with you in open court.

3         Can I bring the issue up of the life expectancy charts,

4    the Consumer Price Index, etcetera, and the Fifth Circuit's --

5         THE COURT:   Bring up whatever you would like to bring

6    up.

7         MR. CASHIO:   Your Honor, according to the Fifth

8    Circuit's ruling in Ennis versus Borraco --

9         THE COURT:   What is the citation, counsel?

10        MR. CASHIO:   There's no citation.  It was a not

11   published decision, but the decision itself has been given to

12   your clerk.

13        THE COURT:   Okay.  That case.  I didn't know the name

14   of the case, but I saw it.

15        MR. CASHIO:   And in that case there was no economic

16   expert.  The court took -- Judge Vance took judicial notice of

17   the P Bill rate and allowed the self-authenticating documents,

18   which defendant has already admitted, of the Consumer Price

19   Index, and the --

20        THE COURT:   I thought I already ruled in your favor on

21   that one.

22        MR. CASHIO:   I think you ruled against me.

23        THE COURT:   That's not that I recall.  Hold on,

24   because I did read that case.

25        In my minute entry dated -- I don't see the date on it,

1    but you all received this October the 7th, 2004.  On page 4.  I

2    stated that the U.S. Department of Labor Bureau of Labor

3    Statistics, Consumer Price Index shall not be admitted unless

4    the plaintiff lays a proper foundation, and plaintiff has

5    admonished that lay opinion testimony shall not be allowed, but

6    other that if you lay the proper foundation I was going to allow

7    that.

8          MR. CASHIO:    Your Honor, my point is it's a

9    self-authenticating document, and it's of assistance to the

10   jury, and even the defendant has admitted that in the Federal

11   Pattern Jury instructions.

12         THE COURT:    Well, that's fine.

13         What's your objection?

14         MR. BALLINA:    Your Honor I, thought this had been

15   addressed by the Court and there was a ruling and it wasn't

16   admissible.  My objections to it would be --

17         THE COURT:    Well, I said unless the plaintiff lays the

18   proper foundation then it would be.  Now, what I meant by that,

19   and maybe this was ambiguous, but what I meant by that, counsel,

20   was the documents themselves, according to that Fifth Circuit

21   opinion, seemed to me that they would be admissible, so maybe I

22   put in the wrong term.  But maybe what I should have said was I

23   don't know how you plan to use it, the documents and record, but

24   you cannot use lay opinion to make any calculations, and I'll go

25   one step further.

1    Under the Court's standing rule, under the Court's

2    standing pretrial notice which was given to you, that I'm going

3    to refer to page 8d, counsel shall not be allowed to ask

4    questions on cross-examination of an economic expert which would

5    require the witness to make mathematical calculations in order

6    to frame a response unless the factual elements of such

7    questions shall have been submitted to that expert witness not

8    less than three full working days before trial.  So I don't know

9    if that has been complied with.  If that has been complied with,

10   then that would be the appropriate foundation.  However, if that

11   had not been complied with, then that would not be the

12   appropriate foundation, although I will allow the documents to

13   be included, but beyond that, I don't know how you're going to

14   to get under cross-examination from the economic expert anything

15   if you do not specifically submit questions as ordered by this

16   previous notice, number one.

17        And then Number 2, your client's not going to sit up

18   here and make calculations.  That's not his role nor your role.

19        MR. CASHIO:   You're correct, Your Honor.  Under

20   Louisiana Law, the Hobgood case and others, and also the

21   Louisiana case just decided by the Fifth Circuit here, there

22   needs to be no calculations made by anybody.  The jury can make

23   their calculations themselves without any expert testimony.

24        THE COURT:   I understand that.

25        MR. CASHIO:   So I just want to put those in and let

1  the jury make the calculations.

2       THE COURT:   All right.  Mr. Ballina, what is your

3  response?  Although, I'll tell you right now, Mr. Ballina, I'm

4  inclined to -- you've read the opinion, too.  Unless you can

5  distinguish that opinion, I will allow the documents, and

6  they'll speak for themselves.  However, it will not be any lay

7  opinion as to what the documents state, number one.

8       And number two, if this pretrial notice has not been

9  complied with, then he's not going to be able to cross-examine

10  the economic expert on any aspects of what is contained in my

11  pretrial notice.

12       MR. CASHIO:   Your Honor, are you're saying that I lost

13  my right to cross-examine the expert?

14       THE COURT:   No, but you're going to go have to comply

15  -- certainly, you'll never lose your right to cross-examine,

16  however, it must be done within the permitters of what has been

17  expressly stated in this pretrial notice that you both received

18  many moons ago, and I read it to you, and again, I'll be glad to

19  make another copy for you if you do not have your copy, but it

20  states specifically what I specifically read.

21       MR. CASHIO:   Your Honor, I don't recall getting that,

22  and it may be my mistake.

23       THE COURT:   This was attached, sir, to what, James?

24       THE CLERK:   The scheduling order.

25       THE COURT:   The scheduling order and pretrial notice.

1   I've signed the document and this was attached to the scheduling

2   order.

3           MR. CASHIO:    Is the Court saying that I can't ask any

4   questions of the economic expert unless I submit those to him?

5           THE COURT:    I will repeat what I just read to you,

6   sir, and this was a standing order:  Counsel shall not be

7   allowed to ask questions on cross-examination of an economic

8   expert which would require the witness to make mathematical

9   calculations in order to frame your response unless the factual

10  elements of such questions shall have been submitted to that

11  expert witness not less than three full working days before

12  trial.

13          You must comply with this pretrial standing order as

14  must Mr. Ballina.  So that if you had an expert, if Mr. Ballina

15  had not done that, Mr. Ballina would not be able to do that

16  either, but this must complied with.

17          MR. CASHIO:    Okay, Your Honor, but I can submit these

18  documents, the CPI.

19          THE COURT:    Well, let's listen to Mr. Ballina's

20  argument against it.

21          Now, Mr. Ballina, whatever you argue, go ahead and tell

22  me how you can distinguish what that Fifth Circuit Court said.

23          MR. BALLINA:    Your Honor, at this point I have nothing

24  further to add other than what may have been raised in the

25  objections submitted to the Court.

1        Based upon the Court's advises and discussion, and if I

2   understand the Court, that if they're some authenticating and

3   admissible on that basis, that's fine, Your Honor, I have know

4   objection to that.

5        THE COURT:    Again, this might have been worded not the

6   best way, and I apologize for that, but the foundation which

7   has not been laid is what is included in that pretrial notice.

8   However, the documents will be admitted into evidence based on

9   the Fifth Circuit opinion.  Now, to what extent you can use

10  those it will definitely be limited to what I've read, which is

11  again, part of our pretrial order.  And again, also from what

12  I've mentioned in the -- I say pretrial order -- the pretrial

13  notice, and I'll make a copy of this for you.

14       MR. CASHIO:    Your Honor, but I can call --

15       THE COURT:    Mr. Cashio, I'm not finished, sir.

16       MR. CASHIO:    I'm sorry.  Excuse me.

17       THE COURT:    I'll make a copy of this for you if you

18  need that, but I will again remind you that that lay testimony

19  shall not be allowed to try to calculate -- I'm not going to

20  let an economic expert calculate, so I'm not going to allow your

21  client to get up there, nor am I going to allow you in closing

22  argument to use that to calculate.  If the jury chooses to use

23  these documents for whatever reason they choose to use them for,

24  so be it.  And again, I'm only ruling that way because of what

25  the Fifth Circuit has indicated that I must do.

1      MR. CASHIO:   Okay.   Your Honor, also the Louisiana

2  cases all say that lay testimony is sufficient to establish

3  future earning capacity.

4      THE COURT:   I know that, and lay testimony can be

5  used, but I'm not going to allow people to calculate.   He can

6  say what his testimony is, that he earned X-number of dollars.

7  I thought we've already gone over that.   I'm letting you do

8  that.

9      MR. CASHIO:   Your Honor, I propose to tell the jury

10  that I think that the calculations of his expert are incorrect

11  and that I'm sure you're going to tell them they don't have to

12  follow his calculations, and these are my suggested figures, but

13  they can use their own judgment with the documents in front of

14  them to make the decision they want.

15      THE COURT:   How do you plan to calculate that for the

16  jury, or how do you plan to suggest that to the jury?

17      MR. CASHIO:   I'm just going make-up some money from

18  his tax returns and tell them to use their best judgment on

19  using the T Bills, which is the safe investment.   They're using

20  the CPI, which is the inflation rate and using the life

21  expectancy charts.

22      THE COURT:   Do your homework tonight and give us some

23  cases tomorrow for us to allow you to hang your hat on those.

24  Let me know what cases you're going to rely on.

25      MR. CASHIO:   But I can introduce these documents.   I

1  will prepare these and make a new exhibit list.

2      THE COURT:   Based on that Fifth Circuit case that you

3  presented to me, I'm going to allow those documents to be

4  introduced into evidence over Mr. Ballina's objection.  Again,

5  to what extent you can use those, I've already indicated that

6  and that's how I'm ruling unless I'm convinced otherwise by

7  whatever cases that you're going to cite for us, but I want you

8  to do this though, when you cite those cases, bring me copies of

9  those cases tomorrow, but also bring copies to Mr. Ballina,

10  since he will not have had the opportunity to look at those

11  cases, perhaps.

12      MR. CASHIO:   I will.

13      THE COURT:   Let me ask you this:  Mr. Ballina, Mr.

14  Cashio's already indicated that he believed that it was only

15  going to take him five minutes to cross-examine.  It took him a

16  lot longer than five minutes, but be that as it may, he has ever

17  right to take as much time as he needs as long as it's relevant,

18  etcetera.

19      Assuming that Mr. Cashio will take the same amount of

20  time for each of these next four fact witnesses, do you

21  anticipate that these four witnesses are going to be long as

22  Mr. Dorsey was from your end?

23      MR. BALLINA:   I believe Ms. Wilson will be.

24      THE COURT:   All right.  Let's go in order.

25      Mr. Turner, do you think he's going to be as long?

1      MR. BALLINA:   I do not believe he's going to be as

2  long, sir.

3          I do not believe Christopher Stevenson will as long.

4          I do not believe Chehalis Waugh will be as long.  I

5  think she won't be long at all.

6          THE COURT:   All right.  You can tell Mr. Roberts to be

7  here after lunch then.  I don't want him sitting around all

8  morning and running the meter for you, Mr. Cashio.

9          MR. CASHIO:   Thank you, Your Honor.

10         THE COURT:   Now, I don't know what time that is going

11 to be, but what I hope to accomplish tomorrow, and I don't know

12 that we're going to be successful, quite frankly, is to take

13 these four witnesses before the lunch hour.  Since we're

14 starting later than normal, the jurors might not be hungry at

15 noon, so we might be able to not break for lunch until perhaps

16 1:00 o'clock or so.  Again, I don't know that we're going to be

17 able to get through all four fact witnesses by then, but at

18 least, have Mr. Roberts on the standby, that we will take him

19 after the launch hour, but that's subject to change, too.  I

20 know that you don't want him sitting around, nor do I want him

21 sitting around for your sake.

22         MR. CASHIO:   Your Honor, thank you.

23         Could I possibly do this:  It seems to me that we won't

24 take him at anytime prior 2:00 o'clock, because his will

25 probably go from 12:30 to 1:00, and if it was, I can put Shaun

1   Smith on for a little while until he gets here.  So can I tell

2   him 2:00 o'clock?

3          THE COURT:    That's fine.

4          MR. CASHIO:    Thank you.

5          THE COURT:    The problem that Mr. Ballina had was not

6   taking him earlier.  You can take him later, because of the

7   reasons that Mr. Ballina has already mentioned, so, no, I don't

8   have any problem with that.  Mr. Ballina wanted him to be taken

9   after these four fact witnesses, right?  So with that said, I

10  don't care what time he's taken tomorrow as long as it's after

11  the four fact witnesses.  If you choose to take Mr. Smith first,

12  that's fine, too.  Mr. Ballina certainly now has enough notice

13  in that regard.

14         MR. CASHIO:    Right.

15         THE COURT:    Now, with that said, and I'll give you a

16  chance to speak, Drew, but before you get there, let's look at

17  your witness list.

18         MR. CASHIO:    Could I speak to that one point, your

19  Honor?

20         THE COURT:    Speak to what?

21         MR. CASHIO:    The point about the witnesses.

22         From what I appreciate, Mr. Ballina has told the Court

23  that the reason this out of order thing was a problem was

24  because he wanted his expert, Mr. Stokes, to be here.  So I

25  would suggest to the Court that he makes sure he's here to

1    listen to him, because that was one of his reasons.

2            THE COURT:    Well, we've accommodated Mr. Ballina

3    today.   Tomorrow he's on his own, okay.

4            Again though, out of fairness to all parties, I

5    understand that you're not going to take Mr. Roberts until after

6    lunch, so Mr. Ballina certainly does not have to have any

7    experts here until after lunch also, but if you choose to take

8    him at 2:00 o'clock, and the economic expert's not here, then so

9    be it, you can take him then, but I just want to make sure he's

10   taken after the other four fact witnesses that you stated that

11   you were going to call.

12           Now, let's talk about, Mr. Ballina, who do you have

13   after these witnesses?

14           You have Blair Easton.

15           MR. BALLINA:   Officer Monaco is not going to testify.

16           MR. CASHIO:   Your Honor, he has put him on his witness

17   list, now he's telling us he's not going to testify.

18           THE COURT:   You want him?

19           MR. CASHIO:   No, I don't want him, but I want you to

20   instruct the jury that he promised to bring him here and now

21   he's not bringing him.

22           THE COURT:   I'm not going to do that, but I will order

23   the marshal to pick him up if you want him to testify.

24           MR. CASHIO:   No, I don't want him to.

25           THE COURT:   Okay.   We're not going there.

1         MR. CASHIO:    I'll put somebody on.

2         He's complaining about the my list being so precise,

3   and now he's not even bringing a witness that he promised.

4         THE COURT:    We're not going to argue about it.

5         What else, do you have?  If he's not going to call the

6   witness, perhaps he's heard the testimony and he doesn't need

7   the witness, so I'm not going to make him call.  However, I

8   don't want you to be misled, counsel.  So this witness will be

9   brought over by the United States Marshal if you want him to

10  testify.

11        MR. CASHIO:    I don't want him.

12        THE COURT:    Thank you.

13        So we have Blair Easton.  How long will this person

14  take?

15        MR. BALLINA:    Blair will take on direct 20 minutes.

16        THE COURT:    All right.  Larry Stokes?

17        MR. BALLINA:    That's an expert.  That my take 45

18  minutes, 30 minutes, 35 minutes.  And Ken Boudreaux, the same

19  thing.

20        THE COURT:    So there's no surprise tomorrow, and I'm

21  going to address this to Mr. Ballina so there's no

22  misunderstanding.  I've already told plaintiff counsel what he

23  cannot do because of this pretrial notice.  However, be careful

24  because if you open the door, counsel does not have to have, nor

25  is it fair for counsel to have his hands tied, so he's not going

1   to be able to go into that under cross-examination on his own.

2   However, he's not going to be limited in his cross-examination

3   to -- in other words, normally, as we all know, he's given wide

4   latitude under cross-examination and he can go into anything

5   that he chooses to go into that might be relevant, okay.  I

6   don't want there to be a situation, Drew, of your opening the

7   door and him not being able to cross-examine your expert on

8   whatever you've open the door to, but it's going to have to be

9   directed to what he's testified to under direct examination.

10          MR. BALLINA:   And, Judge, just to be --

11          THE COURT:   I can't speculate anymore than I'm saying.

12          MR. BALLINA:   And to be forthcoming, I may, depending

13   upon the testimony, make the decision that I'm not calling him,

14   Dr. Ken Boudreaux.

15          MR. CASHIO:   That's all right with me.

16          THE COURT:   Well, you all want to stipulate that now?

17          MR. BALLINA:   Depending upon what --

18          THE COURT:   I understand.  But I just wanted to make

19   sure that we're all on the same page, because I don't want you

20   to think that you can have free rein and that this man's

21   client's hands are going to be tied, because that's not going to

22   happen.

23          MR. BALLINA:   I am clear I believe in my understanding

24   of the Court's comments regarding the standard pretrial notice,

25   that Dr. Boudreaux cannot be asked questions on

1    cross-examination requiring mathematical calculations?

2          THE COURT:    That's very clear.  Again, I'm going to

3    give Mr. Cashio a copy of this again just so that you can look

4    at it.

5          Is there anything else that we need to put on the

6    record?

7          THE CLERK:    Mr. Cashio was not clear about what he

8    was offering five minutes ago.  Was it a proffer or an exhibit?

9          MR. CASHIO:    It's an exhibit.  I don't have any

10   numbers on it.

11         THE CLERK:    Is it going be a joint or a plaintiff

12   exhibit?

13         MR. CASHIO:    It's going to be joint, according to the

14   Court.

15         THE CLERK:    We already have a Defendant Exhibit,

16   Number 5.

17         MR. CASHIO:    5 wasn't a defendant Exhibit.

18         THE CLERK:    You have a Joint 5, and a Defendant 5.  If

19   you want to renumber it, that's fine.

20         MR. CASHIO:    You're right, okay.

21         This is going to be Plaintiff 1, 2, and 3.  It's going

22   to the Consumer Price Index, the life expectancy charts, and the

23   T Bill rates.

24         THE CLERK:    Thank you.

25         THE COURT:    Are you objecting, Mr. Ballina?

1          MR. BALLINA:    I have no objection to the limited

2     admissibility as the Court has set forth.

3          THE COURT:    To the extent for appeal purposes, that my

4     minute entry dated October the 7th, 2004 might seem to conflict

5     with the ruling of this Court, I wanted to make it perfectly

6     clear that I am disregarding this minute entry as it relates to

7     the inadmissibility of it, that I am finding that it is

8     admissible to pursuant to the Fifth Circuit case of --

9          MR. CASHIO:    Borroco versus Ennis.

10          THE COURT:    -- Borroco versus Ennis.  However, the

11     remaining portion of my minute entry does stand; that is, as it

12     relates to no lay opinion, and that proper foundation has not

13     been laid, and the proper foundation that I'm referring to is

14     not the same proper foundation which would warrant the

15     admissibility or inadmissibility of the documents.  I am letting

16     them into evidence, but subject to no lay opinion testimony, and

17     also subject to the pretrial notice, page 8, Number 13d.

18          MR. CASHIO:    Your Honor, but I do have the right to

19     bring you those Louisiana cases on lay opinions?

20          THE COURT:    I'll take a look at them.

21          All right.  We'll see you tomorrow morning.

22          MR. CASHIO:    Thank you, Your Honor.

23          THE COURT:    Actually, Mr. Cashio, what I would like

24     for you to do, even though you're not going to be here until

25     10:15, or so --

1          MR. CASHIO:   I'm going to try to get here early.

2   What time does the court open?

3          THE COURT:   Somebody's always here real early.

4          But what I would like for you do is at least get those

5   citations to my Law Clerk, Al Robert, so that we can get started

6   looking at them.

7          MR. CASHIO:   I will.

8          THE COURT:   Thank you.

9          All right.  See you all tomorrow.

10          Thank you,

11          MR. BALLINA:   Thank you.

12          THE CLERK:   All rise.

13          Court's in recess.

14             (WHEREUPON, AT 545 P.M. COURT RECESSED)

15          *       *       *       *       *       *

16                   C E R T I F I C A T E

17          I, Victor D. Di Giorgio, Official United States Court
     Reporter in and for the Eastern District of Louisiana, do hereby
18   certify that the foregoing proceedings were taken down by me in
     shorthand at the time and place aforesaid, transcribed under my
19   personal direction and supervision, and that the preceding pages
     represent a true and correct transcription, to the best of my
20   ability and understanding.

21

22

23          _____

24          Victor D. Di Giorgio, CCR
            Official U.S. Court Reporter

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25