UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SHAUN LEE SMITH                     CIVIL ACTION NO. 04-27
                                    NEW ORLEANS, LOUISIANA
     VS.                            WEDNESDAY, OCTOBER 13, 2004
                                    10:50 A.M.
HARRAH'S NEW ORLEANS                SECTION "A"
CASINO, ET AL.


**TRIAL  -  DAY 2**
BEFORE THE HONORABLE JAY C. ZAINEY
UNITED STATES DISTRICT COURT JUDGE, and THE JURY


A P P E A R A N C E S:

FOR THE PLAINTIFF,                  S. MICHAEL CASHIO, ESQ.
SHAUN LEE SMITH:                    Attorney at Law
                                    2107 31st Court
                                    Kenner, Louisiana 70065
                                    (504) 443-3737



FOR THE DEFENDANT,                  HELLER, DRAPER, HAYDEN, PATRICK
HARRAH'S NEW ORLEANS                & HORN, L.L.C.
CASINO, ET AL.:                     By: Drew R. Ballina, Esq.
                                    2500 Poydras Center
                                    650 Poydras Street
                                    New Orleans, Louisiana 70130
                                    (594) 568-1888



REPORTED BY:                        VICTOR D. Di GIORGIO, CCR
                                    OFFICIAL COURT REPORTER
                                    501 Magazine St., Room 406
                                    New Orleans, Louisiana  70130
                                    (504) 589-7782


Proceedings recorded by mechanical stenography.
Transcript produced by computer aided transcription.

I-N-D-E-X

WITNESS                                                    PAGE


ROOSEVELT TURNER
        By Mr. Cashio.............................171/210
        By Mr. Ballina................................205


JESSICA RENE' WILSON
        By Mr. Cashio.............................218/246
        By Mr. Ballina............................228/253


CHEHALILS WAUGH
        By Mr. Cashio.............................255/259
        By Mr. Ballina............................256/260


CHRISTOPHER STEVENSON, JR.
        By Mr. Cashio................................261
        By Mr. Ballina...............................271


BOBBY ROBERTS
        By Mr. Cashio.............................274/302
        By Mr. Ballina...............................288


SHAUN LEE SMITH
        By Mr. Cashio................................307

1                        P-R-O-C-E-E-D-I-N-G-S

2                   (10:500 A.M.  -  MORNING SESSION)

3                    (WEDNESDAY, OCTOBER 13, 2004)

4                      (COURT CALLED TO ORDER)

5          THE COURT:   All rise.

6          Court's in session.

7          THE COURT:   Good morning.

8          Please be seated.

9          Call in the jury.

10         MR. CASHIO:   Your Honor, could I ask one question?

11         THE COURT:   Yes.

12         MR. CASHIO:   Your Honor, we had some uncontested

13   material facts.

14         THE CLERK:   Counsel is not here yet.

15         MR. CASHIO:   Oh, I'm sorry, I thought he was here.

16                    (COUNSEL WALKED IN)

17         THE COURT:   All right.  Go ahead.

18         Mr. Cashio, go ahead.

19         MR. CASHIO:   Yes, Your Honor.

20         We had six uncontested material facts that I would like

21   the Court to read to the jury, if you don't mind.

22         THE COURT:   When would you like that done?

23         MR. CASHIO:   When they enter this morning.

24         THE COURT:   When?  Right now?

25         MR. CASHIO:   Yes, Your Honor.

 1          THE COURT:    Okay.

 2          MR. CASHIO:    Okay.  Thank you.

 3          THE COURT:    That's fine.

 4          Any objections?

 5          MR. BALLINA:    If I can address the jurors at that time

 6  and tell them why my client does not dispute those facts.    My

 7  client is contesting liability in this case, but she's

 8  generally --

 9          THE COURT:    Well, I'm sure you did not admit liability

10  in the uncontested issue of facts.

11          MR. BALLINA:    No, sir.

12          THE COURT:    No one's going to make any statements.

13          I'll go ahead and I will to the jury that in compliance

14  with court orders you all had prepared a pretrial order, and the

15  following are listed as uncontested material facts, and I'll

16  just read A through F.

17          MR. CASHIO:    Your Honor, can you read the first part.

18  It says "The parties have agreed or stipulated that".

19          THE COURT:    No, I'm just going to say it just the way

20  that I said it.

21          MR. CASHIO:    Okay.

22          THE COURT:    All right.  Call in the jury, please.

23          THE MARSHAL:    All rise.

24                  (THE JURY ENTERED THE COURTROOM)

25          THE COURT:    Good morning.

1          I hope you had a restful evening last night.

2          Please have a seat.

3          Before we begin, I'm going to read to you a couple of

4    things pursuant to a court order, to my court order, the lawyers

5    had entered into an agreement that the following are uncontested

6    material facts, so I'll go ahead and read this to you the

7    following six issues are not disputed in this case.

8          On December the 10th, 2003 at approximately 8:45 p.m.,

9    Shaun Smith was involved in an accident as a pedestrian with his

10   father's truck driven by Kevin Augustine at Harrah's New Orleans

11   Casino.  That's the first one.

12         The second one:  At the time of the accident, Mr.

13   Augustine was working as a parking valet for Harrah's New

14   Orleans Management Company.

15         Third:  As a result of the accident, Mr. Smith had

16   spiral fractures of the left tibia and fibula.

17         Next, Mr. Smith underwent an open reduction and

18   internal fixation of the left tibia at the Medical Center of

19   Louisiana at New Orleans and was hospitalized for three days.

20         Next, the Medical Center of Louisiana at New Orleans

21   has asserted a privilege for $19,362.63.

22         And finally, after gambling at the casino and losing

23   all his money, Mr. Smith left the casino and attempted to

24   retrieve his truck from the valet.

25         Thank you very much.

1          Go ahead and proceed, Mr. Cashio with your next

2    witness.

3          Who do you call?

4          MR. CASHIO:    I call Mr. Roosevelt Turner under

5    cross-examination, Your Honor.

6          THE COURT:    Roosevelt Turner, please.

7          THE CLERK:    Raise your right hand, please.

8                        ROOSEVELT TURNER

9          After having been first duly sworn, did testify under

10   oath, as follows:

11         THE CLERK:    Have a seat and state your name for the

12   record, please.

13         THE WITNESS:    My name is Roosevelt Turner.

14                        CROSS-EXAMINATION

15   BY MR. CASHIO:

16   Q.    Mr. Turner, what is your job title at Harrah's Casino?

17   A.    I'm a lead valet.

18   Q.    And you're still working there?

19   A.    Yes, sir.

20   Q.    Okay.  And isn't it true that the lead valet is supposed to

21   handle the guests' vehicles safely and cautiously at all times?

22   A.    Yes, sir.

23   Q.    Were you ever told in -- what kind of training did you have

24   by Harrah's to become a valet lead?

25   A.    We had training on greeting the guests as the guests come

1  to Harrah's.  We welcome them.  We wish them fair well.  That's

2  when they're leaving.  We go through a training just being

3  polite and being courteously to our guests.

4  Q.    Did you have any training -- do they put you through any

5  training in driving the vehicles?

6  A.    Yes, sir, they do.

7  Q.    What is that?

8  A.    It's a training where they put you through driving the

9  vehicles, someone would ride with you, a supervisor or lead

10 valet where they would train you and show you what's the

11 procedures of driving in valet.

12 Q.    Okay.  And where do they train you for that at?

13 A.    They have a class they train you in.

14 Q.    But did you actually drive vehicles in the class?

15 A.    No, sir, you can't drive vehicles in the class.

16 Q.    But do you drive vehicles during your training period?

17 A.    Yes, sir, after you ride with a supervisor, or lead at a

18 certain point, then you become to drive once you get familiar

19 with the garage?

20 Q.    And you did that when you first went there?

21 A.    Yes, sir.

22 Q.    Okay.  Tell the jury how many times you drove a vehicle

23 with a supervisor before you were hired by Harrah's in their

24 training procedures?

25 A.    I don't remember.

```
 1   Q.    Do you have any idea.

 2   A.    I could have drove for two or three days.

 3   Q.    Do you remember if you ever drove a vehicle that was a

 4   large diesel truck in your training period?

 5   A.    Yes, sir, we all do.

 6   Q.    And where do they get that diesel truck from?

 7   A.    Guests come in, and within the training, the supervisor

 8   lead, whatever, would take the driver that's in training to the

 9   different spaces and garage position.

10   Q.    So what I'm understanding, if I owned a large diesel truck,

11   and I went to Harrah's, had it parked in valet, one of the

12   supervisors might take my truck out of the parking spot and

13   bring one of his assistants, and put the assistant in my truck

14   and drive it around to see how he handled it.

15   A.    No, sir.

16   Q.    Well, how does that happen?

17   A.    The supervisor would park the truck himself.

18   Q.    Okay.

19   A.    The assistant would just ride with him to see where the

20   truck is being parked.

21   Q.    Okay.  So the person who's learning doesn't actually get to

22   drive the truck?

23   A.    No, sir, not at the beginning, no, sir.

24   Q.    And there's no vehicles that Harrah's has that they can

25   practice on when you're in training to drive, for example, at a
```

1  parking lot near their vehicle Harrah's owned where they would

2  bring the trainees out there to drive certain trucks and cars

3  around to see how they handled them.  You don't have anything

4  like that, do they?

5  A.    No, sir.

6  Q.    Now, when the guests leave -- when the guests first enters

7  and gets out of his car or truck, what exactly do you and the

8  other valet people tell them?

9  A.    First, when the guests arrive, we welcome them to Harrah's.

10  We ask them their name, which we put on the back of their claim

11  check.  We give them part of their claim check.  We put the

12  other part in the car in order for the driver to park the car.

13  Q.    Anything else?

14  A.    After that, the driver would come up, he would write the

15  information down on the vehicle, what color it is, the make, the

16  model, he would initial his name on the name tag, and he would

17  proceed to park the car.

18  Q.    But there's nothing else you tell the people when they get

19  out, right, of the vehicle?

20  A.    No, sir.

21  Q.    Okay.  You don't tell them that with a Diamond or Platinum

22  card your parking will be free, do you?

23  A.    Yes, sir, we'll tell them that.  Most of our guests know

24  that Platinum or Diamond is free.

25  Q.    I thought you told me that was all you told them.  Then

1  when I asked you that question you said, "Now, you tell them

2  that"?

3              MR. BALLINA:    Objection.    Argumentative, Your Honor.

4              THE COURT:    Sustained.

5              THE WITNESS:    Okay.    When the guests arrives --

6              THE COURT:    Don't answer the question, sir.

7              THE WITNESS:    -- at Harrah's.

8              THE COURT:    Sir, don't answer the question.

9              THE WITNESS:    Okay.

10             THE COURT:    Rephrase your question, counsel.

11                                    EXAMINATION

12 BY MR. CASHIO:

13 Q.    Now, is there any kind of communication between the valet

14 booth and the driver who is driving the truck or car down from

15 the parking area?    In other words, do they have a radio or

16 walkie-talkie?

17 A.    The cashier does, not the driver.

18 Q.    Okay.    So there's no communication between the valet booth

19 and the driver while he's driving the vehicle, is that correct?

20 A.    No, sir.

21 Q.    Now, do you have the authority to waive the payment of cash

22 of the valet fee?

23 A.    Do I have the authority to waive, no, sir.

24 Q.    Okay.    Remember when I took your deposition under oath at

25 your lawyer's office, at Harrah's lawyer's office?

1  A.    Uh-huh.

2  Q.    On May the 27th, 2004?

3  A.    Yes, sir.

4  Q.    Did you tell the truth then?

5        THE COURT:    Counsel, tell counsel what page you're

6  referring to, please.

7        MR. BALLINA:    Thank you, Your Honor.

8                        EXAMINATION

9  BY MR. CASHIO:

10  Q.    Page 17, lines 8 through 10.  Did you tell the truth then?

11  A.    Yes, sir, as far as I know.

12  Q.    Okay.  Remember when I asked you the question -- I'm

13  going to let you read it with me.  "Do you have the authority to

14  waive payment of the cash of the valet fee?"  What was your

15  answer that day under oath?

16  A.    I would have to see it.  My answer was "Yes."

17  Q.    And just a second ago under oath you told me your answer

18  was no.

19        THE COURT:    Is that a question, counsel?

20                        EXAMINATION

21  BY MR. CASHIO:

22  Q.    Is that correct?  Is that correct, what I just said?

23  A.    Yes, sir, but during the time when you asked me that you

24  was asking me also did I have a chance to void out tickets, and

25  you said that, and I told you I did.

1        THE COURT:    Counsel, give him the whole page.   Let him

2    read the whole page to make sure it's in context, please.

3        MR. CASHIO:    Okay.

4        THE COURT:    Just let him read it.

5        MR. CASHIO:    Okay.

6                            EXAMINATION

7    BY MR. CASHIO:

8    Q.    Read the page.   Tell me where I said something about void

9    out tickets?

10   A.    Okay.

11       THE COURT:    All right.   Counsel ask your next

12   question.

13                           EXAMINATION

14   BY MR. CASHIO:

15   Q.    Let me show you something else on that same page.   I asked

16   you "Has that ever happened to you in the past", right after

17   that, and do you remember what your answer was?

18   A.    Yes.

19   Q.    Your answer was yes?

20   A.    My answer was --

21       THE COURT:    Counsel, let him read it first.

22       The proper way to lay the foundation, sir, is to let

23   him read the statement first, then you can ask him questions.

24       MR. CASHIO:    Okay.

25                           EXAMINATION

1  BY MR. CASHIO:

2  Q.   Isn't it true that at that time I then asked you the

3  question, "And has that --"

4              THE COURT:    Wait.  Counsel, counsel.

5              MR. CASHIO:   On page 17, line --

6              THE COURT:    Let him read page 17 in it's entirety.

7              MR. CASHIO:   Line 13, through 15 --

8              THE COURT:    Counsel --

9              MR. CASHIO:   He's already read page 17, Your Honor.

10             THE COURT:    Let him read it, then ask him a question.

11             You're referring to page 17.  Read the entire page 17.

12             You've done that already, sir?

13             THE WITNESS:   Okay.

14                         EXAMINATION

15  BY MR. CASHIO:

16  Q.   Have you read page 17 already?

17  A.   I'm reading it now.

18             THE COURT:    Now, ask your question, counsel.

19             MR. CASHIO:   Okay.

20                         EXAMINATION

21  BY MR. CASHIO:

22  Q.   Do you remember when I asked you "Has that every happened

23  to you in the past", right after I asked you about, "Do you have

24  the authority to waive payment of the valet fee?  You remember

25  what your answer was then?

1  A.    Yes.

2  Q.    What was it?

3  A.    Yes.

4  Q.    Okay.  Now, you were the one who got in the original

5  argument with Mr. Smith, is that correct, Shaun Smith?

6  A.    No, sir.

7  Q.    Who got in -- was there an argument at the valet booth that

8  day, that night?

9  A.    I was not at the valet booth that night.

10  Q.    You weren't around the valet booth that night?

11  A.    I was on the valet ramp.

12  Q.    If Mr. Dorsey said that you were on the valet booth, you

13  were next to the valet booth arguing with Mr. Smith, you would

14  disagree with that, is that correct?

15        MR. BALLINA:    Objection.  That's a mischaracterization

16  of the witness' testimony.

17        THE COURT:    Sustained.  Rephrase your question,

18  counsel.

19                            EXAMINATION

20  BY MR. CASHIO:

21  Q.    So you would disagree that you were at the valet booth

22  arguing with Mr. Smith that night, is that correct?

23        MR. BALLINA:    Objection.  That's been asked and

24  answered already.

25        THE COURT:    Overruled.  Repeat your question.

```
 1                         EXAMINATION
 2  BY MR. CASHIO:
 3  Q.    So you would disagree that you were at the valet booth arguing
 4  with Mr. Smith, is that correct?
 5  A.    I never did argue you with Mr. Smith.
 6  Q.    Okay.  You said you were on the valet ramp, is that
 7  correct?
 8  A.    Yes, sir.
 9  Q.    And were you ever at the valet booth when Mr. Smith was
10  directing any comments to you?
11  A.    I came to the valet booth to return some tickets in to the
12  cashier.  At that time the cashier informed me that Mr. Smith
13  had came to the cashier booth and said that he needed his car.
14  He refused to pay but he left his ticket on the counter.
15  Q.    Okay.  Did he speak to you about that matter?
16  A.    I don't remember.
17  Q.    You had the authority to waive that $10 fee, as you told me
18  under oath?
19  A.    Mr. Smith, Mr. Dorsey --
20  Q.    Wait, wait let me ask the question.  Mr. Dorsey --
21            THE COURT:   Sir, let him answer.
22            MR. CASHIO:   I didn't have a question out, Your Honor.
23            THE WITNESS:   Yes, sir.
24            THE COURT:   You asked him, he's responding.
25            MR. CASHIO:   Okay.
```

1              THE COURT:    Answer the question.

2              THE WITNESS:    Mr. Dorsey had already spoken with Mr.

3    Smith.

4                              EXAMINATION

5    BY MR. CASHIO:

6    Q.    So Mr. Dorsey spoke to Mr. Smith before you spoke to Mr.

7    Smith?

8    A.    Yes, sir.  Yes, sir.

9    Q.    Okay.  And but when you came up there, did Mr. Dorsey have

10   the authority to give him the parking free or waive his valet

11   fee?

12   A.    Yes, sir, after he followed procedure.

13   Q.    He had the authority, right?  Now, from what I understand

14   Shaun Smith talked to Mr. Dorsey, and then you come up to the

15   valet booth, and did you have a conversation with Mr. Shaun

16   Smith?

17   A.    No.

18   Q.    Okay.  Did you know that Mr. Shaun Smith had a problem in

19   paying for his $10 ticket?

20   A.    Mr. Dorsey informed me that Mr. Smith refused to pay for

21   his parking.

22   Q.    Did you at any time ask Mr. Smith or Mr. Dorsey what game

23   Mr. Smith had been playing in the casino to see if he could get

24   a comp for that game?

25   A.    Mr. Dorsey was the supervisor on duty in charge and he was

1  the one handling the situation.

2  Q.    Okay.  Was Mr. Dorsey normally in the valet booth?

3  A.    From time to time Mr. Dorsey -- he's the supervisor, he's

4  the manager on duty.

5  Q.    Okay.  What is his exact title, do you know?

6  A.    He's a manager.

7  Q.    Well, what kind of manager?

8          MR. BALLINA:    Objection.  Asked and answered.

9          THE COURT:    Overruled.

10          Answer the question if you can, sir.

11          THE WITNESS:    Okay.  He's the manager on duty, which

12  he can be in any department at any given time.

13                        EXAMINATION

14  BY MR CASHIO:

15  Q.    Okay.  But you don't know his --

16          THE COURT:    Asked and answered, counsel.

17          Move on.

18          MR. CASHIO:    Okay.

19                        EXAMINATION

20  BY MR. CASHIO:

21  Q.    Now, if the client has lost all his money, can he go back

22  to the casino and speak to someone in the casino in order to get

23  a car out of valet?

24  A.    Yes, sir.

25  Q.    Now, are there some occasions where you said a person asked

1   you to waive the fee for payment of his valet parking and you

2   did not, is that correct?

3   A.    Could you repeat that?

4   Q.    Okay.  Can you recall any times when a person had asked you

5   to waive the cash fee for valet parking and you did not waive

6   it?

7   A.    No, sir, we always tell the guests the procedures, where is

8   that they played on their card they earn points in order to get

9   free valet parking or they could go back in and get a comp where

10  they were playing at, and they could be playing table games or

11  slots or whatever and they have a choice to go back in.  They

12  could use the ATM card or they could use a credit card.

13  Q.    So you always tell the guests that, right?

14  A.    Yes, sir, once they say they cannot pay.

15  Q.    Did you hear anyone tell Shaun Smith that night that he

16  could go back in the casino?

17  A.    As I said, Mr. Dorsey spoke to Mr. Smith, I don't what was

18  said.

19  Q.    You weren't close to him when he spoke?

20  A.    I was not there when this transaction was made, no, I was

21  not.

22  Q.    And when the cashier told you he wasn't paying for his

23  valet ticket, did you intervene at that time and say, Mr. Smith,

24  why don't you go into the casino you can get a comp for your

25  valet parking?

1  A.    No, I did not.

2  Q.    Now, were you close to the accident when that happened?

3  A.    Close?

4  Q.    Yeah.

5  A.    Yes, sir, I was close.

6  Q.    Okay.  How far were you?

7  A.    Approximately, I could have been 10, 20 feet.  I really

8  don't know.

9  Q.    That valet booth that was outside at the time, the night of

10 the accident, is that correct?

11 A.    Yes, sir.

12 Q.    That valet booth has been moved inside since the time of

13 the accident, is that correct?

14 A.    Correct.

15 Q.    The lady's name who was the cashier was Jessica Wilson at

16 the time of the accident, is that correct?

17 A.    Yes, sir.

18 Q.    And she had moved to a -- she's no longer a valet cashier,

19 is that true?

20 A.    Yes, correct.

21 Q.    Okay.  Kevin Augustine, the driver of the vehicle, he's

22 also no longer -- well, he's no longer with Harrah's anymore, is

23 that correct?

24 A.    That's correct.

25 Q.    Now, after the accident -- well, how far were you from the

1  accident when it happened?

2          THE COURT:    Asked and answered, counsel.

3          Move on.

4          MR. CASHIO:    I'm sorry.  Did you say the feet, I was

5  going to ask him.

6          THE COURT:    Yes, he's answered that question.

7          MR. CASHIO:    Okay.  I'm sorry.

8                        EXAMINATION

9  BY MR. CASHIO:

10 Q.    Could you tell if the driver, Kevin Augustine, had any idea

11 that Shaun Smith was there near his truck at the time of the

12 accident?

13         MR. BALLINA:    Objection.  It calls for speculation.

14         THE COURT:    Sustained.  Speculative,

15         MR. CASHIO:    No, Your Honor, he's already told

16 me under --

17         THE COURT:    Sustained.

18         He's already told you something.  It's repetitive,

19 counsel.

20         MR. CASHIER:    No, under oath, and I wanted --

21         MR. BALLINA:    Objection, Your Honor.

22         THE COURT:    It's speculative.  Objection sustained.

23                        EXAMINATION

24 BY MR. CASHIO:

25 Q.    Okay.  Mr. Smith was not right outside of the window before

1  the driver took off so that the driver could easily see him, is

2  that correct?

3          MR. BALLINA:    Objection.

4          THE COURT:    Sustained.

5          Rephrase your question, counsel.

6                          EXAMINATION

7  BY MR. CASHIO:

8  Q.    Was Mr. Smith in a position where the driver could see him

9  at the time immediately before the accident?

10         MR. BALLINA:    Objection.

11         THE COURT:    Sustained.

12         MR. BALLINA:    Speculation, Your Honor.

13         THE COURT:    Sustained.    Speculative.

14                         EXAMINATION

15 BY MR. CASHIO:

16 Q.    Now, you were right there, did you see what happened that

17 caused Mr. Shaun Smith to be lying on the ground?

18 A.    No, sir.

19 Q.    Was your attention diverted to some other area so that you

20 couldn't see the accident right in front of you?

21 A.    No, sir, once Mr. Smith was told that his vehicle was to be

22 re-parked, he was standing on the side, I turned, next thing I

23 turned around, Mr. Smith was laying on the ground.

24 Q.    When Mr. Smith fell, did you immediately go to see what was

25 wrong with him?

1  A.   Mr. Dorsey was right there on the scene.   What I did was

2  walked over to get some extensions to go around Mr. Smith.

3  Q.   Okay.  I don't think you're answering my question.

4       THE COURT:   He answered it, counsel.

5                          EXAMINATION

6  BY MR. CASHIO:

7  Q.   When Mr. Smith fell --

8       THE COURT:   He answered your question.  Ask another

9  question.

10                         EXAMINATION

11 BY MR. CASHIO:

12 Q.   From what I understand, you said you didn't immediately go

13 to his aid, is that correct?

14       MR. BALLINA:   Objection.  Asked and answered.

15       THE COURT:   Sustained.

16       THE WITNESS:   Mr. Dorsey was standing right there,

17 sir.

18       THE COURT:   Don't answer the question, sir.

19       When there's an objection made just wait until I rule.

20       THE WITNESS:   Okay.

21                         EXAMINATION

22 BY MR. CASHIO:

23 Q.   Was Mr. Smith screaming at the time when he was on the

24 ground?

25 A.   Yes, sir, he did scream.

1   Q.    Okay.  What did you do immediately after the accident?

2   A.    I walked over to get some extensions to surround the area.

3   Q.    And that was immediately after the accident?

4   A.    Yes, sir, we walked to the side to get the extensions.

5   Q.    Okay.  Now, I want you to read page 38, lines 8 through 11.

6           THE COURT:   Let him read it before you ask him

7   questions, counsel.  Let him read it to himself.

8                           EXAMINATION

9   BY MR. CASHIO:

10  Q.    Have you read that lines 8 through 11?  You read it?

11  A.    Uh-huh.

12  Q.    Okay.  Can I ask you a question now.  When you were under

13  oath at 38, line 8 through 11, I said "When Mr. Smith fell did

14  you immediately give him -- go to see what was wrong with him?"

15  What was your answer?

16  A.    My answer was "Yes".

17  Q.    Okay.  And is that true?

18          MR. BALLINA:   Your Honor, can we have the witness read

19  the entire testimony on that line?

20          THE COURT:   Read the entire page, sir.

21          MR. CASHIO:   Okay.  You can read the entire --

22          THE COURT:   Counsel, hold on one second.  I'm talking,

23  please.

24          MR. CASHIO:   Yes, Your Honor.

25          THE COURT:   Read as much as you want, sir.  Read it to

1    yourself.

2                THE WITNESS:   Okay.

3                MR. CASHIO:   Oh, to himself, okay.

4                THE COURT:   Why don't you go by the podium and let him

5    read it to himself.

6                THE WITNESS:   Okay.

7                THE COURT:   Okay.  Counsel, go ahead and ask him a

8    question.

9                              EXAMINATION

10   BY MR. CASHIO:

11   Q.   Mr. Turner --

12               MR. CASHIO:   Can I have it, Your Honor?

13               THE WITNESS:   Wait a second.  You were telling me this

14   and this over here?

15               THE COURT:   Wait, Mr. Turner.  Let him ask you a

16   question.

17               MR. CASHIO:   There's no question.

18               Can I have the deposition?

19               THE COURT:   Not until he's finished reading it,

20   counsel.

21               MR. CASHIO:   I thought he was.

22               THE COURT:   You can impeach him, but he has a chance

23   to read what he said.

24               MR. CASHIO:   Well, I'm not asking him anything.

25               THE COURT:   All right, counsel, go ahead, ask him a

1  question.

2                          EXAMINATION

3  BY MR. CASHIO:

4  Q.   After the accident happened, did you notice if any other

5  people immediately went to see how Shaun Smith was doing?

6  A.   Yes, sir, Mr. Dorsey.

7  Q.   Okay.  Now, isn't it true that you told me that it was your

8  opinion that the only thing that could have caused Shaun Smith

9  to fall to the ground is when he jumped on the railing of his

10 truck and he slipped and fell to the ground?

11         MR. BALLINA:    Objection, Your Honor.  I believe that's

12 an improper form of the question.

13         THE COURT:    The objection's sustained.

14                          EXAMINATION

15 BY MR. CASHIO:

16 Q.   Didn't you think that Shaun Smith had just slipped and fell

17 off the truck?

18 A.   Yes.  Did I think Mr. Smith slipped and fell off the truck?

19 Q.   Right.

20 A.   Yes, sir.

21 Q.   Okay.  Now, isn't there a procedure at the casino that if a

22 guest refuses to pay for his parking in valet that the car or

23 truck is not to be brought down until the matter is clarified?

24 A.   Could you repeat that.

25 Q.   Isn't there a procedure at the Harrah's Casino that if a

1    guest refuses to pay for his parking in valet that the car or

2    the truck is not to be brought down until the matter is

3    clarified?

4    A.    No.

5    Q.    Okay.  Page 41 --

6         THE COURT:    Let him read the page to himself and you

7    can ask him whatever questions you want, counsel.

8         Lines 18 to the end, and page 42.

9         THE COURT:    Counsel, go back to the podium, please.

10        MR. CASHIO:    Oh, I'm sorry.

11        THE COURT:    Until he reads it, then you can pick up

12   the transcript and ask him whatever you want to ask him.

13                         EXAMINATION

14   BY MR. CASHIO:

15   Q.    Now, when I asked you under oath, "Isn't there a procedure

16   at the casino that if a guest refuses to pay for his parking in

17   valet that the car is not to be brought down until the matter

18   is clarified?"  Do you remember what you told me under oath a

19   couple of months ago?

20   A.    I told you "Yes".

21   Q.    Okay.

22   A.    Because you asked me whether the procedure was written or

23   oral.

24   Q.    Why, would that make a difference from no to yes if it was

25   written or oral?

```
1   A.   Because there is a procedure.  You said written or oral
2   meaning that if the procedure is saying that we could bring up
3   the guest's car.  We bring up the guest's car as they come up to
4   the window so we can try to get their car up immediately as soon
5   as possible.
6   Q.   Do you remaking a statement that you signed that when the
7   driver of the --
8             THE COURT:   Counsel, let him read the statement first.
9             MR. CASHIO:   Okay.  The last two lines.
10            THE COURT:   He can read the whole statement.
11            MR. CASHIO:   He could read the whole thing, I'm only
12  asking the last two lines.
13            THE WITNESS:   Uh-huh.  Okay.
14                         EXAMINATION
15  BY MR. CASHIO:
16  Q.   Didn't you sign a statement, Mr. Turner, that said --
17            MR. BALLINA:   Your Honor, I'm going to enter an
18  objection.  It's hearsay.  It's a prior statement, and I don't
19  think there's been any establishment that there's any
20  inconsistent statement.
21            THE COURT:   Right.
22            Counsel, you can ask him questions about the statement,
23  but just ask the him the question, and then if it contradicts
24  what's in the statement, then you can impeach him with the
25  statement.
```

1          THE COURT:    Okay.  Right.

2                          EXAMINATION

3    BY MR. CASHIO:

4    Q.    Did you say that the guest became upset?

5    A.    Yes, sir, the guest became upset.  He started to use vulgar

6    language and was just really outraged about his vehicle.

7    Q.    And did you also say that the guest said that he wanted his

8    truck?

9    A.    Yeah, he said he wanted his M and F-g truck, and "if you S

10   and Bs don't give it to me I'm going to take it".

11   Q.    Okay.  Did you also say the driver began to pull off and

12   the guest jumped on the side rail and fell off?

13   A.    No, the driver began to pull off, the guest jumped on the

14   rail at first and then after that he got off the rail.

15   Q.    I asked you this direct question.  "Did you write down that

16   the driver began to pull off, the guest jumped on the side rail

17   and fell off?"  Did you say that and put your signature on it?

18          MR. BALLINA:    Your Honor, asked and answered, and I

19   don't think --

20          THE COURT:    Overruled.

21          MR. CASHIO:    He never said anything about falling off,

22   Your Honor.

23          THE COURT:    Overruled.

24          MR. CASHIO:    Oh, I'm sorry, I didn't hear you.

25          THE COURT:    Counsel, please don't argue.

1          MR. CASHIO:    Excuse me.

2          THE COURT:    Answer the question, Mr. Turner.

3                              EXAMINATION

4    BY MR. CASHIO:

5    Q.    Do you want me to ask it again, Mr. Turner?

6    A.    Okay.  Yes, sir.

7    Q.    Did you say and put your signature to a statement "that the

8    driver began to pull off, the guest jumped on the side rail and

9    fell off"?

10   A.    Yes.

11   Q.    Okay.  But you couldn't even see the accident, right?

12   A.    As the driver brought the vehicle up and Mr. Smith began to

13   use the vulgar language and everything bringing the car up, he

14   was talking to the driver, he jumped on the railing at the time,

15   okay.  After that the driver stopped.  I talked to Mr. Smith.  I

16   told him that we had to re-park his vehicle, and the driver

17   began to pull off, that's when Mr. Smith jumped on the railing

18   and fell off.

19   Q.    Okay.  You told me that you didn't know what happened

20   before in other questions and you weren't looking at the time of

21   the accident, isn't that correct?

22   A.    I glanced to the side, but I could see out the side when

23   Mr. Smith right by the car.

24   Q.    So you could see it now, right?  You could see the accident

25   from --

1          MR. BALLINA:    Objection.  Asked and answered.

2          THE COURT:    Asked and answered.

3          MR. CASHIO:    Okay.

4                        EXAMINATION

5    BY MR. CASHIO:

6    Q.    Has there been any reason in the last couple of months

7    since I took your deposition that you changed your testimony?

8          MR. BALLINA:    Objection, Your Honor.  That's an

9    argumentative question.

10         THE COURT:    Sustained.  Rephrase your question,

11   counsel.

12                       EXAMINATION

13   BY MR. CASHIO:

14   Q.    When a driver first comes into valet from Canal Street,

15   isn't it true that one of the valet personnel will waive him in

16   to where they want him to park?

17   A.    When they're entering, yes, sir.

18   Q.    Okay.  And isn't it true that there are -- well, let me ask

19   you this --

20         THE COURT:    And refer to a date.  There are, meaning

21   now or December?  Be more specific.

22         MR. CASHIO:    Okay.  December.

23                       EXAMINATION

24   BY MR. CASHIO:

25   Q.    Have any of the signs changed in front of the casino before

1    you get to actually touch the entrance door?  Well, let me

2    rephrase that.  Have any signs changed since the night of

3    December 10th 2003, from where you enter the casino lot from

4    Canal Street until you go through the entrance doors?

5            MR. BALLINA:   Objection.  Any signs?

6            MR. CASHIO:   Yes.  I'm going to say he --

7            MR. BALLINA:    That's overly broad.

8            THE COURT:    Overruled.

9                          EXAMINATION

10   BY MR. CASHIO:

11   Q.    Go ahead, please.

12   A.    No, sir.

13   Q.    They're all the same.  How many signs were up there that a

14   patron could see on the night of December 10th, 2003, from the

15   time he enters Canal Street into the valet area?

16           MR. BALLINA:   Objection, Your Honor.  The question

17   calls for the witness --

18           THE COURT:    Sustained.  He doesn't know what a patron

19   can see or not.  Be more specific, counsel.

20           MR. CASHIO:    Okay.

21                          EXAMINATION

22   BY MR. CASHIO:

23   Q.    Have you ever walked into or driven into the valet area

24   from Canal Street?

25   A.    Yes, I have.

1  Q.    Okay.  How many signs could you see on the night of

2  December 10th, 2003 from the entrance at Canal Street until you

3  enter the casino?

4       MR. BALLINA:    Objection, Your Honor.  It's irrelevant,

5  and I don't believe it's been established that he drove into the

6  valet parking garage on the night of December 10th, 2003.

7       THE COURT:    Rephrase your question, counsel.

8       MR. CASHIO:    He was there.

9       THE COURT:    Well, ask if he saw him.  You're assuming

10 that he did.

11                          EXAMINATION

12 BY MR. CASHIO:

13 Q.    You were there on the night of December 10th, 2003, is that

14 correct?

15 A.    Yes, I was.

16 Q.    And are the signs there easily visible to you, the signs at

17 the casino door from the entrance at Canal Street?

18 A.    Yes, they are.

19 Q.    Okay.  I'm asking you how many signs were out there that

20 night between the entrance to Canal Street and the entrance door

21 of the casino?

22 A.    I don't know a number.

23 Q.    You don't know how many?

24 A.    No, sir.

25 Q.    How do you know they haven't changed any?

```
 1              MR. BALLINA:    Objection.  It's argumentative.

 2              THE COURT:    Sustained.

 3                           EXAMINATION

 4   BY MR. CASHIO:

 5   Q.   What do the signs say?

 6              THE COURT:    What signs, counsel?

 7              THE WITNESS:    All the signs.

 8              MR. CASHIO:    All the signs.

 9                           EXAMINATION

10   BY MR. CASHIO:

11   Q.   All the signs you remember on December 10th 2003, what do

12   they say?

13   A.   The signs at the beginning of the ramp coming off of Canal

14   Street states the rates of valet parking.  That's the rate from

15   zero to two hours all the way up to 24 hours.  It's a big

16   windmill sign that states -- it's right there as you enter into

17   valet.

18   Q.   A big windmill sign.  Okay.  What else?

19   A.   There are signs at the entrance of valet.

20   Q.   Okay.

21   A.   As you go into the casino.

22   Q.   Okay.

23   A.   Through the double doors, there are signs posed there

24   stating the rates of valet.

25   Q.   How many signs?  You said signs plural.
```

1   A.    Okay.   You have one at Canal Street, and you have one at

2   the entrance going into the casino.

3   Q.    Because you told me there were signs with an s on it as you

4   entered the casino.

5           MR. BALLINA:    Objection.

6           THE COURT:    Objection sustained.

7           Move on.   He just said two signs.

8           MR. CASHIO:    Okay.

9                           EXAMINATION

10  BY MR. CASHIO:

11  Q.    Aside from those two signs, aside from those two signs, how

12  many signs did they have that night?

13  A.    We have signs directing the guests into valet.   I mean,

14  signs -- I don't know the number of signs that was there that

15  night.

16  Q.    You somehow can remember the exact location of valet signs,

17  but you can't remember anything about any other signs there.

18          MR. BALLINA:    Objection, Your Honor, argumentative.

19          THE COURT:    Overruled.

20          Answer the question, sir.

21          THE WITNESS:    Okay.   The signs with the rates on it

22  always stays the same in valet.   They're always posted in the

23  same position.   The signs that we direct the traffic into valet

24  are moved, because as one lane get full, we move the sign to the

25  next lane.

<center>EXAMINATION</center>

BY MR. CASHIO:

Q.   Was there any sign that had that a yellow border?  I want

to show you a picture.

          THE COURT:   Has defense counsel seen it?

          MR. CASHIO:   It's a defense exhibit.  It's the picture

of the valet.

          What's that number?

          MR. BALLINA:    That would be Defense Exhibit Number 5,

Your Honor.

<center>EXAMINATION</center>

BY MR. CASHIO:

Q.   Defense Exhibit Number 5, that valet sign, do you see that

sign?

A.   Yes, sir.

Q.   Now, did the sign that was underneath the porte cochere,

the covering here, did it look like this one?

A.   No, it stated the same rates but it wasn't the same.  It

wasn't on the same stand?

Q.   I know it's not the same stand.  I'm talking about the

color and -- the colors, first of all.

A.   Yes, sir.

Q.   Okay.  Now, are there any other signs -- were there any

other signs on December 10th, 2003 that looked just like this

sign but had different words on it?

1   A.   There could have been.

2   Q.   But you don't remember?

3   A.   No, I don't.

4   Q.   You just remember those signs, right?

5   A.   Those signs --

6        MR. BALLINA:   Objection, Your Honor.

7        THE WITNESS:   -- stay there, sir.  They're there all

8   the time.

9        MR. BALLINA:   Asked and answered.

10        THE COURT:   Objection sustained.

11                       EXAMINATION

12   BY MR. CASHIO:

13   Q.   Those signs stay there?

14   A.   Yes, sir.

15   Q.   Do other signs move?  Do other signs that look like this

16   sign move?

17   A.   As I stated to you, we have signs that direct traffic into

18   the casino in different lanes.  Yes, they can be moved.

19   Q.   Okay.  So you don't know how many signs and the location of

20   them on December 10th, 2003, other than you think you remember

21   where these two valet signs were, is that correct?

22        MR. BALLINA:   Objection, Your Honor.  Asked and

23   answered.

24        THE COURT:   Sustained.  Asked and answered three

25   times.

```
1                          EXAMINATION
2   BY MR. CASHIO:
3   Q.    When I come into the valet from Canal Street, I notice that
4   there is a gray thing on the bottom of the valet sign, what is
5   that?
6   A.    It's a foundation that holds the sign.
7   Q.    Okay.  Is that a movable sign that's been moved off that
8   foundation?
9   A.    Rephrase that.
10  Q.    I said is that sign movable or is it stuck in the ground
11  there?
12  A.    Oh, it's movable.
13  Q.    And isn't it true that that sign sometimes is turned around
14  so that other words are directed at the people who are coming
15  from Canal Street?
16  A.    Yes, sir.
17  Q.    If you would have known that Mr. Shaun Smith had lost all
18  of his money playing blackjack that night, would have given him
19  free parking?
20        MR. BALLINA:    Objection, Your Honor.  It's
21  speculation.
22        THE COURT:    Overruled.
23        Answer the question if you can, sir.
24        THE WITNESS:    Repeat it.
25                          EXAMINATION
```

BY MR. CASHIO:

Q.    I said if you had known that Shaun Smith had lost all his money at blackjack that night would you have given him free parking?

A.    I would gave him the procedures that he should follow.

Q.    And what were those procedures?

A.    First, I would ask him whether he had a credit card or did he have a ATM card that maybe he could make payment with.  If not, I would have asked him would he go back into the casino to try to get a comp for his parking.

Q.    First you would have asked him if he had a credit card?

A.    Yes, sir.

Q.    So you wouldn't give him the option of going back into the casino first getting it free --

A.    I would have --

Q.    -- you wanted to get the money first?

A.    -- given him all options.

        MR. BALLINA:    Asked and answered.  Argumentative.

        THE COURT:    Overruled.

        Mr. Turner, you're going to have to wait.  I told him not to interrupt you, but you can't interrupt him.

        Ask your question again, Mr. Cashio.

                              EXAMINATION

BY MR. CASHIO:

Q.    You told me that ordinarily you would ask him if he had a

1  credit card or an ATM card first.  If he didn't have that, then

2  you would tell him to go into the casino and try to get it free.

3  So you wanted him to try first, and then as a second alternative

4  you would tell him, okay, you can go get it free?

5  A.    No, sir.

6         MR. BALLINA:    Objection, Your Honor.  I think it's

7  argumentative.

8         THE COURT:    Answer the question.

9         THE WITNESS:    There is a charge on valet, so if a

10  patron parks in valet you're supposed to pay for your parking,

11  so if you have a credit card or an ATM card, you would go -- you

12  would receive the cash in order to pay for parking.

13                          EXAMINATION

14  BY MR. CASHIO:

15  Q.    Did you know that there's no other casinos in this state or

16  in Mississippi that charge for valet parking except Harrah's?

17         MR. BALLINA:    Objection, Your Honor.  Irrelevant.

18         THE COURT:    Sustained.

19         Move on, counsel.

20         MR. BALLINA:    And lack of evidence.

21                          EXAMINATION

22  BY MR. CASHIO:

23  Q.    Have you ever been to any other casino?

24         MR. BALLINA:    Irrelevant.  Objection.  Irrelevant.

25         THE COURT:    Sustained.  Irrelevant, counsel.

```
 1                          EXAMINATION
 2  BY MR. CASHIO:
 3  Q.    Who else was out there near the scene of the accident at
 4  the time it happened?
 5  A.    Stacey Dorsey and Christopher Stevenson.
 6  Q.    Did Christopher Stevenson go immediately to Shaun Smith as
 7  he lay on the ground to give him aid?
 8  A.    No, sir.
 9          MR. CASHIO:    That's all I have.
10          Thank you.
11          THE COURT:    All right.  Mr. Ballina, direct
12  examination of Mr. Turner, please.
13                       DIRECT EXAMINATION
14  BY MR. BALLINA:
15  Q.    Good morning ladies and gentlemen.
16          Good morning, Mr. Turner.
17  A.    Good morning.
18  Q.    Any time that night did Mr. Smith tell you that he lost
19  all his money playing blackjack?
20  A.    No, sir.
21  Q.    At any time that night did Mr. Smith tell you that he
22  didn't have money to pay his parking?
23  A.    No, sir.
24  Q.    At any time that night did you overhear Mr. Smith tell any
25  one at Harrah's that he had lost all his money playing
```

1 blackjack?

2 A.    No, sir.

3 Q.    Did you overhear Mr. Smith at any time that night say that

4 he didn't have the money to pay?

5 A.    No, sir.

6 Q.    What is the procedure if a customer does tell someone that

7 they don't have the money to pay the parking fee?

8 A.    The procedure is that we would ask them do they have a

9 credit card if they doesn't have the cash, or if they have an

10 ATM card maybe they can go inside and use the ATM machine, and

11 if not, we'll asked them to go back to either the table games,

12 slot attendance or whatever, or total rewards to try to get comp

13 for their parking.

14 Q.    What has to be done if the cashier, like Jessica Wilson,

15 has already rung up the charge and then the customer says they

16 don't have the money to pay it?

17 A.    You would have to void out the transaction out of the cash

18 register so that the cashier can go on and wait on the next

19 customer.

20 Q.    Is that waiving the charge?

21 A.    No, that's not waiving the charge, that's just simply

22 clearing the register so that the cashier can wait on the next

23 customer that comes in line or maybe already in line while you

24 was standing on the side and explaining to the guest they cannot

25 pay for their parking, what the procedures are.

1    Q.    And if you've gone through that procedure with the customer

2    who's told you that they don't have the money to pay?

3    A.    Yes, sir.

4    Q.    And they don't have a credit card, they don't have a check,

5    they don't have a debt card, they don't have an ATM card and

6    they cannot get a complimentary voucher from inside, what do you

7    do?

8              MR. CASHIO:    Objection.  Leading, Your Honor.

9              THE COURT:    Overruled.  Answer the question.

10             THE WITNESS:    That's when we would do a department

11   charge and we would let the guest go.

12                              EXAMINATION

13   BY MR. BALLINA:

14   Q.    What is the procedure when a guest refuses to pay their

15   parking charge?

16   A.    We would hold their car if they refuse to pay for the

17   parking because service has been rendered and they are supposed

18   to pay for their parking.

19   Q.    So there are different procedures between a customer who

20   cannot pay who doesn't have the money to pay and a customer who

21   refuses to pay?

22   A.    Yes, sir.

23   Q.    And on the night in question with Mr. Smith, what is it

24   that Mr. Dorsey told you, or the cashier had told you that Mr.

25   Smith said?

1  A.    Mr. Dorsey told me --

2              MR. CASHIO:    Objection.  Hearsay, Your Honor.

3              THE COURT:    Sustained.

4                              EXAMINATION

5  BY MR. BALLINA:

6  Q.    Did anyone tell you, anyone at Harrah's tell you that night

7  that Mr. --

8              MR. CASHIO:    Objection, Your Honor.

9              THE COURT:    Well, wait.  Let him finish his question.

10             MR. CASHIO:    He said did anybody tell you.

11             THE COURT:    Objection sustained.

12                             EXAMINATION

13 BY MR. BALLINA:

14 Q.    Has it happened at the casino that the keys for a

15 customer's car go out before the customer has actually paid

16 their parking charge?

17             MR. CASHIO:    Objection.  Irrelevant, Your Honor.

18             THE COURT:    Overruled.

19             THE WITNESS:   Yes, sir.

20                             EXAMINATION

21 BY MR. BALLINA:

22 Q.    And why does that happen that the keys will sometimes go

23 out before the cashier has actually gotten the money from the

24 customer?

25 A.    Because as a guest enters the cashier window, the cashier

1   normally calls the number out to another cashier which gives her

2   the time and she rings up this customer, but by that time the

3   cashier that's given out the keys, the keys is already gone, so

4   that we can try to get the guest's car there as fast and quickly

5   as possible, service, for service, faster service.

6   Q.   Do you have any training in rendering medical assistance?

7   A.   No, sir.

8   Q.   Is providing medical assistance part of your job at

9   Harrah's Casino?

10  A.   No, sir.

11  Q.   Does Harrah's Casino have employees who's job it is to

12  provide medical assistance?

13  A.   Yes, sir.

14  Q.   On the night in question with Mr. Smith, to your knowledge,

15  were the individuals of the personnel at Harrah's who were hired

16  to provide medical assistance, were they notified?

17  A.   Yes, sir.

18  Q.   And to your knowledge, did they come on the scene and

19  provide medical attention to Mr. Smith?

20  A.   Yes, sir.

21  Q.   The sign that is located at the entrance on Canal Street,

22  what language or what does it say on the other side of the sign

23  from the rates, do you know what it says?

24  A.   Yes, it says Diamond Cars Only?

25  Q.   And what does that mean?

1   A.   That's when we turn the sign around when we were only

2   taking diamond cars into valet.   That mean, no cash customers or

3   Platinum.

4   Q.   So, if that sign -- if that side of the sign is being

5   displayed valet parking is not accepting cash customers?

6   A.   They're not accepting cash customers.

7          MR. BALLINA:   Thank you, Mr. Turner.   That's all that

8   I have.

9          THE COURT:   Any recross?

10          MR. CASHIO:   Yes, sir.

11          THE COURT:   Limited to what was brought out on the

12   direct examination, Mr. Cashio.

13                       RECROSS-EXAMINATION

14   BY MR. CASHIO:

15   Q.   Now, you said that medical assistance was rendered to Mr.

16   Shaun Smith, is that correct?

17   A.   Yes, sir.

18   Q.   Isn't it true that Shaun Smith was left lying in traffic by

19   himself on the scene for a good while before they came onto to

20   the scene?

21          MR. BALLINA:   Objection, Your Honor.   I think that is

22   beyond the scope of my cross.

23          THE COURT:   Overruled.

24          MR. CASHIO:   Go ahead.

25          THE WITNESS:   No, sir, I would say medical assistance

 1  was called out.  They have to have time to get there.

 2                          EXAMINATION

 3  BY MR. CASHIO:

 4  Q.   I asked you the question, isn't it true that --

 5              THE COURT:   Sir, he answered the question.

 6              MR. BALLINA:   Objection.

 7              THE COURT:   Move on.

 8              MR. CASHIO:   I don't think he did, Your Honor.

 9              THE COURT:   That's for the jury to decide, counsel.

10              Ask your next question.

11                          EXAMINATION

12  BY MR. CASHIO:

13  Q.   Did you ever ask Mr. Smith about if he had a driver's

14  license or if he would sign a voucher or an IOU for the $10?

15              MR. BALLINA:   Objection, Your Honor.  Asked and

16  answered.

17              THE WITNESS:   No, sir.

18              MR. CASHIO:   Your Honor, he asked all about the

19  procedure.

20              THE COURT:   Objection sustained.

21              Move on.

22                          EXAMINATION

23  BY MR. CASHIO:

24  Q.   And you told Mr. Ballina that one of the important aspects

25  of Harrah's is the fast service, is that correct?

```
 1              MR. BALLINA:   Objection.

 2              THE COURT:   Overruled.

 3              MR. BALLINA:   That may be a mischaracterization.

 4              THE COURT:   It's a mischaracterization, but he did

 5    mention about fast service.

 6              Go ahead.  Answer the question, sir.

 7              THE WITNESS:   Okay.  Repeat the question.

 8                         EXAMINATION

 9    BY MR. CASHIO:

10    Q.   I said, didn't you tell your lawyer, Mr. Ballina --

11              MR. BALLINA:   Objection, Your Honor.

12              THE COURT:   Sustained.

13              He's not Mr. Turner's lawyer, counsel.  That's a

14    mischaracterization.

15                         EXAMINATION

16    BY MR. CASHIO:

17    Q.   Okay.  Didn't you tell Harrah's lawyer that fast service is

18    one of the things Harrah's prides themselves on?

19    A.   Yes, sir.

20              MR. BALLINA:   Objection.  That's a

21    mischaracterization.

22              THE COURT:   Sustained.

23                         EXAMINATION

24    BY MR. CASHIO:

25    Q.   I want to show you the accident scene and ask you to tell
```

1  me where you're located in that scene.

2       MR. BALLINA:   Objection, Your Honor.  Beyond the scope

3  of my cross.

4       THE COURT:   Sustained.

5       MR. CASHIO:   He asked him about the accident, Your

6  Honor.

7       THE COURT:   Objection sustained.

8                        EXAMINATION

9  BY MR. CASHIO:

10 Q.   Now, you talked about the different ways that the customer,

11 that Shaun Smith could have paid that night, is that correct?

12      MR. BALLINA:   Objection, Your Honor.  I don't believe

13 he testified --

14      THE COURT:   Overruled, counsel.  You ask himed and he

15 went into debt card, credit card and all that.  That's a proper

16 question.

17      Ask the question again, Mr. Cashio.

18                        EXAMINATION

19 BY MR. CASHIO:

20 Q.   Okay.  You talked about how Mr. Smith could have paid that

21 night?

22 A.   Yes sir.

23 Q.   Are you familiar with the Harrah's --

24      MR. BALLINA:   I'm sorry, Your Honor, to interrupt

25 again, but I don't believe there was testimony that's how Mr.

1    Smith could have testified that night because his testimony was

2    Mr. Smith refused to pay and he testified as to the procedure.

3            THE COURT:    Your question was about the procedure.

4    Limit it to the procedure.

5            MR. CASHIO:    Okay.    The procedure, yeah.

6                                EXAMINATION

7    BY MR. CASHIO:

8    Q.    Okay.    Is the procedure to describe to the visitor, the

9    patron, Shaun Smith, especially if he's a first time visitor --

10           MR. BALLINA:    Objection, Your Honor.

11           MR. CASHIO:    -- the card privileges on how to get

12   parking free?

13           MR. BALLINA:    Objection.    That's, I believe, beyond

14   the scope of my examination.

15           THE COURT:    Sustained.

16           MR. CASHIO:    That's the procedure, Your Honor.    That's

17   what he asked him.

18           THE COURT:    Next question.

19           I'll tell you, I'll allow that question.    He brought up

20   procedure.

21           Answer that question, was that explained to Mr. Smith,

22   the procedure?

23           THE WITNESS:    I don't know.    I wasn't there when Mr.

24   Smith arrived.    I don't know what was explained to him.

25           THE COURT:    All right, sir.

1          MR. CASHIO:   Okay.

2                         EXAMINATION

3   BY MR. CASHIO:

4   Q.   Do you know if Harrah's asked the people in valet to

5   explain the card procedures to the patrons, especially if that's

6   the first time they've been there?

7          MR. BALLINA:   Objection, Your Honor.  I believe this

8   is beyond the scope.  I think he's asking, and I'm not sure when

9   the customer first arrives, and I didn't ask any questions

10  regarding when the customer first arrived.

11         MR. CASHIO:   This is at any time, Your Honor.

12         THE COURT:   Overruled.  If he knows the procedure.

13         Mr. Ballina asked questions related to the procedures,

14  so you can ask questions related to the procedure.

15         Go ahead.  Re-ask your question, Mr. Cashio.

16                         EXAMINATION

17  BY MR. CASHIO:

18  Q.   Isn't it true that Harrah's requires the people in valet to

19  explain and describe the card procedures and privileges to the

20  cash customers?

21         MR. BALLINA:   At what time, Your Honor?

22         MR. CASHIO:   At any time.

23         THE COURT:   Be more specific.

24                         EXAMINATION

25  MR. CASHIO:

1  Q.   At the time they come to the valet cashier?

2       MR. BALLINA:   When they arrive, or when they're

3  leaving, Your Honor?

4       MR. CASHIER:   No, the valet -- he doesn't know the

5  procedure.

6                        EXAMINATION

7  BY MR. CASHIO:

8  Q.   The valet cashier is only at the time when they are

9  leaving, isn't that correct?

10 A.   The valet cashier at the time that they are leaving?

11 Q.   So when they come to the valet cashier, isn't it true that

12 Harrah's requires the cash customers to be given a description

13 of the card privileges?

14 A.   If a cash customer comes into valet, the cashier can let

15 them know that we do have free parking in our self parking

16 garage that they can earn comps for their parking.

17 Q.   Is that answer yes or no, could --

18      MR. CASHIO:   Your Honor, could you ask, because I

19 didn't understand the answer.  I don't think he --

20      THE COURT:   Counsel, he answered it.

21      MR. CASHIO:   Okay.

22                        EXAMINATION

23 BY MR. CASHIO:

24 Q.   Does Harrah's require the valet cashier, people at the

25 valet cashier booth to describe to cash customers, especially

1    first time customers that they can get card privileges if they

2    gamble where they can get free parking in valet?

3              MR. BALLINA:   Objection, Your Honor.  I think that's

4    asked and answered.

5              THE COURT:   Sustained.

6              MR. CASHIO:   That's all that I have, Your Honor.

7    Thank you.

8              THE COURT:   Thank you.

9              Any recross?  But limited to what he brought out on

10   redirect, counsel.

11             MR. BALLINA:   No, Your Honor.

12             THE COURT:   All right.  Thank you, Mr. Turner, you can

13   step down.

14             Any further need for this witness by either party?

15             MR. CASHIO:   No, Your Honor.

16             MR. BALLINA:   No, Your Honor.

17             THE COURT:   All right.  You're relieved from your

18   subpoena.  You can leaf.

19             Call your next witness, Mr. Cashio.

20             MR. CASHIO:   I'd like to call Ms. Jessica Wilson.

21             THE CLERK:   Raise your right hand, please, ma'am.

22                          JESSICA RENE' WILSON

23             After having been first duly sworn, did testify under

24   oath, as follows:

25             THE CLERK:   Have a seat and state your name for the

1    record, and come right up to the microphone?

2          THE WITNESS:   Jessica Rene' Wilson.

3          THE COURT:   Speak into the microphone, ma'am, if you

4    would, please.

5          THE WITNESS:   Oh, I'm sorry.  Jessica Rene' Wilson.

6          All right, Mr. Cashio.  Your witness, please, under

7    cross-examination.

8                         CROSS-EXAMINATION

9    BY MR. CASHIO:

10   Q.   Okay.  Mrs. Wilson, did you see the truck strike Mr. Smith

11   on the evening of December the 10th?

12   A.   No, I didn't.

13   Q.   Okay.  And why was that?

14   A.   Because the truck was -- I was on the left side of the

15   truck.

16   Q.   Did you see Mr. Smith lying in the traffic lanes after the

17   accident screaming?

18   A.   Yes, I did.

19   Q.   I want to play a video for you, and I want you to tell me

20   if --

21          THE COURT:   Before you play it, what are you asking

22   her?

23          MR. CASHIO:   Okay.  Well, I'm going to ask her a few

24   questions about it, Your Honor.

25          THE COURT:   Well, why don't you ask.  Let's try to

1  clear this up.

2           MR. CASHIO:   Okay.

3                         EXAMINATION

4  BY MR. CASHIO:

5  Q.   Did you see anyone go to Shaun Smith's side to help him

6  immediately after the accident?

7  A.   I don't remember.

8  Q.   If I show you the video, do you think that it will help

9  your memory?

10          THE COURT:   Certainly it will, counsel.

11          Show her the video then.

12          MR. CASHIO:   Okay.

13                     (THE VIDEO WAS PLAYED)

14                        EXAMINATION

15  BY MR. CASHIO:

16  Q.   If you'll look at this screen, Ms. Wilson, right here, this

17  is Mr. Smith.  Can you see him, okay?

18  A.   Um, yeah.

19  Q.   Do you see Mr. Smith on the ground?

20  A.   Yes, I do.

21  Q.   Is anyone going to his side to help him?

22          MR. BALLINA:   Objection.  Your Honor, I think it's

23  self --

24          THE COURT:   Sustained.

25          Counsel, she's not to identify what she's looking at.

1  Ask her what she observed that night.

2                          EXAMINATION

3  BY MR. CASHIO:

4  Q.   Do you recall now after seeing this video whether or not

5  anyone immediately went to Shaun Smith's side to give him

6  assistance?

7  A.   No.  Looking at the tape, no, one came to his side.

8  Q.   Now, did you see Mr. Smith grab onto the vehicle at any

9  point in time?

10 A.   Yes.  When he approached the vehicle, I saw him grab onto

11 the rear view mirror.

12 Q.   And you could see that even though you couldn't see the

13 accident, right?

14 A.   Yes.

15 Q.   Do you remember if there was any delay in getting Shaun

16 Smith's car down before there was even a question about him

17 paying?

18 A.   Getting it down?

19 Q.   Yes.

20 A.   Getting it around, there was a delay, yes, because he put

21 his ticket on the counter of the valet booth and walked off.

22 Q.   Okay.  You remember when I took your deposition at Harrah's

23 lawyer's office under oath?

24 A.   Yes, I do.

25 Q.   Okay.  I want you to read page 13, lines 24 and 25, and

1  then page 14, 1 through 3 to yourself, and then I'll ask you

2  that question again.

3  A.    Okay.

4  Q.    Let me know when you're through reading.

5  A.    Okay.  I'm ready.

6  Q.    Now, do you remember under oath I asked you "Do you

7  remember if there was a delay in getting his car down and before

8  there was even a question about him paying?"  What was your

9  answer that night?

10  A.    My answer was "No there wasn't a delay in getting the car

11  down".

12  Q.    Okay.

13  A.    And that's because --

14        MR. BALLINA:    Your Honor, I think he made reference to

15  other lines.  There's a question right above that --

16        THE COURT:    You can ask her.  You can ask her.  I

17  mean, if he doesn't ask you can ask.

18        Go ahead ask your question now.

19        Wait, she was in the middle of answering a question

20  when she was interrupted.  Go ahead.

21        THE WITNESS:    Okay.  I was about to say that there

22  wasn't a problem parking his car which is what I -- at the time

23  of the deposition I thought that's what you were talking about.

24  But there wasn't a problem.  There was a problem getting his car

25  to him when he wanted it.

1                        EXAMINATION

2    BY MR. CASHIO:

3    Q.   Okay.  Now, let's go over that question again because may

4    be you misunderstood it, and I want --

5              THE COURT:   Well, what I want her to do then is to

6    read from the beginning then so that it's in proper context,

7    counsel.

8              MR. CASHIO:   You can read line 18.  I think that's the

9    beginning.

10             Is that okay with you, Mr. Ballina?

11             MR. BALLINA:   I'm sorry.

12             MR. CASHIO:   I said is that okay with you if we read

13   from line 18 to start at the beginning of the colloquy?

14             MR. BALLINA:   On page 13, line 18?

15             MR. CASHIO:   Yes, to make it more --

16             THE COURT:   Go ahead.

17                        (WITNESS COMPLIED)

18             MR. CASHIO:   We're ready?

19             THE WITNESS:   Yes.

20                        EXAMINATION

21   BY MR. CASHIO:

22   Q.   Okay.  Now, the question again was, "Do you remember if

23   there was a delay in getting his car down before there was even

24   a question about him paying", and what was your answer?

25   A.   My answer was "No, there wasn't a delay in getting the car

1  down".

2  Q.    Okay.  Is it okay for you to call, when you were working in

3  the valet cashier booth, for a vehicle to be brought down from

4  the parking area to the valet area before you have ascertained

5  that the patron has paid for the vehicle?

6  A.    It's not procedure but to accommodate the guest if they've

7  been waiting or if they know their preference, then we can call

8  for the car before they pay.

9  Q.    Is that what you did that night for Mr. Smith?

10 A.    Yes, I did because he had been waiting.

11 Q.    I thought you said there wasn't a delay?

12         MR. BALLINA:    Objection.

13         THE  WITNESS:    No, I said --

14         THE COURT:    Sustained.

15                         EXAMINATION

16 BY MR. CASHIO:

17 Q.    But to answer the question completely when -- I'm going to

18 let you read this and tell me what you said exactly to that same

19 question under oath a couple of months ago at Harrah's lawyer's

20 office.

21         THE COURT:    Counsel, she's already --

22         MR. CASHIO:    No, she's answered differently, Your

23 Honor.

24         THE COURT:    She answered differently.

25         MR. CASHIO:    That's why I want a --

```
 1          THE COURT:   But you have already asked her what she
 2   said under oath at her deposition and she said --
 3          MR. CASHIO:   No, no, this is a different one.   I
 4   haven't asked her this one.
 5          THE COURT:   And don't make comments on what she said,
 6   just her the question after she gets a chance to read it.
 7          MR. CASHIO:   Can you read page 14, lines 15 through
 8   21.
 9          THE COURT:   Counsel, let her read it.   Don't look over
10   her shoulder.
11          MR. CASHIO:   Okay.
12                        EXAMINATION
13   BY MR. CASHIO:
14   Q.   Now, when I asked you under oath, "Do you remember if
15   there was --" Oh, I'm sorry.   "Is it okay for you to call for a
16   vehicle to be brought from the parking area to the valet area
17   before you have ascertained that the patron has paid for the
18   vehicle?"   What did you tell me under oath?
19   A.   I said, "Yes", and then I said "No".
20   Q.   You said "Yes", and then you said "No".   Tell me where you
21   said "Yes".   I'll let you read it again.
22   A.   Right here.   "Is it okay, I say yes".
23          THE COURT:   Speak into the microphone, ma'am.
24                        EXAMINATION
25   BY MR. CASHIO:
```

1  Q.    No, no, I said "Yes" when you asked me, "Is it okay".  A
2  means your answer.  What was your answer that day?
3  A.    I said "No".
4  Q.    Did Mr. Smith give you the ticket as soon as he walked up
5  to the valet booth?
6  A.    No, he didn't give a ticket to me.
7  Q.    Okay.  Did you get the ticket within one minute of the time
8  Mr. Smith walked up to the valet booth, his ticket?
9  A.    I'm not sure what you're asking me.
10 Q.    Did you ever physically receive his ticket -- and I'm
11 talking about Shaun Smith -- within one minute after he walked
12 to the valet booth?
13 A.    No.
14 Q.    How long did it take you before you actually received his
15 ticket?
16 A.    I'm not sure of the time frame.
17 Q.    Was it a good while?
18 A.    I'm not sure.
19 Q.    Now, before the accident happened, did you hear Mr. Stacey
20 Dorsey, this gentlemen right here, yell or say anything to the
21 driver of Mr. Smith's vehicle?
22 A.    I'm, sorry, can you repeat your question for me?
23 Q.    My question is, shortly before the accident happened, did
24 you hear Mr. Stacey Dorsey say anything or yell anything to the
25 driver of Mr. Smith's vehicle right before the accident?

1  A.    Yes, he said to re-park the vehicle.

2  Q.    Did he say park it back, bring it back?

3          MR. BALLINA:    Objection.    She just testified to what

4  she said.

5          THE COURT:    Sustained.

6                          EXAMINATION

7  BY MR. CASHIO:

8  Q.    Well, let then let me ask you what you said under oath?

9          Can you read deposition page 28, line 25, and 29, lines

10  1 through 2?

11  A.    (WITNESS COMPLIED).

12  Q.    What did you tell me under oath that Mr. Dorsey said?

13  A.    I told you that he said to park it back, bring it back.

14  Q.    And you could hear him say that?

15  A.    Yes.

16  Q.    How far is the valet booth from the scene of the accident?

17  A.    I'm not sure.

18  Q.    And that truck was a rather loud truck, it was a diesel

19  truck, do you remember that?

20  A.    I'm not sure what kind of truck it was.

21  Q.    But you could hear Mr. Dorsey?

22  A.    Because he was in the booth with me.

23  Q.    Do know you if Mr. Stacey Dorsey or yourself or Roosevelt

24  Turner or anyone in the valet area ever suggested to Shaun Smith

25  that he go discuss getting a comp for his gaming that night in

1   order to pay for his parking?

2   A.    I didn't.  I'm not sure what Roosevelt or Stacey requested

3   that he do.

4   Q.    Okay.  When Mr. Smith came to your valet booth, did you

5   tell him how long it would take for his vehicle to get there

6   when he first came?

7   A.    No.

8   Q.    Okay.  Are you familiar with anyone in the valet parking

9   ever getting comps from the people in the casino where they

10  don't have to pay for the valet parking?

11  A.    Yes.

12  Q.    Is this a common procedure?

13  A.    It doesn't happen often, but it happens.

14  Q.    Have you ever seen a car impounded by the Harrah's valet

15  personnel for a $10 parking charge?

16  A.    No.

17          MR. CASHIO:    That's all that I have.

18          THE COURT:    Direct examination by Mr. Ballina.

19          MR. BALLINA:    Your Honor, with the Court and the

20  jurors indulgence if I could have a moment.  I'm going to show

21  Ms. Wilson some video coverage and I'd like to setup my video.

22          MR. CASHIO:    That's fine, Your Honor, but I think he

23  needs to ask the questions beforehand like I did.

24          THE COURT:    You just want him to set it up now.

25  You're not going to show anything until you start asking

1    questions?

2                MR. BALLINA:    Correct.

3                THE COURT:    Go ahead.

4                MR. BALLINA:    I apologize, Your Honor.  I apologize,

5    ladies and gentlemen.

6                THE COURT:    Can you start asking while he's setting

7    up?

8                        DIRECT EXAMINATION

9    BY MR. BALLINA:

10   Q.    Good morning, Ms. Wilson, how are you?

11   A.    Fine.

12   Q.    The deposition testimony that Mr. Cashio read to you

13   regarding was there a problem with getting Mr. Smith's vehicle

14   down, does the term down have a special meaning at Harrah's

15   valet parking?

16   A.    Yes, it does.  When you say down you're referring to

17   parking the vehicle and not bringing the car to the customer.

18   Q.    When Mr. Cashio asked you that question in your deposition,

19   what was your understanding of the word down in his question?

20   A.    Meaning parking his vehicle, parking Mr. Smith's vehicle.

21   Q.    And not getting Mr. Smith's vehicle back, retrieving it?

22                MR. CASHIO:    Objection.  Leading, Your Honor.

23                THE WITNESS:    That's correct.

24                THE COURT:    Sustained.  Don't lead.

25                MR. BALLINA:    Okay.

1                              EXAMINATION

2   BY MR. BALLINA:

3   Q.    What Was your understanding when Mr. Cashio asked you that

4   question in your deposition that Mr. Cashio was referring --

5               MR. CASHIO:    Objection, leading.

6               THE COURT:    Objection sustained.  Don't lead, counsel.

7               Rephrase your question.

8               You can ask her what her understanding was, but don't

9   tell her what you think it was.

10              MR. BALLINA:    Thank you, Your Honor.

11                             EXAMINATION

12  BY MR. BALLINA:

13  Q.    What was your understanding when Mr. Cashio asked you that

14  question?

15  A.    My understanding when Mr. Cashio asked me was there a

16  problem getting his car done down was, was there a problem

17  parking his car that night, and my answer was "No".

18  Q.    You spoke with Mr. Smith that night?

19  A.    Yes, I did.

20  Q.    At any time that you spoke with Mr. Smith, did Mr. Smith

21  tell you that he didn't have the money to pay the parking?

22  A.    No, he didn't.

23  Q.    Did Mr. Smith ever tell you --

24              MR. CASHIO:    Objection.  Leading, Your Honor.

25              THE COURT:    Sustained.

<div style="line-height:2">

                              EXAMINATION

1

2  BY MR. BALLINA:

3  Q.    Did Mr. Smith tell you that he had lost all his money

4  gambling?

5            MR. CASHIO:    Objection, Your Honor, leading.

6                              EXAMINATION

7  BY MR. BALLINA:

8  Q.    Did Mr. Smith tell you he had lost all his money playing

9  Blackjack in the casino?

10  A.    No, he didn't.

11  Q.    Okay.  Was Mr. Smith told that there was a charge for the

12  parking?

13  A.    Yes, he did -- yes there was, he was told.

14  Q.    When he was told that there was a charge for parking, what

15  did Mr. Smith say?

16  A.    He said he's not paying 10 MF-ing dollars for a parking.

17  Q.    Was Mr. Smith told that he had to pay the $10?

18  A.    Yes, he was.  Yes, he was told.

19  Q.    And do you know who told him that?

20  A.    I told him, Stacey Dorsey told him, and so did Roosevelt

21  Turner.

22  Q.    Did you hear Mr. Smith, after he was told that there was a

23  -- he had to pay the $10, did you hear Mr. Smith direct any

24  rational slurs to you or anyone else there at Harrah's?

25  A.    Yes, I he did.  He made racial slurs towards Stacey.

</div>

1   Q.   And without saying the racial slur or slurs he may have

2   used, what did Mr. Smith say to Mr. Dorsey?

3   A.   Basically that he owned Stacey and his family?

4   Q.   Did Mr. Smith say that to Mr. Dorsey after he had been told

5   that he had to pay the parking?

6   A.   Yes.

7   Q.   He did not say that to Mr. Dorsey before he was told that

8   he had to pay the parking?

9   A.   No, he didn't.

10          THE COURT:   Don't lead, counsel.

11                      EXAMINATION

12  BY MR. BALLINA:

13  Q.   How long did you work as a valet cashier?

14  A.   Two and a half years.

15  Q.   Do you still work for Harrah's?

16  A.   Yes, I do.

17  Q.   What do you do for Harrah's now?

18  A.   I'm a reservation agent.

19  Q.   Were you fired from your job as a valet cashier by

20  Harrah's?

21  A.   No, I didn't.

22          MR. CASHIO:   Objection, Your Honor.  Leading.

23          THE COURT:   Sustained.

24          Don't lead.

25                      EXAMINATION

1  BY MR.  BALLINA:

2  Q.   Why did you leave your job as a valet cashier at Harrah's?

3  A.   I transferred to another department.

4  Q.   In December 2003, where there signs at Harrah's valet

5  parking area regarding parking rates?

6  A.   Yes, there was in the front at the entrance of the valet

7  area.

8        MR. BALLINA:   May I approach the witness?

9        THE COURT:   Yes.

10                     EXAMINATION

11 BY MR. BALLINA:

12 Q.   Ms. Wilson, I'm going to show you a copy of what's been

13 admitted into evidence, does that appear to be the parking

14 valet tickets that Harrah's was using in December 2003?

15 A.   Yes.

16 Q.   And could you explain or tell the jurors what part of that

17 ticket you would get as the valet cashier from the customer when

18 they were ready to leave?

19 A.   This bottom portion right here that I'm touching with my

20 right hand.

21 Q.   And let me ask you, if you could, to read what that ticket

22 says in order to claim your vehicle, what was does the customer

23 do?

24 A.   It says, "To claim your vehicle, please present this stub

25 to the valet cashier located in the porte cochere.  Please allow

1  15 minutes for the retrieval of your vehicle".

2  Q.   Did Mr. Smith on December 10th, 2003, did Mr. Smith give to

3  you this lower portion of the ticket?

4  A.   No, he didn't present me with the ticket.

5  Q.   I'm going to ask you to take a look at the video, C1.

6         MR. CASHIO:   Don't show it to him until he says it's

7  okay.  He's got to ask a question first.

8         MR. BALLINA:  I just asked a question.

9         MR. CASHIO:   What was the question?

10         THE COURT:   Ask a question, counsel.

11                         EXAMINATION

12  BY MR. BALLINA:

13  Q.   Did Mr. Smith give you the lower portion of this ticket?

14  A.   No, he didn't.

15         THE COURT:   That's what you're referring to in the

16  video, counsel?

17         MR. BALLINA:   Yes, sir.

18                         EXAMINATION

19  BY MR. BALLINA:

20  Q.   When Mr. Smith first came up to the counter, did Mr. Smith

21  give you the lower portion of this ticket?

22  A.   No, he didn't.

23         MR. CASHIO:   Your Honor, I don't understand the

24  purpose of this.  If she's already testified what he gave her,

25  what is the purpose of this?  It's not to refresh her memory.

1    THE COURT:    Counsel, I'm allowing him like I allowed
2  you to show when you asked the question.
3    MR. CASHIO:    All right.
4    MR. BALLINA:    I apologize, ladies and gentlemen, we'll
5  get this in a minute.
6    THE COURT:    Counsel, continue with the questions while
7  he fools with that and then you can go ahead and redirect this
8  issue.
9    MR. BALLINA:    Yes, Your Honor.
10                       EXAMINATION
11 BY MR. BALLINA:
12 Q.    As a valet cashier, did it happen that you'd issue the keys
13 before --
14    MR. CASHIO:    Objection.  Leading, Your Honor.
15    THE COURT:    Sustained.
16                       EXAMINATION
17 BY MR. BALLINA:
18 Q.    In December 2003, where were trucks parked, oversized
19 vehicles like a truck parked at Harrah's?
20 A.    In the bus barn.
21 Q.    And where is the bus barn, and where was it in December of
22 2003?
23 A.    The bus barn is on Convention Boulevard.
24 Q.    And how far approximately is that away from the casino?
25 A.    For a driver to walk, it's about five minutes.

1  Q.    In December of 2003, where were the customers keys kept

2  when the car was parked at the bus barn?

3  A.    On the porte cochere by the valet booth.

4  Q.    In December of 2003, where was the valet booth?

5  A.    Outside on the porte cochere.

6  Q.    On the night in question on December 10th, 2003, where were

7  you working?

8  A.    I worked in valet outside in the porte cochere.

9  Q.    On the night of December $10th, 2003, were you working in

10  the booth?

11  A.    Yes, I was.

12  Q.    And could you explain to us the procedure for a customer

13  whose car would be in the bus barn, what would happen when he or

14  she would walk up and give you that lower stub portion of the

15  ticket, what would you do?

16  A.    If the customer came to my line and they presented me the

17  ticket I would call for the time to the key person who's

18  downstairs who takes all of the time that the vehicle was

19  parked.  I would process the transaction on the cash register

20  and give them their receipt with their stub, their portion of

21  the stub that they're going the claim their vehicle with, and I

22  would tell them that it's going to be about a 10 to 15-minute

23  wait for their vehicle because it's at the bus barn.

24  Q.    And what would you do after the customer has given you

25  that ticket in terms of ringing up the charge or processing the

1    charge?    Would you then charge the customer?

2    A.    Okay.    If it was a customer that had to pay for their

3    vehicle, once I received the time from the key person, which is

4    downstairs keeping all of the time, I would let them know how

5    much their parking is and process the transaction, and I would

6    process the transaction, and let them know that it's going to be

7    awhile, at that time, eight to 15 minutes for their vehicle to

8    come around.    I would then take the keys out the cabinet where

9    the bus barn keys are, which is oversized vehicles, and I'd call

10   for it on the radio for Roosevelt Turner to call for one of the

11   drivers to come and get the car -- the keys, and bring the car

12   around.

13            THE COURT:    Are you ready?

14            MR. BALLINA:    I believe we're ready.    Thank you.

15            MR. CASHIO:    Is there a question, Your Honor?

16            THE COURT:    Well, he had asked it's been awhile about

17   the ticket, wasn't that it?

18            MR. BALLINA:    Yes.    Whether or not when Mr. Smith

19   first walked uptown and this is Mr. Smith right here --

20            MR. CASHIO:    Objection, Your Honor.    He's leading

21   telling --

22            MR. BALLINA:    I'm describing the video.

23            MR. CASHIO:    No, I think she needs --

24            THE COURT:    Counsel, yesterday I told you.    He can't

25   take two people talking at the same time.

1        MR. CASHIO:    I'm sorry.

2        Objection, Your Honor, he's leading in description.

3        I think he needs to ask the witness.

4        THE COURT:    Ask the question, Mr. Ballina.

5        MR. BALLINA:    Can you go back?

6        THE VIDEO OPERATOR:    Sure.

7                            EXAMINATION

8    BY MR. BALLINA:

9    Q.    Let me ask while it's frozen.    Is that you, Ms. Wilson?

10   A.    Yes, that was.

11   Q.    Now, is this Mr. Smith?

12       MR. CASHIO:    Again, Your Honor, leading.

13       THE COURT:    Ask the proper way.    That's a leading

14   question.

15                           EXAMINATION

16   BY MR. BALLINA:

17   Q.    Do you know who that is?

18   A.    Yes, that was Mr. Smith.

19   Q.    Did Mr. Smith give you the ticket when he walked up?

20   A.    No, he didn't.

21   Q.    Do you know what Mr. Smith did with the ticket?

22   A.    He placed it on the counter.

23   Q.    And what were you doing?    What were you doing at that time

24   when Mr. Smith did that?

25   A.    I was marrying my tickets together.

```
 1              MR. BALLINA:    Go ahead and play it, Jack.
 2              MR. CASHIO:    Wait, wait.  Is there a question, Your
 3  Honor?
 4              THE COURT:    Go ahead and play it, then ask a specific
 5  question.
 6              Let's move this along.
 7              I'll let you do the same thing, Mr. Cashio.
 8                   (WHEREUPON, THE TAPE WAS PLAYED)
 9                            EXAMINATION
10  BY MR. BALLINA:
11  Q.    Ms. Wilson, did you see Mr. Smith's ticket on the counter?
12  A.    No.
13  Q.    Did you know where on the counter the ticket was placed?
14  A.    No.
15  Q.    Do you know who that is?
16  A.    That's Mr. Smith.
17  Q.    And do you recall what Mr. Smith was telling you at that
18  time?
19  A.    No, I don't.
20  Q.    Did you -- wait.  Let me ask you this:  How did the valet
21  drivers know to go get a customer's car?
22  A.    If they were oversized?
23  Q.    Yes.  Yes, ma'am.
24  A.    I would call Roosevelt Turner on the radio and let him
25  know.  I would say Valet 1, which means that valet key, one
```

1    valet key that's going out.

2    Q.    And where would you put the customer's keys so that the

3    valet would know to go get that car?

4    A.    I would place it on the counter.

5    Q.    And did you ever place keys on the counter before the

6    customer had paid?

7             MR. CASHIO:    Leading, Your Honor.

8             THE COURT:    Overruled.

9             THE WITNESS:    Yes, I have.

10                           EXAMINATION

11    BY MR. BALLINA:

12    Q.    And why would you do that?

13    A.    I would place it because in valet is where oversized

14    vehicles keys are placed -- are held at, and like I said it's an

15    eight to 15 minute wait for the vehicle to come around, so to

16    appease the guests I would put the keys out before they pay for

17    their vehicle to make their wait less.  Most guests pay for

18    their parking.  I rarely have guests who refuse to pay for their

19    parking which is why I normally did that.

20    Q.    Do most customers pay for their parking?

21    A.    Yes.

22    Q.    Do most cash customers pay for their parking?

23    A.    Yes, they do.

24    Q.    Is it rare that there is a problem with a customer paying

25    their parking charge?

```
 1            MR. CASHIO:   Objection leading.

 2            THE COURT:   Sustained.

 3            THE WITNESS:   Yes, it is rare.

 4            THE COURT:   Sustained.

 5            MR. BALLINA:   No, no.  Don't answer the question.

 6            THE WITNESS:   I'm sorry.

 7            THE COURT:   Don't answer the question.  Just wait

 8   until I rule.

 9            THE WITNESS:   I'm sorry.

10                          EXAMINATION

11   BY MR. BALLINA:

12   Q.   Does it happen that a customer can't pay?

13            MR. CASHIO:   Objection, leading.

14            THE COURT:   Ask the question, counsel.  Let me hear

15   the whole question.

16                          EXAMINATION

17   BY MR. BALLINA:

18   Q.   Does it happen that the customer can't pay their parking

19   charge?

20            THE COURT:   Overruled.  Answer the question.

21            THE WITNESS:   Does it happen where they can't pay for

22   their parking?

23                          EXAMINATION

24   BY MR. BALLINA:

25   Q.   They don't have the money to pay for their parking?
```

1  A.    Yes.

2  Q.    Does it happen where the customer refuses to pay for their

3  parking?

4  A.    No, not often.

5  Q.    At some point on the evening of December 10, 2003, did Mr.

6  Dorsey come into the valet booth and give you assistance?

7  A.    Yes, he did.

8  Q.    Had that ever happened before?

9  A.    Yes.

10  Q.    And why did he come in and what was he doing in the booth?

11  A.    He was assisting me in getting my tickets together.

12  Q.    After Mr. Dorsey came into the booth, was there an exchange

13  between Mr. Dorsey and Mr. Smith, a verbal exchange between

14  them?

15  A.    Yes.  Mr. Smith was refusing to pay for his parking and

16  Stacey was explaining to him the procedures, that it was

17  possible for him to pay for his valet parking.

18  Q.    And were you present in the booth when Mr. Dorsey and Mr.

19  Smith where having an argument?

20  A.    Yes.

21  Q.    I'll ask her a couple of questions about that.

22         THE COURT:    Well, identify for the jury what you plan

23  to show her and ask her if she was there.  Lay a foundation.

24         MR. BALLINA:    Ladies and gentlemen, what I'm going to

25  show you is part of the surveillance video that shows --

1    THE COURT:   No, no.  Address not the jury.  Tell her
2    what you're going to show her.
3                        EXAMINATION
4    BY MR. BALLINA:
5    Q.   I'm going to show you the part of the video where Mr.
6    Dorsey and Mr. Smith are at the booth, the exchange between
7    them.
8    A.   Okay.
9         MR. BALLINA:   And that's going to be Number 8.
10                   (WHEREUPON, THE VIDEO WAS NOT PLAYED)
11        THE COURT:   Mr. Ballina, would you ask questions.
12                        EXAMINATION
13   BY MR. BALLINA:
14   Q.   Did you overhear, or did you hear Mr. Dorsey at any time
15   call Mr. Smith a "Cracker"?
16        MR. CASHIO:   Objection.  Leading.
17        THE COURT:   Sustained.
18        Don't answer the question.
19                        EXAMINATION
20   BY MR. BALLINA:
21   Q.   Did you ever hear Mr. Dorsey curse Mr. Smith?
22        MR. CASHIO:   Objection.  Leading.
23        THE COURT:   Sustained.
24                        EXAMINATION
25   BY MR. BALLINA:

1  Q.    What did you hear Mr. Smith say to Mr. Dorsey?

2  A.    Mr. Smith told Mr. Dorsey that he owned -- he said that he

3  wasn't paying for his parking, that he owned him and his family.

4  He said -- he told him, he didn't know who the F he was, and

5  that he wasn't paying for his parking.

6  Q.    And what did you hear Mr. Dorsey tell Mr. Smith?

7  A.    The parking policy that he have to pave pay for his

8  parking.   Mr. Dorsey asked him, so are you paying for your

9  parking.   Mr. Smith told him "no".

10  Q.    Did you ever hear Mr. Dorsey tell Mr. Smith anything other

11  than that he had to pay the parking charge and what the parking

12  charge was?

13  A.    No.

14              MR. BALLINA:    I think we have it now, Your Honor.

15              (WHEREUPON, THE VIDEO WAS PLAYED)

16                        EXAMINATION

17  Q.    Is that you, Ms. Wilson?

18  A.    Yes, it is.

19  Q.    Do you know who that is?

20  A.    Stacey Dorsey.

21  Q.    Do you know who that is?

22  A.    Mr. Smith.

23  Q.    And what are you doing in that -- what are you doing right

24  now, do you know?

25  A.    Gathering my tickets together.

```
 1   Q.    And is there a conversation going on between Mr. Dorsey and
 2   Mr. Smith at this time?
 3   A.    I'm not sure.
 4   Q.    Is Mr. Smith speaking with Mr. Dorsey right now?
 5   A.    Yes, he is.
 6   Q.    Could you overhear what he was saying?
 7   A.    Not at the time.  I'm not sure what he was saying.
 8   Q.    Do you remember what Mr. Smith said exactly at that moment?
 9   A.    No, I'm not sure.
10   Q.    Was Mr. Smith mad at that time?
11   A.    Very.
12           MR. CASHIO:    Objection, Your Honor.
13           THE COURT:    Overruled.
14                              EXAMINATION
15   BY MR. BALLINA:
16   Q.    Was Mr. Smith upset?
17   A.    Very upset.
18   Q.    Do you know what Mr. Smith was mad and upset about?
19   A.    Because he was told that the vehicle was wasn't going to be
20   released to him until he paid for his parking.
21           MR. CASHIO:    Your Honor, is there a question?
22           MR. BALLINA:    With the court and the jury's patience
23   when it gets to the point --
24           THE COURT:    All right.
25           MR. BALLINA:    It's just a matter of seconds, Your
```

```
 1  Honor.  I apologize.
 2                        EXAMINATION
 3  BY MR. BALLINA:
 4  Q.   Did you overhear what Mr. Smith is saying to Mr. Dorsey
 5  right now?
 6  A.   Yes, I did hear him at that time what he was he saying.
 7  Q.   Do you remember what he was saying right now?
 8            THE COURT:   That's a question.
 9            THE WITNESS:   Right.  I'm sorry.
10            At the time I believe at that time that's the point
11  where he was telling me "you don't know who I am".
12  Q.   Was Mr. Smith mad?
13  A.   Yes, he was?
14  Q.   Was Mr. Smith upset?
15  A.   Yes, he was.
16  Q.   Do you know what Mr. Smith is telling Mr. Dorsey at that
17  point?
18  A.   That's when he was telling him "you don't know who I am,
19  and that I own you and your family".
20                   (THE VIDEO WAS STOPPED)
21                        EXAMINATION
22  BY MR. BALLINA:
23  Q.   Did Mr. Smith ever tell you that he may have money in his
24  truck?
25  A.   Not at all.
```

1  Q.    Did you ever overhear Mr. Smith say to anyone that he may

2  have money in his truck?

3  A.    No.

4          MR. BALLINA:    Thank you, ma'am.

5          I don't have any other questions.    Thank you.

6          THE COURT:    Okay.    Recross is limited to what was

7  brought up on your cross-examination, Mr. Cashio.

8                              RECROSS-EXAMINATION

9  BY MR. CASHIO:

10  Q.    Did you ever see Mr. Smith looking in his wallet?

11  A.    I'm sorry, can you repeat the question.

12  Q.    Did you ever see Mr. Smith looking in his wallet?

13  A.    No, not that I can recall.

14  Q.    Okay.    When Mr. Smith first came up to you he placed the

15  ticket on the counter, is that correct?

16  A.    That's correct.

17  Q.    Were you waiting on anybody else at that time?

18  A.    No, I wasn't.

19  Q.    Okay.    Were you paying attention to the customer who came

20  up to the counter by himself?

21  A.    I'm not sure.

22  Q.    You told us that Stacey Dorsey explained the procedures to

23  Shaun Smith, is that correct?

24  A.    That's correct.

25  Q.    Did Stacey Dorsey ever explain the procedure that a person

1  could go into the casino and get a comp for a $10 parking

2  charge?

3  A.    Not that I can recall.

4  Q.    Did you ever explain to Mr. Smith that as a cash customer

5  he had certain privileges that he could get because he went into

6  the casino and didn't have a card?

7  A.    I'm sorry, repeat your question to me.

8  Q.    Mr. Smith was a cash customer, correct?

9  A.    That's correct.

10  Q.    Okay.  Did you ever describe the card privileges to Mr.

11  Smith?

12  A.    No, I didn't.

13  Q.    Did you know that Harrah's has a rule that you're supposed

14  to describe those cash -- I mean, those card privileges to cash

15  customers?

16  A.    Yes, there's a rule but the minute that I told Mr. Smith

17  that he had to pay for his parking he immediately went off.  He

18  immediately started saying he wasn't going to pay for his

19  parking.

20  Q.    So you didn't give him the option on not paying by

21  describing the card privileges, did you?

22  A.    And he didn't give me the option of explaining it to him

23  neither.

24  Q.    You never tried to explain it him, did you?

25          MR. BALLINA:    Objection.  Asked and answered.

```
 1              THE COURT:   Sustained.
 2                          EXAMINATION
 3   BY MR. CASHIO:
 4   Q.   When you said he didn't give you the option, did he run off
 5   when you tried to explain it to him?  What he did do?
 6   A.   I mean, verbally he started saying that he wasn't paying
 7   for his parking.  He was refusing to pay for his parking?
 8   Q.   And you think that's not giving you the option?
 9   A.   Well, he was speaking loud.
10              MR. BALLINA:   Objection.  Argumentative.
11              THE COURT:   Sustained.
12                          EXAMINATION
13   BY MR. CASHIO:
14   Q.   After he says he wasn't going to pay, did you ever explain
15   to him the card privileges of a cash customer?
16   A.   No, I didn't.
17              MR. BALLINA:   Asked and answered.
18                          EXAMINATION
19   BY MR. CASHIO:
20   Q.   Isn't that a minimum service standard required of valet
21   cashiers by the Harrah's Rules?
22   A.   Yes, it is.
23   Q.   And you violated that, didn't you?
24   A.   Based on Mr. Smith's temper, I couldn't get anything out to
25   explain to him, that, you know, those were the privileges.  He
```

1  just immediately started talking loud and refused to pay for his

2  parking.

3  Q.   And how long had you and Mr. Smith been in communication

4  before Mr. Smith's supposed temper came about?

5  A.   Not long.  It was immediate, the minute I told him.

6  Q.   Right after he got there you and he had a -- and you didn't

7  have a chance to explain, is that correct?

8  A.   Right after I told him the reason that his vehicle hadn't

9  come up and there was going to be a fee for his parking he

10  immediately started saying he wasn't paying.

11  Q.   And because he was upset, that's the reason you didn't

12  describe the card privileges to him, is that correct?

13  A.   Because the level of his voice, yes, I couldn't explain

14  anything to him.

15  Q.   Don't you think you could have avoided this whole situation

16  by explaining the card privileges to him?

17            MR. BALLINA:   Objection, Your Honor, argumentative.

18            THE COURT:   Sustained.  Argumentative.

19                           EXAMINATION

20  BY MR. CASHIO:

21  Q.   If you would have explained the card privileges to him, a

22  cash customer as required by the minimum service standards on

23  page 28 of the Harrah's booklet of valet cashiers --

24            MR. BALLINA:   Objection.  It's still argumentative,

25  Your Honor.  Interrupting.

1    THE COURT:   Overruled.  He hasn't asked the question

2  yet.

3    Go ahead, counsel, continue.

4    MR. CASHIO:   Let me rephrase that.  I forgot after the

5  interruption, Your Honor.

6                      EXAMINATION

7  BY MR. BALLINA:

8  Q.   If you would have described the card privileges to Shaun

9  Smith, a cash customer, as required by the Minimum Service

10 Standards of Valet Cashiers on page 28 of the Harrah's

11 Employee's Booklet, would he have been able to go into the

12 casino especially if he had lost all his money and gotten a comp

13 to pay for his valet parking?

14    MR. BALLINA:   Objection, Your Honor.  It's

15 argumentative, and I think it's beyond the scope of my

16 examination.

17    THE COURT:   Overruled.

18    Answer that question, if you can.

19    THE WITNESS:   If you're a cash paying customer, the

20 majority of -- well, all of my cash paying customers don't have

21 the total rewards cards.  You can't get a comp if you don't have

22 a total rewards card.

23                      EXAMINATION

24 Q.   And did you ever tell Mr. Smith his car would be ready in

25 10 to 15 minutes?

```
 1  A.    No, I did not.
 2  Q.    Now, again on page 28 of the Harrah's brochure --
 3              MR. CASHIO:    Does the jury have their -- can I present
 4  that to the jury, Your Honor.
 5              THE COURT:    Certainly.
 6                            EXAMINATION
 7  BY MR. CASHIO:
 8  Q.    Exhibit 1 page, 28, do you have your exhibit book in front
 9  of you, ma'am?
10  A.    No, sir, I don't.
11              THE COURT:    We'll get you one.
12              Do you have any other exhibit books floating around?
13              All right, counsel, where are you referring now,
14  please?
15              MR. CASHIO:    Exhibit 1.
16              THE COURT:    Okay.
17                            EXAMINATION
18  BY MR. CASHIO:
19  Q.    Exhibit 1, page 28 on the bottom right hand side second dot
20  from the bottom on the right.  Do you see that, Ms. Wilson?
21  A.    You said the second dot?
22  Q.    And the heading is Minimum Service Standards For Valet
23  Cashiers, is that correct?
24  A.    Yes.
25              THE COURT:    All right.  28 on the top, right.  I think
```

1    you said the bottom right?

2              MR. CASHIO:    No, that's the top of the thing.    What

3    I'm referring to is the question I just asked on you quoting him

4    it would be 10 minutes for his car.    Aren't you supposed to --

5    it says, "Your vehicle in eight minutes.    10 minutes for SUV's".

6    You didn't do that, did you?

7    A.    That's once the transaction has been processed.

8    Q.    Okay.    But you did not do that at any time, did you?

9    A.    Because the transaction wasn't processed.

10   Q.    And right above that it says you're supposed to tell the

11   cash customer how -- you're supposed to describe the card

12   privileges, aren't you?

13   A.    Yes.

14   Q.    And you violated that rule, right?

15             MR. BALLINA:    I think that's been asked and answered,

16   Your Honor.

17             THE COURT:    Answer the question, ma'am.

18             THE WITNESS:    No, I didn't tell him.

19                             EXAMINATION

20   BY MR. CASHIO:

21   Q.    I said you violated the rule, yes or no?

22   A.    Yes.

23             MR. CASHIO:    Thank you.

24             That's all I have.

25             THE COURT:    All right.    Any redirect?

1    Limited to what he brought up out under cross, counsel.

2                          REDIRECT EXAMINATION

3    BY MR. BALLINA:

4    Q.   Why didn't you tell Mr. Smith the things that are in that

5    exhibit that were just read?  Why didn't you tell those things

6    to Mr. Smith?

7    A.   Because when I told him how much his parking would be,

8    before I can say -- because before I can say you would have

9    saved $10 for your parking, he immediately went off.  I didn't

10   get a chance to tell him anything about the privileges.

11   Q.   And what did he tell you when you told him there was a

12   charge?

13   A.   He said, "I'm not paying F-ing $10 for my car, for my

14   vehicle".

15            MR. BALLINA:    Thank you, ma'am.

16            THE WITNESS:    You're welcome.

17            THE COURT:    All right.  Ladies and gentlemen, we're

18   going to take our lunch break now.  We're going to meet back

19   here at 2:00 o'clock, and I'm going to remind you of what I

20   stated to you yesterday; that is, do not discuss this case or

21   any of the testimony that you've heard so far with anybody,

22   including each other, and we'll see you back here at promptly

23   2:00.

24            Mr. Woods, do you need to leave today for

25   transportation?

1    OCTAVE E. WOODS (JUROR NO. 7):   Yes.

2    THE COURT:   About 5:45, did you say?

3    OCTAVE E. WOODS (JUROR NO. 7):   That would be good.

4    THE COURT:   All right.  Thank you.  We'll see you back

5    here at 2:00 o'clock.

6    You're excused, from your subpoena, ma'am.

7    THE WITNESS:   Thank you.

8    THE COURT:   Counsel, I'll meet you back here at

9    2:00 o'clock.

10    THE COURT:   Court's in recess.

11    (1:45 P.M.  -  LUNCHEON RECESS)

12    *      *      *      *      *      *      *      *

13    (2 P.M.  -  AFTER RECESS)

14    **P-R-O-C-E-E-D-I-N-G-S**

15    THE CLERK:   All rise.

16    (THE JURY ENTERED THE COURTROOM)

17    THE CLERK:   Court's in session.

18    THE COURT:   Please have a seat.

19    All right.  Counsel, let's go ahead and proceed.

20    Call your next witness.

21    MR. CASHIO:   Chehalis Waugh, Your Honor.

22    THE COURT:   Chehalis Waugh.

23    THE CLERK:   Raise your right hand, please.

24    CHEHALIS WAUGH

25    After having been first duly sworn, did testify under

1  oath, as follows:

2       THE CLERK:    Have a seat, state your name for the

3  record, please.

4       THE WITNESS:    Chehalis Waugh.

5                     CROSS-EXAMINATION

6  BY MR. CASHIO:

7  Q.    Ms. Waugh, what is your occupation at Harrah's Casino?

8  A.    I am a report writer in Customer Safety.

9       THE COURT:    Ma'am, get a little closer to the

10 microphone, please.

11                      EXAMINATION

12 BY MR. CASHIO:

13 Q.    So you write reports on accidents and things like that?

14 A.    Yes, sir.

15 Q.    All right.    Okay.    And did you arrive on the scene to see

16 Shaun Smith laying down in pain?

17 A.    He was laying down, yes, sir.

18 Q.    Was he in pain?

19 A.    He said he was, yes, sir.

20 Q.    Okay.    Was he screaming or anything?

21 A.    He was on his cell phone.

22 Q.    Okay.    Do you know who he was calling?

23 A.    No, sir.

24 Q.    And did you arrive after the EMTs got there?

25 A.    I arrived at the same time.

1  Q.    Okay.  And who told you to come over there and write this
2  report up?
3  A.    My manager, Stacey Dorsey called for a report writer and I
4  answered.
5  Q.    When you got to the scene was Stacey Dorsey assisting Mr.
6  Smith, Shaun Smith?
7  A.    No, sir, he was at the cashier booth.
8  Q.    Now, I think you told me you noticed that Mr. Smith was
9  slurring his speech and his eyes were bloodshot?
10 A.    Correct.
11 Q.    Did you know he had just been in involved in an accident
12 where a big truck had run over him?
13 A.    Yes, sir.
14 Q.    Okay.  Could you smell any alcohol on his breath?
15 A.    I don't smell alcohol.
16        MR. CASHIO:    That's all I have.
17        THE COURT:    Your witness under direct examination, Mr.
18 Ballina.
19                      DIRECT EXAMINATION
20 BY MR. BALLINA:
21 Q.    God afternoon, Ms. Waugh.  When you arrived at Mr. Smith
22 were you alone?
23 A.    No, sir.
24 Q.    Who were you with?
25 A.    The EMT, Mr. Easton.

1    THE COURT:    Ma'am, you have to speak a little bit
2  louder, please.  Get a little bit closer to the microphone.
3    THE WITNESS:    The EMT, Mr. Easton.
4                          EXAMINATION
5   BY MR. BALLINA:
6  Q.    And who did Mr. Easton work for?
7  A.    Harrah's Casino.
8  Q.    And do you know the approximate length of time between when
9  you were notified of the incident by Mr. Dorsey and when you
10  arrived -- and you and Mr. Easton arrived at Mr. Smith?
11  A.    It was approximately two minutes.
12  Q.    When you got to Mr. Smith, did you hear him say anything?
13  A.    He was on his cell phone and finally when we got him off
14  his cell phone, he was just cussing us out.
15  Q.    And what was he saying after he got off his cell phone?
16  A.    He told us that his leg was hurt and he was calling us all
17  kinds of names.
18  Q.    Did you hear Mr. Smith say anything to Mr. Easton while Mr.
19  Easton was trying to treat him?
20  A.    Yes, he said, you know, "You're a MF'er", and all kinds of
21  names.
22  Q.    Was Mr. Smith cooperative with you and Mr. Easton?
23  A.    No, he was not.
24  Q.    When you and Mr. Easton got to Mr. Smith, was there
25  anything around Mr. Smith?  That is, any type of objects around

1    Mr. Smith?

2    A.    If I recall I believe there were a couple of stanchions

3    around him.

4    Q.    Did an ambulance arrive on the scene?

5    A.    Yes, sir.

6    Q.    Approximately how long after you had gotten to Mr. Smith,

7    you and Mr. Easton, did the ambulance arrive?

8    A.    It was approximately 10 minutes.

9    Q.    And how long was the ambulance on the scene?

10   A.    Maybe five to 10 minutes longer.

11   Q.    What did you do after the ambulance arrived?

12   A.    I began to question other people in the area as to what

13   they saw.

14   Q.    When the ambulance arrived, did you leave Mr. Smith?

15   A.    Yes, I did.

16   Q.    When you left Mr. Smith, did Mr. Easton stay with Mr.

17   Smith?

18   A.    Yes, he did.

19          MR. BALLINA:    Thank you, ma'am.

20          I don't have any other questions.

21          THE COURT:    Mr. Cashio, again limited to what was

22   covered under direct examination, sir.

23          MR. CASHIO:    Yes, Your Honor.

24                        RECROSS-EXAMINATION

25   BY MR. CASHIO:

1  Q.    When he was there, he was laying in the traffic lane, is

2  that correct?

3  A.    Correct.

4  Q.    And Mr. Smith was rolling over complaining, holding his leg

5  and complaining about it, is that right?

6  A.    That's correct.

7  Q.    And Mr. Easton was trying to fight him to keep him from

8  rolling over, is that correct?

9       MR. BALLINA:    Objection to his characterization of

10  fighting.

11       THE COURT:    Sustained.

12       Rephrase your question, counsel.

13                          EXAMINATION

14  BY MR. CASHIO:

15  Q.    Mr. Easton was trying to prevent Shaun from rolling over,

16  right?

17  A.    He was trying to stabilize him.

18  Q.    Well, he was trying to prevent him from rolling over, is

19  that right?

20  A.    Yes.

21  Q.    And that's when he started cursing?

22  A.    It was before we even touched him.

23  Q.    Okay.  And did Mr. Easton cut off his expensive boots?

24  A.    It was his left boot.

25       MR. BALLINA:    Objection to the characterization of

1  "expensive boots".

2          THE COURT:    Sustained.

3                                EXAMINATION

4  BY MR. CASHIO:

5  Q.    Is this the boot that was -- Exhibit 2, Your Honor -- is

6  this boot that was cut off his leg at that time?

7  A.    As I recall, yes, sir.

8  Q.    Okay.  And did Shaun object to you cutting his boots off?

9  A.    Yes, he did.

10          MR. CASHIO:    Can I show this to the jury for a second,

11  Your Honor?

12          THE COURT:    They can see it from here, sir.

13          MR. CASHIO:    Don't show it?

14          THE COURT:    That's okay.  They'll be given the

15  opportunity to see it.

16          Prior to calling the next witness, they can look at it

17  while we're waiting for the next witness after your examination.

18          MR. CASHIO:    That's all I have.  Thank you.

19          THE COURT:    Thank you.

20          Any redirect?  Limited to what he brought out under

21  recross.

22                          REDIRECT EXAMINATION

23  BY MR. BALLINA:

24  Q.    Do you know why Mr. Easton cut Mr. Smith's boot?

25  A.    Mr. Smith said his leg hurt, so in order for Mr. Easton to

1  stabilize his leg he had to cut the boot.

2            MR. BALLINA:    Thank you, ma'am.

3            THE COURT:    Thank you ma'am.

4            Any further need for this witness?

5            MR. CASHIO:    No, Your Honor.

6            THE COURT:    Ma'am, you're excused from your subpoena.

7  You can leave.

8            Call your next witness, counsel.

9            MR. CASHIO:    Mr. Chris Stevenson, please.

10           THE COURT:    Why don't you go ahead and show the boot

11  to the jury while we're waiting for the next witness.

12           All right, Mr. Cashio, I think they're through with the

13  boot, sir.

14           MR. CASHIO:    I'm sorry.

15           THE CLERK:    Raise your right hand, please.

16                          CHRISTOPHER STEVENSON, JR.

17           After having been first duly sworn, did testify under

18  oath, as follows:

19           THE CLERK:    Have a seat and state your name for the

20  record, please.

21           THE WITNESS:    Christopher Stevenson, Jr.

22                          CROSS-EXAMINATION

23  BY MR. CASHIO:

24  Q.   Mr. Stevenson, were you at the scene of this accident on

25  December the 10th of last year?

1  A.    Yes, sir.

2  Q.    Did you see the accident happen?

3  A.    Yes, sir.

4  Q.    Is there any way to communicate by either radio,

5  walkie-talkie or any other means between the valet cashier's

6  booth and the drivers who are driving the vehicles?

7  A.    No, sir.

8          THE COURT:    Sir, I'm going to ask that you speak a

9  little bit closer to the microphone so we can hear you.

10          THE WITNESS:    I'm sorry.

11          THE COURT:    Thank you.

12          You can lift the microphone, if you choose.

13                         EXAMINATION

14  BY MR. CASHIO:

15  Q.    Have you ever seen the pit bosses or the pit supervisors

16  give little pieces of paper to certain people so they wouldn't

17  have to pay for their valet parking?

18  A.    I worked in valet, I've never seen it, no, sir.

19  Q.    Okay.  You remember when I took your deposition under oath

20  -- oh, I'm sorry, my fault.  Wrong.  Okay.

21          Have you been to -- I withdraw that question.  Have you

22  been to any other casinos.

23  A.    Yes, sir.

24  Q.    Have you ever parked at any other casinos?

25          MR. BALLINA:    Objection.  Irrelevant.

1      THE COURT:    Sustained.

2      MR. CASHIO:    Can I approach the bench, Your Honor.

3      THE COURT:    The first time today.  I'm proud of you

4  guys.

5      (BENCH CONFERENCE, AS FOLLOWS):

6      THE COURT:    Yes, sir.

7      MR. CASHIO:    Your Honor, I think the relevance of this

8  is to show this, that Shaun had been to other casinos and he was

9  not used to ever paying for valet parking, and it's not very

10  common to pay for it, so when he got there, well, he assumed

11  that -- well, he didn't look at any of the signs, so that shows

12  the relevance that he wouldn't expect to pay for valet parking.

13      MR. BALLINA:    Mr. Smith can testify to that, Judge.

14      MR. CASHIO:    Okay.  He can as long as he can, that's

15  fine.

16      THE COURT:    Of course, he can.

17      I Really don't have a problem with your asking, again,

18  Mr. Smith, but as it relates to this man, he doesn't necessarily

19  know one way or the other.

20      MR. CASHIO:  He's already testified about going to

21  other casinos.

22      THE COURT:    Okay.  Well, that's fine.

23      MR. CASHIO:    I won't ask -- I'm sorry.

24      THE COURT:    You can ask if you want to.  However, you

25  can't ask other casinos policies or are other casinos' policies

1  different from Harrah's policies.

2       MR. CASHIO:   No, I won't, I'll just --

3       MR. BALLINA:   No, wait.  Wait.  Judge, again, I want

4  to reiterate, what goes on at other casinos is irrelevant to

5  this lawsuit.

6       MR. CASHIO:   It's relevant to him.

7       THE COURT:   It might be relevant to Mr. Smith's state

8  of mind.

9       The plaintiff is given wide latitude on

10 cross-examination, so I will allow it.  However, it will go

11 beyond relevance if they're trying to compare the two

12 procedures.

13      MR. CASHIO:   No.  No.

14      THE COURT:   But I will allow that limited question.

15      All right, sir.  Thank you.

16                 (BENCH CONFERENCE CONCLUDED)

17                       EXAMINATION

18 BY MR. CASHIO:

19 Q.   Sir, have you ever parked in valet parking at any casinos

20 in this area?

21 A.   Yes, sir.

22 Q.   Can you give us the names of the casinos you've been to?

23 A.   Boomtown and Treasure Chest.

24      THE COURT:   Sir, you have to speak louder, please.

25      THE WITNESS:   Boomtown and Treasure Chest.

```
 1                            EXAMINATION
 2   Q.   Have you ever had to pay any money there?
 3   A.   I don't remember, sir.
 4   Q.   You don't remember?
 5   A.   No, sir.
 6             THE COURT:   Counsel, let me see you both.
 7                  (BENCH CONFERENCE, AS FOLLOWS):
 8             THE COURT:  Is your client going to testify that he's
 9   been to these other casinos?
10             MR. CASHIO:   He's either been or checked with them to
11   see if they charged.
12             THE COURT:   Say that again.
13             MR. CASHIO:   He's either been or he's called them to
14   see if there is any charge.
15             THE COURT:   No, no, we're not going to go into if he's
16   called them.  If he has been there, fine.
17             MR. CASHIO:   But he's been to other casinos in
18   Shreveport.
19             THE COURT:   Well, but if he hasn't been to these two
20   it's not relevant, Mr. Cashio.
21             NR. CASHIO:   That's fine.
22                  (BENCH CONFERENCE CONCLUDED)
23             THE COURT:   Proceed, Mr. Cashio, please.
24             MR. CASHIO:   Okay.
25             THE COURT:   Thank you.
```

```
1                        EXAMINATION
2    BY MR. CASHIO:
3    Q.    Did you notice that Shaun Smith was in pain after the
4    accident?
5    A.    Did -- rephrase, I'm sorry.
6    Q.    Do you remember the accident involving Shaun Smith?
7    A.    Yes, sir.
8    Q.    Did you notice if he was in pain right after the accident?
9    A.    The only thing I noticed is him yelling after the accident?
10   Q.    And you didn't notice whether or not he was in pain?
11   A.    No, I just heard him yelling "I'm going to sue you.  I'm
12   going to sue you guys", that's all I heard.
13         THE COURT:    I can't understand you, sir.  I don't
14   think the jury can.
15         Speak slowly and loud into that microphone.
16         THE WITNESS:    The only thing I heard him saying, over
17   and over and over again was "I'm going to sue you MF'ers".
18   That's all that I heard.
19         MR. CASHIO:    Okay.
20                        EXAMINATION
21   BY MR. CASHIO:
22   Q.    Did you go to his assistance?
23   A.    No, sir.
24   Q.    When you were training for your job at Harrah's, did you do
25   any training with any large diesel trucks?
```

1  A.    Excuse me?

2  Q.    You drive the trucks at Harrah's, is that correct?

3  A.    Yes.

4  Q.    And the cars?

5  A.    Yes, sir, I do.

6  Q.    Before you were hired there, did they train to see how well

7  you drove large diesel trucks?

8  A.    They go by your experience at other jobs.  You're supposed

9  to be able to drive valet.

10  Q.    So they didn't have an actual training where you have to go

11  through a training period to see if you can drive well?

12  A.    No, they sit in the car with you while you drive for two

13  days, that's your training.

14  Q.    Okay.  So they let you drive and they sit in the car with

15  you when you're first hired?

16  A.    The first day you sit in the car with them while they're

17  driving.  The second day they sit in the car while you're

18  driving.

19  Q.    Okay.  But you don't go through any training before that,

20  right?

21  A.    No, sir.

22  Q.    Now, when a valet ticket is brought, is there anything

23  stamped on the back of the ticket?

24  A.    Referring to what?

25  Q.    Okay.  Are you familiar with the valet tickets?

1  A.    Yes.

2  Q.    Assume that Shaun Smith brought a valet ticket to the valet

3  booth the night of the accident, okay?

4  A.    Okay.

5  Q.    After the valet ticket is taken by the valet cashier, is

6  anything stamped on the back of it, like the time or anything

7  like that?

8  A.    The ticket that he receives?

9  Q.    No, the ticket that's brought back to the valet cashier

10  from him?

11  A.    No, the time is not stamped on his ticket, no.

12  Q.    Is the time stamped on any tickets that Harrah's has?

13  A.    The time is on the back of the claim ticket, on the keys

14  yes, sir.

15  Q.    And do you know where that ticket is today?

16  A.    No, sir.

17  Q.    Do you remember what the truck that was in the accident

18  looked like?

19  A.    I remember it was a dually, I'm not sure.  I'm just

20  guessing on the color.  It was gray.

21          THE COURT:    It was a what?

22                              EXAMINATION

23  BY MR. CASHIO:

24  Q.    It was a what?

25  A.    A dually.

1    Q.    What's dually mean?

2    A.    It was a big truck, two tires in the front, four in the

3    back.

4    Q.    And was it a diesel?

5    A.    I'm not sure, sir.

6    Q.    You don't remember if it made any noise?

7    A.    No, sir.

8    Q.    Do you know what happened to the truck after the accident?

9    A.    No, sir, I don't.

10   Q.    You don't know if it was brought back to the bus barn?

11   A.    Yes, sir, it was brought back to the bus barn?

12   Q.    I thought you said you didn't know?

13   A.    I don't know what happened to it after the accident, no.

14   Q.    Okay.

15   A.    You're speaking at this time?

16   Q.    It was an accident on the night -- it was night, right?

17   A.    Yes, sir.

18   Q.    Of December 10th, last year.  The big truck, do you know

19   what happened to it after the accident?

20   A.    Direct examination after the accident, the truck was

21   brought back to the bus barn.

22   Q.    And you don't know what happened after that, do you?

23   A.    No, sir, I don't.

24   Q.    Now, did Shaun Smith fall off of the -- let me ask you

25   this:  Did you see the accident?

1   A.    Yes, sir.

2   Q.    Did Shaun Smith fall off of the truck, or did the truck run

3   over him?

4   A.    He -- the truck was moving.  It stopped, after I told

5   Kevin to take the truck back to the bus barn, and it moved

6   passed Mr. Smith.  He reached back for the mirror and by Mr.

7   Smith being -- well, he was talking to me.  By him being -- by

8   me figuring he's intoxicated because I smelled alcohol on his

9   breath, he reached back off balance, he flipped over the mirror.

10  It toted him over and he went under the truck.

11  Q.    He went underneath the truck?

12  A.    Yes, sir.

13  Q.    And you thought he was intoxicated?

14  A.    Yes.

15  Q.    Did you see how -- if he could walk in a straight line?

16  A.    No, sir, I smelled alcohol on his breath when he was in my

17  face and he was talking very slowly.

18  Q.    If he just had a beer when he was coming out of the casino,

19  wouldn't he have alcohol on his breath?

20  A.    I can't testify to that, sir.  I'm not an expert on beer.

21  Q.    But you said you thought he was intoxicated.  I want to

22  find out why.  Did you notice whether or not he could use the

23  telephone with one finger?

24  A.    I didn't see a telephone, sir.

25  Q.    Okay.  Did you notice whether or not he could walk in a

1  straight line?

2  A.    I can't testify to that.

3           MR. BALLINA:    Asked and answered.

4           THE COURT:    Sustained.

5                         EXAMINATION

6  BY MR. CASHIO:

7  Q.    Did you notice whether or not he had any instability to his

8  walking?

9  A.    Well, when he talking to me, not his walking but his

10  standing, yes, sir.

11  Q.    He was having trouble standing?

12  A.    Yes, sir.

13           MR. CASHIO:    Okay.   That's all I have.

14           Thank you.

15           THE COURT:    All right.   Mr. Ballina, your witness

16  under direct examination, sir.

17                      DIRECT EXAMINATION

18  BY MR. BALLINA:

19  Q.    Good afternoon, Mr. Stevenson.    How long have you worked

20  at Harrah's?

21  A.    Since August 19th, last year.

22  Q.    Have you ever received any training in providing medical

23  attention to injured individuals?

24  A.    No, sir.

25  Q.    What did you hear Mr. Smith say as he approached the truck?

1    A.    "Give me my F-ing truck.  You're not taking my F-ing truck

2    anywhere".

3    Q.    Did you hear Mr. Smith say that he had money in his truck?

4    A.    No, Mr. Smith never said he had money in his truck.  The

5    only thing I heard from Mr. Smith was "I'm not F-ing paying.

6    Give me my F-ing truck".

7    Q.    Did Mr. Smith say that he had money in the console of his

8    truck?

9    A.    That was never said to me.

10    Q.    The last time that the truck moved before Mr. Smith got

11    rolled over, before the truck started to move, was Mr. Smith

12    holding or grabbing onto the truck?

13              MR. CASHIO:    Leading, Your Honor.

14              THE COURT:    Sustained rephrase your question, counsel.

15                          EXAMINATION

16    BY MR. BALLINA:

17    Q.    The last time before the truck started to move, before Mr.

18    Smith got rolled over, what was Mr. Smith doing?

19    A.    He was standing -- I made sure that Mr. Smith was all the

20    way off the truck.  He wasn't touching the truck at all, and I

21    told Kevin to go on.  He was still yelling at me.  Telling me

22    his truck was going any F-ing where.

23    Q.    Did you tell Mr. Smith anything when he was standing near

24    the truck?

25    A.    I told him he had to get off the truck and he had to calm

1    down, and he did so, and then he kept grabbing back on the truck

2    and getting back on.

3    Q.    After the truck started to move that last time before Mr.

4    Smith got rolled over, after it started to move, what did Mr.

5    Smith do?

6    A.    After it started to move?

7    Q.    Yes, sir.

8    A.    He reached behind him to the left-hand side and grabbed

9    the driver's side mirror.

10   Q.    Who was driving the truck?

11   A.    Kevin.

12   Q.    What is Kevin's last name?

13   A.    I'm not sure.

14   Q.    Did Kevin work for Harrah's after this accident happened?

15   A.    Approximately two or three months after it happened.

16   Q.    Does Kevin work for Harrah's now?

17   A.    No, sir.

18          MR. BALLINA:    Thank you, sir.  I don't have any other

19   questions.

20          THE COURT:    Mr. Cashio, any recross?

21          MR. CASHIO:    I'm fine, Judge.

22          THE COURT:    Thank you.

23          Any further need for this witness by any party?

24          MR. BALLINA:    No, Your Honor.

25          THE COURT:    No, Mr. Ballina.

1          You're excused from your subpoena.  You may leave.

2          THE WITNESS:    Thank you.

3          THE COURT:    Call your next witness, Mr. Cashio,

4  please.

5          MR. CASHIO:    Yes, Mr. Bob Roberts, please.

6          THE CLERK:    Raise your right hand, please.

7                        BOBBY S. ROBERTS

8          After having been first duly sworn, did testify under

9  oath, as follows:

10          THE CLERK:    Have a seat and state your name, please:

11          THE WITNESS:     My name is Bobby Roberts.

12          THE COURT:    Is there a stipulation?

13          MR. CASHIO:    Yes, Your Honor, it's stipulated that Mr.

14  Roberts is an expert in the field of vocational evaluation.

15          THE COURT:    Is that correct?

16          MR. BALLINA:    Correct, Your Honor.

17          THE COURT:    Thank you very much go ahead and proceed.

18                        DIRECT EXAMINATION

19  BY MR. CASHIO:

20  Q.    Mr. Roberts, did you give a battery of tests to Shaun Smith

21  in the last couple of months?

22  A.    That was on May the 22, 2004, yes, sir.  He was at the

23  office between four and five hours for evaluation and testing.

24  Q.    And did you give him some functional academic tests on what

25  they call the MESA Scale?

1  A.   Well, the MESA System, which stands for microcomputer

2  evaluation and screening assessment test, which there's a lot of

3  different test in the battery, but part of that battery measures

4  function and academic ability; that is, how you take what you've

5  achieved and functionally use it.

6  Q.   And what was his grade in mathematics?

7  A.   On mental math calculations, fourth grade level.

8  Q.   Okay.  And what his grade in reading comprehension?

9  A.   Sixth grade level.

10  Q.   Did you give him also something called the SCL 90R Profile

11  Testing?

12  A.   Well, that's a subjective screening test for different

13  situational personality factors.  Situational, meaning how he

14  responds on a zero to four rating system to psychological and

15  physical base systems within the last seven days, including the

16  day of the test, he was given that subjective reporting

17  instrument.

18  Q.   Were any of the profiles of that test extremely elevated?

19  A.   Yes, sir.  The depression profile, that's the name of it,

20  was extremely elevated.

21  Q.   Okay.  Doctor, on your current interest of Shaun Smith and

22  his percentage of chances of succeeding in his current interest

23  areas, did you make a determination and opinion as to that?

24  A.   Well, he was given a Career Occupational Preference System,

25  which is 168 item interest inventory.  There's 14 occupational

1    clusters.  His highest area of interest was in the outdoor

2    activities, which is consistent with the kind of work he did in

3    the past.  I gave him a nonexistent prognosis for returning to

4    that area, because it requires either medium to heavy or very

5    heavy functional capabilities.

6          His other area of interest was in professional

7    business.  Typically we find people with Bachelor and Master's

8    degrees performing that, and since he was low functioning

9    academically overall and had not finished school, I didn't think

10   he'd have more than five chances out of a hundred of completing

11   remedial education, getting his GED, and graduating from

12   college, and getting a job in that area.

13   Q.   Okay.  And in the other, the outdoor activities of medium,

14   heavy, and very heavy jobs that he was doing prior to the

15   accident, you said his chances were nonexistent, is that

16   correct?

17   A.   Correct.  Outdoor activities are those jobs that are

18   performed principally outdoors, carpenters, plumbers pipe

19   fitters, oil field workers, horse trainers, so if we look at the

20   physical capacities required to perform those jobs by Department

21   of Labor classification, they range from medium to heavy to very

22   heavy.

23         Medium, meaning working with weights of 20 to 50 pounds

24   of exertion, and heavy 50 to 100 pounds of exertion, and very

25   heavy, greater than 100 pounds of exertion.  Those are found in

1  outdoor work environments.  In other words, we don't find a

2  sitting down job outdoors.

3  Q.    Now, exercising thoroughbred race horses.

4  A.    Yes, sir.

5  Q.    How would you classify that job?

6  A.    Well, it requires heavy to very heavy capabilities because

7  you're dealing with large animals.  Most of these race horses

8  are going to be of varying heights.  Most of them around 16

9  hands.  A hand if four inches.  So they're going to be shoulder

10  height on me and I'm pretty tall.  Most of them to weigh in the

11  800 to 1200 pound range, so they average around a thousand

12  pounds, so if one tries to go away on you, you've got to exert

13  considerable effort to maintain it.

14  Q.    Did you know that Shaun Smith is going to have a rod and

15  screws in his left leg for the remainder of his life?

16  A.    I understand that from reading Dr. Hamsa's deposition, also

17  listening to his testimony yesterday, yes, sir.

18  Q.    Have you seen these X-rays?

19  A.    I have, yes, sir.

20  Q.    Okay.  Now, have you also been able to determine that Mr.

21  Shaun Smith has an extreme sensitivity on the inside of his left

22  leg?

23  A.    Yes, sir, he --

24         MR. BALLINA:    Objection, Your Honor.  I think he's

25  asking him a medical opinion now.

1       THE COURT:    Overruled.   I sustain it.

2       Rephrase your question to him.

3       MR. CASHIO:    Okay.

4                          EXAMINATION

5   BY MR. CASHIO:

6   Q.   Have you been able to determine from the information you've

7   gotten whether Shaun Smith has any problems with the inside of

8   his left leg?

9       MR. BALLINA:    The same objection, Your Honor.   I don't

10  think he's asked a question.

11      THE COURT:    Well, he can refer to the doctor's report.

12  He's not a doctor, but he can certainly refer to a report.

13      Was that indicated in Dr. Hamsa's report?

14      MR. CASHIO:    Yes, Your Honor.

15      THE COURT:    Okay.

16      THE WITNESS:    Yes, sir, on page two of my report in

17  the interview, he reported that sensitivity and I described it

18  approximately three inches on either side of his break site.

19  Dr. Hamsa referenced it in his reports and deposition as well as

20  his testimony yesterday, and Dr. John D. Olson also recommended

21  or identified it in medical reports that he had issued.

22  Q.   Okay.  Did you determine -- have you been able to see what

23  kind of medication Shaun Smith is taking?

24  A.   Yes, sir, that was referenced by Dr. Hamsa yesterday in his

25  testimony and also a copy of the prescriptions were attached to

1  Dr. Hamsa's deposition that your office provided for me to

2  review.

3  Q.    Okay.  Do you know what the Elavil -- have obtained

4  information on what the Elavil treats?

5          MR. BALLINA:    Objection.  I think he's asking a

6  medical opinion.

7          THE COURT:    Sustained.

8                          EXAMINATION

9  BY MR. CASHIO:

10 Q.    Do you know if any of those medications from the

11 information you've gleaned treats RSD?

12         MR. BALLINA:    Objection, Your Honor.  That's asking

13 for a medical opinion.

14         THE COURT:    Sustained.

15                          EXAMINATION

16 BY MR. CASINO:

17 Q.    Okay.  Do you know Mr. Larry Stokes?

18 A.    Yes, sir, I do.

19 Q.    You're a vocational evaluator, is that correct?

20 A.    That's correct.

21 Q.    And he's a vocation counselor, is that correct?

22 A.    Well, he's a vocational rehabilitation counselor.

23 Q.    And I wanted to ask you about certain jobs.  Do you think

24 Shaun could function in these jobs that he can't stand six to

25 eight hours a day.  A cashier and parimutuel clerk?

A.    You're referring to page seven of his report that you

provided me a copy of?

Q.    Yes.

A.    The Department of Labor classifies all jobs, and job like

the court reporter, who I've known for many years, is

performing, he's classified as sedentary.  That means he's

principally seated working with 10 pounds or less.

        The next category is light work, which involves working

with exertional levels of 10 to 20 pounds.  It requires walking

six to eight hours per day, and I've already described medium

heavy and very heavy.

        And Mr. Stokes had listed a series of jobs on page

seven, all of which he has classified as light work.  All of

those jobs would require standing and walking six to eight hours

a day.

Q.    So according to the information you have and your opinion,

do you think he can do those light jobs?

A.    Well, certainly not based on my test results.  I mean, we

did a deposition where I indicated he was not even functioning

competively at the sedentary level.

        To do a light job you've got to be able to do that.  He

wasn't when I tested him and from my listening to Dr. Hamsa,

yesterday, I didn't think it was likely he was going to get

there anytime soon if at all.

Q.    Mr. Smith lives in small labor market in Hot Springs,

1    Arkansas, about 40,000 people.  Would it be more difficult for

2    him to compete against --

3            MR. BALLINA:   Objection, Your Honor.  I think

4    counsel's testifying rather than asking a question.

5            THE COURT:   Sustained.

6            Ask him, but don't testify, counsel.

7            MR. CASHIO:   He's an expert, Your Honor.  I thought I

8    could lead.

9            THE COURT:   Well, you can lead, but you can't put

10   words in his mouth.

11           Ask him about the labor market in Arkansas, but that's

12   for him to say, not for you to say, sir.

13           MR. CASHIO:   Okay.  Thank you.

14                           EXAMINATION

15   BY MR. CASHIO:

16   Q.   Do you think Shaun Smith can compete with able-bodied

17   persons in a labor market like Hot Springs, Arkansas in the

18   sedentary field even?

19           MR. BALLINA:   Objection.  I think he's asked a

20   question that goes beyond this witness' expertise.

21           THE COURT:   Why don't you lay a better foundation,

22   sir.  I'm not sure this witness --

23                           EXAMINATION

24   BY MR. CASHIO:

25   Q.   Did this --

1    THE COURT:  Well, wait.  Let me finish, counsel, just

2    so we're all on the same page.

3    You're mentioning Arkansas.  This witness might know a

4    lot about Arkansas, but you need to lay a better foundation than

5    that, sir.

6                              EXAMINATION

7    BY MR. CASHIO:

8    Q.   Are you familiar with the Hot Springs, Arkansas area?

9    A.   I have not been there.

10   Q.   Assume that it's a 35 to 40,000 population town, okay.  Do

11   you think a person with the impairments that Shaun Smith has

12   could compete on an equal level at a 40-hour a job in the

13   sedentary level?

14   MR. BALLINA:    Objection, Your Honor.  It's beyond this

15   witness' expertise.  He's asking a labor question.

16   THE COURT:   Come up here.

17                  (BENCH CONFERENCE, AS FOLLOWS):

18   THE COURT:   Was this even included in his report?

19   MR. BALLINA:    No.

20   THE COURT:   You can't go into it if it's not included

21   in his report.

22   MR. CASHIO:    Okay.  I thought it was included in his

23   report that's why I'm going into it.  I thought I had a right.

24   He already has knowledge of that.

25   THE COURT:   Well, I did not know that.  You have to

1  lay a better foundation.

2       MR. CASHIO:   Okay.

3       THE COURT:   When you say, you know, 35,000 people,

4  what does that mean?

5       MR. CASHIO:   All right.

6       THE COURT:   If it was referred to in his report you

7  certainly can ask him.

8       MR. BALLINA:   So the Court and counsel understands

9  part of the basis of my objection, is that my appreciation that

10 Mr. Roberts has been tendered as an expert in vocational

11 evaluation?

12      THE COURT:   Okay.

13      MR. BALLINA:   He's not been tendered as an expert in

14 labor market surveys or job placement, and I think the question,

15 when you ask about labor market --

16      MR. CASHIO:   Okay.  I withdraw it.  I admit you

17 whipped me.

18      THE COURT:   Let him finish.

19      Okay.  Withdrawn, okay.  Objection sustained.  He's

20 withdrawing.

21      MR. CASHIO:   Yes.

22              (BENCH CONFERENCE CONCLUDED)

23      THE COURT:   All right.  Counsel's going to withdraw

24 that last question.

25                     EXAMINATION

BY MR. CASHIO:

Q.   Are you familiar with certain activities that I'm going to name in the horse industry.  A, are you familiar with cleaning and mucking out of stalls, Mr. Roberts?

MR. BALLINA:   Your Honor, I'm going to object.  I'm not sure whether the witness is now being tendered as an expert in the horse racing industry or the horse care industry.

THE COURT:    Overruled.

Go ahead, and let's see where you go with it.

THE WITNESS:   Over 25 years I've owned anywhere from a couple to about seven horses, and Captain Landry, who is a captain in the St. Charles Parish Sheriff's Department, or at least was, had some stables out on River Road in St. Charles Parish.  I boarded his horses in one of the stables.  My kids were riding Hunter Jumper.  They also boarded thoroughbred horses there.  We were frequently out there around the trainers and around the cleaning.  And myself having horses, yes, I'm quite familiar with taking care of them, including mucking stalls.

EXAMINATION

BY MR. CASHIO:

Q.   And how about, have you ever -- do you have any familiarity with jockeys and exercise riders on thoroughbred horses such as places like the Fairgrounds Racetrack?

A.   Other than observing them like numerous times because

1  Captain Landry had a one-mile track.  Jockeys and trainers were

2  out there riding horses most of the time that I would be out

3  there, and, of course, you can't help but stop and watch them

4  and talk to them, you know, these things, so I am familiar with

5  it.  I've never done it, but I'm quite familiar throughout the

6  racing.

7  Q.   From your knowledge of that industry you feel that riding

8  of horses is a heavy job?

9         MR. BALLINA:    Objection, Your Honor.  I'm not sure if

10  the witness has now been tendered as an expert in horse racing.

11         THE COURT:    He hasn't been, and he's not going to be,

12  but I think he can certainly testify as to whether or not that's

13  a heavy job.  I mean, that would be obvious especially in his

14  expertise as a vocational evaluator, I believe he can.

15         All right.  Go ahead, sir.

16         THE WITNESS:    I believe I've already testified that he

17  performed heavy to very heavy work, working, riding horses, and

18  it's no different really for a jokey than one who's assisted

19  training, exercising, riding horses.  It requires significant

20  physical skill.

21                         EXAMINATION

22  BY MR. CASHIO:

23  Q.   Did you know that Shaun had had jobs in the past driving 18

24  wheelers?

25  A.   It's my understanding that he had hauled horses which

1    required a vehicle such of a size that it required a commercial

2    driver's license, yes, sir.

3    Q.    And are you familiar with some of those 18 wheelers, how

4    many gears they have to shift?

5    A.    Well, I haven't driven one, but I am familiar.  They have

6    high and low range, and most of them have six to eight gears

7    for low range and six to eight gears for high range, depending

8    on the truck.

9    Q.    And in order to get to the 18 wheeler in gear you have to

10   use your left leg on the clutch, is that correct?

11           MR. BALLINA:    Objection, Your Honor, I think the

12   witness just said he's never driven one.

13           THE COURT:    Sustained.

14                          EXAMINATION

15   BY MR. CASHIO:

16   Q.    But do you know if the left leg, the leg that Shaun has

17   been permanently damaged, would that --

18           MR. BALLINA:    Objection, Your Honor --

19           THE COURT:    Sustained.

20           MR. BALLINA:    -- counsel's testifying.

21           THE COURT:    Sustained.

22           MR. CASHIO:    I think that's already been --

23           THE COURT:    Counsel, no comments.  Just ask the

24   questions.

25                          EXAMINATION

1   BY MR. CASHIO:

2   Q.   Do you think Shaun can do all of that shifting and hauling

3   with 18 wheelers with the assessments you've given him and with

4   the X-rays, and the medical you have --

5          MR. BALLINA:    Same objection, Your Honor.

6          THE COURT:   Objection sustained.

7                              EXAMINATION

8   BY MR. CASHIO:

9   Q.   How would you classify the job of driving an 18 wheeler?

10         MR. BALLINA:    Objection, Your Honor.  The witness has

11  testified he's never driven one.

12         THE COURT:   Overruled.

13         THE WITNESS:  The U.S. Department of Labor classifies

14  it as medium work, which means exertional capability between 20

15  and 50 pounds, and that's with the upper and lower extremities.

16                             EXAMINATION

17  BY MR. CASHIO:

18  Q.   And you've already told us that with light, medium, and

19  heavy jobs, you don't think that Shaun has much of a chance and

20  success, is that correct?

21  A.   I said that medium, heavy, and very heavy nonexisting,

22  meaning no chance.  Light, very little chance.

23         MR. CASHIO:   That's all that I have.

24         Thank you.

25         THE COURT:   Cross-examination, Mr. Ballina.

CROSS-EXAMINATION

BY MR. BALLINA:

Q.    Good afternoon, Mr. Roberts.

A.    Good afternoon.  Good to see you again.  It seems like only yesterday.

Q.    Yes.   Mr. Cashio referred Mr. Smith to you, correct?

A.    That's correct, he did, yes, sir.

Q.    And Mr. Cashio paid your bill?

A.    He did.

Q.    And you haven't seen Mr. Smith or haven't -- rather, let me rephrase that.  You have not evaluated Mr. Smith since May 24th, is that correct?

A.    Since May the 22nd, 2000

Q.    May the 22nd.  Thank you.

A.    And the answer is correct, I have not.

Q.    Mr. Smith's lawyer didn't hire you to help Mr. Smith find a job, did he?

A.    Well, evaluators don't find jobs.  We test people to determine what they can do and what the likelihood of them doing certain things in the future?

Q.    You don't do that?

A.    I don't do job placement, no.

Q.    Do you know if anyone has been hired to perform job placement for Mr. Smith?

A.    No, and I would not anticipate it until after he has

1  completed his medical and physical rehab process.

2  Q.    You're not a licensed rehabilitation counselor, correct?

3  A.    I'm not a counselor.  I never had a counseling course in my

4  life.

5  Q.    Does a rehabilitation or licensed rehabilitation counselor

6  provide job placement services for an individual?

7  A.    Yes, they do.

8  Q.    You don't perform labor market surveys for individuals?

9  A.    No, sir, the counselors do those.

10  Q.    To you knowledge has Mr. Smith been referred to a licensed

11  rehabilitation counselor?

12  A.    Your office I believe referred him.

13  Q.    Other than to Dr. Larry Stokes, are you aware that -- do

14  you know whether or not he's been referred to any other licensed

15  rehabilitation counselor?

16  A.    No, sir.  And typically that doesn't happen until after the

17  person gets to the point where they're ready to be developed and

18  placed in a job, and since he's not at MMI, no, I wouldn't think

19  he would be.

20  Q.    Your tests that you gave Mr. Smith that took about four or

21  five hours, correct?

22  A.    The evaluation total, which included the interview and the

23  test, yes, sir.

24  Q.    And your testing consist of written tests, correct?

25  A.    There's some written tests and then there's computerized

1  tests and there's functional tests which are called work samples

2  which are hardware pieces where you perform some seated and some

3  standing.   They are all commercially developed standarized

4  tests.

5  Q.    Those written tests that you gave to Mr. Smith, those tests

6  don't test or measure his physical abilities or inabilities, do

7  they?

8  A.    No, not -- no, they don't.   They measure the academic

9  achievement.   I gave him interest and his symptoms screening.

10  Those paper and pencil tests measure those things.   They're not

11  measuring capacity to do activities other than to sit and take

12  the test?

13  Q.    Based upon the written tests that you gave to Mr. Smith,

14  you did not see that he had any learning disability, did you?

15  A.    I did not.

16  Q.    Based upon the evaluation that you did of Mr. Smith, it's

17  your opinion that he can take instructions and directions?

18  A.    Oh, sure.

19  Q.    Based upon the tests or the evaluation that you did of Mr.

20  Smith, you think he will reenter labor market, don't you?

21  A.    That's what I said in my report, yes, sir.

22  Q.    I want to make sure that the jurors knew that was your

23  opinion, because they don't have your report.

24  A.    Well, if you want to look at specifically what I said on

25  page 8.

1  Q.   No, I think you've answered my question.  Let me ask you

2  another question?

3           MR. CASHIO:   Your Honor, can he answer the question?

4           THE COURT:   Yes, he can.

5           MR. CASHIO:   No, he doesn't want it.

6           THE COURT:   Go ahead.

7           THE WITNESS:   The sentence that I stated.  I said that

8  there's no doubt that he will eventually return to the labor

9  market.  The question then becomes in what capacity.  Capacity,

10  meaning sedentary, light.

11                          EXAMINATION

12  BY MR. BALLINA:

13  Q.   And you would agree right now we don't know?

14  A.   We know he has complications that make his future quite

15  uncertain, yes, we know that.

16  Q.   But we don't know?

17  A.   We don't know what the outcome is going to be because of so

18  many things going on.  That's correct, we don't know.

19  Q.   You heard Dr. Hamsa's testimony yesterday?

20  A.   I did.

21  Q.   Any disagreements with Dr. Hamsa's opinions given yesterday?

22           THE COURT:   That's a general question, counsel.

23  That's an awful general question.  Try to be more specific,

24  please.

25                          EXAMINATION

1  BY MR. BALLINA:

2  Q.  Specifically, did you here Dr. Hamsa's testimony that Mr.

3  Smith is not at maximum medical improvement?

4  A.  I did.

5  Q.  Any disagreement with that?

6  A.  None whatsoever.

7  Q.  Did you hear Dr. Hamsa's testimony that he has recommended

8  physical therapy and hydrotherapy for Mr. Smith?

9  A.  I did.

10  Q.  And to your knowledge, has Mr. Smith undergone either of

11  those?

12  A.  I believe Dr. Hamsa addressed that yesterday in his

13  testimony that he had not.

14  Q.  I just wanted to see if you knew something perhaps that Dr.

15  Hamsa did not?

16  A.  Well, I too recommended physical therapy in my report back

17  in May.

18  Q.  And would you agree with Dr. Hamsa's testimony that Mr.

19  Smith's condition will improve if he undergoes that treatment?

20  A.  Well, the typical outcome of therapy is improvement, and we

21  hope that such therapy is going to improve him.  The concern

22  obviously is the delay in getting into that therapy.

23  Q.  All right.  Did you hear Dr. Hamsa's testimony concerning a

24  functional capacity evaluation?

25  A.  I did.

1  Q.    You did not perform a functional capacity evaluation of Mr.

2  Smith?

3  A.    No, sir, the work samples are designed to measure the

4  ability to functionally do work activities specifically using

5  industrial engineering standards, and FCE is a medical model,

6  not a vocational model, whereas they have people lift, bend,

7  push, pull, so Dr. Hamsa described that fairly adequate in his

8  testimony.

9  Q.    That was my next question.  You don't disagree with Dr.

10  Hamsa's description of a functional capacity evaluation?

11  A.    Other than he says he finds him fairly consistent from

12  place to place.  I get reports from all different places.  I

13  don't see where they're quite as consistent as he thinks they

14  are, but that's his opinion, not mine.

15  Q.    To your knowledge, has Mr. Smith had a function capacity

16  evaluation?

17  A.    No.  And it's like the job placement efforts.  You wouldn't

18  want to do that until after maximum medical improvement, because

19  they are quite exertional.

20  Q.    Well, you would agree that if Mr. Smith had a functional

21  capacity evaluation, that that would allow you to expand on your

22  determination regarding his future employability?

23  A.    No.  I think if he had one today, I think that it would be

24  more detrimental to Mr. Smith and beneficial to me.

25  Q.    Did you hear Dr. Hamsa's testimony that he believes that he

1  thinks Mr. Smith can do work that requires him to stand for

2  maybe half a day, not six to eight hours, but a half a day?

3  A.    I heard him say that, yes.

4  Q.    Are there any sedentary jobs in the horse racing industry?

5  A.    You're talking about with the horses?

6  Q.    In the horse racing industry and related to the horse

7  racing industry?

8  A.    I'm sure they're clerical based jobs and probably some

9  management base jobs as far as the supporting industry is

10  concerned, but as far as working directly with the horses, no,

11  not that I'm aware of?

12  Q.    Did you hear Dr. Hamsa's testimony that he believes that

13  naturally Mr. Smith will be able to go back to what he was doing

14  but maybe not on a full-time basis?

15  A.    I heard that testimony, yes, sir.

16  Q.    And a doctor renders opinions about someone's physical

17  abilities and inabilities, is that right?

18  A.    Based on their experience, correct.

19  Q.    Well, you would agree that you're not qualified to render

20  an opinion about someone's physical abilities, that's for a

21  doctor?

22  A.    I don't give medical opinions, but I see people

23  longitudinally over time from short term post injury to years

24  post injury, and so I've got that experience of looking at

25  people over time, so if I draw a different opinion based on my

1   experience, certainly that's my opinion.  He draws his opinion

2   based on his medical treatment to the point that he releases

3   people, which may be on the short run.  So he's got his opinion.

4   Ours may differ, but our training is different, and I'm not

5   trained as a medical doctor to diagnosis and/or treat

6   impairments.

7   Q.   I understand that you and Dr. Hamsa may have different

8   opinions.  What I'm asking you is, is that what Dr. Hamsa, as a

9   doctor, is qualified to render an opinion about what you are not

10  is the physical aspect of Mr. Smith.

11  A.   The physical aspect based on medical diagnoses and

12  treatment, that's correct.

13  Q.   Any information that Mr. Smith has to undergo any type of

14  medical treatment for depression?

15  A.   Beyond prescription for for Amitriptyline, which is the

16  generic name for Elavil, I'm not aware of it, no.

17  Q.   The therapy that Dr. Hamsa has recommended that Mr. Smith

18  undergo.

19  A.   It's hyrotherapy.

20  Q.   And the physical therapy that I believe you just told me a

21  moment ago, you also talked about that in your report, that will

22  take about six months, is that right?

23  A.   It all depends.  If we're just dealing with the broken

24  bone, that's one thing.  If we're dealing with soft tissue,

25  that's something else on top of it, and Dr. Hamsa adequately

1  described adhesions which are significant concern because it

2  involves the soft tissue, and, of course the RSD type symptoms.

3  So you've got three different things going on which may

4  complicate the normal recovery process of physical therapy.  So

5  if it were just the bone, I'd say, yes six months, but

6  considering it's got additional factors, I'm not quite that

7  optimistic that it will be accomplished in six months,

8  especially with the adhesions.  Those are difficult to deal

9  with.

10  Q.    But you would agree that until it's tried, we won't know?

11  A.    Oh, absolutely, and that's why a statement I made a little

12  earlier about doing this in a timely fashion is important.

13  Q.    You would prefer, would you not to see Mr. Smith after he

14  has undergone the services that Dr. Hamsa has recommended,

15  because that would give you a better idea of what basically

16  we're going to wind up with Mr. Smith?

17  A.    Well, if you want to know what you ultimately have, you

18  wait until every thing's done and everybody concludes that

19  there's nothing else we can do.  At that point you test and you

20  see exactly what you have.  So prior to that, you have to go on

21  your experience of working with other people in trying to make

22  your projections based on your experience, so obviously if it

23  was all done and everybody said we're done.  We can't do any

24  more.  That's what you're going to have.  You test it, you know

25  exactly what you got.

1   Q.    And my point exactly is that we're not done.  We haven't

2   gotten to that point with Mr. Smith, have we?

3   A.    I personally think we're -- based on experience, that we've

4   got a long way to get done.

5   Q.    But you would agree that we haven't even tried to get to

6   that point.  We're not at that point?

7   A.    All I can say we're not done, and I think it's going to be

8   a long time to get done.

9   Q.    It's my recollection in the report that you rendered in

10  connection with your evaluation of Mr. Smith that you made

11  recommendations, correct?

12  A.    I did.  I made five of those.

13  Q.    Did you give those recommendations -- you didn't give those

14  recommendations to Mr. Smith.  You gave them to Mr. Cashio,

15  correct?

16  A.    The report goes to the referal source.  In this case, Mr.

17  Case was the referral source, the report went to him.

18  Q.    So you did not tell the person who you evaluated what your

19  recommendations were?

20  A.    The evaluator's job is not to tell the person what they're

21  recommending.  The evaluator's job is to make sure that they're

22  safely tested so that we don't make things worse, they go away,

23  and it's after they go away that all the tests are scored.  All

24  the medicals are reviewed and the report is dictated.  The

25  dictation goes to the referral source with the anticipation that

1  whoever referred the person in would share the information.  If

2  there were any questions they'd be followed up back to me as to

3  why I made those recommendations.  What's the hope of the

4  outcome if those would follow these things.

5  Q.    You did not tell your recommendations to Mr. Smith, did

6  you.

7  A.    Evaluators do not engage in -- that would be considered in

8  my mind a counseling activity, and I don't do counseling, so,

9  no, I did not tell him the recommendations.  Again, I don't make

10 those until long after he's gone.

11 Q.    Thank you.  You don't see any reason why Mr. Smith can't

12 attempt to get a GED, do you?

13 A.    Well, we talked abut this in my deposition.  I anticipate

14 that there would be no problem between what he's got between his

15 ears, assuming that the affect of his medication does not affect

16 concentration, and that the affect of physically getting there,

17 sitting there is not interrupted by increased pain.

18 Q.    And again, until Mr. Smith tries to do that, we won't know

19 what affect the medication has on him and whether or not he can

20 do it?

21 A.    That's correct, we wouldn't, but again, like most other

22 services were recommended that we would prefer he be at MMI, so

23 we're more able to accommodate, or design a program based on

24 where he's at.  In other words, at MMI if he's close to where he

25 is, we're going to have design a specific program and maybe even

1    get specific tutorial services.  If he significantly increases,

2    then he'll be on his own, but again, a lot of this decision

3    making we want can't make ultimately until he gets to the point

4    where we know what he's going to be able to tolerate.  How long

5    he's going able to tolerate it, and to what degree he's going to

6    be able to tolerate it.

7    Q.    And again, MMI is maximum medical improvement?

8    A.    MMI is maximum medical improvement realizing that that may

9    not yield a person employable.  It may just yield them -- you

10   know, at maximum medical, again meaning that nothing else is

11   going to be done to improve the problem.

12   Q.    When you spent the four or five hours that you did with Mr.

13   Smith, he didn't exhibit any pain behaviors to you, did he?

14   A.    He did not express any pain.

15   Q.    Did he act like he was in pain?

16   A.    Several times he did.  But it's the way I describe it is if

17   you're married to a person long enough they don't have to tell

18   you they're in pain, you can look at them and tell that, so I

19   have been doing this for thirty-one years and I can observe it.

20   So he not verbalize pain, except when I asked him about it

21   during the interview, but I could determine by watching him,

22   observing him that he was having some level of difficulty and I

23   talked about that.

24   Q.    If the individual that you're evaluating does specifically

25   verbalize pain, you'll note that in your records and your

1  report, correct?

2  A.   Correct, I do.

3  Q.   And for Mr. Smith you didn't note that in your records or

4  your report, did you?

5  A.   That's correct, I believe we talked about that in

6  deposition.  If he overtly or verbalizes it, I talk about it.

7  If he doesn't, I don't other than under the residual functional

8  capacity section where it is expressed specifically when asked

9  during the interview.

10  Q.   Mr. Smith's academic testing was consistent with his

11  advises to you that he had quit school in the 10th grade?

12  A.   Correct.  I indicated he's functioning overall around the

13  8th grade level which is consistent with what we anticipate

14  with someone who quit school in the 10th grade.

15  Q.   Mr. Smith never gave you a history, a work history of

16  being employed, did he?

17  A.   Well, in my mind almost all horse trainers are

18  self-employed, so he indicated he worked with his father.  He

19  indicated that he was hired by Mr. Springer, but beyond that I'm

20  sure that he probably had something lined up where he hauled

21  horses and got paid.  Whether or not that was self-employment,

22  you know, we'd call that, or whether or not his father was

23  getting paid and paid him, you know.  I don't know exactly how

24  that went.

25  Q.   Would I be correct in saying that you don't know exactly

1  because Mr. Smith didn't tell you?

2  A.    Well --

3  Q.    Did Mr. Smith tell you, yes or no?

4  A.    Other than that he worked for his father, no, and when you

5  work for a parent, you know, I don't want know what you want to

6  call it.

7  Q.    The testing that you did give to Mr. Smith, his best scores

8  were in sedentary, is that right?

9  A.    Well, we indicate -- I need to explain something quick.

10  The test -- the work samples have industry engineering

11  standards.  Those standards go from zero to 150. 100 is

12  considered employable.  80 to 90 indicates close enough to

13  employment that you could pretty much guarantee short term rehab

14  will get you to the hundred level.  So in his case his highest

15  scores on the MTM was 56. -- I'm sorry, it was 58 -- one second.

16  Strictly on sedentary testing he was in the 50s.  I had the

17  exact number written down, and on the like, which involves

18  standing was 33.  So he was higher by 20 points on the sedentary

19  work samples.  So that means, yes, he did better doing the

20  sedentary seated than he did the standing.

21  Q.    And again, Mr. Roberts, it is your opinion that Mr. Smith

22  will return to the work force, to the labor market?

23  A.    Sir?

24  Q.    It is your opinion that you believe that Mr. Smith will

25  return to the work force, to the labor market?

1   A.   I believe I read that sentence earlier that there was no

2   doubt that he would eventually return to the labor market.  It's

3   just a measure for capacity.

4        MR. BALLINA:   Thank you, sir.

5        THE COURT:   Redirect, Mr. Cashio, Please, sir.

6        MR. CASHIO:   Your Honor, thank you.

7                     REDIRECT EXAMINATION

8   BY MR. CASHIO:

9   Q.   Mr. Roberts, it is your opinion that outdoor activities

10  such as medium, heavy, and very heavy jobs, that you don't

11  anticipate he's ever going to do that realistically, is that

12  correct?

13  A.   That's correct.  That's beyond the capacity that even Dr.

14  Hamsa projected.

15  Q.   Okay.  And you also think that in the future you wouldn't

16  give him better than five out of a hundred shots of being

17  successful in the professional business, is that correct?

18  A.   I think I explained that those jobs require college

19  education.  That means he's going to get educationally

20  remediated get a GED.  He's going to succeed in college and he's

21  going to get a professional business.  I'm not saying it's not

22  possible, but I'm saying no more than five out of a hundred that

23  that will happen.

24  Q.   So it's more likely than not that he won't, is that

25  correct?

1  A.    Five out of a hundred is much more probable than not.

2  Q.    Now, you had a sedentary score in the 50s.  What were you

3  saying about the employability levels, what were they?

4  A.    Well, sedentary work is done seated working with 10 pounds

5  or less, and the general rule of thumb is the less physically

6  demanding the work, the higher the education.  The more

7  physically demanding work, the less the education.  So when we

8  drop down to sedentary his scores were in the 50s, realizing

9  that was better, a hundred fully employable.

10        80 to 90 we expect short term rehab to get the person.

11  His were in the 50s, but that's just on being able to see it.

12  That doesn't take into consideration his limited academics

13  because again, the less physically demanding the more education.

14  So even though he tolerated sitting better than standing on

15  testing, his academics preclude almost all sedentary work, so

16  that's the problem, and I indicated in my report that that's

17  going to be a problem.

18  Q.    Do you have any idea of the cost of the type of physical

19  therapy that has been suggested, the hydrotherapy and the

20  physical therapy for Shaun?

21        MR. BALLINA:    Objection, Your Honor.

22        THE COURT:    Sustained.

23        MR. CASHIO:    Can we approach the bench, Your Honor.

24        THE COURT:    No.  Objection sustained.

25        Move on.

```
1                          EXAMINATION
2   BY MR. CASHIO:
3   Q.   Do you know whether or not it will be extremely expensive?
4            MR. BALLINA:   Objection, Your Honor.
5            THE COURT:   Sustained.
6                          EXAMINATION
7   BY MR. CASHIO:
8   Q.   Did you also hear Dr. Hamsa on the stand say he would defer
9   to the opinion of a vocational evaluator in most instances?
10  A.   I did.
11  Q.   And you're a vocational evaluator, is that correct?
12  A.   I am.
13  Q.   Now, these adhesions that you talked to Mr. Ballina
14  about --
15  A.   Those were the adhesions Dr. Hamsa was talking about
16  yesterday.
17  Q.   Right.  But in his cross-examination of you it was brought
18  up.  Is that the same in your knowledge as scar tissue?
19           MR. BALLINA:   Objection, Your Honor.  He's asking for
20  a medical opinion.
21           THE COURT:   Sustained.
22                          EXAMINATION
23  BY MR. CASHIO:
24  Q.   And I think you said that you wanted the physical therapy
25  to be addressed in a timely fashion, is that correct?
```

1  A.    Correct.

2  Q.    Okay.  And if Shaun couldn't afford the cost of this

3  physical therapy --

4           MR. BALLINA:   Objection.  Beyond the scope of my

5  cross-examination, Your Honor.

6           THE COURT:   Overruled.

7           Let's see where you're going,  Mr. Cashio.

8                         EXAMINATION

9  BY MR. CASHIO:

10  Q.    If Shaun couldn't afford the cost of this physical and

11  hydrotherapy, would that delay and aggravate his present

12  condition?

13           MR. BALLINA:   Objection, Your Honor.

14           THE COURT:   Sustained.

15           MR. CASHIO:   That's all that I have.

16           Thank you, Mr. Roberts.

17           THE COURT:   Thank you.

18           Any further need for witness?

19           MR. BALLINA:   No, Your Honor.

20           THE COURT:   Thank you, sir.

21           You're excused from your subpoena.

22           Have a good day.

23           THE WITNESS:   Thank you, Your Honor.

24           Good to see you.

25           THE COURT:   Let's take a five-minute recess and you

```
 1   can call your next witness, Mr. Cashio.

 2            THE CLERK:   All rise.

 3                         (3:15 P.M.  -  RECESS)

 4        *        *        *        *        *        *        *

 5                 (3:55 P.M.  -  AFTER RECESS)

 6                   P-R-O-C-E-E-D-I-N-G-S

 7            THE CLERK:   All rise.

 8       Court's in session.

 9       THE COURT:   Bring in the jury.

10       THE MARSHAL:   All rise.

11               (THE JURY ENTERED THE COURTROOM)

12       THE CLERK:   All rise.

13       Court's in session.

14       THE COURT:   Thank you very much.

15       Please be seated.

16       Call your next witness.

17       MR. CASHIO:   I would like to call Shaun Smith, Your

18   Honor.

19       THE COURT:   All right.

20       THE CLERK:   Raise your right hand, please, sir.

21                      SHAUN LEE SMITH

22       After having been first duly sworn, did testify under

23   oath, as follows:

24       THE CLERK:   Please have a seat, and state your name

25   for the record, please.
```

1          THE WITNESS:    Shaun Lee Smith.

2                    DIRECT EXAMINATION

3   BY MR. CASHIO:

4   Q.    Shaun, what is your age, please?

5   A.    25.

6   Q.    And what occupations did have before your accident of last

7   December?

8   A.    Assistant trainer, exercise rider.  All -- I'm sorry, do

9   you mean all of the occupations that I've had?

10  Q.    Yes, just tell the jury what you've done in the past.

11  A.    I was assistant trainer, exercise rider.  I drove an

12  18-wheeler for about six months.  I was a farm manager at one

13  time.  I was a groom.  I was a hot walker.

14  Q.    Okay.  Tell us what a hot walker is?

15  A.    It's the first part of the horse business.  It's where you

16  start.  You walk the horses.  You either walk them just to

17  stretch their legs while the groom cleans their stall for about

18  30 minutes, or after they get through exercising, to cool them

19  out which is about 45 minutes.

20  Q.    And do you have to continually hold the horse and walk them

21  around during that 45 minutes?

22  A.    Yes, sir.  You walk them around the barn and under the barn

23  where the stalls and everything are.  You walk them in a circle,

24  let them drink so they can cool out, yes, sir.  Hold them while

25  they get a bath and that sort of thing.

1    Q.    Okay.  And what kind of horses are these?

2    A.    Thoroughbred race horses.

3    Q.    Are they real gentle animals?

4    A.    No, sir, they're by nature very high strong.  They're bred

5    that way.

6    Q.    And when you walk them around, what do you hold on to?

7    A.    It's called a lead shank.  There's a chain that you put on

8    the halter which goes around the horse's nose.  There's

9    different ways to put it on, and a leather strap connected to

10   it.

11   Q.    Do you walk in front of the horse when you do that?

12   A.    You always walk on the left side.  Primarily everything you

13   do with a horse you want to work from the left side of them.

14   Q.    Okay.  And are you familiar with what they call young or

15   baby horses?

16   A.    Yes, sir.

17   Q.    Okay.  And explain that to the jury what a young two-year

18   old is like?

19   A.    Two year olds, they're green.  They really don't know

20   what's going on, and it's the trainer and everyone that works

21   under the trainer's job to teach them what they're bred to do.

22   They're pretty wild.  You never know what to expect with a

23   two-year old.

24   Q.    Tell us some of your -- just quickly experiences with

25   two-year olds when they first get to the race track and you're

1  going to be the exercise rider?

2  A.    Well, the first that you want to do is drop your irons.

3  Q.    What are your irons?

4  A.    Your irons are what you put your feet in.  What we call the

5  iron is the -- it's an Aluminum stirrup, or whatnot, where you

6  put your foot and there's a leather strap connected to your

7  saddle and you let them down longer so that you can stay in the

8  middle of one better.  My next experience that I've had was your

9  question, I believe?  I'm sorry.

10  Q.    Just tell us, is it more difficult to ride and gallop

11  two-year olds at the race track than it is older horses?

12  A.    Most definitely.

13  Q.    And why is that?

14  A.    Well, because they haven't -- you know, they've only been

15  broke which is about -- they've had about 60 days of a person

16  being on their back.

17        Being on the racetrack is a whole different experience,

18  especially in the morning time because they're so many horses on

19  the racetrack trying to train at the same time.  You only have a

20  certain time period when you can do this.  There's horses coming

21  at them.  There's horses going with them.  Horses passing them.

22  Horses stopped.  You have to go around, which is a total

23  different world for a two-year old.

24        I remember one time in Dallas -- actually it wasn't in

25  Dallas, it was Grand Prairie between Dallas and Forth Worth,

1   Lone Star Park there was a -- it was summer, summertime, it was

2   really hot.  They had built the racetrack.  It was the first

3   season, and they had jackhammers, actually jackhammers during

4   the morning time, while we were training, on the front side

5   which is the grandstand area, and the two-year olds would -- it

6   was a mess.  I mean, there was loose horses running everywhere.

7   Q.   What do you mean by "a loose horses", does that mean the

8   horse kicked the jokey --

9         MR. BALLINA:    Objection.  He's leading the witness.

10                       EXAMINATION

11  BY MR. CASHIO:

12  Q.   Okay.  What is a loose horse?

13  A.   A loose horse, he'd thrown a rider.  He'd proped, ducked

14  out from under rider and the horse was loose without the rider.

15  Q.   Have you ever been thrown on two-year olds before?

16  A.   Yes, sir, several times.

17  Q.   Several times, okay.  And tell the jury when you're

18  exercising thoroughbred race horses, do you just sit down in the

19  saddle and just hold on?

20        MR. BALLINA:    Objection, Your Honor.  He's leading the

21  witness.

22                       EXAMINATION

23  BY MR. CASHIO:

24  Q.   Just tell us how you do that.

25  A.   You never sit unless you stop the horse to stand.  While

1   you're galloping you're always standing.  Whether you're

2   jockeying it backwards or galloping it around you're always

3   standing in your irons.

4   Q.   So are you still standing in the irons of the stirrups when

5   you're going real fast?

6   A.   Almost definitely.

7   Q.   Okay.

8   A.   Most definitely.  Very rarely are you on the back of the

9   horse.  Walking to the track you're on the back.  You're

10  actually sitting on the horse.  You make the horse relax.  The

11  rest of the time you're standing, other than at one other point

12  when you -- you see, you jog a horse backwards and then you stop

13  to let him catch his breath real quick and then you'll sit to

14  make him relax and then you turn him around to gallop and then

15  the rest of the time you're standing.

16  Q.   Okay.  Now, when you first started exercising horses,

17  let's go to the first day.  How did you feel the next morning

18  after you exercised that first day?

19  A.   I was very sore.

20  Q.   I'm sorry.

21  A.   I was extremely sore.  I mean, to gallop a thoroughbred

22  it's not riding a pony or anything.  You just don't sit there.

23  You have to use every muscle.  Ever muscle in my body hurt.  My

24  legs really hurt because I wasn't used to that type of thing.

25  You only put just your toes really in the irons to hold yourself

1  up.

2  Q.    Is there any pressure on your legs when you're doing that?

3  A.    Extreme pressure.

4  Q.    Okay.

5  A.    Also the insides of my legs, and even after time you go

6  through this, like if you take a month off or something because

7  of an injury or whatever.  When you come back to galloping you

8  have to go through the same process, one of the main processes.

9  One of the main things is strawberry's, I remember very well.

10  You get strawberry's all on the inside of your legs from the

11  rubbing of when you're galloping.

12  Q.    Okay.  Since your accident, have you had any problems with

13  the inside of your leg, your left leg in particular?

14  A.    Yes, sir, severe problems.  I can't wear boots anymore

15  because they rub that part of the leg.  Where the break is it's

16  real sore.  It feels like pins and needles from the break all

17  the way down to my foot, that one spot's touched, it's about

18  that big.  I mean, my wife -- not my wife, I'm sorry, my

19  girlfriend, we're supposed to get married in June -- she'll wake

20  me up in the middle of the night, rub her fight foot against me

21  accidentally or something.  I have a lot of sensitivity on the

22  inside of my leg, yes, sir.

23  Q.    So, you said that you're supposed to get married next June?

24  A.    No, I was supposed to get married this past June.

25        MR. BALLINA:    Objection as to the relevance of this,

1  Your Honor.

2        THE COURT:    Sustained.    Rephrase your question,

3  counsel.

4        MR. CASHIO:    Okay.

5                            EXAMINATION

6  BY MR. CASHIO:

7  Q.    Why haven't you gotten married?

8  A.    We don't have any money.

9  Q.    Okay.  Have you ever sued anybody before in your life?

10 A.    No, sir.

11 Q.    Have you ever been injured in any accidents where you could

12 sue?

13 A.    Yes, sir.

14 Q.    Besides the thoroughbred horses, have you ever driven any

15 kind of large vehicles before the date of the accident?

16 A.    Yes, sir.  I drove a --

17 Q.    I'm sorry.

18 A.    I drove an 18-wheeler for Hal Sullens, I think about six

19 months hauling horses.

20 Q.    I'm sorry.

21 A.    Hauling horses.

22 Q.    Okay.  And tell us, how is that to drive an 18-wheeler,

23 what do you do?

24 A.    Well, there's a lot of things that you do.  The actual

25 driving part of it, the truck I drove which is the -- it's

1    pretty much the most -- I'm sorry, I don't know how to phrase

2    it.  I don't know how to say it.  It's a 13-gear truck.  That's

3    the usual transmission that you have.  I mean, you have to

4    double clutch.  Each time you shift you have to double clutch,

5    which is you clutch with your left leg when you get it out of

6    gear and then you let off, and then before you put it into the

7    next gear you clutch again.

8    Q.    Okay.  And the night of the accident were you driving a

9    large truck?

10   A.    No, sir, I wasn't driving a semi, I was driving a one ton.

11   Q.    A one ton, that was your Dad's truck?

12   A.    Yes, sir.

13   Q.    And how many tires did that have on it?

14   A.    Six.

15   Q.    Where were you working at the time of the accident?

16   A.    Fairgrounds, New Orleans.

17   Q.    Okay.  And who were you working for?

18   A.    Bobby Springer.

19   Q.    Okay.  Why had you gone to work for him?

20   A.    My father -- I was working for my father before and he lost

21   some horses, some horses had -- we had to turn out had some

22   injuries, loss some clients and stuff and he didn't really have

23   -- we didn't have enough force horses really for my type of

24   work.  I needed to make more money, so I went and worked for

25   Bobby Springer?

1  Q.    Okay.  And has Bobby Springer trained any famous horses?

2  A.    Yes, sir.  War Emblem.  He developed War Emblem.

3  Q.    And what did War Emblem do?

4  A.    He won the Kentucky Derby.

5         MR. BALLINA:    Your Honor, let me enter an objection to

6  the relevance of this line of testimony.

7         THE COURT:    Overruled.

8         MR. CASHIO:    I think I have some relevance.

9                        EXAMINATION

10  BY MR. CASHIO:

11  Q.    So was Bobby Springer a nationally-known trainer?

12  A.    Yes, sir.

13         MR. BALLINA:    Objection.

14         THE COURT:    Overruled.

15                        EXAMINATION

16  BY MR. CASHIO:

17  Q.    And why did you want to get with a nationally-known

18  trainer?

19  A.    Because that's -- I mean, for my upcoming career, I've

20  been wanting to be a trainer since I was that big since I can

21  remember, and when you gallop horses for a nationally-known

22  trainer, one like him, you know, the owners come out in the

23  mornings and they watch the horses gallop and you get to know

24  them that way.

25  Q.    And how does that help you?

1  A.   Well, getting to know them, you know, I was hopping in a

2  few years I could take on a stable of my own.

3  Q.   Okay.  And how would that help you by knowing them?

4  A.   That's what you have to do.  You have to be known by these

5  people and that's the general way that you go about it to

6  establish yourself.

7  Q.   And how long had you been working with horses?

8  A.   Since I was young, six, seven years old.

9  Q.   Okay.  Did anyone in your family other than your father

10 ever train horses?

11 A.   I'm a fourth generation trainer.  My great

12 great-grandfather trained horses until he passed away.  My

13 grandfather, he still trains, he's 71, my father.

14 Q.   Okay.  Do you have any brothers that were going to go into

15 training?

16 A.   No, sir.

17        MR. BALLINA:    Objection, Your Honor.  He's leading the

18 witness.

19        THE COURT:    All right.  Don't lead the witness,

20 counsel.

21                        EXAMINATION

22 BY MR. CASHIO:

23 Q.   Okay.  What were your plans on -- I mean, did you ever plan

24 on becoming a trainer?

25 A.   Yes, sir, that was my goal.

1  Q.    Okay.  And were you on your way to becoming a trainer?

2         MR. BALLINA:    Objection, Judge, that's calling for

3  speculation.

4         THE COURT:    Sustained.  Counsel, rephrase your

5  question.

6                              EXAMINATION

7  BY MR. CASHIO:

8  Q.    Tell us the steps you had taken from when you were six or

9  seven until the time of your injury?  And let me ask you:  At

10 the time of your injury, how old were you last year?

11 A.    First off, I was 24 at the time of my injury.

12 Q.    Tell us the steps you had taken from the time you were

13 seven until the time you were 24 in learning the training

14 business.

15 A.    I started walking horses the first time for my grandfather

16 in New Mexico during my summer vacation, and after that I was

17 pretty well hooked.  I dropped school.  Every break vacation

18 summer, fall break, spring break whatever it was, I went to the

19 barn to work and it didn't really seem like work to me.  I

20 started by walking horses, and then I groomed horses.  I was

21 started grooming horses when I was about 15.  I groomed horses

22 for a year or two, and then I started learning how to exercise

23 horses.

24 Q.    Before your Dad lost some of these horses and some of them

25 had problems and lost clients like you told us --

1            MR. BALLINA:   Your Honor --

2            MR. CASHIO:   He just told us that, Your Honor.

3            MR. BALLINA:   -- counsel's testifying instead of

4    asking a question.

5            THE COURT:   He's not testifying, counsel.

6            Overruled.

7            Go ahead, but get to the point, counsel.  I know you're

8    trying to refer him back to what he said previously.

9            MR. CASHIO:   Right.

10                         EXAMINATION

11   BY MR. CASHIO:

12   Q.   But do you have any idea how many horses your Dad made and

13   how much he making a year as a trainer?

14            MR. BALLINA:   Objection as to relevance.

15            THE COURT:   Sustained.

16            MR. CASHIO:   Your Honor, can we approach the Bench.

17            THE COURT:   No.  Objection sustained.  Move on.

18            MR. CASHIO:   I think under the Louisiana law I have a

19   right to explore his possibilities in the future.

20            THE COURT:   Objection sustained.

21                         EXAMINATION

22   BY MR. CASHIO:

23   Q.   Do you know how much a trainer with approximately 30 horses

24   makes.

25            MR. BALLINA:   Objection.  It calls for speculation

1   and opinion.

2           THE COURT:   Come forward.

3                   (BENCH CONFERENCE, AS FOLLOWS):

4           THE COURT:   How is this man going to know?  Has he

5   studied it?  I mean, what is the basis for your asking --

6           MR. CASHIO:   He knows what his Daddy had made in the

7   past.

8           THE COURT:   So what does this have to do with this

9   guy?

10          MR. CASHIO:   It has a lot to do.  A plaintiff can

11  testify as to his knowledge of any kind of income in that

12  industry, and it's relevant.

13          THE COURT:   Show me the basis for that.  You have not

14  shown me anything.

15          MR. CASHIO:   Loss of earning capacity, Your Honor.  He

16  can talk about this.

17          THE COURT:   You have not shown me anything.

18          MR. CASHIO:   There's Louisiana cases that say that the

19  plaintiff can testify --

20          THE COURT:   Show me.  Show me.

21          MR. CASHIO:   Okay, here's a case.  First of all, I

22  want to say Barocco, the Ennis versus Barocco case.  In this one

23  -- let me get my glasses, but I have another one which is even

24  more on point than that one.

25          Here's Pierce versus Milford, Your Honor.  I think that

1    was by Judge Vance in the Ennis case.  This is her ruling.  The

2    Fifth Circuit affirmed her.

3           THE COURT:   In determining whether a personal injury

4    plaintiff is entitled to recover for the loss of earnings

5    capacity, the trial Court should consider how much plaintiff's

6    current condition disadvantages him in the work force.  The

7    trial court should thus ask itself what plaintiff might have

8    been able to have earned but for his injuries and what he may

9    now earn given his resulting condition.

10          I don't disagree with you, Mr. Cashio, as to what the

11   law is, but it's just how do you get to this point?

12          What proof do you have what the father made, and then

13   how are you going to establish that this guy would have made as

14   much money as his father would have made?

15          MR. CASHIO:   The plaintiff's own testimony is

16   sufficient.

17          THE COURT:   I understand that.  Look, let's get to the

18   same page --

19          MR. CASHIO:   Here's proof that he knows what his

20   father made?

21          THE COURT:   Please, stop.  I don't interrupt you, so

22   please don't interrupt me, okay.

23          You're right, the plaintiff can testify, okay, but we

24   all know that an expert, not a lay person, an expert can base

25   the expert opinion on hearsay, okay, but a lay person cannot,

1   okay.  So I know what the law is, and we all know what the law

2   is that he can certainly say what he thinks he would have made,

3   but what does he base that on is my question.  None of the cases

4   that you have shown me says he can  base it on hearsay, and none

5   of these cases I've at looked at it Pierce --- I've looked at

6   that first case you gave me, the <u>Willis versus Letoulle' case</u>

7   (phonetic), and Judge Vance's case, and the Barocco case.  It

8   says that he can say that, but it doesn't say what he can base

9   it on, and you haven't shown me any proof of what he can base it

10  on.  What you're trying to elicit from this man is hearsay that

11  he's basing his calculation on, on the hearsay testimony.  Not

12  even testimony, on hearsay statements about what his father

13  made.  About what the industry says, that's hearsay as far as

14  I'm concerned.

15          MR. CASHIO:   Your Honor --

16          THE COURT:   Tell me why I'm wrong.

17          MR. CASHIO:   The plaintiff has a right to make his own

18  -- in effect, become an expert in the case by saying he knows

19  other people's income in similar situations as he aspires to be,

20  and therefore, he can make that opinion.  The jury has a chance

21  to disregard that if they want.

22          MR. BALLINA:   Your Honor, I disagree with the

23  proportion that a plaintiff can render opinion testimony as to

24  his future loss.  I believe what the cases stand for is that a

25  lay witness -- you do not need expert testimony to prove his

loss.  A plaintiff can testify as to what their earning history

was, and then the trier of fact, from that information, can

opine as to what a person's loss may or may not be for the

plaintiff, but I don't believe that's what these cases say that

the plaintiff can testify, and I don't think it's in any of

those cases, the plaintiff is allowed to testify.

MR. CASHIO:  Can I speak, Your Honor?

THE COURT:  I'll let you speak, but hold on one

second.  In the Willis verus Letoulle' case, the plaintiff

claimed that he could have earned more money had he not been

limited by the physical disability because of the accident, so

he made that statement.  He did not call an economist or other

expert to testify to loss of income, and the witnesses assigned

a disability rating and he was awarded $50,000, but it doesn't

say what he based his statement or what he based his claim of

what he could have earned on.

In Pierce versus Milford says earning capacity in

itself is not necessarily determined by actual loss; damages may

be assessed for depravation of what the injured plaintiff could

have earned despite the fact that he may never have seen fit to

take advantage of that capacity.  That's what Judge Vance said

in her opinion that the injury done him has deprived him of a

capacity he would have been entitled to enjoy even though he

never profited from it monetarily.

It goes on to say, even an accident victim who is

1    unemployed at the time of the injury is entitled to an award for

2    impairment of diminution of earning power.  The trial Court

3    should consider whether and how much plaintiff's current

4    condition disadvantages him from the work force.

5            MR. CASHIO:   That's what she said, too.

6            THE COURT:   The trial Court should thus ask itself

7    what plaintiff might have been able to have earned but for his

8    injuries.

9            Okay.  We can ask that, but the question is where do we

10   get that information from?  It does not tell me, and, counsel,

11   I'm not trying to limit you.  We've got to follow the rules of

12   evidence.  I understand what you're getting at, and you can go

13   into that, but you can't use his hearsay evidence to go into

14   that unless you show me, otherwise you have not shown me a case

15   that shows me that you can go on hearsay.  An expert can.  This

16   man is not an expert contrary to what your statement was that he

17   would be an expert in his own determination of it, that's

18   hogwash, he's not an expert.

19           MR. CASHIO:   I didn't say he was an expert, if I did I

20   was wrong.  I said he can give opinion testimony, Your Honor.

21   His lay opinion is sufficient.  All the cases say that.

22           THE COURT:   But lay opinions cannot be based on

23   hearsay unless you show me something.  Expert opinion can be

24   based on hearsay.  Case law is complete with that, but this man

25   is not an expert, so he cannot give a lay opinion based on

1    hearsay unless you show me the case that says that he can.

2        Here's what we're going do.  I'm going to sustain his

3    objection now.  You'll be able to rebut after they finish their

4    case and I will allow you, if you can show me.  Now, if you can

5    substantiate for me by case law that he can give an opinion or

6    some sort of proof of future loss of earning capacity based on

7    hearsay to substantiate the end result of what he can do, but

8    you haven't shown me how he can get there.  You've shown me

9    three cases saying the end result, I hear you, but not one of

10   these cases tells me how they got there.  So if you can show me

11   that he can rely on hearsay I'll let you prove that in rebuttal,

12   okay.  So you've got some homework to do tonight.

13       MR. CASHIO:   Yes.

14       Can I say something?

15       THE COURT:   You can say whatever you want to say after

16   I'm through.

17       MR. CASHIO:   I thought you were.

18       THE COURT:   I'm going to limit you now, okay.  I'm

19   going to allow you to reserve your right on rebuttal.  If the

20   truth opens the door, or if you show me some cases, you know,

21   first thing tomorrow morning, then I will let you rebut.  I'm

22   sustaining it for now because I don't see any law that's going

23   to support it.  Show me otherwise.

24       Go ahead.

25       MR. CASHIO:   My point, Your Honor, I'm in a conundrum.

1    The only -- it's impossible for a lay witness to testify what he

2    might have earned, even if he had not done that job in the

3    future, without resorting to some kind of hearsay.  He can't

4    possibly have any information himself.  He can give an opinion

5    on anything but hearsay.

6              MR. BALLINA:   And, Your Honor, that's a --

7              THE COURT:   In reading Pierce versus Milfred, they're

8    referring to a case in the State Supreme Court case, Coco versus

9    Winston.  Coco involved an injury to a 20-year old employee who

10   at the time of his injury could only prove a history of annual

11   earnings of whatever, or one half of $5,000 the jury awarded

12   plaintiff for his future lost annual earning capacity.  The

13   Supreme Court reinstated the jury award, notwithstanding an

14   absence of historical evidence, because plaintiff was entitled

15   to full idemnification under Civil Code 2315.

16             Okay.  Here we go.  A claim for loss of earnings need

17   not be proved with mathematical certainty, but only by such

18   proof that reasonably establishes the claim.  This may even

19   consist only of the plaintiff's own reasonable testimony, if

20   accepted as truthful, although, of course, the better practice

21   is introduce corroborating testimony.

22             MR. CASHIO:   Exactly.

23             THE COURT:   Exactly, but it still doesn't tell me he

24   can use hearsay, though.

25             MR. CASHIO:   It states any -- I thought you said any

1   kind of evidence even if is isn't very good evidence.  I didn't

2   hear the exact words.  No historical evidence, it says.

3           THE COURT:   Well, I agree with you, but only as such

4   proof that reasonably establishes the claim.

5           MR. CASHIO:   And that is for the trier of fact to

6   determine whether it's reasonable or not.

7           THE COURT:   I agree with you, but you can't use

8   hearsay of what his father made.

9           How do know we know what his father made?  Because he's

10  going to tell the jury that?  How can he cross-examine him on

11  that?

12          MR. CASHIO:   You can't, but --

13          THE COURT:   I don't think that's fair.

14          MR. CASHIO:   But he can say you don't have any proof.

15          MR. BALLINA:   No, Judge.

16          MR. CASHIO:   That will damage his credibility in that

17  area.

18          THE COURT:   Hold on.

19          THE LAW CLERK:   Would you like me to go research

20  more, Judge?

21          MR. CASHIO:   I can go on to something if you want,

22  Your Honor, and just take your ruling and see if I can get a

23  better case for you.

24          We're actually going to be doing this tomorrow, I'm

25  sure.  It's already 4:00 o'clock.

1       THE COURT:    Okay, I want you to move on.  I'm

2   sustaining his objection.  However, again, you do some research

3   tonight, and again, I'll reserve your right to go into it even

4   if he does not open the door today --

5       MR. CASHIO:    Thank you.

6       THE COURT:    -- with anybody else.  If I'm wrong on the

7   law, I'm wrong on the law.  You have not shown me that I'm wrong

8   on the law yet.

9       MR. CASHIO:    Thank you, Judge,

10      MR. BALLINA:    Judge, just so I'm clear.  My position

11  is he can't render an opinion as to what his future loss is.  He

12  can testify as to what his earnings were.  He can give the trier

13  of fact information for the trier of fact to make that

14  determination, and I would, you know, reference the motions in

15  limine that were filed to exclude the evidence for loss of

16  future earnings and the case law that was cited therein, and I

17  understand the Judge's ruling on that, but I don't think he can

18  render an opinion.

19      MR. CASHIO:    The reason is -- the in limine was

20  against the economist, an economist, which I'll never use.

21      THE COURT:    The law is clear, he doesn't have to have

22  a work history, Mr. Ballina, so I'm disagreeing with you there.

23  He doesn't have to have a historical thing, so he is going to be

24  able to say something, but I'm not sure what he can base the

25  something on at this point, because I have not seen anything, so

1    let's move on.

2         MR. CASHIO:    Okay.

3         THE COURT:    And again, like you did this morning,

4    first thing we're going to start tomorrow at 9:30.  I want you

5    to both be here at 8:30, and I want you to show Mr. Ballina at

6    8:30 what you have to base your argument on and we'll take it up

7    before the jury arrives tomorrow.

8         MR. CASHIO:    Thank you, Judge.

9         THE COURT:    Now, are these you're only copies?

10        MR. CASHIO:    No, I have a copy.

11        MR. BALLINA:    Do you have any another copy?

12        MR. CASHIO:    I'll give you a copy, just ask me for

13    one.

14        THE COURT:    All right.  Before the end of the day,

15    counsel, give Mr. Ballina those copies.

16                    (BENCH CONFERENCE CONCLUDED)

17        THE COURT:    Go ahead, counsel.

18                         EXAMINATION

19    BY MR. CASHIO:

20    Q.    Now, Shaun, after your accident -- well, the day of your

21    accident, before it happened, how many horses could you exercise

22    during one day or gallop?

23    A.    If I spent the whole day doing it, I could probably get on

24    20.

25    Q.    Okay.  But what was the normal amount you did during that

1  time period?

2  A.    Ten.

3  Q.    And how long would it take to gallop one horse and get him

4  back to barn?

5  A.    Thirty minutes on average.

6  Q.    And were you having any problems with you legs the day

7  before the accident?

8  A.    No.  No, sir.

9  Q.    Okay.  And now since the accident, can you tell if your

10 left leg that was injured is the same size as your right leg?

11 A.    Yes.

12 Q.    Is it?

13 A.    My right leg is a lot bigger than my left one.

14 Q.    Okay.  Have you been able to take any of this hydrotherapy

15 or physical therapy that we've been talking about?

16 A.    No, sir.

17 Q.    And why is that?

18 A.    I can't afford it.  I checked with numerous places in Hot

19 Springs.  For like a six-month period, it was going to cost

20 about $15,000.  I'm living off of money I borrowed from my

21 family and food stamps?

22 Q.    Now, you live with your fiancee', is that correct?

23 A.    Yes, sir.

24 Q.    And her name is Donna?

25 A.    Donna Antenelli.

1  Q.   Do you have any children of your own that live with you?

2  A.   Yes, sir.

3  Q.   And who is that?

4  A.   I have a daughter, Stormy Smith.  She has a daughter.

5  Q.   Who has a daughter?

6  A.   My fiancee'.

7  Q.   Donna has a daughter also that lives with you?

8  A.   Yes, sir.

9  Q.   And you're trying to provide for all of them?

10 A.   Yes, sir.

11 Q.   Have you gotten any bills from creditors of the hospital --

12 A.   Yes sir.

13 Q.   -- since your accident?

14 A.   Yes, sir.

15 Q.   Okay.  Did you ever contact Harrah's in order to have them

16 pay for your bills or prescriptions.

17 A.   Yes, sir.

18        THE COURT:   Counsel.  Let me see counsel at the bench.

19              (BENCH CONFERENCE, AS FOLLOWS):

20        THE COURT:   I want to get back to the issue you've

21 raised about the future earnings.

22        In my minute entry of October the 7th, I stated that

23 the documents of earnings of Shaun Smith from Springer Racing

24 Stable are admitted.  Defendant shall have the opportunity to

25 cross-examine plaintiff concerning the authenticity and ogigin

1    of these records.

2         You can go into that.  I think that is better evidence

3    than any hearsay.  In other words, I have to look at we do

4    apparently have some historical evidence here, and in these

5    other cases they said you don't need historical evidence, but I

6    do find in this case, and I've already allowed it to be admitted

7    into evidence some historical evidence, so I will allow you,

8    obviously, to go into the historical evidence, and the jury gets

9    to listen and you can cross-examine him, okay.

10        And, again, unless you show me a case on point that

11   allows hearsay, I'm not going allow that, because this would

12   certainly outweigh any type of hearsay that you might want to

13   raise, okay.  So I don't want you to think that your hands are

14   completely tied.  And you might want to go into that before

15   rebuttal because I might not allow you to go into any on

16   rebuttal.

17        MR. CASHIO:    I'm sorry.

18        THE COURT:    Even when I'm ruling in your favor you

19   interrupt me.

20        MR. CASHIO:    Excuse me.

21        THE COURT:    I'm putting all this on the record to

22   protect you.

23        MR. CASHIO:    It's just my brain doesn't work well.

24        THE COURT:  No, it works very well.  You're doing a

25   great job, but you've got to let me speak.  So let's finish.

1      So I will allow you, consistent with my minute entry,

2  to go into this now, so I don't what you to forego this.

3      MR. CASHIO:   No.

4      THE COURT:   Okay.  And unless you convince me

5  otherwise of the hearsay, you're not going to go into that, but

6  you can still go into this again subject to Mr. Ballina's

7  cross-examination.

8      MR. CASHIO:   We also have some documents where he was

9  making approximately 50,000.  We have some 1099 forms.

10     Can I see ask him if he expected in the future to have

11  an increase in those wages, his earnings?  That's tax returns.

12     THE COURT:   I'll let him say that subject to your

13  cross-examination.

14     MR. BALLINA:   But that's right back to what he's

15  basing that on, do you think that would increase.

16     THE COURT:   But I think that a lot of those cases that

17  you showed me say that he can do that.

18     Give me the cases one more time.  Let's get this thing

19  resolved right now if we can.

20     I go back to Pierce versus Milford, which say damages

21  may be assessed with information what the injured plaintiff

22  could have earned despite the fact he may never have seem fit to

23  take advantage of that capacity.  Again, that's consistent with

24  Judge Vance's case.

25     The theory is that injury done him has deprived him of

1    the capacity he would have been entitled to enjoy, even though

2    he never profitted from it monetarily, it does state that, and

3    I'll note Mr. Ballina's objection.  And, of course, Mr. Ballina,

4    again, you can cross-examine him on that, but he's not going to

5    go into what his father made or what standard in the community,

6    because there is no standard in the community that this man

7    knows, which would not be hearsay evidence.

8              MR. CASHIO:   Okay.  Thank you.

9              MR. BALLINA:    And not to be --

10             THE COURT:  Go ahead.  He's still arguing, I think you

11   would want to be here.

12             MR. CASHIO:   I'm sorry.

13             MR. BALLINA:   What is he basing it on, an opinion that

14   it would increase?

15             THE COURT:   He's not going to give his opinion.

16             I will let this man say that he believed that he would

17   be able to make the same amount that he was making before, and

18   I'll let him say why he believed that.

19             MR. CASHIO:   But, Your Honor, that's a loss of wages

20   not loss of future earning capacity, that's the difference.

21             THE COURT:   My ruling remains the same, okay.

22                    (BENCH CONFERENCE CONCLUDED)

23             THE COURT:  All right, counsel.

24                         EXAMINATION

25   BY MR. CASHIO:

1    Q.    And where do you live now, Shaun?

2    A.    In Hot Springs, Arkansas.

3    Q.    I mean, whose house are you living in?

4    A.    My parents right now.

5    Q.    Are you going to be living in that house next month?

6    A.    No, sir.

7    Q.    How are you able to live in the house with the children and

8    with Donna?

9    A.    My parents are in Shreveport, actually Bossier City.

10   That's where he's training right now, and he'll return next

11   month, probably the beginning of next month for the race there

12   in Hot Springs.  The house isn't big enough for all of us.

13   Q.    Now, after the accident, did you ever try to do any kind of

14   work?

15   A.    One time while.  See, I was working for Mr. Springer, when

16   I'd get down there anywhere from 8:00 o'clock in the morning

17   until 10, 11, somewhere in there, I would haul shavings for

18   various trainers and I thought, you know, I had a friend of mine

19   while I was in the hospital try and keep that going for me so I

20   would have something to do when I got out, and me and him went

21   one day and tried to do it and I just couldn't handle it.  I was

22   just going to do the driving, he was going to do all the

23   unloading and we were going to split it.  It wasn't much to

24   split anyway.

25   Q.    What time do you usually get out to the racetrack in the

1  morning to start your work when you were working for Mr.

2  Springer?

3  A.    Around 5:00 a.m..

4  Q.    Now, did you have any kind of license to drive an

5  18-wheeler?

6  A.    Yes, sir.

7  Q.    What's that called?

8  A.    A CDL, commercial driver's license.  It was an A, I

9  believe, whatever the highest level was.

10  Q.    Let's get to the accident scene.  Had you ever driven a

11  vehicle into Harrah's New Orleans parking lot, valet parking

12  before the night in question?

13  A.    No, sir.

14  Q.    And when you first came into that valet parking lot that

15  night, did you know anything about a fee being charged for valet

16  parking?

17  A.    No, sir.

18  Q.    And did you think that there was going to be a fee for

19  valet parking?

20  A.    No, sir, I didn't.

21  Q.    And why not?

22  A.    All the other casinos I've been to there's never been a

23  fee.  Shreveport, all the ones in Shreveport haven't, and I

24  checked all the ones here.  I've got a list of them.

25  Q.    But don't say that, the Judge doesn't -- but anyway, so --

1    THE COURT:    Counsel, not that the Judge doesn't want

2    to.  The rules of evidence don't.

3    MR. CASHIO:    Oh, I'm sorry.  The rules of evidence.

4    THE COURT:  Thank you.

5    EXAMINATION

6    BY MR. CASHIO:

7    Q.    When you first came into the casino with that truck with

8    the six wheels on it, what did you first notice into that

9    parking area?

10   A.    Well, I was looking for the valet man to direct you, tells

11   you where to pull up to so they can take your vehicle.

12   Q.    And when you first spotted him, what was he doing?

13   A.    He was waving me or -- I can't say exactly, but he was

14   waving somebody, me or maybe the guy in front of me where to

15   pull to.

16   Q.    Okay, so when you saw him waving, did you look around to

17   see if there were any signs there?

18   MR. BALLINA:    Objection.  Leading the witness.

19   THE COURT:    Sustained.

20   Rephrase you question, counsel.

21   EXAMINATION

22   BY MR. CASHIO:

23   Q.    Did you notice any signs at the time when you first came

24   in?

25   A.    No, sir.

1    Q.    Were you looking for any signs?

2    A.    No, sir.

3    Q.    What was your attention focused on?

4    A.    The gentlemen that directs you, the valet man.

5    Q.    Was it easy to park that six-wheeler truck into the area he

6    showed you?

7    A.    It was a pretty tight fit.  There's vehicles all around us,

8    people walking everywhere.  I was trying to pay attention.

9    Q.    Okay.  When you got out of your car, did they give you a

10   ticket?

11   A.    Yes, sir.

12   Q.    Did anybody tell you that there was a charge for parking or

13   anything about the parking procedures?

14   A.    No, sir.

15   Q.    Okay.  So, where did you go next, Shaun, after you got out

16   of your vehicle?

17   A.    Into the casino towards the front doors to go into the

18   casino.

19   Q.    When you went into the casino, what were you looking for at

20   the time you entered the casino?

21   A.    The door.  Some of the doors have handles inside and some

22   of them have handles on the outside.  I was trying to find a

23   door with a handle.

24   Q.    Okay.  And why were you trying to find a door with a

25   handle?

1  A.   So I could get into the casino to gamble.

2  Q.   And where did you go when you first got into the casino?

3  A.   To play Blackjack, I believe.

4  Q.   Is that a game you normally played before?

5  A.   No, sir, I usually play slots.

6  Q.   Okay.  And how did you do at Blackjack?

7  A.   I lost all my money.  I lost just about every --

8           THE COURT:  Counsel, let see you.

9      (CONFERENCE AT THE BENCH OUT OF THE PRESENCE OF THE JURY AND

10          COURT REPORTER)

11                    (CONFERECE CONCLUDED)

12           THE COURT:   Go ahead, counsel, I'm sorry.

13                          EXAMINATION

14 BY MR. CASHIO:

15 Q.   I'm sorry.  And so how did you do at Blackjack?

16 A.   Not very good.  I lost.

17 Q.   How much did you lose, do you know?

18 A.   Around 3, $400.

19 Q.   Okay.  And when you were playing Blackjack -- well, first

20 all, that's a number's game, is that correct?

21           MR. BALLINA:   Objection.  He's leading the witness,

22 Your Honor?

23           MR. CASHIO:   Let me just ask him about Blackjack.

24                          EXAMINATION

25 BY MR. CASHIO:

1  Q.   Do you have to do any addition in Blackjack?

2  A.   Yes, sir.

3       MR. BALLINA:   Objection as to the relevance of this,

4  Your Honor.

5       THE COURT:   Overruled.

6       MR. CASHIO:   Okay.

7                          EXAMINATION

8  BY MR. CASHIO:

9  Q.   And are you good with numbers?

10  A.   No, sir.

11  Q.   What grade did you go to in school?

12  A.   The ninth grade.

13  Q.   Okay.  And how did you do in school?

14  A.   Not very good.

15  Q.   And during the time you were playing Blackjack, do you know

16  if any waitresses came around offered you free drinks?

17  A.   Yes, sir, they come around all the time.

18  Q.   And how many drinks did you have during that time period?

19  A.   Two, three.

20  Q.   Okay.  Did you have any drinks at the time you lost your

21  last hand in Blackjack?

22  A.   Yes, sir, I believe so.

23  Q.   And what did you do with that drink, did you leave it at

24  the table?

25  A.   No, I think I took it with me, dumped it in the trash can

1  before I went out.

2  Q.    And when you took it with you, did you drink it or did you

3  just dump it in the trash can?

4  A.    I'm sure I drank it.

5  Q.    And that was right before you went out to valet parking?

6  A.    Yes, sir.

7  Q.    Were you drunk in any fashion?

8  A.    No, sir, not by any means.

9  Q.    When you got out to valet parking were you using any kind

10 of -- did you have anything in your hand?

11 A.    I'm sorry, can you repeat the question?

12 Q.    Did you use the telephone at any time while you were out at

13 valet parking?

14 A.    Yes, sir.

15 Q.    How many fingers did you use to dial the phone?

16 A.    Just one.

17 Q.    Okay.  Did you have any difficulty in dialing the phone?

18 A.    No, sir.

19 Q.    Now, when you first came to valet parking, what did you do

20 with that ticket that you had?

21 A.    I gave it to -- brought it to the valet desk.

22 Q.    Now, was there anybody else there at the time you handed

23 the ticket accept for the -- were there any other customers

24 there?

25 A.    Not that I remember, no.

1        MR. CASHIO:   Let me show you this video.  See if this

2    will refresh your memory.  Is that okay, Your Honor?

3        THE COURT:   That will be fine.

4        Now, what are you showing, counsel, the entire video

5    from beginning to end or what part?

6        MR. CASHIO:   I'm going to show the first couple of

7    minutes about the ticket, Your Honor, then I may stop it and go

8    back.  You press this thing right here?

9        THE COURT:   Now, just don't blind any of the court

10   personnel, okay.  Keep it on the screen.

11       THE OPERATOR:   Yes, sir.

12                   (THE VIDEO WAS SHOWN)

13       MR. CASHIO:   Okay.  Shaun when you come up to the

14   scene, would you point yourself out with the red?

15       THE WITNESS:   Yes, sir.

16       THE COURT:   Is this the exact tape that's in evidence?

17       MR. CASHIO:   Yes, Your Honor.  I think it the machine

18   now.

19              (THE WITNESS POINTED TO HIMSELF)

20                      EXAMINATION

21   BY MR. CASHIO:

22   Q.   Is that you Shaun?

23   A.   Yes, sir.

24   Q.   Okay.  I'm sorry, I missed it.  Did you put anything on the

25   counter?

1  A.    Yes, sir.

2  Q.    And what was that?

3  A.    The ticket.

4  Q.    Was the lady paying attention to you, the only customer?

5          MR. BALLINA:    Objection, Your Honor.  It calls for

6  speculation.

7          THE COURT:    Sustained.

8          The tape speaks for itself.  It's quite clear.

9          MR. CASHIO:    Okay.

10                          EXAMINATION

11  BY MR. CASHIO:

12  Q.    Do you know if the lady ever picked up the ticket?

13  A.    Here in just a second.  There (pointing).

14          MR. BALLINA:    Objection.  Is he commenting on what

15  she's doing?

16          THE COURT:  Objection sustained.  He doesn't know if

17  that's his ticket or not.

18          MR. CASHIO:    You don't --

19          THE COURT:    Do you?  Was that you just now, sir?

20          THE WITNESS:    Yes, sir.

21          THE COURT:    Okay.

22          MR. CASHIO:    Your Honor --

23          THE COURT:    Overruled.

24                          EXAMINATION

25  BY MR. CASHIO:

1  Q.    When you went up there that second time, what happened

2  then, what conversation was there?

3  A.    I think she asked me -- I'm sorry, I think she asked me

4  about if I'd given her a ticket, if I'd given her my ticket or

5  something.  I said, "Yes",

6            MR. BALLINA:    Your Honor, I object to hearsay.

7            THE COURT:    Sustained.

8            Well, that wouldn't be hearsay, counsel, but he said he

9  thinks she said, and that's certainly not admissible.

10            THE WITNESS:    I can't say exactly.

11                          EXAMINATION

12  BY MR. CASHIO:

13  Q.    Have you seen this videotape before?

14  A.    Yes, sir.

15  Q.    And are you sure that that's the ticket that you gave her

16  that she picked up a minute or so later?

17  A.    Yes, sir.

18  Q.    Okay.  Now, did you have any problems with anybody at that

19  point in time?

20  A.    No, sir.

21  Q.    Okay.  A bit later in the video -- a bit later, did you

22  notice whether any other people were getting their cars ahead of

23  you?

24  A.    Yes, sir.

25  Q.    Were you able to estimate how many people got their cars

1  while you were waiting?

2  A.    Estimating, probably 20, 25.

3  Q.    Okay.  And how were you feeling as all of these other

4  people were getting their cars and you were not being served?

5  A.    Prejudiced.  I don't know.  I felt that I didn't

6  understand.  I just couldn't understand what the reason was.

7  Q.    Okay.  After the 20 or 25 people had gotten their cars,

8  did you start to begin to ask for your car?  What was wrong with

9  your vehicle?

10  A.    Yes, sir.

11  Q.    Okay.  And what was the first thing you remembered somebody

12  telling you?

13  A.    That I think that I didn't give them the ticket.

14  Q.    Okay.  And what did you say?

15  A.    I said, "Yes, I did".

16  Q.    Okay.  And did you remember ever going into your wallet to

17  double check if the ticket was there?

18  A.    Yes, sir.

19  Q.    And was it there?

20  A.    No, sir.

21  Q.    Okay.  Did at any point in time later on, after all these

22  people had been served, did they suddenly find your ticket?

23          MR. BALLINA:    Your Honor, let me enter an objection --

24          THE WITNESS:    I really can't say,

25          MR. BALLINA:    -- that's a leading question.  Quit

1  leading the witness.

2          THE COURT:    Sustained.

3                          EXAMINATION

4  BY MR. CASHIO:

5  Q.    Okay.  At some point in time after the other 20 or 25

6  people had gotten their tickets -- I mean, their cars, did you

7  have any conversations with a gentleman, Stacey Dorsey?

8  A.    Yes, sir, I did.

9  Q.    And what do you remember about the first conversation you

10  had with him?

11  A.    It wasn't pretty.  I asked him what the problem was.  He

12  said, you know, that there's people coming and going, and I

13  didn't know what was going on.  I thought they were playing some

14  kind of joke on me at first or trying to scam me.  I didn't know

15  what was happening, and I said, you know, I said:  "Well,

16  where's my F-ing truck?"  And he said, "You're not going to get

17  your F-ing  truck".  He said, I bet you don't get it, Cracker".

18  He said, "Bet me you won't get your truck".

19  Q.    Okay.  After he -- I'm sorry.

20  A.    I used the N word at that time.  I apologize, and I've

21  apologized under oath at my deposition --

22  Q.    Okay.  Have you --

23  A.    That's not something I --

24          THE COURT:    Counsel, please don't interrupt.

25          MR. CASHIO:    Excuse me.  I'm sorry.  Go ahead.

```
 1            THE WITNESS:   It's not something I -- it's not normal
 2   behavior.
 3                              EXAMINATION
 4   BY MR. CASHIO:
 5   Q.   Okay.  Did Mr. Dorsey ever apologize back to you at any
 6   time?
 7   A.   No, sir.
 8   Q.   Did Mr. Dorsey or anybody from Harrah's ever apologize to
 9   you for running you over?
10   A.   No, sir, my dad said --
11            MR. BALLINA:   Objection to the relevance.
12            THE COURT:   Sustained.
13                              EXAMINATION
14   BY MR. CASHIO:
15   Q.   Okay.  After the accident, what type of pain did you feel?
16   A.   I was in severe pain.
17   Q.   And where were you hurting?
18   A.   My left leg.
19   Q.   Did anybody come to help you right away?
20   A.   He walked off.
21   Q.   Do you remember Mr. Dorsey saying anything to you when he
22   walked off?
23   A.   Yes, sir, he said something smart "serves you right".
24   Q.   And is that when you told them that you were going to sue
25   Harrah's after he said that to you?
```

1   A.   It's possible.

2           MR. BALLINA:   Judge, let me interrupt.

3           THE COURT:   Objection sustained.

4           MR. BALLINA:   And it's constant, judge.  I haven't

5   been objecting.

6           THE COURT:  And constantly object.

7                          EXAMINATION

8   BY MR. CASHIO:

9   Q.   Was the engine in your truck smooth or noisy?

10          MR. BALLINA:   Objection.  Irrelevant.

11          THE COURT:   Overruled.

12          THE WITNESS:   It was very loud.  It was loud.  It was

13  a diesel engine.

14          THE COURT:   I don't know the relevance, but we've

15  heard it for two days now, so I'm letting it in without

16  objection, so I'm going to let it in now.

17          MR. CASHIO:   I think I'll show the relevance later,

18  Your Honor.

19          THE COURT:   I'm not commenting on the evidence

20  obviously, but it's been objected to now I think for the first

21  time so I'm letting it in.

22          I'm sure that counsel hopes to prove relevancy of it,

23  so I'm allowing it in.

24                          EXAMINATION

25  BY MR. CASHIO:

1  Q.    When you went up to the truck, for the first time when you

2  saw your truck coming out there, what did you say?

3  A.    I said to Mr. Dorsey, I said, "I got $10 in my truck.  You

4  can take it and stick it up your --"

5  Q.    Stick it where?

6  A.    "-- up your butt".

7  Q.    So after you told him is that when you left the valet

8  booth?

9  A.    Yes, sir.

10  Q.    Okay.  And after you left the valet booth -- why did you

11  leave the valet booth?

12  A.    Because I seen my truck coming up.

13  Q.    And when you saw it coming, what did you do when you got

14  close to the truck?

15  A.    I walked around the side of it.  The guy went to take off.

16  I said, "Look, I got $10 in the middle console".

17  Q.    Okay.

18  A.    I might have said, "I think I got $10 in the middle

19  console".  I wasn't sure, then he went to take off again.  He

20  stopped again.  I don't know if I already said that.

21  Q.    Okay.  I'm sorry, he stopped again, and what happened?

22  A.    I might have already said that, I'm sorry.

23  Q.    Okay.  Did Mr. Dorsey ever walk out to the scene while you

24  were at the truck?

25  A.    Yes, sir.

1  Q.    Did you hear anything he said to the driver?

2  A.    Yes, sir.

3  Q.    And what he did say?

4  A.    He said, "Take off and park it".

5  Q.    What happened right after he said, "Take off"?

6  A.    The guy he took off.

7  Q.    And what happened to you?

8  A.    He run over me.  I got run over.

9  Q.    Okay.  Were you aggravated at the time after you got run

10 over?

11 A.    Yes, sir.

12 Q.    And when they came out to -- did they do anything to your

13 boots, the EMTs?

14 A.    Yes, sir.

15 Q.    What did they do?

16 A.    They cut them off.

17 Q.    And what were you trying to do at the time when the EMTs

18 were trying tho cut off your boots?

19 A.    He kept getting mad at me because I wasn't holding still.

20 He kept screaming "Hold still.  Hold still".  I mean, I was in

21 so much pain my natural reaction, I wanted to grab my leg.  I

22 wanted to curl up in a ball.  I couldn't hold still.  I mean, I

23 didn't know, I just couldn't hold still, I was in so much pain.

24 Q.    Okay.  And did you use bad language?

25 A.    I don't recall it, but it's possible.

1  Q.    Were these boots working boots or your kind of --

2  A.    Those are my dress boots.

3        MR. BALLINA:    Objection as to relevance, Your Honor.

4        THE COURT:    Sustained.

5        MR. CASHIO:    I think it's relevant, Your Honor.

6        THE COURT:    I'll note your objection, counsel.

7                          EXAMINATION

8  BY MR. CASHIO:

9  Q.    And how much did those boots cost?

10       MR. BALLINA:    Objection.    Irrelevant.

11       THE COURT:    Has that been an element of damages,

12 counsel?

13       MR. CASHIO:    It's a damage element, yes, Your Honor.

14       THE COURT:    It's in your pleadings?

15       MR. CASHIO:    Notice pleadings, Your Honor.

16       THE COURT:    Approach the bench.

17            (BENCH CONFERENCE, AS FOLLOWS):

18       THE COURT:    Has that been listed as an element of

19 damages in your pretrial order?

20       MR. CASHIO:    I don't think so, but I don't think I

21 have to list it specifically.

22       THE COURT:    By the way on a different note, I'll tell

23 you right now, I asked my law clerk to call Judge Vance and ask

24 her if in the case that you cited --

25       MR. CASHIO:    Right.

1          THE COURT:    -- If she allowed hearsay evidence to

2    substantiate, and she said she did not.

3          MR. CASHIO:    Because we didn't need to, Your Honor,

4    but I think you have a right --

5          THE COURT:    We do not need to.  You tried the case

6    before judge Vance?

7          MR. CASHIO:    Yes, that was my case.

8          THE COURT:    I'm just merely telling you what she said,

9    but find me a case.

10          MR. CASHIO:    Okay.

11          THE COURT:    If you have an exception to the hearsay

12    rule for that, but otherwise I'm not going to allow it.

13          MR. CASHIO:    I admit I didn't list it as a specific

14    item, Your Honor, so if you want to exclude it, fine.

15          THE COURT:    What exactly was your question?

16          MR. CASHIO:    How much they cost.  About how much they

17    cost.

18          THE COURT:    If you did not list that as an element of

19    damages, then I'm not going to allow that.

20          MR. CASHIO:    Okay.

21          THE COURT:    Okay.  Thank you.

22               (BENCH CONFERENCE CONCLUDED)

23          THE COURT:    Objection sustained.

24          MR. CASHIO:    Now, I forgot about what questions we

25    were talking about a bit ago.

1          THE COURT:    The boots.

2                              EXAMINATION

3    BY MR. CASHIO:

4    Q.    Did Harrah's take a taped interview from you before you had

5    an attorney?

6          MR. BALLINA:    Objection.    Irrelevant.

7          THE WITNESS:    Yes, sir, they did.

8          THE COURT:    Overruled.

9          THE WITNESS:    Yes, sir, they did.

10                             EXAMINATION

11   BY MR. CASHIO:

12   Q.    And how did that come about?

13   A.    Well, I went to -- I called, I didn't go anywhere, I called

14   the guy at Harrah's, some man, I don't remember his name.  I was

15   wondering if they were going to pay for my doctor bills, my

16   prescriptions or what they were going to help me with or what

17   not, and the guy told me that I needed to talk to --

18         MR. BALLINA:    Objection to hearsay.

19         THE COURT:    Sustained.

20         MR. CASHIO:    Okay.

21                             EXAMINATION

22   BY MR. CASHIO:

23   Q.    Did they take that taped interview of you?

24   A.    Yes, sir.

25   Q.    And did they pay for any of your prescriptions?

```
 1   A.    No, sir.

 2   Q.    Did they pay for any of your medical bills?

 3   A.    No, sir.

 4   Q.    Were you disappointed?

 5   A.    Yes, sir.

 6              MR. BALLINA:   Objection.  Irrelevant.

 7              THE COURT:   Overruled.

 8                        EXAMINATION

 9   BY MR. CASHIO:

10   Q.    And did you get an attorney after that?

11   A.    Yes, sir.

12              MR. BALLINA:   Objection.  Irrelevant.

13              THE COURT:   Overruled.

14                        EXAMINATION

15   BY MR. CASHIO:

16   Q.    Okay.  Do you remember looking in your wallet during the

17   time you were at the --

18              MR. BALLINA:   Objection.  Leading, Your Honor.

19              THE COURT:   Sustained.

20              MR. CASHIO:   Okay.  Can I show this, Your Honor?

21              THE COURT:   Yes, sir.

22                        EXAMINATION

23   BY MR. CASHIO:

24   Q.    Do you have a pointer?

25   A.    Yes, sir.
```

1  Q.    Okay.  Can you tell the time on the top of the screen

2  there?

3  A.    The last three numbers, 2029.  That's the time.

4            THE COURT:    Wait.  What was your question again?

5            MR. CASHIO:    My question is about how many times he

6  took his wallet out and why.  I wanted to see if it could

7  refresh his memory.

8            THE COURT:  All right.

9                          EXAMINATION

10 BY MR. CASHIO:

11 Q.    Who is that coming into the valet booth, do you know, at

12 821?

13 A.    Mr. Stacey Dorsey.

14            THE COURT:    That's the fellow with the white shirt?

15            THE WITNESS:    Yes, sir.

16            THE COURT:   All right, sir.

17                          EXAMINATION

18 BY MR. CASHIO:

19 Q.    You know where you are at this time, Shaun?

20 A.    I think I'm over here somewhere (pointing).

21 Q.    When you come into the picture, can you point yourself out?

22 A.    Yes, sir.

23 Q.    You see any other people being waited on while you're

24 waiting for your car?

25            MR. BALLINA:   Objection, Your Honor.  It speaks for

 1  itself.

 2          THE COURT:   Sustained.

 3                          EXAMINATION

 4  BY MR. CASHIO:

 5  Q.   Do you remember other people being waited on while you were

 6  waiting for your car?

 7          MR. BALLINA:   Objection.   Irrelevant.

 8          THE COURT:   Well, he's already testified that he did.

 9                          EXAMINATION

10  BY MR. CASHIO:

11  Q.   Tell us when you come into the picture, Shaun, please.

12  A.   Yes, sir.

13  Q.   Point it out.

14          THE COURT:   Apparently, you have not entered the scene

15  yet, is that correct?

16          THE WITNESS:   No, sir.   Actually, I think I did for

17  just a second, but then I was out of it.

18          MR. CASHIO:   Your Honor, for clarity, he's already

19  entered and given his ticket before this.

20          THE COURT:   You've already given your ticket?

21          THE WITNESS:   Yes.

22          MR. CASHIO:   Just a few minutes before this.

23                          EXAMINATION

24  BY MR. CASHIO:

25  Q.   Okay.   What are you doing now?

1  A.    I'm on the phone.

2  Q.    Are you having any trouble walking?

3  A.    No, sir.

4  Q.    Who are you speaking to?

5          MR. BALLINA:   Objection.   That was an opinion, Your

6  Honor.

7          THE COURT:   Sustained.

8                              EXAMINATION

9  BY MR. CASHIO:

10  Q.    Who are you speaking to on the phone?

11          MR. BALLINA:    Irrelevant.

12          THE COURT:   Sustained.

13          MR. CASHIO:    Your Honor, I think he needs to say what

14  he was doing to prove he wasn't drunk like they're contending.

15          THE COURT:    All right.   Go ahead and answer the

16  question.

17                              EXAMINATION

18  BY MR. CASHIO:

19  Q.    Who are you speaking to on the phone, Shaun?

20  A.    I was speaking with Jody.

21  Q.    What about?

22  A.    Business.

23          MR. BALLINA:    Irrelevant.

24          THE WITNESS:   Taking care --

25          THE COURT:   Objection sustained.

```
 1                           EXAMINATION
 2   BY MR. CASHIO:
 3   Q.    About what --
 4             MR. CASHIO:    Oh, you sustained it?  You can't say --
 5             THE COURT:    Objection sustained.
 6             MR. CASHIO:    Your Honor, I think he needs to be able
 7   to show a specific business being conducted at that time that a
 8   drunk wouldn't conduct.
 9             MR. BALLINA:    Your Honor, objection.
10             THE COURT:    Objection overruled.  I'll let you
11   cross-examine him.
12                           EXAMINATION
13   BY MR. CASHIO:
14   Q.    What type of business were you conducting on the phone
15   there?
16   A.    I was talking to Jody trying to set up a load of shavings
17   for the next day.
18   Q.    Were you drunk?
19   A.    No, sir.
20             MR. BALLINA:    Objection.
21             THE COURT:    Sustained.
22             He's already answered it anyway.
23                           EXAMINATION
24   BY MR. CASHIO:
25   Q.    What were you wearing on your head?
```

1          MR. BALLINA:    Objection.    Irrelevant.

2          THE COURT:    Overruled.

3          THE WITNESS:    It was a white cap, I think.    It appears

4    to be looking at it, a white baseball cap of some kind.

5                              EXAMINATION

6    BY MR. CASHIO:

7    Q.    Is this a tape you made or where did you get this tape?

8    A.    Harrah's Casino.

9          MR. BALLINA:    Objection, Your Honor.    It's admitted

10    into evidence.    I think that's irrelevant.

11          THE COURT:    I agree.

12          MR. CASHIO:    Your Honor, I think it's relevant on --

13          THE COURT:    Objection sustained, counsel.    It's

14    admitted into evidence.

15                              EXAMINATION

16    BY MR. CASHIO:

17    Q.    Is that you, Shaun?

18    A.    Yes, sir.

19    Q.    Are you giving anybody any problems at this point in time?

20          MR. BALLINA:    Objection, Your Honor.

21          THE COURT:    Sustained.    The tape speaks for itself.

22          MR. CASHIO:    But, Your Honor, the --

23          THE COURT:    The jury's looking at the tape, counsel,

24    and you're leading anyway.

25          MR. CASHIO:    You can't tell if you're talking, Your

1    Honor.

2              THE COURT:    You're leading.

3              The best evidence is what the jury is looking at right

4    now.

5              MR. CASHIO:    I agree, Your Honor.

6                               EXAMINATION

7    BY MR. CASHIO:

8    Q.    What did you do just do, Shaun?

9    A.    Hung the phone up.

10   Q.    What are you going to do here, Shaun?

11   A.    Asking what the holdup is, I think.    I just got through

12   seeing a bunch of people coming and going.

13   Q.    What does the lady tell you when you asked her that?

14   A.    She said she didn't have my ticket.

15   Q.    And did you look in your pocket for your ticket?

16   A.    Yes, sir, I am right now.

17   Q.    And what did you tell her?

18   A.    I didn't have it, that I had given it to her.

19   Q.    What are you doing here?

20   A.    I'm still looking for the ticket.

21   Q.    And had you seen you give your ticket on the tape about 15

22   minute before this?

23              MR. BALLINA:    Objection, Your Honor --

24              THE WITNESS:    Yes, sir.

25              MR. BALLINA:    He's asking the witness to comment.

1      THE COURT:   Sustained.

2                        EXAMINATION

3  BY MR. CASHIO:

4  Q.   Who is that, Shaun?

5  A.   That's me.

6  Q.   What is she telling you here, do you know?

7  A.   I think she's saying I don't have the ticket.  I'm telling

8  her I don't have it.

9      MR. BALLINA:    He said he guessed.

10                       EXAMINATION

11 BY MR. CASHIO:

12 Q.   What were your feelings now that all this is going on?

13     MR. BALLINA:   Objection.  Irrelevant.

14     THE COURT:   Overruled.

15     THE WITNESS:  I just couldn't -- I didn't understand

16 what was going on, you know.  I'd given them -- I'm pretty sure

17 I'd given them my ticket.  You can see on the tape I did.

18     MR. BALLINA:   Objection, as to the witness commenting

19 on the tape, Your Honor.

20     THE COURT:   Sustained.  The tape speaks for itself.

21     THE WITNESS:  I'm sorry.

22                       EXAMINATION

23 BY MR. CASHIO:

24 Q.   What are you doing here, Shaun?

25 A.   I'm on the phone.

1  Q.    You know who you were talking to?

2           MR. BALLINA:    Objection, irrelevant.

3           THE COURT:    Overruled.

4           MR. CASHIO:    Okay.  I withdraw it.

5           THE COURT:    No, no, I let the last one in, I'll let

6  this one in.  Do you know?

7           THE WITNESS:    I'm not sure.

8           MR. CASHIO:    No, I just withdraw it, and I think I

9  have a right to, and I'll ask it a little later.

10          THE COURT:    No, he said he wasn't sure, so you won't

11 ask it later.

12          MR. BALLINA:    Your Honor, could I ask the witness to

13 maybe speak more into the mike.  I'm having a difficulty hearing

14 him, please.

15          THE COURT:    Yes.

16          MR. BALLINA:    Thank you.

17                              EXAMINATION

18 BY MR. CASHIO:

19 Q.    What are you thinking here, do you know, Shaun?

20 A.    No.  I'm just -- I can't understand what's going on.

21 Q.    Did anybody tell you you needed to pay $10 at this point in

22 time?

23 A.    I don't think so.

24 Q.    Had anybody told you that your car was on the way down or

25 your truck, your Dad's truck?

1   A.   Not that I recall, to be honest with you.

2   Q.   Do you know if they are checking to see what had happened

3   to your ticket all the time you were away?

4           MR. BALLINA:   Objection.  It's calling for

5   speculation.

6           THE COURT:   Sustained.  Rephrase your question,

7   counsel.

8                              EXAMINATION

9   BY MR. CASHIO:

10  Q.   Did anyone, Mr. Dorsey, or Ms. Wilson tell you that they

11  were checking on your car to see what was going on while you

12  were waiting all this time?

13          MR. BALLINA:   Objection to counsel characterizing and

14  testifying when he's asking a question.

15          THE COURT:   Sustained.  Rephrase your question,

16  counsel.

17                             EXAMINATION

18  BY MR. CASHIO:

19  Q.   While you were waiting, did any of them tell you what was

20  going on with your ticket while you were waiting up to this

21  point in time?

22  A.   No, sir.

23  Q.   Do you know what you're doing here?

24  A.   Asking her what the problem is, what's the holdup.  I

25  believe this is when I start getting aggravated.

1    Q.    Is this when they told you about the $10?

2            MR. BALLINA:    Objection.  He's leading the witness,

3    Your Honor.

4            THE COURT:    Sustained.

5                            EXAMINATION

6    BY MR. CASHIO:

7    Q.    What did they tell you here, do you remember?

8    A.    I believe she's telling me that she doesn't have the

9    ticket.  She can't find the ticket.  I think it's Mr. Dorsey

10   that tells me about the $10.  I don't remember if it was her or

11   Mr. Dorsey.  It's been a long time.  I mean, the first time --

12   I'm sorry, the first time it was said to me.  I don't know who

13   the first one was that said it.

14   Q.    Do you know what they were saying to you here?

15   A.    (No Response).

16   Q.    Shaun, do you know what they were saying here?  What your

17   response was?

18   A.    Yes, right here I told him -- he's saying there, "We don't

19   have your ticket, and I pointed over here and I said, "Yes, sir

20   --" I didn't say yes, sir.  I said, "Yeah, I was standing right

21   here when I give it to her".  And I just pointed on the counter,

22   I said, "I put it on the counter".

23   Q.    And they're still claiming they don't have your ticket?

24           MR. BALLINA:    Objection.

25           THE WITNESS:    Yes, sir.

1        THE COURT:   Sustained.

2        THE WITNESS:   I'm sorry.

3                      EXAMINATION

4   BY MR. CASHIO:

5   Q.   What were you doing there, Shaun?

6   A.   I was looking in my wallet to see if I had any money by

7   chance.

8   Q.   Why were you looking for money?

9   A.   Because they just told me that it was going to cost $10.

10  Q.   Is that -- who was that gesturing with his hands just now?

11  A.   Mr. Stacey Dorsey.  I believe he was telling this guy to --

12       MR. BALLINA:   Objection.

13       THE COURT:   Sustained.

14                    EXAMINATION

15  BY MR. CASHIO:

16  Q.   What were you doing on the phone here, Shaun?  Who are you

17  calling?

18  A.   Donna.

19  Q.   And why were you calling Donna?

20  A.   To tell her to either pick me up or bring me some $10 or

21  something.

22  Q.   And what happens here in this discussion between you and

23  Mr. Dorsey?

24  A.   I'm sorry, what happens?

25  Q.   Yeah, what were you all saying at that time?

1  A.   I'm not exactly sure.

2  Q.   And what did you put on the counter just then?

3  A.   Well, just then -- I'm not --

4  Q.   Okay.  I see something you put on the counter, do you know

5  what that was?

6  A.   Right then?

7  Q.   Yeah.

8  A.   My license.

9  Q.   Why did you do that?

10  A.   I was telling him he could take my license.

11  Q.   And what he did say?

12  A.   I think he ignored me, I'm not sure.  I don't really

13  recall.

14  Q.   Were they trying to help you or were they still ignoring

15  you?

16          MR. BALLINA:   Objection

17          THE COURT:   Sustained.

18                          EXAMINATION

19  BY MR. CASHIO:

20  Q.   What were they doing there, Shaun?

21          MR. BALLINA:   Your Honor, may we approach the bench a

22  moment, please.

23          THE COURT:   Yes.

24          Why don't you stop it.  Can you stop it where it is?

25          THE OPERATOR:   Yes, sir.

1    THE COURT:   Okay.

2         (CONFERENCE AT BENCH, AS FOLLOWS):

3    THE COURT:   Judge, I've making the same objections

4  over and over again.   I think Mr. Cashio knows that he's asking

5  a leading question and he continues to do it.

6    THE COURT:   Mr. Cashio.

7    MR. CASHIO:   This is has been days?

8    THE COURT:   Well, I understand that.

9       So that the record is clear, Mr. Cashio is advocating

10  for his client, so I don't think he's doing anything

11  intentionally --

12    MR. CASHIO:   No.

13    THE COURT:   -- inappropriate.  However, you are really

14  leading this guy.  Some leading is okay so that we can get

15  through it, okay.  And Mr. Ballina has not objected to every

16  question, nor have you, but your objection is very well-founded,

17  please.  Both of you guys, because you're guilty of it, too,

18  defense counsel.  Both of you guys quit leading, or lead, but

19  don't object, and let the other guy lead and not object.  What

20  goes for one goes for the other.

21       Since Mr. Ballina, you've been objecting, I'm going to

22  sustain the objections.  If you guys can agree not to object so

23  much that will be fine, too, but as long as he's going to

24  object, if it's a proper objection, I'm going to go ahead and

25  sustain the objection.  So the bottom line is quit leading.  The

1    tape speaks for itself.  I'm letting you ask, but I don't want

2    you to narrate.

3            MR. CASHIO:   Okay.   The last question that he objected

4    to I was just saying what was going on between the two, that's a

5    perfectly legitimate question.

6            THE COURT:   I don't know what the last question was,

7    to be quite frank with you at this point, and I don't think he

8    was referring to the last question.

9            I understand.   Thank you.

10                (BENCH CONFERENCE CONCLUDED)

11                           EXAMINATION

12   BY MR. CASHIO:

13   Q.   Okay.  Shaun, you see yourself Shaun?

14   A.   Yes, sir.

15   Q.   And do you know who you're speaking to?

16            THE COURT:   Where is he to the left?  Is that you?

17            THE WITNESS:   Yes, sir.

18                           EXAMINATION

19   BY MR. CASHIO:

20   Q.   Do you know who you're speaking to on the phone?

21   A.   Donna or my Dad.

22   Q.   Do you remember what you were saying?

23   A.   I'm sorry?

24   Q.   Do you remember what you were saying on the phone, does

25   that refresh your memory?

1  A.    I told her -- it was Donna I was speaking to.  I was

2  telling her to come get me here or bring me some money or

3  something.

4  Q.    Do you what you're saying here, Shaun?

5  A.    No, not really.

6  Q.    How are you feeling here, Shaun, do you know?  Does that

7  refresh your memory?

8  A.    Angry.

9  Q.    Why were you angry?

10  A.    Numerous things.  For one, he was arguing with me, and then

11  he went to ignoring me, and I said, "What's your name?"  And he

12  turned his badge over so I couldn't see his name, his name tag

13  or badge or whatever it was.

14  Q.    Do you see the reaction of the two people there, Shaun?

15  A.    Yes, sir.

16  Q.    Are they reacting to --

17          MR. BALLINA:    Objection.

18          THE COURT:    Sustained.

19                              EXAMINATION

20  BY MR. CASHIO:

21  Q.    At what time did use the N word, do you know?

22  A.    No, sir, I wasn't using it there.  I believe just once.

23  Q.    In any of these videos have you seen anybody turn their

24  head while you were talking to Mr. Dorsey?

25  A.    I didn't, no.

1    MR. BALLINA:   Objection.

2    THE COURT:   Sustained.

3                              EXAMINATION

4  BY MR. CASHIO:

5  Q.   And who is that leaving the booth?

6  A.   Mr. Stacey Dorsey.

7  Q.   Okay.  And why did you leave the booth before him?

8  A.   I see my truck coming.

9  Q.   And when you saw your truck coming, did that refresh your

10 memory anything about any money?

11    MR. BALLINA:   Objection.  He's leading.

12    THE COURT:   Sustained.

13                              EXAMINATION

14 BY MR. CASHIO:

15 Q.   When you saw your truck coming, did you recall any things

16 that you hadn't before?

17 A.   When I seen my truck coming I told Mr. Stacey, "Look, I got

18 $10 in the truck.  You can take it and stick it in your butt".

19 Q.   Are you by the truck now?

20 A.   No, sir, I'm right here (pointing)?

21 Q.   Okay.  And can you point out Mr. Stacey Dorsey when he

22 comes?

23 A.   Yes, sir.

24 Q.   Did the truck driver acknowledge your presence, Shaun?

25 A.   Yes, sir, he definitely knew I was there.

1   Q.   What did he do?

2   A.   He stopped.

3   Q.   And where is Mr. Dorsey?  You see him now on the scene?

4   A.   Yes, sir, he's right here (pointing).

5   Q.   After he gets out there, what's he saying?

6   A.   He tells him "take off, park it".

7            MR. CASHIO:    Thank you.

8                       (END OF VIDEO)

9                        EXAMINATION

10  BY MR. CASHIO:

11  Q.   Did anyone explain to you that you would not have to pay

12  for valet parking, you could go into the casino and get a comp

13  for your valet parking?

14  A.   No, sir.

15  Q.   Did anyone explain to you to look for signs indicating

16  valet parking that night?

17  A.   No, sir, all of the other casinos I've been to it's free?

18  Q.   Now, the photographs that were taken here were taken

19  during the day-time.  What time did the accident happen?

20  A.   Night.   When you say time?

21  Q.   I mean, what time of day?  Was it day or night?  I'm sorry.

22  Now, when you got there, how long did you gamble?

23  A.   About an hour.

24  Q.   Okay.  And when was the last time you had a beer or

25  anything to drink before you got to the casino that night about

1  an hour before this accident?

2  A.    Lunchtime, after my morning work.

3  Q.    And what's lunchtime for you?

4  A.    Around 11:00.

5  Q.    Okay.  And what did you have?

6  A.    I went to Liuzza's, I believe, and I had a Heineken or two.

7  Q.    And did you have any beers or any alcohol for the next

8  seven or eight hours?

9  A.    No, sir.

10 Q.    Had you ever any had problems with paying for parking

11 before in your life?

12 A.    Yes.

13        MR. BALLINA:    Objection, irrelevant.

14        THE COURT:    Overruled.

15        MR. CASHIO:    Go ahead.

16        THE WITNESS:    I didn't have the money once at the

17 airport and they told me that -- I gave them the money that I

18 had.

19        THE COURT:  This is irrelevant.  Sustained.

20                       EXAMINATION

21 BY MR. CASHIO:

22 Q.    Had your car ever been, or truck that you were driving,

23 ever been not given back to you in any parking area accept for

24 this one?

25        MR. BALLINA:    Objection, irrelevant.

1          THE COURT:   Sustained.

2                         EXAMINATION

3    BY MR. CASHIO:

4    Q.   When you got to the truck and the man driving the truck

5    stopped the first time, what did you tell him after that?

6    A.   I had $10 in the console.

7    Q.   Were you calm when you told him or were you --

8    A.   I wasn't as calm as I am now, no, sir.

9    Q.   Now, how were you -- okay.  After the accident did Mr.

10   Dorsey, Mr. Turner, or Mr. Stevenson come to your assistance?

11   A.   No, sir, they walked off.

12   Q.   Okay.  And how did that make you feel when they completely

13   walked away from you?

14          MR. BALLINA:   Objection.

15          THE COURT:   Overruled.

16          THE WITNESS:   Not very good.

17                         EXAMINATION

18   BY MR. CASHIO:

19   Q.   How did it make you feel when Mr. Dorsey said what he said

20   to you?

21          MR. BALLINA:   Objection, irrelevant, Your Honor.

22          THE COURT:   Overruled.

23                         EXAMINATION

24   BY MR. CASHIO:

25   Q.   After the accident, did an ambulance come for you?

1  A.    Yes, sir.

2  Q.    And were you taken to the hospital?

3  A.    Yes, sir.

4  Q.    Did you have to have surgery the next day or so?

5  A.    Yes, sir.

6  Q.    Did the doctors explain the risk of the surgery to you?

7  A.    Yes, sir.

8  Q.    Tell me some of the things they told you that could go

9  wrong?

10              MR. BALLINA:    Objection.    Hearsay.

11              THE COURT:    Overruled.

12              THE WITNESS:    Death, paralyzed.

13                         EXAMINATION

14 BY MR. CASHIO:

15 Q.    Were there others?

16 A.    Yeah, I can't remember.

17 Q.    Can you remember them?

18 A.    No.

19 Q.    And did you consider that before you agreed to the surgery?

20 A.    I was in a lot of pain.    Whatever needed to be done.

21 Q.    Do you know how long the surgery lasted?

22 A.    I believe it was four hours.    That's what the nurse told

23 me, four or five hours.

24 Q.    And after the surgery were you getting therapy at Charity

25 hospital?

1  A.    Yes, sir.

2  Q.    Okay.  And why did you discontinue the therapy at Charity?

3  A.    The physical therapy?

4  Q.    Yes.

5  A.    I didn't have any money.  I couldn't pay my rent, so I had

6  to move into my parents' house.

7  Q.    Okay.  After you got out of the surgery, did you have any

8  incidents while you were attending Charity for the physical

9  therapy?

10 A.    Yes, sir.

11 Q.    What happened?

12 A.    I fell down coming in the hospital.

13 Q.    Have you had any other falls since that accident?

14 A.    Yes, sir.

15 Q.    And that surgery?

16 A.    Yes, sir.

17 Q.    Okay.  Approximately, how many?

18 A.    Altogether, 10, 15, easy.

19 Q.    Do you know what caused you to fall?

20 A.    My balance.

21 Q.    Okay.  Do you have any problems walking upstairs?

22 A.    Yes, sir.

23 Q.    What about, did they give you anything to keep the weight

24 off of your body when you left Charity?

25 A.    I was on crutches for quite a while.

1    Q.    Do you have any idea?

2    A.    Five months, six months, I'm not really sure.  Five months.

3    Q.    After you got off of the crutches -- well, even before

4    that, have you had any problems with any other parts of your

5    body since the accident?

6    A.    Yes, sir, my knee on my right leg having to carry all my

7    weight on one side, just like a horse will do, locks up on me.

8    Pain in the lower part of my knee and my back gives me some

9    problems.

10   Q.    Did you have any problems with them before the accident?

11   A.    No, sir, other than, you know, everyday minor aches and

12   pains.

13   Q.    Okay.  Do you have any -- well, did you have a chance to

14   look at this tape a few times to prepare for court?

15   A.    Several times.

16   Q.    And after watching the tape, how did that make you feel?

17                 MR. BALLINA:    Objection.  Irrelevant.

18                 THE COURT:    Sustained.

19                 MR. CASHIO:    Okay.

20                              EXAMINATION

21   BY MR. CASHIO:

22   Q.    Okay.  Have you had any problems with sleeping at night?

23   A.    Yes, sir  especially here lately.  I'm starting to get --

24   my nightmares are coming back.  One in particular there, I'm

25   laying on the ground and everyone's laughing at me.

1   Q.    And were they laughing at you in real life when it

2   happened?

3   A.    No, sir.

4   Q.    I'm sorry.

5   A.    No, sir.  Mr. Stacey made his little comment, you know, but

6   I don't remember anyone laughing, no, sir.

7   Q.    That's just in your nightmares?

8   A.    Yes, sir.

9   Q.    Shaun, have you ever filed tax returns before?

10  A.    Yes, sir.

11  Q.    I'm sorry?

12  A.    Yes, sir.

13  Q.    Okay.  And did you know much about filing tax returns?

14  A.    No, sir, I don't know much about any of that.

15  Q.    Okay.  And before 2002, and 2003 tax returns, which are in

16  the record, had you filed any tax returns?

17  A.    No, sir.

18  Q.    And do you know why you hadn't filed?

19          MR. BALLINA:    Your Honor, excuse me.  Let me enter an

20  objection to counsel's reference to what's in the Exhibit book

21  as being filed.  I don't think there's any evidence that those

22  had been filed.

23          THE COURT:    Well, they're admitted into evidence and

24  you will be able to cross-examine him on that issue.

25          But, counsel, you did lead him on that.  You can ask

1  him if he filed them, but don't make as a statement that he did,

2  because that means you're testifying.  Ask him.  You can ask him

3  that question, but you made a statement.

4          MR. CASHIO:    I'm sorry.  Can we approach the bench

5  bout those tax returns?

6          THE COURT:    Yes.

7          We're going to take a five-minute recess.

8          THE CLERK:    All rise.

9          The jury can step out.

10              (BENCH CONFERENCE, AS FOLLOWS):

11          THE COURT:    Go ahead, Mike.

12          MR. CASHIO:    I was under the impression yesterday you

13  allowed me to place into evidence the documentation that it had

14  been mailed.

15          THE COURT:    Yes, but you said it's --

16          MR. CASHIO:    That's not in evidence yet.  He's

17  claiming that he mailed it to the wrong place, but I just want

18  to -- it hadn't gone into evidence yet, and I just want to make

19  sure.

20          THE COURT:    Oh, so you're not bringing up his

21  objection, you're talking about something else?

22          MR. CASHIO:    No.  Wait.  What is your objection?

23          THE COURT:    Well, the objection was you made a

24  statement that he has filed.  You can ask him if he has, but

25  that's not in evidence yet.

1           MR. CASHIO:   Okay.   I'll just ask if he ever sent them
2    off.
3           THE COURT:   So that was leading.
4           Let's talk about this next issue.
5           What are you bringing up now?
6           MR. CASHIO:   No, that's it.  Just the fact I wanted to
7    put that into evidence, and it hadn't really been put in.   It
8    goes along with the tax returns, the documentation that it was
9    filed.  I think you let that in yesterday that it was sent by
10   mail.
11          THE COURT:   Yes, and then Mr. Ballina can
12   cross-examine him on that.
13          MR. CASHIO:   Oh, sure, he can.
14          MR. BALLINA:   My objection was to the leading nature,
15   and the fact that there was a reference that it was filed.
16          THE COURT:   And I sustained the objection.
17          MR. CASHIO:   And I'll withdraw that.  I'll just ask if
18   he sent it.
19          THE COURT:   Okay.  I sustain your objection.
20          Off the record.
21               (CONFERENCE-OFF-THE RECORD)
22          THE COURT:   We're back on the record.
23          I'm going asking counsel for defendant if he plans to
24   call all the witnesses tomorrow that he has listed on his will
25   call list.  You say that you're going to call Larry Easton.  You

1  stated that you're not going to call NOPD officer, Scott Monaco,

2  and we spoke about him yesterday, since he was on defendant's

3  will call list, do you want to call him?

4           MR. CASHIO:    No, thank you, Your Honor.

5           THE COURT:    Fine.  Also on your will call witness list

6  is Larry Stokes.  Do you intend to call him tomorrow?

7           MR. BALLINA:    Yes, sir.

8           THE COURT:    And how about Ken Boudreaux, or J. Stuart

9  Wood, do you plan to call them?

10          MR. BALLINA:    Right now, Your Honor, I haven't made

11 that decision to call them.  I'm depending upon plaintiff's

12 testimony on direct examination.

13          THE COURT:    That's fine.  Now, if the defendant does

14 not call either Boudreaux, Cliff or Stuart, as he had listed on

15 his will call list, they will be made available for you to call,

16 Mr. Cashio, if you choose to.

17          MR. CASHIO:    I don't want them, Your Honor.

18          Could I propound -- this is a conundrum again.  I

19 didn't propound those questions to him before, does that change

20 the status now if he doesn't call them, I call them?  I don't

21 want them.  I don't care.  I will definitely will not call them

22 no matter what happens.

23          THE COURT:    Okay.

24          MR. CASHIO:    I won't call them, so that's a moot

25 question.

1          MR. BALLINA:   Just because you mention this issue, I

2    want to make sure that I'm clear, that if the economist does

3    testify he's not subject to cross-examination on calculations

4    pursuant to the Court's standing pretrial notice?

5          MR. CASHIO:   Yeah.  Fine.

6          THE COURT:   Absolutely.  Absolutely.

7          MR. CASHIO:   I'm sorry, I keep walking away from you,

8    Judge.

9          THE COURT:   All right.  It's 5:25.  I'm going to ask

10   the jury when they return if Mr. Woods, I think his name is, if

11   he still needs to leave at a quarter to 6:00 or so, we'll break

12   for the day at quarter to 6:00, and we will take it from there,

13   then we will resume at 9:30 tomorrow morning.

14         Anything else we need to put on the record right now,

15   Mike?

16         MR. CASHIO:   No, Your Honor.

17         MR. BALLINA:   Judge, did you have a chance, I had

18   those zoomed and highlighted videos done again extending them

19   further.

20         MR. CASHIO:   I remember this correctly, we may have

21   to refer back.

22         Your Honor said the jury was going to only see the

23   complete.  His extended tapes would be shown to the jury out

24   here but they don't get to go in as evidence.

25         THE COURT:   Correct.  They're not evidence.

1          MR. CASHIO:   Okay.

2          THE COURT:   What is evidence is the entire tape,

3   however he can show, as he's already shown, highlighted

4   additions during the trial.

5          MR. CASHIO:   Fine.

6          THE COURT:   As long as the jury is allowed to see the

7   complete tape from beginning to end.

8          MR. CASHIO:   Right.

9          THE COURT:   If there's a dispute as to what the end

10  is, I thought I made it perfectly clear yesterday that the end

11  is the last time we see plaintiff on the screen, or is there

12  anything relevant beyond that time?

13         MR. CASHIO:   Well, he gave me a tape in discovery that

14  I think we both agreed is the whole tape.

15         THE COURT:   Okay.  All right.  Well, to the end of

16  that tape.

17         MR. CASHIO:   Right.  Okay.

18         MR BALLINA:    As long as that whole tape has been

19  shown.

20         THE COURT:   It will be shown to the jury.  I mean,

21  you've shown --

22         MR. CASHIO:   Yeah.

23         THE COURT:   Mr. Cashio has shown parts of it, most of

24  it.  You've shown bits and pieces of the highlighted version of

25  it.  However, you all want to handle it.

1           I'm going to limit you guys to closing argument to 20

2  minutes.

3           MR. CASHIO:    Your Honor, I've got so much.  Can I have

4  30?

5           THE COURT:    I'm limiting you guys to 20 minutes now,

6  but that's not going to include the showing of the tape, so

7  you're not going to have to spend your time in your closing

8  argument showing the tape.

9           MR. CASHIO:    Okay.  Great.

10          THE COURT:    Now, how do you all want to handle that?

11          It truly doesn't matter to me, if after all the

12  evidence is in, you want to show it one more time without

13  narration?  In other words, you know, ya'll are taking bits out

14  favorable to your sides, which is great, okay.

15          Would it be appropriate -- and I'm merely asking you

16  this.  I'm not telling you what to do -- I think the jury should

17  see the tape without being narrated and without be being

18  interrupted, but from beginning to end, because up to this

19  point, you know, Mr. Cashio, you've shown what you wanted them

20  to see.  Mr. Ballina, you've shown them what you wanted them to

21  see, but since the whole tape is admitted into evidence they

22  should see the whole tape un-narrated, but from beginning to

23  end.  Does anybody have any objection to that?

24          Mr. Cashio?

25          MR. CASHIO:    Not in the context, Your Honor.

1      I wanted to be able to get my input to the tape during

2  the closing argument.

3          THE COURT:   Well, you can do that as can Mr. Ballina.

4          MR. CASHIO:   Right.  But if you want to show the whole

5  tape to them at one point in time before we argue, that's fine.

6          MR. BALLINA:   My understanding of the Court's

7  suggestion is that perhaps when all witnesses are done, if we

8  say jurors we're going to show -- we're going to start this tape

9  from beginning to end, know questioning, no narration, no

10  commenting, and we'll sit there, I think it's --

11          MR. CASHIO:   25 minutes.

12          MR. BALLINA:   -- 25 minutes, 30 minutes time, and then

13  I think the Court is satisfied that the jurors have seen the

14  entire tape, and if I understand the judge's earlier comments,

15  then at that point, I can take the highlighted tape, or the

16  zoomed, the highlighted and zoomed and use that in closing.

17          THE COURT:   Oh, absolutely.  Both of you can do that.

18  However, that's going to be part of your 20 minutes.

19          MR. CASHIO:   Wait.  I thought you said it didn't,

20  wasn't.

21          THE COURT:   No, no, I said the full tape is going to

22  be shown to the jury and obviously that will not be a part of

23  either of your closing arguments, okay.

24          MR. CASHIO:   Your Honor --

25          THE COURT:   Well, look, there's been a lot of fumbling

1    around and this jury has been patient and it's not fair to the

2    jury for you to take the 20 minutes apiece, plus the 25 or 30

3    minutes left of the tape, plus you're fumbling around.  So make

4    sure you have it right on the right spot and you move on with

5    it, okay.  Because there's going to be -- you know, you all have

6    done a great job, but the facts are the facts, and the tape is

7    the tape.  I don't know how much more you all need to argue

8    without be being redundant.

9         MR. BALLINA:    We're not there already?

10        THE COURT:    You're very redundant, and that's why

11   you're being limited to 20 minutes.  Both of guys are.  So for

12   your own good, I'm limiting you to 20 minutes, because when you

13   start to try to reinvent the wheel, from past experience, I know

14   that the jury gets very bored.  And quite frankly, they feel

15   demeaned when a party repeats themselves, and I don't want that

16   to happen, so that's why I'm limiting you to 20 minutes now.

17        So what we're going to do is this:  Plaintiff is going

18   to put on its case, as you're doing.  You're doing a very good

19   job of that, and I'll tell you, you lawyers are doing a great

20   job.  Now, at the end of your case, he's going to present his

21   case.  And again, you can use whatever excerpts of the tape you

22   that want to use, okay.  And then when you put on your case

23   defense counsel, what you've already done using excerpts, and I

24   don't know how much more you need to since you don't have any

25   other fact witnesses except for Larry Easton.  Okay.  You can

1   certainly use whatever excerpts that you want to, and you're

2   going to have rebuttal, limited to these witnesses that you will

3   be calling, these three witnesses now.

4           What I suggest is at the end of the live testimony of

5   the case, we will then say, okay.  Jurors, we're now going to

6   show you the entire tape which has been admitted into evidence

7   without narration and without interruption, after which time we

8   will start closing arguments.  Fair enough, Mr. Cashio?

9           MR. CASHIO:   Yes.

10          THE COURT:   Mr. Ballina?

11          MR. BALLINA:   Yes.

12          THE COURT:   But in the meantime you all can use any

13  excerpts that you want, obviously.

14          MR. BALLINA:   And then once the jurors have seen the

15  entire videotape in our closing, I can use the highlighted

16  portion?

17          THE COURT:   Absolutely.

18          MR. BALLINA:   Regardless of if it goes into the people

19  walking away or it --

20          THE COURT:   I don't care, that's your argument, you

21  can argue any way that you want to argue as long as the excerpts

22  that you use is a true and accurate copy of what the tape is

23  that's in evidence, which is what I've already ruled on.

24          MR. BALLINA:   Yes.  That was my understanding.

25          And regarding witnesses, I think the Court allowed,

1    depending upon Mr. Smith's testimony that I had reservation of

2    rights of calling a witness back to rebut Mr. Smith's testimony.

3         THE COURT:    Yes, you have that right, because

4    technically you have had your case, okay, but you accommodated

5    the Court, quite frankly, by calling your witnesses when you

6    did, so it would only be fair to defendant that -- but I don't

7    want them to repeat their previous testimony, but if they're

8    needed to be called to rebut testimony of plaintiff, I will

9    allow that, certainly.

10         MR. BALLINA:    And obviously, you know, probably the

11    only witness that I would anticipate would be perhaps Mr. Darcy.

12    I'm not going to drag all these other people back in.

13         THE COURT:    I understand that, but again, plaintiff's

14    counsel has the right to rebut any witnesses that you call,

15    certainly.

16         MR. BALLINA:    I understand.

17         THE COURT:    I've handed each of you the jury

18    instructions.  Those are based on pattern jury instructions from

19    both the Fifth Circuit and state law.  Okay.  Go ahead and

20    review them tonight.  I think they are complete, that's what I

21    intend to read to the jury.  However what we will do tomorrow

22    morning we will have a charge conference and we will discuss any

23    proposed charges that you guys might have that you feel are not

24    adequately covered in the draft instructions that I've just

25    given each of you.

1          Great.  All right.  Let's call back in --

2          MR. CASHIO:   One other question.

3          Are we going to get the jury interrogatories?

4          THE COURT:   The verdict form.  Yes, we'll have that

5     for you by first thing tomorrow.

6          MR. CASHIO:   Okay.  Because I intend to argue that

7     form.

8          THE COURT:   Well, do you have a proposed set?

9          MR. BALLINA:   My recollection is they are both pretty

10    similar.

11         THE COURT:   I'll look at them tonight, that's that

12    simple.

13         MR. BALLINA:   Yeah, and I think we have a lot of time

14    for that.

15         Can I just realty quickly run out and tell a witness

16    that I told to come in the event that we went faster than usual?

17         THE COURT:   Yes.  Don't call in the jury yet.  Let's

18    wait until Mr. Ballina comes in.

19              (5:35 P.M.  -  AFTER RECESS)

20         *         *         *         *         *         *         *

21              **P-R-O-C-E-E-D-I-N-G-S**

22         THE MARSHAL:   All rise.

23              (THE JURY ENTERED THE COURTROOM)

24         THE COURT:   Thanks.

25         Please be seated.

1        It's about 25 minutes to 6:00.  Mr. Woods, you need to
2   be going in about 10 minutes?
3            OCTAVE E. WOODS (JUROR NO. 7):   Yes.
4            THE COURT:   All right.  We will take 10 more minutes
5   of testimony, and then we will break for the evening, and then
6   what we will is we will reconvene tomorrow morning at 9:30.
7            Is that okay with Mr. Amite and Ms. Hammond, can you be
8   hear at 9:30?
9            MARY M. MARTEN (JUROR NO. 40):   Yes.
10           JOSEPH M. CURRIER (JUROR NO. 5):  I left there two
11  earlier this morning and made it.
12           THE COURT:   Great.  Thank you very much.
13           Proceed, counsel.
14                          EXAMINATION
15  BY MR. CASHIO:
16  Q.   Shaun, before filing or -- okay.  Did you send in your tax
17  returns for 2002, and 2003?
18  A.   Yes, sir.
19  Q.   And when did you do that?
20  A.   A few days ago.
21  Q.   Okay.
22  A.   I believe it was on a Friday.
23  Q.   And why did you wait until October of 2004 to file those
24  returns?
25  A.   Like I said before, I don't know very much about taxes.

1  The tax man that I took the papers to I thought he said that I

2  had --

3          MR. BALLINA:    Objection to hearsay.

4          THE COURT:    Sustained.   No hearsay.

5          THE WITNESS:    He said that I had an extension.

6          THE COURT:    No hearsay.   Don't answer, sir --

7          THE WITNESS:    I'm sorry.

8          THE COURT:    -- when I sustain an objection.

9                          EXAMINATION

10 BY MR. CASHIO:

11 Q.    Did you have any kind of impression that you had until

12 October the 15th to file your tax returns of this year?

13 A.    Yes, sir.

14 Q.    And where did you that impression from?

15 A.    The tax man.

16          MR. BALLINA:    Objection, Your Honor.   He just got into

17 evidence that he couldn't get in over hearsay.

18          THE COURT:    He can state his own state of mind, sir.

19                          EXAMINATION

20 BY MR. CASHIO:

21 Q.    Okay.   Why hadn't you filed those taxes before, I think, it

22 was last Friday?

23 A.    I'm sorry, sir, can you repeat the question?

24 Q.    Why hadn't you filed those taxes before last Friday?   What

25 was the delay?

1   A.    I hadn't gotten the papers from Mr. Springer and my father.

2   Q.    And how did you find out you needed to get some papers

3   from Mr. Springer and your father?

4   A.    You told me.

5   Q.    Okay.  And did you get those papers finally from Mr.

6   Springer and your father?

7   A.    Yes, sir, I got them from my father.  Mr. Springer, the

8   actual form thing, I don't think he every got that to me.

9   Q.    Were you trying to ask him to send it to you?

10  A.    Yes, sir.

11  Q.    How many times?

12  A.    I spoke to him and his wife several times.

13  Q.    Okay.  And did your father send some checks from his

14  checking account to you?

15  A.    Yes, sir.

16  Q.    And did most of those checks bear your signature on the

17  back of them?

18  A.    Yes, sir.

19  Q.    Okay.  And could you figure out by yourself how much taxes

20  you owed and how to do that?

21  A.    No, sir.

22  Q.    What did you do with those papers that Mr. Springer, and

23  your father sent you and the checks?

24  A.    I took them to the tax man in Arkansas.

25  Q.    Okay.  And what did he do with them?

1   A.    Whatever it is he does.

2   Q.    Okay.

3   A.    I don't know.

4   Q.    Did he ever send up what they call a 1040 form with your

5   taxes on that?

6   A.    Yeah.   Yes, sir.

7   Q.    Okay.   And did he sign those tax returns as the tax

8   preparer?

9   A.    No, sir.

10  Q.    Do you know why he didn't sign those tax returns?

11          MR. BALLINA:    Objection.   It calls for speculation.

12          MR. CASHIO:    Go ahead.

13          THE WITNESS:    Because -- I'm sorry, can you repeat the

14  question?

15          MR. CASHIO:    Yes.

16                          EXAMINATION

17  BY MR. CASHIO:

18  Q.    Do you know why he didn't sign the tax return?

19  A.    Because I hadn't paid him.   I think I owed him $650.

20  Q.    Okay.   And did you think you could send in the tax return

21  without his signature being on there?

22  A.    No, I didn't.   I thought I needed it.

23  Q.    Okay.   And did you ask anyone if you could, or did anyone

24  tell you that you could send in the tax return merely by signing

25  your own name to it?

1  A.    Yes, sir, you did.

2  Q.    And did you do that?

3  A.    Yes, sir, I did.

4  Q.    Now, that was for the last couple of years.  The years

5  before that, had you paid any tax returns?

6  A.    No, sir.

7  Q.    And why hadn't you paid any tax returns a couple of years

8  before these last two years?

9  A.    I didn't think I made enough money, one thing, and they

10  were taking it seemed like a quite a bit of money out of my

11  check.

12  Q.    And so what did you think when -- well, let me ask you

13  this:  The employers who were taking quit a bit of money out of

14  your check, were they sending you any forms called 1099s?

15          MR. BALLINA:    Objection, Your Honor.

16          THE COURT:    Overruled.

17          THE WITNESS:    No, sir.

18                          EXAMINATION

19  BY MR. CASHIO:

20  Q.    Okay.  So did you know how much money you had made in the

21  couple of years, last couple of years before 2002, and 2003?

22  A.    No, sir.

23  Q.    Did you make much?

24  A.    2002, and 2003, yes, sir.

25  Q.    But before 2002, and 2003, did you make much?

1  A.   No, sir.

2  Q.   Okay.  Your job with Mr. Springer, was that -- rephrase,

3  Your Honor.

4       The job you had with Mr. Springer, he did send you a

5  copy of some kind of receipt, is that correct?

6  A.   Yes, sir.

7  Q.   But it wasn't a 1099 form?

8  A.   No, sir.

9  Q.   Okay.  And the money you were making with Mr. Springer, was

10  that all the money you were intending to make with him at the

11  fairgrounds season?

12  A.   No, sir.

13  Q.   And why were you going to make more money than he was

14  paying you for the first couple of weeks?

15  A.   Well, he hadn't gotten all of his horses in yet, and he

16  told me that --

17            MR. BALLINA:   Objection, hearsay.

18            THE COURT:   Sustained.

19            MR. CASHIO:   Okay.

20                         EXAMINATION

21  BY MR. CASHIO:

22  Q.   Were you promised an increase in pay?

23  A.   Yes, sir.

24            MR. BALLINA:   Objection.  That's hearsay.

25                         EXAMINATION

BY MR. CASHIO:

Q.    And how much were you going to be receiving in the future

from Mr. Springer?

A.    $600 a week, plus bonuses, Christmas bonus, because he was

going out of town, and I was going to run the barn while he was

gone.

Q.    You were injured on the 10th of December, did you ever get

your Christmas bonus?

A.    No, sir.

Q.    Okay.  What other type of bonuses would you have been

eligible for had you been able to continue working?

A.    Stakes.

Q.    And what is a stake?

A.    When the better horses win big races -- it differs between

each trainer, but usually anything over a $25,000 purse, you'll

get one percent of or some trainers -- I didn't know exactly how

he was going to do it yet -- some trainers give you $50 per win.

Some trainers -- I believe, Springer was a percentage man.

Q.    Okay.  So you think it was one percent of the amount of

money won?

A.    Yes, sir.  The horses that I got on, yes, sir.

Q.    And can you estimate how much that would have been per

month in stakes?

                MR. BALLINA:    Objection.

                THE COURT:    Objection sustained.

1          You didn't lay a proper foundation.

2                          EXAMINATION

3    BY MR. CASHIO:

4    Q.    In the past did you receive stakes of one percent from

5    anyone else?

6    A.    Yes, sir, from my father.

7    Q.    Okay.  And how much money had you made in stakes per month

8    in the past year?

9    A.    Around 20,000.

10   Q.    Are you saying 20,000 per month?

11   A.    No.  Per month?  No, I thought you meant for the year.  Per

12   month -- I don't know.  It just depends on how good they run

13   that month.

14          THE COURT:   I think now is the time to break.  It's

15   quarter to 6:00.

16          Ladies and gentlemen, we are going to break for the

17   evening.  Again, I remind you, as I instructed you yesterday.

18   You are not to discuss any of the testimony or any of the facts

19   of this case with each other, of course, and also you're not

20   even to discuss it with your family members at home.

21          We'll see you all tomorrow morning.  We're going to

22   begin at 9:30.

23          Thank you very much.

24          THE MARSHAL:   All rise.

25           (AT 5:45 P.M. THE JURY WAS EXCUSED AND THE PROCEEDINGS

```
 1        WERE HAD, AS FOLLOWS):

 2            THE COURT:   Mr. Cashio, would you like to put anything

 3    on the record, sir, before we break for the evening?

 4            MR. CASHIO:   Yes, sir.   I'm trying to find this

 5    document.

 6            Can I wait until the morning, Your Honor, and just add

 7    those?

 8            THE COURT:   Oh, absolutely, yes.   I mean, your

 9    client's still testifying.

10            MR. CASHIO:   I just wanted to add those proof of

11    mailings.

12            THE COURT:   Okay.   Well, you might want to do that in

13    front of the jury anyway.

14            Mr. Ballina, do you have anything you want to put on

15    the record before we break for the evening?

16            MR. BALLINA:   No, Your Honor.

17            THE COURT:   Okay.   All right we're going to break for

18    the evening.

19            THE CLERK:   All rise.

20            Court's in recess.

21                    (AT 4:48 P.M. THE COURT RECESSED)

22        *       *       *       *       *       *       *       *

23

24

25
```

397

1

2                    C E R T I F I C A T E

3

4

5

6        I, Victor D. Di Giorgio, Official United States Court

7  Reporter in and for the Eastern District of Louisiana, do hereby

8  certify that the foregoing proceedings were taken down by me in

9  shorthand at the time and place aforesaid, transcribed under my

10  personal direction and supervision, and that the preceding pages

11  represent a true and correct transcription, to the best of my

12  ability and understanding.

13

14

15

16                    _____

17                    Victor D. Di Giorgio, CCR
                     Official U.S. Court Reporter

18

19

20

21

22

23

24

25