1       UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF LOUISIANA

3

4

5 SHAUN LEE SMITH     CIVIL ACTION NO. 04-27
             NEW ORLEANS, LOUISIANA

6   VS.        THURSDAY, OCTOBER 14, 2004
             9:30 A.M.

7 HARRAH'S NEW ORLEANS   SECTION "A"
 CASINO, ET AL.

8

9       **TRIAL  -  DAY 3**
     BEFORE THE HONORABLE JAY C. ZAINEY

10   UNITED STATES DISTRICT COURT JUDGE, and THE JURY

11

12 <u>A P P E A R A N C E S:</u>

13 FOR THE PLAINTIFF,    S. MICHAEL CASHIO, ESQ.
 SHAUN LEE SMITH:     Attorney at Law

14            2107 31st Court
             Kenner, Louisiana 70065

15            (504) 443-3737

16

17 FOR THE DEFENDANT,    HELLER, DRAPER, HAYDEN, PATRICK
 HARRAH'S NEW ORLEANS   & HORN, L.L.C.
 CASINO, ET AL.:     By: Drew R. Ballina, Esq.

18            2500 Poydras Center
             650 Poydras Street

19            New Orleans, Louisiana 70130
            (594) 568-1888

20

21

22 REPORTED BY:      VICTOR D. Di GIORGIO, CCR
            OFFICIAL COURT REPORTER

23            501 Magazine St., Room 406
            New Orleans, Louisiana  70130

24            (504) 589-7782

25 Proceedings recorded by mechanical stenography.
 Transcript produced by computer aided transcription.

I-N-D-E-X

WITNESS                                              PAGE


SHAUN LEE SMITH
      By Mr. Cashio.............................402/458
      By Mr. Ballina..............................414


BLAIR EASTON
      By Mr. Ballina..............................466
      By Mr. Cashio...............................472


LARRY STOKES
      By Mr. Ballina...........................477/507
      By Mr. Cashio...............................496


KENNETH J. BOUDREAUX
      By Mr. Ballina..............................509
      By Mr. Cashio...............................520


CLOSING ARGUMENT
      By Mr. Cashio............................540/557
      By Mr. Ballina..............................552


JURY CHARGE.......................................562

21

22

23

24

25

1               **P-R-O-C-E-E-D-I-N-G-S**

2                   (9:30 A.M.  -  MORNING SESSION)

3                   (THURSDAY, OCTOBER 14, 2004)

4           THE MARSHAL:   All rise.

5                   (THE JURY ENTERED THE COURTROOM)

6           THE COURT:   Good morning.

7           Please have a seat.

8           Let's go ahead and get started.

9           THE CLERK:   Mr. Smith, I remind you that you are still

10    under oath.

11          MR. BALLINA:   Your Honor, excuse me.  May we approach

12    the bench?

13          THE COURT:   Yes.

14                  (BENCH CONFERENCE, AS FOLLOWS):

15          MR. BALLINA:   Pardon me, Judge.

16          MR. CASHIO:   You want to go first?

17          I'm going to have to learn to back off a little.  I'm

18    too quick.  Go ahead.

19          MR. BALLINA:   Judge, in light of the court's admission

20    of the signed tax return and the evidence of the mailing of the

21    same last Friday on October 8th, the defendant would like to

22    introduce into evidence Publication 17 by the IRS for the years

23    2002, and 2003 showing where those tax returns are to be mailed.

24          THE COURT:   So what you're trying to say is he just

25    mailed it to the wrong address?

 1          MR. CASHIO:   We'll stipulate to that, but there's a

 2  lot of other stuff in there.

 3          THE COURT:   You'll stipulate to it, then that's fine.

 4  Thank you.

 5          MR. CASHIO:   Also I think you already allowed us to

 6  put this into -- this Internal Revenue documentation that we

 7  sent to the wrong address, and this is -- I think we already

 8  agreed on these prescriptions, these recent prescriptions, they

 9  go in with the other prescriptions.

10          MR. BALLINA:   I have no objection.

11          THE COURT:   Okay.

12          Counsel has just introduced into evidence Plaintiff

13  Exhibit Number 4.

14          MR. CASHIO:   Okay.  We'll make these 4 and 5.

15          THE COURT:   Exhibit Number 4 is going to be the

16  documentation to IRS, and Exhibit Number 5 will be the

17  prescription bills.

18          Any objection by defense counsel?

19          MR. BALLINA:   No objection, Your Honor.

20          Well, I had an objection to the mailing, but I think

21  you had previously overruled my objection and it was admitted.

22          THE COURT:   Yes, but, I mean, the record is clear for

23  you on that.

24          MR. BALLINA:   Yes, sir.

25          And if I could ask in light of the stipulation similar

1    to what the Court suggests, that if the Court could advise the

2    the jurors of the stipulation of fact between the parties

3    regarding that.

4            MR. CASHIO:    Right.

5        The tax return was mailed to the incorrect address.

6            THE COURT:    I can do that or you can just ask was it

7    mailed to the correct address.

8            MR. CASHIO:    I mean, he mailed it.  We have no problem

9    there.

10            THE COURT:    I see what you're saying.

11            MR. CASHIO:    Just give it, we'll admit it.

12            THE COURT:    Okay.

13            MR. BALLINA:    If you don't mind.

14            MR. CASHIO:    You can tell them.

15            THE COURT:    Thank you.

16                    (BENCH CONFERENCE CONCLUDED)

17            THE COURT:    Ladies and gentlemen, at the bench here,

18    admitted into evidence as Plaintiff Exhibit 4, in connection

19    with Mr. Smith's testimony yesterday about mailing tax returns,

20    you heard that testimony, and that's the plaintiff Exhibit 4.

21    There's been a stipulation by both plaintiff and defendant that

22    this mailing was to the wrong address, is that correct, counsel

23    for plaintiff?

24            MR. CASHIO:    But it was mailed to Internal Revenue

25    Service.

1        THE COURT:    It was mailed to Internal Revenue Service
2   but at an incorrect address.
3        MR. CASHIO:    Right.
4        THE COURT:    Is that correct, counsel for plaintiff?
5        MR. CASHIO:    Yes.
6        THE COURT:    Is that correct, Mr. Ballina?
7        MR. BALLINA:    Yes, Your Honor.
8        THE COURT:    Does that satisfy both of you, the
9   stipulation?
10       MR. BALLINA:    Yes.
11       THE COURT:    Thank you.
12       Let's proceed.
13                          EXAMINATION
14  BY MR. CASHIO:
15  Q.    Shaun, has Dr. Hamsa changed the medicine you had in the
16  last few months?
17  A.    Yes, he -- I'm on some of kind medicine they give to cancer
18  patients.
19  Q.    What is that?
20  A.    Morphine.
21  Q.    And do you remember ever getting morphine before when you
22  were in the hospital?
23  A.    Yes, sir.
24  Q.    And when was that?
25  A.    Originally when an operation was done and after that.

```
 1   Q.    Do you know how the morporhine makes you feel?

 2   A.    Drowsy, nauseous at times.

 3   Q.    Are you taking any other medicines?

 4   A.    Yes, sir, I take a pill for depression and sleep.

 5   Q.    Okay.  Do you know the name?

 6   A.    No, sir.

 7   Q.    Okay.  I have an Exhibit 4 which has been introduced, some

 8   of the medicines you've taken in the last 10 months.  One of the

 9   medicines I want to show you still has a lot of pills in  it

10   it's called Naproxen?

11   A.    Yes, sir.

12   Q.    Why do they still have a lot of pills in there?

13   A.    They upset my stomach.  I've got some ulcers.

14         MR. CASHIO:   Can I show those to the jury, Your Honor?

15         THE COURT:   Yes.

16         MR. BALLINA:   Your Honor, excuse me, but could I ask

17   the witness to speak up a little bit or move the microphone.

18         THE WITNESS:   Yeah, I'm sorry.

19         MR. BALLINA:   I'm having difficulty hearing him.

20         THE COURT:   Yes.

21         Go ahead.

22         MR. BALLINA:    Thank you.

23         THE COURT:   Go ahead, counsel.

24                        EXAMINATION

25   BY MR. CASHIO:
```

1    Q.    Shaun, since this accident, about 10 months ago, have you

2    been to any casinos and done any gambling?

3    A.    No, sir.

4    Q.    Why not?

5    A.    I think I learned my lesson at the time.  I mean, I didn't

6    just lose my money, I lost my livelihood, my way of supporting

7    my family.

8    Q.    Now, you told us before the nightmares you were having and

9    the problems with sleeping, when you wake up in the middle of

10    the night, do you have any difficulty in going back to sleep?

11    A.    Usually, yes, sir.  I get to thinking about what I'm going

12    to do with the rest of my life.  How I'm going to support my

13    family.  I have been doing this work since I was a little kid.

14    That's all that we know, all my family knows.  I don't know what

15    to do.

16    Q.    Now, I think you told us yesterday something about you

17    having problems in the other knee.  What are those problems?

18    A.    The lower part of it, it just locks up, it hurts when I

19    bear all the weight against it.

20    Q.    What did you weigh at the time of the accident?

21    A.    About 145 pounds.

22    Q.    And what do you weigh now?

23    A.    Around 180.

24    Q.    And do you know why you gained that much weight?

25    A.    Not been able to work, not being able to exercise.  I used

1    to run.  I used to jog a lot.  When I was in school I played on

2    the school team.  I played for a youth professional team.  We

3    went to Europe and played.  I played since I was about seven.

4    My Dad originally got me into it to build up my legs because he

5    felt that that was a lot of jockeying and exercise riders

6    problems.  Their lower body was too weak.

7    Q.    Did you have any problems with your legs before this

8    accident?

9    A.    No, sir.

10   Q.    Since the accident how is your balance?

11   A.    It's not very good.  I've fallen down quite a few times.

12   Q.    And when you're on unlevel ground, does that present any

13   problems to you?

14   A.    Yes, sir.  I either have to move slower or -- sir, it's

15   more difficult.

16   Q.    How about when you're walking and trying to cross the

17   street in traffic to beat the light, have you ever had any

18   problems with that?

19   A.    Yes, sir, just yesterday.  I can only move so fast.

20   Q.    Now, do you know the percentage in the industry that all

21   trainers charge for winning a race?

22   A.    10 percent.

23   Q.    And 10 percent of what?

24   A.    The purse.  The jockey gets 10 percent, the trainer gets 10

25   percent.

1    Q.    That's the earnings of the horse?

2    A.    The earnings of the horse.

3    Q.    That's the purse in one race?

4    A.    Yes, sir.

5    Q.    And can a horse earn money in a race without finishing

6    first?

7    A.    Yes, sir, it depends on the type of race, but you usually

8    get paid first through fifth.  It's standard.  Stake races, I

9    think it goes to sixth, if that's correct.

10   Q.    And do you know the price that trainers charge for daily

11   upkeep of horses?

12   A.    Between 50 to $125 a day.

13   Q.    Okay.  Do you know what your Dad charged?

14   A.    $75 a day.

15   Q.    Okay.  And what percentage does a trainer usually make on

16   that charge?

17   A.    About 10 percent.

18   Q.    Okay.  And after --

19   A.    After bills and everything.

20   Q.    I know you told us your dream was to become a trainer.

21   What -- excuse me.  Are you familiar with the trainers and the

22   stalls they are allotted at the racetracks?

23   A.    Yes, sir.

24   Q.    And what is an average trainer's amount of stalls?

25   A.    20, 25.

1    Q.    Okay.  What was the most stalls your Dad ever had at a

2    racetrack?

3    A.    80.

4    Q.    80.  Okay.  And what does he have now, do you know?

5    A.    Around 20.

6    Q.    Okay.  Are you familiar with the racing publication called

7    the Racing Daily From?

8    A.    Yes, sir.

9    Q.    Is that the standard publication of the racing industry?

10    A.    Yes, sir.

11    Q.    Does that publication everyday contain a list of earnings

12    by trainers?

13    A.    Yes, it does.

14    Q.    Okay.  And I want to show you --

15         MR. BALLINA:   Your Honor, if I may, I haven't seen

16    this document yet, and I'm going to enter an objection.  It's

17    not a document that's entered into evidence.

18         MR. CASHIO:   It's not in evidence, Your Honor, it's

19    just something for him to refer to.

20         THE COURT:   Well, let counsel look at it first.

21         MR. CASHIO:   Yes.

22         MR. BALLINA:   Your Honor, my objection is he's showing

23    the witness a document that's not into evidence.

24         THE COURT:   Well, it's not going to be introduced into

25    evidence, but he can show him a document even though the

1  document is not going to be introduced into evidence.

2          MR. BALLINA:    After having seen the document, I'm

3  going to enter an objection as to relevance.

4          THE COURT:    Overruled.

5                          EXAMINATION

6  BY MR. CASHIO:

7  Q.    I want to show you the Daily Racing Form for Thursday,

8  December 18th, 2003, and on page 2 do they have anything that

9  says anything about the earnings of trainers?

10 A.    Yes, sir.

11 Q.    And --

12         THE COURT:    That's hearsay counsel.  That's hearsay.

13 There's no proper foundation laid.  We don't know who the writer

14 is.  We know anything about that.

15         MR. CASHIO:    Your Honor, can I get him to explain it?

16 First of all --

17         THE COURT:    Let him explain it, but I don't want him

18 to read it because that's a hearsay document.

19         MR. CASHIO:    It's a learned treatise from the

20 industry, Your Honor.

21         THE COURT:    It's a learned treatise, why?  Because he

22 says that's the journal?

23         MR. CASHIO:    Yes, Your Honor, I mean, that's standard

24 knowledge, and I ask the Court to take judicial notice of that.

25 I don't know if you're a racetrack fan or not.

```
 1            THE COURT:   Go ahead, counsel.

 2                          EXAMINATION

 3   BY MR. CASHIO:

 4   Q.   Do you know what that trainer's section of the leader board

 5   says about the trainers?

 6   A.   Yes, sir.

 7            MR. BALLINA:   Objection, Your Honor.   Hearsay.

 8            THE COURT:   Sustained.

 9                          EXAMINATION

10   BY MR. CASHIO:

11   Q.   Can you tell us how much the leading trainer in the nation

12   of racehorses made last year as of December 18, 2003?

13            MR. BALLINA:   Objection, irrelevant.

14            THE COURT:   Sustained.

15            MR. CASHIO:   Okay.   Your Honor, I'd like to proffer

16   these.

17            THE COURT:   We'll do it later outside the presence of

18   the jury.

19            MR. CASHIO:   Okay.

20            THE COURT:   Were these included on the witness

21   exhibit?

22            MR. BALLINA:   No, Your Honor.

23            MR. CASHIO:   The racing form, no.

24            THE COURT:   All right.   Go ahead, counsel, proceed.

25                          EXAMINATION
```

1  BY MR. CASHIO:

2  Q.   Shaun, do you know how many people are in the Hot Springs

3  area?

4  A.   35,000.

5  Q.   Okay.  Have you earned any money since the accident?

6  A.   No, sir, I have not.

7         THE COURT:    Speak up please, sir.

8         THE WITNESS:   No, sir, I have not.  I borrowed from

9  everybody I know.

10        THE COURT:   I didn't understand what you said.

11        THE WITNESS:   I borrowed money.

12        THE COURT:   All right.  Speak into the mike so we can

13  all hear you.

14        THE WITNESS:   Yes, sir.

15                          EXAMINATION

16  BY MR. CASHIO:

17  Q.   Did anyone explain to you that night when you got out of

18  your truck that you could have free parking in valet if you did

19  certain procedures?

20  A.   No, sir.

21  Q.   Had you been to any casinos before the accident day?

22  A.   Yes, sir.

23  Q.   An had any of those casinos had a charge for valet parking?

24  A.   No, sir.

25  Q.   Were you thinking about paying for valet parking at any

1    time until you were told at the valet booth sometimes after you

2    got there that there was going to be a $10 charge?

3    A.    No, sir.

4    Q.    Okay.  Did you go to the Harrah's Casino recently, to the

5    outside area?

6    A.    Yes, sir.

7    Q.    Okay.  Did you notice a valet sign when you were driving

8    in?

9          MR. BALLINA:   Objection, Your Honor.  He's leading the

10   witness, and --

11         THE COURT:   Sustained.

12         MR. BALLINA:   It's irrelevant.

13         THE COURT:   It's irrelevant.  Sustained.

14         Move on.

15         MR. CASHIO:   Your Honor, I think  we're trying to show

16   -- okay.  I'll use that in rebuttal, then.

17                              EXAMINATION

18   BY MR. CASHIO:

19   Q.    Shaun, do you have any problems reading?

20   A.    Yes, sir, I have problems.

21   Q.    Did you find out what was causing your reading problems?

22   A.    Somebody told me --

23         MR. BALLINA:   Objection, Your Honor.  I think this may

24   be calling for hearsay testimony, I can't tell.

25         THE COURT:   Well, don't say somebody told me.  That is

1    hearsay.  Objection sustained.

2            Rephrase your question, counsel.

3                            EXAMINATION

4    Q.   With you ever given a diagnosis of your problem?

5            MR. BALLINA:   Objection.  That's still hearsay, Your

6    Honor.

7            THE COURT:   Sustained.

8                            EXAMINATION

9    BY MR. CASHIO:

10   Q.   Right after the accident happened, what did you feel?

11   A.   I was in a lot of pain, severe pain.

12   Q.   Do you know if you were conscious the whole time?

13   A.   There was a time where things went black.  I don't -- yeah,

14   there was a time when things went black.  I don't know if I was

15   unconscious or what.

16           THE COURT:   Counsel, there's no witnesses sitting in

17   court, are there?

18           Are there any witnesses sitting in court?

19           MR. BALLINA:   No, Your Honor.

20           THE COURT:   All right.  Thank you.

21                            EXAMINATION

22   BY MR. CASHIO:

23   Q.   What were your dreams about when you were young?  And I'm

24   not talking about little dreams while you're sleeping, but your

25   dreams for your life?

1    A.    To become a trainer.  When I was a little kid I wanted to a

2    professional soccer player, but shortly after that to be a

3    trainer.

4    Q.    Okay.  Tell me what kind of problems are you having now

5    after the accident with things that you can't do that you did

6    before the accident?

7    A.    A lot of things.  My daughter asked me the other day -- I

8    said the other day, probably two or three weeks ago they wanted

9    to go bowling.  I can't bowl.  We used to bowl before.  Donna

10   and I did.  I can't run anymore.  Everything, seems like it's

11   complicated.

12   Q.    Did you say you can't run anymore?

13   A.    No.

14   Q.    Okay.  And did you run before the accident?

15   A.    All the time.  Especially if I wasn't getting on very many

16   horses to stay fit.

17   Q.    Any other supports that you can't play with your children?

18   A.    Soccer, basketball.  Other than water pole, just about all

19   of them.

20   Q.    How do you feel about not being able to participate in

21   sports with your children?

22   A.    It's depressing.  There's a lot of things that I want, you

23   know.  A lot of things that I was good at that I would like to

24   teach them.

25   Q.    And how about horseback riding?

1  A.    Definitely.  Definitely.

2          MR. CASHIO:    That's all I have, Your Honor.

3          Thank you.

4          Answer Mr. Ballina's questions?

5          THE COURT:    Thank you, sir.

6          Your witness under cross-examination, counsel.

7                        CROSS-EXAMINATION

8   BY MR. BALLINA:

9  Q.    Good morning, Mr. Smith.

10          Good morning, ladies and gentlemen.

11          How are you doing today?

12  A.    Making it.

13  Q.    You went to work after you quit the school in the 10th

14  grade, didn't you?

15  A.    Yes, sir.

16  Q.    You went to work for your Dad?

17  A.    Yes, sir.

18  Q.    And your Dad paid you for that work?

19  A.    Yes, sir.

20  Q.    Did you pay taxes for that year that you made that money?

21  A.    Which year are you talking about?

22  Q.    Did you file tax returns -- the year that you quit school

23  and you went to work for your dad, what year was that?

24  A.    I couldn't say.  About 10 years ago.

25  Q.    About 10 years ago?

```
 1   A.    Yes, sir.  So 1994, that sounds about right.  Yes, sir.

 2   Q.    Do you know how much money you made in 1994?

 3   A.    No, sir.

 4   Q.    Did you file federal tax returns for that year?

 5   A.    No, sir.

 6   Q.    Did you file state tax returns for that year?

 7   A.    No, sir.

 8   Q.    You didn't file an extension for your tax returns, for

 9   federal returns for that year, did you?

10   A.    No, sir, I didn't --

11   Q.    You didn't file any --

12         THE COURT:   Wait, counsel.  Let him answer the

13   question.

14         MR. BALLINA:   I'm sorry.

15         THE WITNESS:   I don't know anything about taxes.  My

16   father, you know, when I got older I asked him, you know,

17   because you hear people talking about taxes.  I said, "What

18   about my taxes?"  He said, "Don't worry about it".  I didn't

19   know he was taking it out, if he was paying it for me or what

20   was going on.

21                         EXAMINATION

22   BY MR. BALLINA:

23   Q.    You didn't file an extension for your state tax returns for

24   the year 1994, did you?

25   A.    Not that can I think of.  I wouldn't think so.
```

1  Q.   You didn't receive a W-2 for the money you made in 1994,

2  did you?

3  A.   Not that I remember, no, sir.

4  Q.   You didn't receive a 1099 for that year, did you?

5  A.   No, sir, I don't believe so.

6  Q.   How about 1995, did you earn money in 1995?

7  A.   Yes, sir.

8  Q.   You don't how much money you made, do you?

9  A.   No, sir.  Like I said before, when I was younger I just

10  worked odd jobs, I didn't make very much.

11  Q.   And for the year 1995, you didn't file a federal tax

12  return, correct?

13  A.   No, sir.

14  Q.   You didn't file a state tax return, did you?

15  A.   No, sir.

16  Q.   You didn't file extensions for either the state or federal

17  returns for that year, did you?

18  A.   No, sir.

19  Q.   Do you know much money you made in 1996?

20  A.   No, sir.

21  Q.   Do you know how much money you made in 1997?

22  A.   No, sir.

23  Q.   Do you know how much money you made in 1998?

24  A.   No, sir.

25  Q.   Do you know how much money you made in 1999?

1  A.    No, sir.

2  Q.    And not going through each of those individual years, you

3  didn't file federal tax returns for any of those years, did you?

4  A.    No, sir.

5  Q.    You didn't file an extension for any of those years, did

6  you?

7  A.    No, sir.

8  Q.    You didn't file state tax returns for any of those years?

9  A.    No, sir.

10  Q.    You didn't file an extension for your state tax returns for

11  any of those years?

12  A.    No, sir.

13  Q.    And you are aware, are you, not based upon the evidence

14  that's been admitted in this case that the Social Security

15  Administration has no records of any earnings for you for the

16  years 1995 through 1999?

17  A.    I don't know.

18  Q.    You don't know how much money you made in 2000, do you?

19  A.    No, sir.

20  Q.    You are aware, are you not, based upon the evidence that's

21  been admitted in this case, that the Social Security

22  Administration shows your earnings for that year of a little

23  over $5,000?

24  A.    I'm sorry, can you repeat the question.

25  Q.    Are you aware that the evidence that's been admitted in

1 this case shows that the Social Security Administration has

2 records of earnings of only 5,164.02 for you for that year?

3 A.    Which year is that?

4 Q.    2000, sir.

5         THE COURT:    Why don't you show him the exhibit.

6         THE WITNESS:    I don't know.  That may be.

7                      EXAMINATION

8 BY MR. BALLINA:

9 Q.    But you don't know how much you made in 2000, do you?

10 A.    No, sir, I don't.

11         MR. CASHIO:    Your Honor, we'll stipulate to that.

12         THE COURT:    Well, he can answer the question, though,

13 counsel.

14                      EXAMINATION

15 BY MR. BALLINA:

16 Q.    You didn't file a federal tax return for the year 2000, did

17 you?

18 A.    No, sir.

19 Q.    You didn't file an extension for your 2000 federal tax

20 returns, did you?

21 A.    No, sir.

22 Q.    You didn't file state tax returns for the year 2000, did

23 you?

24 A.    No, sir.

25 Q.    You didn't file an extension for your state tax returns for

1    2000, did you?

2    A.    No, sir.

3    Q.    You don't know how much money you made in 2001, do you?

4    A.    No, sir.

5    Q.    And I'm assuming you're not aware, or are you, that based

6    upon the evidence that's been admitted in this case that the

7    Social Security Administration shows that you had earnings for

8    that year of $11,309.75.

9    A.    Okay.  If that's what it says, I don't --

10    Q.    You don't dispute that, do you?

11    A.    No.

12    Q.    And you don't dispute what the Social Security

13    Administration shows for the year 2000, do you?

14    A.    No, sir.

15    Q.    You didn't file tax returns for 2001, did you, federal or

16    state?

17    A.    No, sir.

18    Q.    You didn't request or file an extension for either the year

19    2000, or 2001, did you?

20    A.    No, sir.

21    Q.    And all during these years you were working for your

22    father, correct?

23    A.    Yes, at some point in time, yes, sir.

24    Q.    For any of those years, did your father provide you with a

25    W-2?

1  A.   The ones that you were speaking of?

2  Q.   From '95, and we're up to 2001 now.

3  A.   Not that I know of, no, sir.

4  Q.   You don't have a W-2 for any of those years, do you?

5  A.   I don't have anything, no, sir.

6  Q.   You don't have a 1099 from any of those years, do you?

7  A.   No, sir.

8  Q.   In fact, you don't any records of any earnings of yours for

9  those years?

10  A.   No, sir.

11  Q.   Now in 2002, you were working for your father still,

12  correct?

13  A.   Yes, sir.

14  Q.   Do you know how much money you made in 2002?

15  A.   No, sir.

16  Q.   Did your father ever provide you with any record of what

17  you earned in 2002?

18  A.   I believe he did, yes, sir.

19  Q.   What did he provide you, a 1099?

20  A.   That may be.  I don't know what it's called.  It sounds

21  right.

22  Q.   When did he give that to you?

23  A.   When did he -- I'm sorry, could you slow down?  I'm having

24  a hard time understanding you.

25  Q.   Okay.  I'll try to --

1          THE COURT:   Sir, do not answer any question if you

2    don't understand the question.  He'll be glad to repeat himself.

3          THE WITNESS:   Yes, sir.

4          MR. BALLINA:   And I apologize.  If you can't

5    understand me, I'll try to slow down for you.

6          THE WITNESS:   Yes, sir.  Thank you.

7                           EXAMINATION

8    BY MR. BALLINA:

9    Q.   Whatever it is that your father gave you showing your

10   earnings in 2002?

11   A.   Yes, sir.

12   Q.   When did your Dad give that to you?

13   A.   Four or five months ago, six months ago.  I'm not exactly

14   sure when it was.

15   Q.   Do you recall when I took your deposition in July of this

16   year?

17   A.   Yes, sir.

18   Q.   When I took your deposition on July 7th, 2004, your father

19   had not provided you with that information as of that date, had

20   he?

21   A.   I don't believe so.

22   Q.   You don't believe so?

23   A.   I don't believe so.

24   Q.   And you haven't filed a federal tax return for the year

25   2002, have you?

```
1    A.    I believe I did.

2    Q.    When did you do that?

3    A.    Last week.  Friday, I think it was of last week.

4    Q.    Friday October 8th?

5    A.    I think so.

6    Q.    And where did you file that?

7    A.    Where did I file it?

8    Q.    Yes, sir.

9    A.    I got the papers from the tax man.  I presented them and

10   gave them to my lawyer, and I said, "Look, he didn't sign it

11   because I hadn't paid him the $650".  So I signed it, and --

12   Q.    And --

13            MR. CASHIO:    Wait a minute.

14            MR. BALLINA:    Well, wait, wait, I didn't want to

15   interrupt him, because I want to make sure he doesn't say

16   anything that his lawyer may have said to him when they had a

17   discussion.

18            THE COURT:    You asked the question, he can answer the

19   question.

20            MR. BALLINA:    I'm sorry, I didn't mean to interrupt

21   you.

22            THE COURT:    Ladies and gentlemen, what I think he's

23   getting at is everybody has a privilege of confidentially

24   between the person and their lawyer, so is that what you're

25   saying?
```

1           MR. BALLINA:    That was my concern, Your Honor.

2           THE COURT:    I do not want you under the law to make

3    any statements as to what your lawyer might have talked about.

4    Now, if your lawyer asks you questions about what you and he

5    talked about you can waive the privilege between you and your

6    lawyer, but do not tell this gentleman or anybody else any

7    conversations that you had with your lawyer, that's confidential

8    between you and your lawyer unless your lawyer asks you

9    questions.

10          All right.  Do you understand, sir?

11          THE WITNESS:    I think so.

12          THE COURT:    Okay.  You have what's called a privilege.

13   You don't have to -- you know, just like, I don't know what

14   religion you are, but like going to confession, the priest can't

15   tell anybody your sins, okay.

16          THE WITNESS:    Yes, sir.

17          THE COURT:    Not that you have any, of course.

18          THE WITNESS:    Yes, sir.

19          THE COURT:    That's just as important with the lawyer.

20   Whatever you talk to your lawyer about no one has a right to

21   know about that, okay.  No one has a right to know the

22   conversations between you and your lawyer.

23          THE WITNESS:    All right.

24          THE COURT:    Unless your lawyer wants to ask you

25   questions, but that's between you and he.

1          THE WITNESS:   Yes, sir.

2          THE COURT:    All right.   Thank you, sir.

3          Go ahead and proceed.

4                          EXAMINATION

5  BY MR. BALLINA:

6  Q.    When did you get the 2002 tax form from the accountant?

7  A.    A couple of months ago.

8  Q.    Did you get the 2002 tax from the accountant at the same

9  time that you got whatever it was that your father gave you

10 concerning your earnings, is that at the same time?

11 A.    I was given a form by my father and took it to the tax man

12 in Arkansas, and then later on they gave me another thing and

13 that's what I mailed off the other day.

14 Q.    And the form that your father gave you, you got after you

15 filed this lawsuit, correct?

16 A.    Yes, sir.

17 Q.    You got it after I took your deposition in July 2004,

18 correct?

19 A.    I believe so, just after.

20 Q.    And the tax form, the 2002 tax form you got a couple of

21 months ago, correct?

22 A.    It could have been three.  Yes, sir, somewhere in there.

23 Q.    And if I understood your earlier testimony, then you did

24 something with it last Friday, October 8th?

25 A.    Yes, sir, I mailed to the Internal Revenue Service?

```
 1   Q.    You mailed it?

 2   A.    Yes, sir.

 3   Q.    And there's a stipulation of fact that you mailed it to the

 4   wrong address?  Where did you did get the address from that you

 5   mailed it to?

 6   A.    It was on one of the papers or something, I think.  I don't

 7   know where.

 8   Q.    Did you actually mail it yourself?

 9   A.    Did I mail it myself?

10   Q.    Yes, sir, did you mail it?

11   A.    I wrote it down.

12   Q.    You wrote it down --

13         THE COURT:   Counsel, let him answer your questions.

14         MR. BALLINA:   I'm sorry, I apologize, Your Honor.

15         THE COURT:   All right.

16         MR. BALLINA:   I apologize.

17                         EXAMINATION

18   BY MR. BALLINA:

19   Q.    Did you put the materials in the envelope?

20   A.    Yes, sir.

21   Q.    What did you put in the envelope?

22   A.    The papers.

23   Q.    What papers?

24   A.    The papers of whatever -- the papers that they gave me.

25   Q.    Who gave you?
```

1    A.    The tax man.

2    Q.    Do you know what those papers are?

3    A.    No, sir.  No, I don't know what you call them, no, sir.

4    Q.    So you have no idea what it was that you put in that

5    envelope, do you?

6    A.    It was what my tax man told me to send.

7    Q.    Then you mailed it on Friday, October 8th to the wrong

8    address, correct?

9    A.    I suppose so.

10    Q.    Well, I don't want you to suppose.

11    A.    I thought it was --

12            MR. CASHIO:   Your Honor, that's already been

13    stipulated.  Asked and answered about four times.

14            THE COURT:   Between you and the lawyers, it's been

15    stipulated already.

16            Move on.

17                        EXAMINATION

18    BY MR. BALLINA:

19    Q.    And you didn't sign whatever it was that you stuck in that

20    envelope until last Friday, correct?

21    A.    Yes, sir.  I thought I needed the guy's signature.

22    Q.    And you had not filed an extension to file your 2002 tax

23    returns, had you?

24    A.    Yes, I believe -- my 2002?

25    Q.    Yes, sir, 2002.

1   A.   I don't know.

2   Q.   You haven't filed your state 2002 tax returns, have you?

3   A.   I'm not sure.

4   Q.   Did you file them?

5   A.   Did I file them?

6   Q.   Yes, sir.

7   A.   I'm not sure.

8   Q.   Let me ask you about 2003.  Do you know how much money you

9   made in 2003?

10  A.   No, sir, I think quite a bit.  I don't know exactly, no,

11  sir.

12  Q.   And you were basically working for your father in 2003,

13  correct?

14  A.   Yes, sir.

15  Q.   And did you get any information from your father concerning

16  what you made in 2003?

17  A.   Yes, sir.

18  Q.   Was that with the information that you had gotten from your

19  father regarding 2002, several months after you filed this

20  lawsuit?

21  A.   Yes, sir, that's right.

22  Q.   Have you filed a federal tax return for 2003?

23  A.   Have I -- I'm sorry, can you repeat the question?

24  Q.   You have not filed a federal tax return for the year 2003,

25  have you?

1    A.    I thought I had.

2    Q.    When did you do that?

3    A.    The other day when I mailed everything in, isn't that -- we

4    I'm sorry, I don't know anything.  Is that filing when you mail

5    it in?  I'm sorry.

6    Q.    So on Friday when you put the materials, that you told us

7    about earlier when I was asking you about 2002, the materials

8    that you -- and correct me if I'm wrong -- that you didn't know

9    what they were, you also put stuff about 2003 in that same

10   envelope, is that right?

11   A.    I'm sorry, can you repeat the question?

12   Q.    Did you mail your 2003 federal tax returns last Friday?

13   A.    Yes, sir.

14   Q.    And you signed them last Friday, correct?

15   A.    Yes, sir.

16   Q.    You have not filed your state 2003 tax returns, have you?

17   A.    I'm not sure.  Isn't that all in one thing?  I didn't know

18   -- I'm sorry, I don't know if I have or not.  I signed what they

19   gave me and I put it in the envelope.

20   Q.    You can read and write the English language, can't you,

21   sir?

22   A.    Yes, sir.

23   Q.    You filed out an extension for the year 2003 regarding

24   taxes, didn't you?

25   A.    Yes, sir.

1  Q.   But you're not sure if that was for state or federal tax

2  returns, are you?

3  A.    No, sir.

4  Q.    No, you're not sure?

5  A.    No, sir, I'm not sure.

6  Q.    Did you file that; that is, that extension that you don't

7  know whether or not it was for state or federal, did you file

8  that?

9  A.    I think so, when I mailed it.

10  Q.    You mailed it?

11  A.    Yes, sir.

12  Q.    When did you do that?

13  A.    The other day, Friday.

14  Q.    That was in the same packet of stuff that you mailed Friday

15  that you told me about earlier?

16  A.    I thought we were talking about the same thing again.

17  Q.    I was asking you, sir, about an extension.

18  A.    An extension?  No, sir, I'm sorry, I misunderstood.  The

19  extension was filed months ago.

20  Q.    But you don't know, and since maybe you misunderstood my

21  question, I want to make sure I understand your testimony.

22  A.    Yes, sir.

23  Q.    You're not sure if that was for state or federal taxes,

24  correct?

25  A.    Correct.  Yes, sir.

1   Q.   But you filled that extension out, correct?

2   A.   Yes, sir.

3   Q.   And you mailed it, correct?

4   A.   Yes, sir.

5   Q.   And you did that a few months ago?

6   A.   A few is -- I believe it was in April sometime in there.

7   Q.   Do you have a copy of whatever it is that you mailed to

8   them?

9   A.   No, sir.

10  Q.   You haven't brought that here to court to show the jurors,

11  have you?

12  A.   No, sir.

13  Q.   Did you receive anything from whoever it was you mailed

14  that to because you don't know if it's state or federal, did you

15  receive anything from them; that is, the state or federal

16  government regarding that extension?

17  A.   I'm not sure.  I don't remember anything.

18  Q.   So then you don't know whether or not you were granted any

19  extension for whatever taxes that extension pertained to?

20  A.   I believe my tax man said that I had.

21  Q.   Didn't you just tell me that you mailed that extension?

22  A.   Yes, sir, I did.

23  Q.   How would your tax man know, then?

24  A.   I don't know, he asked me if I done it and I said I had.  I

25  guess he assumed that it was all right, I'm not sure --

1  Q.    You told me your tax man -- I'm sorry, I didn't mean to

2  cut you off, I thought you were finished.

3  A.    I am finished, yes, sir.

4  Q.    But you malled it, not the tax man?

5  A.    Yes, sir.

6  Q.    You're not sure if you got anything back from him, correct?

7           THE COURT:    Asked and answer, counsel.  Move on.

8           THE WITNESS:    Yes, sir.

9           MR. CASHIO:    Your Honor, may I make an objection to

10  continue talking about the taxes.  We've already put the taxes

11  in evidence.  Mr. Smith admits that he owes those taxes and

12  we'll stipulate to that.  I don't know why you have to keep on

13  this same subject.

14           MR. BALLINA:    Okay.

15           THE COURT:    All right, counsel, move on.

16                              EXAMINATION

17  BY MR. BALLINA:

18  Q.    Let me ask you some questions about your work.  You have

19  never worked for anyone as an assistant trainer other than your

20  father, have you?

21  A.    No, sir.

22  Q.    No, you haven't or, no, I'm incorrect?

23  A.    No I have not, Mr. Drew, no, sir.

24  Q.    So you weren't working as an assistant trainer with Mr.

25  Springer, correct?

1    A.    Not yet, no, sir.

2    Q.    And what you did for your Dad was you were a galloper and

3    an exercise rider, correct?

4    A.    Galloper, exercise rider.  I groomed for him, walked

5    horses, assistant trainer, whatever needed to be done when I got

6    to a certain point, Mr. Drew, yes, sir.

7    Q.    Let me ask you some questions so I can -- because I don't

8    about horses and what not.  Does a trainer clean out the stalls

9    and feed the horses and that?

10   A.    Sometimes.

11   Q.    Do they generally have other people to do that?

12   A.    Yes, sir.

13   Q.    Do they generally have other people to do the galloping and

14   the exercise riding like you were doing with your Dad?

15   A.    A lot of trainers gallop their horses.  It's a good way of

16   finding out where a horse's sore.  It tells you how fit a horse

17   is.  It's kind of like cheating, really.  It's easier to tell on

18   top of a horse where your horse's at than watching from the

19   ground.  Trainers, you know, when help doesn't show up, they

20   might have to groom one day.  A lot of trainers walk horses

21   most of the morning.  Most trainers are hands -- how do you say

22   it -- hands on, yes, sir.

23   Q.    And your father gallops horses?

24   A.    My father doesn't, no, sir.  He's too big.

25   Q.    He's too big?

```
 1   A.    Yes, sir.

 2   Q.    Your Dad's a pretty famous trainer though, isn't he?

 3   A.    He was, yes, sir.

 4   Q.    You're familiar with the Oak Lawn Racetrack, aren't you,

 5   sir?

 6   A.    Yes, sir.

 7   Q.    Didn't your father share the training championship at Oak

 8   lawn in 1997?

 9   A.    That sounds right.

10   Q.    And would it sound about right that your Dad had maybe

11   about 20 horse at Oak Lawn in the year 2004?

12   A.    20?

13   Q.    Yes, sir.

14   A.    In 2004?

15   Q.    Yes, sir.

16   A.    It sounds about right, yes, sir.

17   Q.    And the most that you ever made earnings --

18   A.    Yes, sir.

19   Q.    -- was for your Dad, was $600 a week, plus bonuses,

20   correct?

21   A.    Yes, sir.

22   Q.    And then you quit working for your Dad in October 2003,

23   correct.

24   A.    Yes, sir, somewhere in there.  Somewhere in there yes, sir.

25   Q.    And then in November 2003, you went to work for Mr.
```

1  Springer, correct?

2  A.    Yes, sir.

3  Q.    And Mr. Springer was paying you $10 a head to exercise the

4  horses, correct?

5  A.    Yes, sir, until the rest of the horses got in.  I had only

6  been working -- at the time of the accident, I had only been

7  working for Mr. Springer for probably four or five weeks tops,

8  somewhere in there.

9  Q.    You started working for Mr. Springer November and the

10  accident was in December, correct?

11  A.    Yes, sir.

12  Q.    And during that time you were making about -- on the

13  average about $440 a week or so with Springer?

14  A.    With Mr. Springer that sounds right.

15  Q.    I want to make sure I use the right term.  Yesterday you

16  used the term loose horse.  Did I hear it correctly, is that it?

17  A.    Yes, sir, that's right.

18  Q.    And that's when a horse throws a rider, correct?

19  A.    Yes, sir.

20  Q.    And I'm assuming, and correct me if I'm wrong, that working

21  with these thoroughbred horses that happens, riders get thrown,

22  correct?

23  A.    Yes, sir.

24  Q.    And I would also assume, and correct me if I'm wrong, that

25  riders get injured?

1  A.    Yes, sir, Mr. Drew, they do.

2  Q.    And I would also assume, and correct me if I'm wrong, that

3  riders break bones in getting thrown?

4  A.    Yes, sir, Mr. Drew, they do.

5  Q.    Or probably in other ways in connection with training and

6  caring for horses, correct?

7  A.    Yes, sir.

8  Q.    And I'm sure you know people in that industry who have

9  broken bones?

10 A.    Yes, sir.

11 Q.    And I'm sure you know people in that industry who have

12 broken bones in their leg?

13 A.    Yes, sir.

14 Q.    And I'm sure you know people in the industry who have

15 broken bones in their leg and gone back to doing what they were

16 doing before, don't you?

17 A.    Yes, sir.  I don't know if anyone has a metal road in their

18 tibia?

19 Q.    Dr. Hamsa, the doctor, he's here in New Orleans, correct?

20 A.    Yes, sir.

21 Q.    Let me ask you some questions about the day of the

22 accident.

23         At lunch at Liuzza's you had a couple of beers,

24 correct.

25 A.    Yes, sir.

1  Q.    Later that day you drove to Harrah's by yourself, correct?

2  A.    Yes, sir, I believe that's correct?

3  Q.    Donna, your girlfriend and your roommate, Gale, also went,

4  but they went in Donna's car, correct?

5  A.    Yes, sir.

6  Q.    And Donna, you don't think parked in valet parking?

7  A.    No, sir, I don't think so.

8  Q.    And you had never valet parked at Harrah's before, is that

9  correct?

10  A.    Not at the Harrah's in New Orleans, no, sir.

11  Q.    And I'll try to make sure I reference Harrah's in New

12  Orleans.  In the event I don't, if I say Harrah's, I'm referring

13  to the Harrah's here in New Orleans.

14  A.    Yes, sir.

15  Q.    But you had been to Harrah's here in New Orleans one time

16  previously with your father, correct?

17  A.    Yes, sir, Mr. Drew.

18  Q.    You didn't see any signs when you pulled into parking valet

19  concerning valet parking, correct?

20  A.    The night of the accident?

21  Q.    Yes, sir.

22  A.    No, sir.

23  Q.    And I assume that you didn't see any signs when you pulled

24  into valet parking that said that the parking was free?

25  A.    No, sir, I did not.

1  Q.    And you didn't see any signs regarding valet parking when

2  you walked into the casino because you were, I think you

3  testified, going for the door handle, is that right?

4  A.    Yes, sir, some of the doors had handles, some of them --

5  well, all of them had handles, but some were on the inside and

6  some were on the outside.

7  Q.    Your concentration was on opening the door rather than

8  seeing a sign around the door, correct?

9  A.    Yes, sir.  There's lots of signs at casinos, you know.

10  "Dolly Parton's coming", or, you know, where to take your chips

11  or what not.

12  Q.    When you went into the casino you had something over $300,

13  300, $400, correct?

14  A.    Yes, sir.

15  Q.    And it's your testimony that you played Blackjack, correct?

16  A.    Yes, sir.

17  Q.    But you don't recall what type of table Blackjack you

18  played at, do you?

19  A.    It was a Blackjack table.

20  Q.    You recall was it a $5 table, $10 table?

21  A.    No, sir, I don't.

22  Q.    You don't remember?

23  A.    No, sir, I'm sure -- I would imagine it was 5.

24  Q.    And you drank some Heinekens, correct?

25  A.    Excuse me.  Yes, sir.

1    Q.    And you're not certain how many you had, it was two or

2    three or four, you don't know?

3    A.    Yes, sir.

4    Q.    So you don't know exactly how many you had, do you?

5    A.    No, sir.  It wasn't one, but it wasn't five.  It wasn't

6    six.

7    Q.    That wasn't the first time that you played Blackjack?

8    A.    No, it wasn't the first time.

9    Q.    You played Blackjack before?

10   A.    Yes, sir, I played Blackjack before.

11   Q.    And you can add to 21, can't you, sir?

12   A.    Yes, sir.

13   Q.    You had valet parked at other casinos, if I understand your

14   testimony, before you went to Harrah's that night, correct?

15   A.    Yes, sir.

16   Q.    And the ones that you had valet parked at previously there

17   was no charge for parking, correct?

18   A.    Yes, sir.

19   Q.    You just have to tip the valet driver, correct?

20   A.    Yes, sir, Mr. Drew.

21   Q.    But you lost all your money playing Blackjack, correct?

22   A.    Yes, sir.

23   Q.    Did you have any money left over to tip the valet driver?

24        MR. CASHIO:    Your Honor, it's already been stipulated

25   in the record that he lost all his money.  He's a agreed to

1  that, so why even keep saying the same thing?

2          THE COURT:   Sustained, counsel.

3                           EXAMINATION

4  BY MR. BALLINA:

5  Q.   Well, then I'll ask the question.  You didn't have enough

6  money to tip the valet driver, did you?

7  A.   No, sir.

8  Q.   When you walked out of Harrah's here in New Orleans that

9  night, you're not sure if you put the ticket in Ms. Wilson's

10  hand or just threw it on the counter, are you?

11  A.   I didn't throw it on the counter, I placed it on the

12  counter, I didn't --

13  Q.   You put it on the counter?

14  A.   Yes, sir --

15  Q.   You don't remember having any discussion --

16          THE COURT:   Wait, Counsel.  He was talking.

17          MR. BALLINA:   Oh, I'm sorry, Your Honor.

18          THE COURT:   Go ahead, sir.

19          THE WITNESS:   In looking at the video you can see

20  that I put it on the counter, yes, sir.

21                           EXAMINATION

22  BY MR. BALLINA:

23  Q.   You can't remember having any discussions with Ms. Wilson

24  at that time, can you?

25  A.   No, sir.

1  Q.    After you put the ticket on the counter you called Donna

2  on the cell phone, correct?

3  A.    I'm not sure who I talked to, no.

4          MR. CASHIO:    Your Honor, I'm going to ask counsel to

5  point out a specific time when he's asking about when he called

6  Donna.

7          THE COURT:    All right.  Objection sustained.  Be more

8  specific, counsel.

9                              EXAMINATION

10  BY MR. BALLINA:

11  Q.    After you put the ticket up on the counter you didn't have

12  any discussion with Ms. Wilson, after that.  Didn't you use your

13  cell phone?  Shortly thereafter, did you not just use your cell

14  phone?

15  A.    Yes, sir.

16  Q.    And didn't you call Donna at that time?

17  A.    I may have.

18  Q.    But you didn't tell Donna at that time that you had lost

19  all the money that you had with you, did you?

20  A.    I would assume so, no, sir.

21  Q.    She wouldn't have been too happy with that?

22  A.    No, sir, she wouldn't?

23  Q.    You're not sure how much time passed when you put the

24  ticket up on the counter when you first went to talk to Ms.

25  Wilson, are you?

1    A.    I'm sorry, can you repeat the question?

2    Q.    You're not sure how much time passed between when you put

3    the ticket on the counter and when you first went back to the

4    counter to speak to Ms. Wilson?

5    A.    Watching the tape, it's 15 -- you know 15, 20 seconds, I'd

6    say.  I can't say for you sure, no.

7    Q.    At that time you asked her if they had your vehicle,

8    correct?

9    A.    Yes, sir -- no.  No, sir.

10   Q.    No?

11   A.    I asked them if they had my vehicle the second time when I

12   come back?  No, sir.

13   Q.    After you put the ticket up on the counter you don't talk

14   to Ms. Wilson, you walk away, you make a cell phone call to

15   Donna, then you go back to the counter and you speak to Ms.

16   Wilson, correct?

17   A.    Yes, sir.

18   Q.    Didn't you ask her at that time if they had your truck?

19   A.    No, sir, she asked me -- I believe she asked me --

20   Q.    Let me --

21        MR. CASHIO:   Wait, wait --

22        THE WITNESS:   -- where my ticket was.

23        MR. CASHIO:   Your Honor, let him answer the question.

24        THE COURT:   Counsel, let him answer the question,

25   please.

1          THE WITNESS:    For something like that, I'd only been

2     there -- I had just given her the ticket.

3                                  EXAMINATION

4     BY MR. BALLINA:

5     Q.    You recall me taking your deposition in July 2004?   I want

6     to direct your attention to page 139.

7          THE COURT:    Counsel, let him read it first.

8          Give it to him and let him read it first and then you

9     can ask him whatever you'd like to.

10         MR. CASHIO:    What line is this?

11         THE COURT:    He said line 139.

12         MR. BALLINA:    Page 139, the question begins on line 2.

13         THE COURT:    2.

14         MR. CASHIO:    Then how far does it go down?

15         THE WITNESS:    Am I supposed to read the whole thing?

16         MR. CASHIO:    Yeah, can he read the whole thing, Your

17    Honor?

18         MR. BALLINA:    The answer goes through line 4.   It

19    begins on line 3 and ends on line 4.

20         MR. CASHIO:    Your Honor, for context, I'd like him to

21    read the whole page, if you don't mind.

22         THE COURT:    He can read as much as he'd like to read.

23         MR. CASHIO:    Read the whole page.

24         THE COURT:    All right.   Counsel, ask your question.

25                                  EXAMINATION

1    BY MR. BALLINA:

2    Q.    So when I asked you in deposition: "Question:  What did

3    you tell her?  What was your answer on that day?

4    A.    I asked her if they had my vehicle.

5    Q.    And didn't she ask you what your number was, your ticket

6    number?

7    A.    Something like that.  The deposition was five or six hours

8    long, I'm sure there are some mistakes I made in my deposition.

9    Q.    Mr. Smith you did have the opportunity to review your

10   deposition, didn't you?

11   A.    Yes, sir.

12   Q.    After it was typed up, didn't you?

13   A.    Yes, sir.

14   Q.    And didn't you sign a witness attestation?

15          MR. CASHIO:   Your Honor --

16          MR. BALLINA:   May I approach?

17          THE COURT:   Counsel, approach the bench.

18               (BENCH CONFERENCE, AS FOLLOWS):

19          THE COURT:   Let me see the attestation.

20          The attestation does not give him the opportunity to

21   change any of his testimony, counsel, so that would be

22   misleading this jury.

23          MR. CASHIO:   Would you explain that, Your Honor,

24   because I was going to object.

25          THE COURT:   I'm not going to let him ask the question,

1    but hold on one second.

2         It says, "To the best of my ability and understanding

3    this is a true and correct transcription of my testimony with

4    the exception of any --" the transcript itself -- that the

5    transcript is accurate is what he's attesting to.  It would be

6    misleading to this jury to think otherwise, and I don't want you

7    to go there.

8         MR. CASHIO:   But he's put that in their heads.  Can

9    you explain it?

10        THE COURT:   Counsel, you're opening a up a door where

11   you don't want to go.  I don't think he's put it in anywhere.

12        MR. CASHIO:   He said did you witness it and

13   everything.

14        THE COURT:   What do you want me to say?

15        MR. CASHIO:   Say that the witness does not have a

16   chance to change anything in his transcript.

17        THE COURT:   Well, that's not true.

18        MR. CASHIO:   Only a misspelling.

19        THE COURT:   Well, that's not true.

20        MR. CASHIO:   That's correct, Your Honor.

21        MR. BALLINA:   Your Honor, if I may.  My only reason is

22   that from his answer he made reference to wrong or there may be

23   stuff wrong or inaccurate.

24        MR. CASHIO:   He said I might have made a mistake.

25        MR. BALLINA:   Or mistake.

1    THE COURT:    He's not allowed to alter or change the

2  transcript.

3    MR. CASHIO:    That's what I want tell to the jury.

4    THE COURT:    Well, then let him read the entire witness

5  attestation, is that fair enough?

6    MR. CASHIO:    Yes.

7    MR. BALLINA:    You want the witness to read it?

8    MR. CASHIO:    No, you read it.

9    THE COURT:    No, you read it to him, but read the whole

10  thing.

11    MR. BALLINA:    Yes, sir.

12    Can I show that he signed it first?

13    THE COURT:    Yes.

14                  (BENCH CONFERENCE CONCLUDED)

15                          EXAMINATION

16  BY MR. BALLINA:

17  Q.    Mr. Smith, I'm sorry, I believe I was asking you or

18  beginning to ask you if you had signed a witness attestation

19  regarding your deposition, and I'm going to ask you if you this

20  is your signature on there?

21  A.    Yes, sir.

22  Q.    And it's dated September 18, 2004, is that correct?

23  A.    9-18-04, yes, sir.

24  Q.    And for the record, I will read what the witness

25  attestation says.

1        "I have read the forgoing testimony to me pursuant to

2   Rule 30(e) of the Federal Rules of Civil Procedure, and/or

3   Article 1445 of the Louisiana Code of Civil Procedure and hereby

4   attest that to the best of my ability and understanding it is a

5   true and correct transcription of my testimony with the

6   exception of any attached corrections or changes complete with

7   reasons for changes on the witness amendment pages.  I have in

8   no way altered the printed transcript pages containing testimony

9   herein, tampered with the seal on the last numbered page herein

10  or tampered with the security strip on the binder hereof.  The

11  integrity of this certified transcript has been maintained in

12  the identical form as it was received by me with the exception

13  of any changes on the witness amendment page".

14        Can I go back to where we were?  And I apologize.

15        You'd gone to the counter the first time you'd spoken

16  with Ms. Wilson?

17  A.   Yes, sir.

18  Q.   And I believe you had just testified that she asked you

19  what your ticket number was and you told her you didn't know,

20  correct?

21  A.   Yes, sir.

22  Q.   And she told you it should be coming or something like

23  that, correct?

24  A.   At that time point in time?

25  Q.   Yes, sir?

1  A.    She told me that it should be coming.    In the deposition I

2  didn't know where we were obviously, now that I'm hearing you

3  say this, because at that time, I mean, I gave her the ticket

4  and then I came back up 20 seconds later.    It's obvious that

5  they don't have my truck.

6  Q.    So you're denying that at that time she told you that it

7  should be coming or something like that?

8  A.    That was later on.

9         MR. CASHIO:    Your Honor, I'd like Mr. Smith to be able

10  to read the whole page 39 down to line 17 because it's not in

11  context.

12         THE COURT:    Okay.  Give him your deposition, Mr.

13  Ballina, since that's where Mr. Ballina's reading from.

14         MR. CASHIO:    Could you read this --

15         THE COURT:    Mr. Cashio, let Mr. Ballina give him his

16  deposition because that's where he's reading from.

17         MR. CASHIO:    Through line 17, I'm going to ask that he

18  read that to the jury, Your Honor.

19         THE COURT:    Counsel, you can ask him to do that under

20  redirect.

21         MR. CASHIO:    Okay.  That's all right.  You don't have

22  of to do it, then I'll ask you.

23         THE COURT:    Go ahead, Mr. Ballina.

24         Let's do this out of fairness to all parties.  Let him

25  read it now while it's fresh on everybody's mind.

1          Read through line, what, 17?

2          MR. CASHIO:    From lines 9 through 17.

3          THE COURT:    Let him read that to the jury, Mr.

4    Ballina.

5          MR. BALLINA:    Yes.

6          MR. CASHIO:    Can Mr. Ballina read his question and

7    Shaun read his response?

8          THE COURT:    Go ahead.  Why don't you do that, put it

9    all in context.

10          MR. CASHIO:    9 through 17.

11                              EXAMINATION

12   BY MR. BALLINA:

13   Q.   Beginning with line 9.  "All right.  What did she tell

14   you?"

15   A.   "I believe she asked me what my number was or something

16   towards that and I told her I didn't know what I'd given her --

17   that I'd given her my ticket.  She's -- I believe she said,

18   okay, it should be coming or something like that.  So I walked

19   off and I waited awhile longer."

20   Q.   How did you wait?

21   A.   "From the time that I gave them the ticket to the time they

22   had brought the truck."

23          MR. CASHIO:    That's it.

24          THE COURT:    Okay.

25                              EXAMINATION

1  BY MR. BALLINA:

2  Q.    After this conversation, about five to 10 minutes later you

3  went back to the counter, correct?

4  A.    Yes, sir.

5  Q.    And at that time you don't recall if you spoke to a man or

6  a woman, do you?

7  A.    No, sir.

8  Q.    You don't know what you told them, and -- you don't know

9  what you told them, do you?

10  A.    No, sir.

11  Q.    You don't know what they told you?

12  A.    No, sir.

13  Q.    Then Mr. Dorsey came over, and you think that they found

14  your ticket and he wanted $10, correct?

15  A.    Yes, sir, that sounds right.

16  Q.    And it was your understanding at that time that Mr. Dorsey

17  was an employee of the casino, correct?

18  A.    Yes, sir.

19  Q.    Now, when Mr. Dorsey told you this he was behind the

20  counter at that booth, correct?

21  A.    Yes, sir.

22  Q.    And you don't know what exactly you told him at that time

23  but you probably said something to the affect, "$10?  What do

24  you mean $10?"

25  A.    Yes, sir.

1    Q.    And he told it cost $10 to park, correct?

2    A.    Something like that, yes, sir.

3    Q.    And then you and Mr. Dorsey got in an argument, is that

4    right?

5    A.    Yes, sir, something like that.

6    Q.    At that point in time you understood that the $10 was a

7    charge for parking, correct?

8    A.    That's what he was telling me.

9    Q.    And at that time you told Mr. Dorsey that you shouldn't

10   have to pay the $10 because you had been there for 20 or 30

11   minutes, is that right?

12   A.    Something like that, yes, sir.

13   Q.    In fact, you told Mr. Dorsey you didn't think you had to

14   pay, correct --

15   A.    I told Mr. Dorsey that -- can you repeat the question?  I'm

16   sorry, could you repeat the question?

17   Q.    You told Mr. Dorsey that you didn't think you had to pay?

18   A.    Yes, sir, I'm sure I said that.

19   Q.    At that time you didn't tell Mr. Dorsey that you didn't

20   have the $10 to pay, did you?

21   A.    At that time I don't think so, no.

22   Q.    At that point you directed some racial slur towards Mr.

23   Dorsey, didn't you?

24   A.    I'm not sure.

25   Q.    But you did at some point?

1  A.    Yes, sir.

2  Q.    Did you tell Mr. Dorsey that you owned him?

3  A.    No, sir, I did not.

4  Q.    Did you tell him that you own his uncles and his cousins?

5  A.    No, sir, I did not.

6  Q.    The first time that you realized that you may have money in

7  your truck was when you saw the truck pull up, correct?

8  A.    Yes, sir.

9  Q.    And at that time you weren't sure how much money you had in

10 the truck, correct?

11 A.    Yes, sir, Mr. Drew.

12 Q.    That is, you didn't know if you had the $10 pay, did you?

13 A.    No, sir, Mr. Drew, I didn't.

14 Q.    You did tell Mr. Dorsey that you refused to pay to the $10,

15 didn't you?

16 A.    At one time, yes, sir.

17 Q.    Because you were upset, correct?  You were mad?

18 A.    Yes, sir.

19 Q.    You loss your money?

20 A.    Yes, sir.

21 Q.    You had been drinking?

22 A.    Yes, sir.

23 Q.    Even though when the truck pulled up, and that's when you

24 first had the thought that there may be money in the truck, you

25 still didn't want to pay the $10, did you?

1   A.   I didn't want to, no, sir, but I told him that I had it in

2   there.  He could take it and stick it up his butt.

3   Q.   But you told him you had the $10, correct, to stick it up

4   his butt?

5   A.   I told him, yes, sir.

6   Q.   But you didn't know how much money you had in the truck,

7   did you?

8   A.   No, I didn't know exactly, no, sir.

9   Q.   After the truck pulls up you walked towards the front of

10  the truck, correct?

11  A.   The way the truck pulls up, yes, you walk in the front of

12  the truck, yes, sir.

13  Q.   As you walked towards the front of the truck it was moving

14  towards you, correct?

15  A.   Yes.  Yes, at a distance.  I wasn't walking towards the

16  front of the truck, I was walking to the driver's side of the

17  truck, but you have to go around the front to get there.

18  Q.   Well, as you walked towards the truck it stopped, didn't

19  it?

20  A.   Yes, sir.

21  Q.   And you walked up to the driver's door, correct?

22  A.   Yes, sir.

23  Q.   And you're not sure if the window was up or down at that

24  time?

25  A.   No, I'm not positive.  I believe it was up.

1   Q.   After the truck stopped, at that point you don't recall

2   exactly what you did, do you?

3   A.   Exactly, no, sir.

4   Q.   But you believe you grabbed onto the side mirror, correct?

5   A.   Originally, when I first walked up to it?

6   Q.   Yes, sir.

7   A.   I may have.  Excuse me.  Well, I do know when --

8   Q.   I direct your attention --

9        MR. CASHIO:   Your Honor, he was explaining something,

10  Your Honor.

11       THE WITNESS:   I know that when he went to take off, I

12  grabbed the mirror, yes, sir.  I may have been holding onto it.

13                          EXAMINATION

14  BY MR. BALLINA:

15  Q.   Well, you grabbed onto it after it started taking off,

16  correct?

17  A.   I don't know.  I can't really say.

18  Q.   While you're uncertain whether or not you grabbed onto the

19  truck before or after it started moving, you do know that you

20  grabbed onto truck, correct?

21  A.   Yes, sir.

22  Q.   And up don't remember, you don't recall, but you may have

23  stepped onto the truck's running board, correct?

24  A.   Yes, sir.

25  Q.   Then the truck stopped again, correct?

```
 1   A.    Yes, sir.
 2   Q.    And you believe the driver's window was up, correct?
 3   A.    Yes, sir.
 4   Q.    You're not sure but you it's possible that that's the first
 5   time that you tried to tell the driver that there was $10 in the
 6   middle console, correct?
 7   A.    Yes, sir.
 8   Q.    But you're not really sure when you told the driver that,
 9   but you think that might be the first time, correct?
10   A.    Yes, sir.
11   Q.    And that was the only time you told the driver that?
12   A.    I'm not sure.  I don't know.
13   Q.    Well --
14   A.    Is that the only -- I'm sorry, can you repeat the question?
15   Q.    Was that the only time that you tried to tell the driver
16   that there was $10 in the console of the truck?
17   A.    Yes, sir, I think that's right.
18   Q.    And it's possible that you said to somebody "Give me my
19   F-ing truck"?
20   A.    Yes, sir.
21   Q.    Or something to that effect, correct?
22   A.    Yes, sir.
23   Q.    You're not sure what you may have said because you were mad
24   and had been drinking, correct?
25   A.    Yes, sir.
```

1   Q.   And you're not sure if you ever told anybody while you're

2   around the truck that I have $10 in the console and I'm going to

3   pay you, or words to that affect, correct?

4   A.   Can you repeat the question?

5   Q.   You're not sure.  You don't know if you ever told anybody

6   around the truck that you had $10 in the console and you were

7   going to pay?

8   A.   I said I was saying it to the man in the truck.

9   Q.   You were telling the man in the truck that you were going

10  to pay, or you were telling the man in the truck there was $10

11  in the console?

12  A.   That there was $10 in the console why else -- I don't know

13  why I would say it.  That's not what I meant.

14  Q.   So while the truck is stopped, this is the second time,

15  correct --

16  A.   Yes, sir, Mr. Drew.

17  Q.    -- it stopped?  That's where we are?

18  A.   Yes, sir.

19  Q.   While it was stopped that time you grabbed onto the mirror?

20  A.   I believe so.

21  Q.   Then the truck started to move again, correct?

22  A.   It sounds right.

23  Q.   But you're not sure if you were still holding onto the

24  mirror when the truck began to move again?

25  A.   I can't be for certain no, sir.

1  Q.    You're not sure, correct?

2  A.    Yes, sir, that's correct.

3  Q.    You're not sure if you were stepping on any part of the

4  truck when it began to move?

5  A.    Yes, sir, Mr. Drew, that's correct.

6  Q.    That is, you're not sure?

7  A.    I'm not sure.

8  Q.    You're not sure but you think you tried to grab onto the

9  truck after it began to move?

10  A.    No, I don't know if I was holding onto it when it went to

11  take off, or if I grabbed it when I heard the engine starting to

12  rev or exactly, no, sir.

13  Q.    Let me direct your attention to your deposition page 178.

14  My question begins on line 2.  Your answer begins on line 4,

15  and I'll the hand it to you.

16          THE COURT:   You can read as much as you like, sir.

17          Ready.  Okay.  Mr. Ballina.

18                          EXAMINATION

19  BY MR. BALLINA

20  Q.    To read my question again, page 178, line 2. "After the

21  truck began to move, did you grab on to any part of the truck".

22  Would you please read what your answer was on that day at line

23  4.

24  A.    "I'm not sure, I think I tried to -- I don't -- I don't

25  really remember".

1  Q.    Although you don't remember, isn't it true that you

2  probably did and may have tried to grab onto the truck after it

3  began to move?

4  A.    I suppose it's possible.

5  Q.    Not possible, probable that you did it?

6  A.    I'm not sure what the difference is in probable and

7  possible.

8  Q.    Let me direct your attention to your deposition, page 179.

9  Line 1 is my question.  Go ahead and read it as much you'd like.

10            MR. CASHIO:    There's no question on line 1.

11            MR. BALLINA:    Yes, there is.

12            THE COURT:    Page 179?

13            MR. BALLINA:    Hold on, I'm sorry.

14            MR. CASHIO:    Where's the question?

15            MR. BALLINA:    I've got to put my glasses on.

16                        EXAMINATION

17  BY MR. BALLINA:

18  Q.    Page 178, line 24 is the question, and you can start

19  reading there, and I'll start with my question, page 178?

20            "So you don't remember tying to grab onto the truck

21  after the incident?"

22            What was your answer?

23  A.    "The second time?"

24  Q.    "Yeah, we're on the --

25  A.    "No, sir, I don't remember.  I probably did and may have.

1  I'm not sure".

2  Q.    You don't remember, and you're not sure, but you probably

3  screamed out that you were going to sue you "MF'ers" after the

4  incident?

5  A.    After the accident?

6  Q.    Yes, sir.

7  A.    Yes, sir.

8         MR. BALLINA:    Thank you, sir.

9         I have know other questions.

10        THE COURT:    Okay, Mr. Cashio, redirect, sir.

11                         REDIRECT EXAMINATION

12 BY MR. CASHIO:

13 Q.    What would the driver do, Shaun, every time you would grab

14 the truck?

15 A.    He stopped.

16 Q.    Okay.  And so when you grabbed onto the truck the time

17 before the accident, what did you expect the driver to do?

18        MR. BALLINA:    Objection, Your Honor.  He's leading his

19 witness.

20        THE COURT:    Overruled.  Go ahead.

21        THE WITNESS:    I figured he was going to stop.  I mean,

22 he stopped every time before.  I didn't think he was just going

23 to punch it and run me over.

24                             EXAMINATION

25 BY MR. CASHIO:

1  Q.    Okay.  Did you ever hear him blow his horn or roll down the

2  window to tell you he was going to punch it?

3  A.    No, sir.

4  Q.    Now, I know you said you were going to sue them, but did

5  someone say something to you before you said you were going to

6  sue them?

7  A.    Yes, sir.

8  Q.    And what was that?

9  A.    Mr. Stacey said, "It serves you right".  Something like

10  that before he walked off?

11  Q.    And how many do you think you used the N word?

12  A.    Once.

13  Q.    Okay.  And what was said to you by Mr. Stacey before you

14  used the N word?

15         MR. BALLINA:    Objection, Your Honor.

16         THE COURT:    Sustained.

17                            EXAMINATION

18  BY MR. CASHIO:

19  Q.    Did anything prompt you to use the N word?

20         MR. BALLINA:    Objection, Your Honor.

21         THE COURT:    Sustained.

22                            EXAMINATION

23  BY MR. CASHIO:

24  Q.    Now, when you came to the casino that particular night of

25  the accident, did you see any signs or were you looking for

1  signs at the casino?

2  A.    No, sir, I figured it was like every other casino.

3  Q.    Okay.  And did anything catch your attention when you first

4  drove into the casino?

5           MR. BALLINA:    Objection, Your Honor.  I believe this

6  is beyond the scope.

7           THE COURT:    Sustained.

8           Beyond the scope of cross-examination, counsel.

9                            EXAMINATION

10  BY MR. CASHIO:

11  Q.    Okay.  What were you trying to communicate with the driver

12  of the truck when you were trying to hold onto the truck?

13  A.    That there was $10 in the middle console and he kept

14  stopping.  I figured, you know, he would, if not, let me look,

15  at least look himself to see if there was money in there so I

16  could get my dad's truck.

17  Q.    Okay.  And why did you think he might let you look in the

18  console?

19           MR. BALLINA:    Objection.  It calls for speculation.

20           THE COURT:    Sustained.

21                            EXAMINATION

22  MR. CASHIO:

23  Q.    Was there any reason you were going to look in the console?

24           MR. BALLINA:    Objection.

25           THE WITNESS:    Yes, sir.

1        MR. BALLINA:   I'm not sure I understand the question.

2        MR. CASHIO:   Your Honor, he --

3        THE COURT:   Wait, wait.  State your question again.  I

4   didn't understand it.

5                          EXAMINATION

6   BY MR. CASHIO:

7   Q.   I said was there any reason you wanted to look into the

8   console?

9   A.   Yes, sir, to see if there was any money so I could pay

10  them.  Once before I didn't have enough money and I gave them

11  the money I had.  They made me sign a ticket and they sent me a

12  bill.  It was at an airport and they let me go.

13  Q.   Did you ever put anything on the valet booth to show that

14  you had a license or something like that that they could take

15  for payment?

16       MR. BALLINA:   Objection, Your Honor.

17       THE COURT:   Sustained.

18                          EXAMINATION

19  BY MR. CASHIO:

20  Q.   Okay.  Were you able to conduct business that night on the

21  telephone while you were waiting?

22  A.   Yes, sir.

23       MR. BALLINA:   Objection, Your Honor.  Beyond the

24  scope.

25       MR. CASHIO:   No, he was asking him what phone calls.

1        THE COURT:    Overruled.

2        MR. CASHIO:    Oh, I'm sorry.  Go ahead.

3        THE WITNESS:    Yes, sir.

4                        EXAMINATION

5   BY MR. CASHIO:

6   Q.    And who were you talking to about business?

7   A.    Jody.

8   Q.    And were you waiting calmly and patiently most of the time?

9   A.    Yes, sir.

10        MR. BALLINA:    Objection.

11        THE COURT:    Overruled.

12                        EXAMINATION

13  BY MR. CASHIO:

14  Q.    Were you drunk in any fashion?

15  A.    No, sir.

16  Q.    Did you have any trouble dialing your phone?

17  A.    No, sir.

18        MR. CASHIO:    That's all I have.

19        Thank you, Your Honor.

20        THE COURT:    Thank you.

21        You my step down.

22        Call your next witness, Mr. Cashio.

23        MR. CASHIO:    Can we approach?

24        THE COURT:    Yes.

25                (BENCH CONFERENCE, AS FOLLOWS):

1          THE COURT:   Yes, sir.

2          MR. CASHIO:   Your Honor, we're going to rest pending

3    my offer of the proffer.

4          THE COURT:   Okay.

5          MR. CASHIO:   You want me to offer the proffer?

6          THE COURT:   You want do it right now?

7          MR. CASHIO:   Okay.  Let me get it.

8          THE COURT:   While you were away I just asked Mr.

9    Ballina about how long was Stokes going to be.  He said very

10   short, so we'll knock out Larry Stokes, and Stokes should been

11   about how long?

12         MR. BALLINA:  I don't think he's going to be very long.

13         MR. CASHIO:   I'm only going to be about 10 minutes.  I

14   might have him 15 minutes.

15         THE COURT:   Then we can finish your case before lunch.

16         MR. CASHIO:   Is Boudreaux coming?

17         MR. BALLINA:   Yes, I was just getting ready to say I

18   see Larry Stokes.  I have not seen Ken Boudreaux.  I think I

19   told Ken probably somewhere closer to noon, and his office has

20   been in communication with him and I haven't heard anything

21   since, so I can't say here right now he'll be here.

22         THE COURT:   All right.

23         MR. BALLINA:   My guess is that, you know, as we're

24   getting closer to the noon hour, he might been thinking it's

25   after lunch.

1          Go ahead, counsel.

2          MR. CASHIO:    Your Honor, I would like to proffer the

3    Daily Racing Form, Thursday December 18, 2003.  I'm just going

4    to put the middle parts in, the relevant pages, that's 1 and 2.

5          THE COURT:    Okay.

6          MR. CASHIO:    And also the Daily Racing Form from

7    October of 2004.  The same pages I'm just going to proffer the.

8    It's proffer Number 2.

9          THE COURT:    Counsel, were either of these documents

10   included in your exhibit list?

11         MR. CASHIO:    I didn't want to include them.  I just

12   wanted the witness to refer to them under Milford versus Pierce

13   and Folse versus Fakouri in order to document the information

14   contained on the earnings.

15         THE COURT:    Okay.  Well I excluded them.  I was not

16   going to let you introduce them into evidence since it was not

17   on the exhibit list, but I did not allow you to refer to it

18   because that would be hearsay evidence anyway and your client

19   certainly is not an expert, so he could not refer or make an

20   opinion based on hearsay, and I think that what is included in

21   the racing daily form would be hearsay evidence.

22         Do you want to put anything on the record, Mr. Ballina?

23         MR. BALLINA:    Yes, Your Honor.

24         My objection to the evidence was based on hearsay.

25         THE COURT:    Okay.

1          MR. CASHIO:    And my response would be that it's a

2  learned treatise of the industry.

3          THE COURT:    Okay.  Thank you.

4          All right.  The plaintiff rests.

5          While you all are up here, do you have any motions,

6  counsel for plaintiff?

7          MR. CASHIO:    No, Your Honor.

8          THE COURT:    Counsel for defendant.

9          MR. BALLINA:    I mean, plaintiff has rested.

10          MR. CASHIO:    Yes, sir.

11          MR. BALLINA:    I move for move for a directed verdict.

12          THE COURT:    Denied.

13          MR. BALLINA:    Thank you.

14          THE COURT:    We're going to go a ahead and proceed.

15          Why don't you say on the record that you rest.

16          MR. CASHIO:    In front of the jury?

17          THE COURT:    Yes, and then we'll start with his case.

18                  (EENCH CONFERENCE CONCLUDED)

19          THE COURT:    All right.  Mr. Cashio, do you have any

20  other witnesses, sir?

21          MR. CASHIO:    No, Your Honor.  The plaintiff rests.

22          THE COURT:    Mr. Ballina, call your first witness

23  please.

24          MR. BALLINA:    Mr. Blair Easton, please.

25          THE CLERK:    Raise your right hand, please.

```
 1                          BLAIR EASTON
 2          After having been first duly sworn, did testify under
 3   oath, as follows:
 4          THE CLERK:   Have a seat and state your name for the
 5   record, please.
 6          THE WITNESS:   Blair Easton.
 7          THE COURT:   All right, speak into the microphone.
 8                       DIRECT EXAMINATION
 9   BY MR. BALLINA:
10   Q.    Good morning, Mr. Easton.
11   A.    Good morning.
12   Q.    Where do you live?
13   A.    13028 Pen Brook Valley Court, St. Louis, Missouri.
14   Q.    Do you currently work for Harrah's?
15   A.    No.
16   Q.    Did you work for Harrah's at one time?
17   A.    Yes.
18   Q.    When was that?
19   A.    It was July 2002 through September of 2004.
20   Q.    And why did you leave Harrah's?
21   A.    Family relocated.
22   Q.    What was your job at Harrah's?
23   A.    I was the medical first responder on duty.
24   Q.    Can you describe to us, explain to us what a week medical
25   first responder is?
```

1  A.    My job was to handle all emergency medical situations and

2  nonemergency medical situations involving both the customers and

3  the staff on the premises.

4  Q.    Were you the only medical first responder that worked for

5  Harrah's?

6  A.    No.  No, there was I believe four at the time.  We

7  attempted to keep somebody on staff pretty much 24 hours a day.

8  Q.    When you worked for Harrah's as a medical first responder,

9  did you work for anyone else at the same time?

10 A.    Yes, I was a member of the New Orleans Fire Department, a

11 certain first responder with the fire department.

12 Q.    When you worked for Harrah's did you hold any

13 certifications or licenses?

14 A.    I'm licensed as a first responder by the State of Louisiana

15 Bureau of Emergency Medical Services, and also now as a

16 nationally registered Emergency Medical Technician licensed in

17 the State of Missouri.

18 Q.    When you worked as a medical first responder for Harrah's

19 on duty, where were you located?

20 A.    We have an office just off the casino floor, which is

21 located besides the poker room.

22 Q.    That is at the casino?

23 A.    Oh, yes, on the casino floor.

24 Q.    Do you recall an incident involving Mr. Smith?

25 A.    Yes, I do.

1   Q.   Were you working that day?

2   A.   I was.

3   Q.   Were you working that day as a medical first responder?

4   A.   That's correct.

5   Q.   How were you notified of the incident?

6   A.   Over the customer safety radio, the dispatch informed me

7   that I was requested to go to the valet.  A man had been struck

8   by a vehicle.

9   Q.   Do you recall how long it took you to get to Mr. Smith

10  after you were notified?

11  A.   I would say right around maybe three minutes.  Right around

12  three minutes.

13  Q.   Was Mr. Smith the first person that you had ever rendered

14  emergency medical attention to?

15  A.   Oh, no.  No, thousands of people have been helped.

16  Q.   When you got to Mr. Smith, what was he doing?

17  A.   He was lying on his left side.  He was on a cell phone.  He

18  was talking on a cell phone.

19  Q.   Do you recall what he was saying?

20  A.   He was saying something to the effect of they hit me with

21  my truck.  They're going to pay.  Oh, they're going to pay.

22  Something like that.

23  Q.   What did you say to Mr. Smith at that time?

24  A.   I asked him to get off the cell phone.  After I identified

25  myself, I asked him to get off the cell phone so I could help

1  him and he did not.  He continued to talk on the cell phone.

2  Q.   And what did you do?

3  A.   After, he did hang up eventually.  I started to render

4  care.

5          THE COURT:   You started to do what?

6          THE WITNESS:   Render care, treatment.

7          THE COURT:   Yes, sir.

8          THE WITNESS:   I explained to him that I needed to

9  immobilize his neck to stop any spinal injuries, at which time

10  he refused.  I continued to explain why I needed to immobilize

11  his neck, and I believe his cell phone rang again, in which he

12  answered it and continued to talk.  I then removed the cell

13  phone from him.

14                          EXAMINATION

15  BY MR. BALLINA:

16  Q.   Did you arrive at Mr. Smith by yourself?

17  A.   I arrived -- yes, I arrived by myself.  I had contacted one

18  of the other Harrah's personnel, who I believe grabbed the long

19  spine board, which is used to immobilize somebody.  I believe

20  she had taken the long spine board while I had grabbed all my

21  equipment.

22  Q.   Do you recall who that was?

23  A.   Chehalis Waugh.

24  Q.   And when you were at this point giving Mr. Smith medical

25  attention, was Ms. Waugh there?

1  A.    Yes.  Yes, she was assisting me.

2  Q.    Did you smell alcohol on Mr. Smith?

3  A.    Yes.

4  Q.    If you could, could you describe what happened next?

5  A.    Well, I had already established that his ear way was clear.

6  Patent ear way is what it's called.  He was breathing fine.  He

7  was conscious.  He was alert and orientated to where he was and

8  what was going on.

9        I finally convinced him to let me immobilize his neck to

10  stop any cervical spine damage, if there had been an injury

11  there.  He kept telling me it was his ankle and not his neck

12  that was the problem, so I proceeded to continue to check the

13  major organs that I needed to check to make sure everything was

14  all right, and then I moved down to his left leg, cut his jeans,

15  cut the leg of his jeans, checked his left femur, proceeded to

16  check his left tibia area.  I didn't see anything.  He was

17  wearing some cowboy boots that went halfway up -- I believe

18  halfway up his leg.  I had to remove the cowboy boots to

19  continue to check down to his ankle, so I removed the cowboy

20  boots, removed his sock, checked his ankle.  There was no sign

21  of any major trauma to his ankle at that time.

22  Q.    Let me ask you a question, if I could.  Did you cut Mr.

23  Smith's boot?

24  A.    Absolutely.

25  Q.    Why did you do that?

1   A.    It had to be removed.  I can't check an ankle while he's

2   still wearing his boot, and there was no other way to get it

3   off.  If had just pulled it off, I could have injured him

4   greatly by just pulling off his boot.

5   Q.    Before you got down to Mr. Smith's ankle area, and you were

6   checking his neck, did Mr. Smith curse you will in anyway?

7   A.    Constantly.

8            MR. CASHIO:    Leading, Your Honor.

9            THE COURT:    Sustained.  Rephrase your question,

10  counsel.

11                          EXAMINATION

12  BY MR. BALLINA:

13  Q.    Before you got down to Mr. Smith's ankle and you were

14  dealing with his neck, what did Mr. Smith say to you?

15  A.    Oh, I couldn't tell you what he said, but I can tell you it

16  was not pleasant and it was continuous.

17  Q.    Did an ambulance arrive?

18  A.    Yes.

19  Q.    Do you know approximately how long after you got to Mr.

20  Smith that the ambulance got there?

21  A.    I would say less than 10 minutes.

22  Q.    And do you know how long the ambulance was on the scene?

23  A.    It couldn't have been more than a couple of minutes once he

24  was packaged and put on to the gurney, loaded in the back of the

25  ambulance, they continued their assistance for a couple of

1  minutes and they left.

2  Q.   After the ambulance arrived, what did you do?

3  A.   I assisted the paramedic and the EMT basic that was on the

4  ambulance in the packaging and loading of the patient into the

5  back of the ambulance.

6           MR. BALLINA:   Thank you, sir.

7           I don't have any other questions.

8           THE COURT:   Mr. Cashio, your witness under

9  cross-examination.

10          MR. CASHIO:   Yes, Your Honor.   Thank you.

11                    CROSS-EXAMINATION

12  BY MR. CASHIO:

13  Q.   So you moved away from Harrah's.   Where do you live now?

14  A.   St. Louis, Missouri.

15  Q.   And Harrah's paid you to come down here?

16  A.   They reimbursed me for traveling expenses, yes.

17  Q.   And how much were those, do you know?

18  A.   The airfare --

19          MR. BALLINA:   Objection, irrelevant.

20          THE COURT:   Overruled.

21          MR. CASHIO:   Go ahead.

22          THE WITNESS:   I think the airfare was $1620.

23          MR. CASHIO:   Okay.

24                      EXAMINATION

25  BY MR. CASHIO:

1  Q.    And Chehalis Waugh, you talked about her, right?

2  A.    Yes.

3  Q.    Does she have medical training?

4  A.    No.

5  Q.    Isn't she Harrah's lawsuit investigator?

6  A.    She is a report writer, yes.

7  Q.    And I noticed a bit of an accent, are you Australian?

8  A.    New Zealand.

9  Q.    New Zealand, okay.  Were you having any communication

10 problems with Mr. Smith?

11 A.    If you mean he wouldn't listen to me, yes, I would say

12 that was communication problem.

13 Q.    Do you know if he could understand you?

14 A.    Absolutely.

15 Q.    You took his phone away him, is that correct?

16 A.    That is correct.

17 Q.    And you cut off his Ostrich boots?

18 A.    Yes.

19 Q.    And you didn't see any major damage.  I think you said no

20 sign of trauma to the tibia or the ankle, is that correct?

21 A.    Not at that point.

22 Q.    Okay.

23 A.    It wasn't until just right when the ambulance pulled up

24 that the fracture became obvious.

25 Q.    Did you check to see if Mr. Smith had sustained a

1  concussion?

2  A.    I'm not an X-ray machine, I can't check to see if he

3  sustained a concussion.

4  Q.    But did you ask him if he had blacked out?

5  A.    Yes, that's part of the initial assessment,

6          MR. CASHIO:    That's all that I have.    Thank you.

7          THE COURT:    Any redirect, counsel?

8          MR. BALLINA:    No, Your Honor.

9          THE COURT:    Any further need for this witness by any

10  party?

11          MR. BALLINA:    No, Your Honor.

12          THE COURT:    Mr. Cashio, any further need for this

13  witness?

14          MR. CASHIO:    No, thank you.

15          THE COURT:    Thank you.

16          You can step down.  You're relieved from your subpoena.

17  You're free to leave.

18          Ladies and gentlemen, we're going to take a five-minute

19  recess, and then you can proceed with your case, counsel.

20          THE CLERK:    All rise.

21          Court's in recess.

22              (11:45 A.M.  -    RECESS)

23          *        *        *        *        *        *        *

24              (11:50 A.M.  -    AFTER RECESS)

25                  **P-R-O-C-E-E-D-I-N-G-S**

1          THE CLERK:   All rise.

2          Court's in session.

3          THE COURT:   Before the jury's brought in, on the issue

4    of the proffer by Mr. Cashio, I'm just going to go ahead and

5    state for the record that I'm again sustaining the objection,

6    but I'm also going to add as a reason that opposing counsel

7    would not have the opportunity to cross-examine the author of

8    that article, so there would really be no way for it to be

9    reliable in my opinion, because we don't know anything about the

10   author or anything like that, and it would not be appropriate,

11   and that's what I'm basing my decision along with the fact that

12   was it hearsay.

13         All right.  Let's call in the jury, please.

14         THE MARSHAL:   All rise.

15               (THE JURY ENTERED THE COURTROOM)

16         THE COURT:   Thank you very much.

17         Please be seated.

18         Mr. Ballina, call your next witness, please.

19         MR. BALLINA:   Dr. Larry Stokes, please.

20         THE CLERK:   Please raise your right hand.

21                       LARRY STOKES

22         After having been first duly sworn, did testify under

23   oath, as follows:

24         THE CLERK:   Have a seat and state your name for the

25   record, please.

1          THE WITNESS:    My name is Larry Stokes.

2          THE COURT:    Is there a stipulation concerning Dr.

3    Stokes?

4          MR. BALLINA:    Yes, Your Honor.    The parties have

5    agreed that Dr. Stokes is an expert in the field of Vocational

6    Rehabilitation.

7          THE COURT:    Is that correct, Mr. Cashio?

8          MR. CASHIO:    I was under the impression he was a

9    vocational counselor.

10          MR. BALLINA:    Can we approach?

11          THE COURT:    Come up.

12              (BENCH CONFERENCE, AS FOLLOWS):

13          THE COURT:    Okay.    You guys were the ones that I

14    thought entered into a stipulation, but you all --

15          THE MR. CASHIO:    Right.

16          THE COURT:    -- don't have a meeting of the minds here.

17          What are you willing to stipulate to, Mr. Cashio?

18          MR. CASHIO:    Vocational counselor.    Rehabilitation is

19    an extremely wide field.    In fact, I asked Mr. Roberts about the

20    specifics of that yesterday.

21          THE COURT:    And he did make a difference between a

22    rehabilitation person and counselor.

23          Well, no, if you're going to try to tender him as an

24    expert rehab, well, then there's no stipulation, then just start

25    from scratch and let's move on, is that what you want to do?

1    MR. BALLINA:   Yes.

2    THE COURT:   So there's no stipulation as to his

3  expertise, okay.

4              (BENCH CONFERENCE CONCLUDED)

5    THE COURT:   Okay.  There's no stipulation, so go ahead

6  and proceed, Mr. Ballina.

7                   DIRECT EXAMINATION

8  BY MR. BALLINA:

9  Q.   Good morning, Dr. Stokes.

10 A.   Good morning.

11 Q.   You are a licensed vocational rehabilitation counselor, is

12 that correct.

13 A.   Yes, sir, I am.

14 Q.   Can you describe to us or tell us what that is, please?

15 A.   Sure.

16    MR. CASHIO:   Your Honor, if could interfere for a

17 second.

18    He says he's a licensed vocational rehabilitation

19 counselor, which I'm willing to stipulate to.

20    THE COURT:   So what are you trying to qualify him as

21 an expert in?

22    MR. BALLINA:   The field of vocational rehabilitation.

23    MR. CASHIO:   Counseling, that's what he --

24    THE COURT:   Try to go beyond counseling.

25    Proceed.  Let's go.

1        MR. BALLINA:   It doesn't matter.  It's the same thing.

2        What did you offer to stipulate?

3        MR. CASHIO:   As I said before, I'll stipulate he's a

4   vocational rehabilitation counselor.

5        MR. BALLINA:   Okay.  Fine.

6        THE COURT:   Let me ask you this, counsel, Mr. Cashio,

7   do you wish to ask Dr. Stokes any question.  He just said that

8   that's the same thing a vocational rehabilitation expert, and a

9   vocational rehabilitation counselor.

10        MR. CASHIO:   Okay.  As long as we -- I'll stipulate

11   that he's a vocational rehabilitation counselor, whatever that

12   includes.

13        THE COURT:   Fine.  He's qualified as an expert in the

14   field of rehabilitation counseling.

15                        EXAMINATION

16   BY MR. BALLINA:

17   Q.   What is vocational rehabilitation, Dr. Stokes?

18   A.   Vocational rehabilitation counseling is a counseling

19   speciality that works with people who become injured or ill and

20   there's an interruption in their ability to work.  We provide

21   rehabilitation evaluations counseling services, job placement,

22   job analysis, a planning assistance through education and

23   training to help people get back to the work force after an

24   accident or an injury Rhode that occurs either on the job or in

25   other ways off the job, slip and fall accidents, automobile

1    accidents, illnesses, many, many different ways where people,

2    their work experiences interrupted.

3    Q.    How long have you been in that field?

4    A.    Going on 23 years.  I started when I got out of the Navy in

5    1982.  I began working as a rehabilitation counselor assisting

6    injured workers getting back to work after injury.

7              I've continued to work in this field since that time.

8    And you asked about a license.  We started licensing --

9    Louisiana started licensing rehabilitation counselors, which is

10   a mandate by the state.  It says that if you're going to

11   practice as a rehabilitation counselor, you must have a week

12   license.  We started in 1987.  I was appointed by the Governor

13   at the time as the Chairman of the Board of Examiners.  My

14   license number is 001.  I was the first person licensed in the

15   State of Louisiana.

16             MR. CASHIO:   Your Honor, in order to save the jury

17   some time, I didn't think we were going to go through all these

18   qualifications.

19             THE COURT:   Okay.  Move on, counsel.

20                            EXAMINATION

21   BY MR. BALLINA:

22   Q.    Does vocational rehabilitation counseling include assessing

23   an individual's rehabilitation potential?

24   A.    Yes, it does, through techniques such as testing,

25   vocational testing, and through interview assessments of onsite

1   situations, return to work programs, those sorts of things.

2   Q.   Does it also include assessing an individual's

3   employability?

4   A.   Yes, including employability and past occupations, whether

5   it was the job they were doing at the time of an injury.

6   Whether or not an injury occurred on the job, the occupation

7   they handled at that time, or jobs they held in the past, or we

8   look towards rehabilitation potential in the form of other

9   alternative forms of work they may be able to go do in the labor

10   market by having transferable skills or vocational potential.

11          We also conduct labor market research jobs in the

12   field.  We actually go out and look at jobs and assess whether

13   or not the jobs are appropriate.

14   Q.   Does it also include the assessment of somebody's wage

15   earning capacity or abilities?

16   A.   Yes, wages come with jobs, and, therefore, many times we're

17   asked to determine not only what they can do but what they can

18   earn.

19   Q.   Were you retained by Harrah's in this case?

20   A.   Yes, through you.

21   Q.   Through my office?

22   A.   Right.  I had no contact with Harrah's whatsoever.  My

23   contact was only with you.

24   Q.   And were you paid for your services?

25   A.   I don't know that.  I billed for my services.  I don't know

1  if I was paid.

2  Q.   I guess I shouldn't have asked you that question.  I should

3  have asked -- do you bill for your services?

4  A.   Yes, I do.

5  Q.   Okay.  Now, would that include billing for your services

6  coming here today?

7  A.   Sure.  It's for my time to come here to appear for this

8  trial and testify.

9  Q.   Do you provide services, your services that you described

10 to us, for both the individuals like Mr. Smith, and companies

11 like my client in a lawsuit?

12 A.   Yes, sir, I'm available to both sides.  At this point in

13 time, my case load, the referrals I get working these

14 evaluations and assessments, is about to 60 to 70 percent

15 defense, which would be the company, and 30 to 40 percent

16 plaintiff at any given time.  In the last month or so, it seems

17 to have swung more towards the retention by the plaintiff's

18 side, or the injured party to almost about 50/50 at this time.

19 Q.   What were you asked to do in this case?

20 A.   I was asked to evaluate Mr. Smith with regard to

21 rehabilitation potential employability and wage earning capacity

22 following a reported accident that occurred at Harrah's.

23 Q.   Did you meet with Mr. Smith?

24 A.   I did.

25 Q.   When did you do that?

1  A.    I meet with him on July 8 of 2004, this year, for the

2  injury that was reported as occurring on December 10th, I

3  believe, 2003.  I conducted my standard method evaluation, which

4  includes an interview followed by vocational testing.  After

5  that, I took a look at the records that I had received and

6  reviewed the medical records particularly for physical

7  limitations.  What I'm looking for are the effects of an injury

8  and how that affects someone's ability to work, particularly in

9  regard to physical restrictions and capacities.

10        After that, I conducted what's called a vocational

11 analysis.  I looked at his past work experiences, his education,

12 his age, any training that he may have undergone and tried to

13 determine what skills he may have to determine through the

14 method of assessing his rehabilitation potential what he might

15 be able to do.

16        The first question we try to answer is can he go back

17 and do the job he was doing at the time of the injury?  The

18 second question is can he go back and do anything he's done in

19 past?  And then the third question would be, of course, if the

20 answer to those questions is no, then we go onto alternative

21 forms of work to determine any alternative forms of employment

22 and earning capacity, so that's what I did.

23 Q.    In connection with your assessment, you reviewed Dr.

24 Hamsa's records, correct?

25 A.    Yes.

Q.    In those records, Dr. Hamsa did not preclude Mr. Smith from
working within sedentary to light level of physical strength
demands, did he?

A.    No, he did not.

Q.    Were you provided were them and did you review earnings
records?

A.    Yes.

Q.    What records were those?

A.    Well, the records I had were social security records from
2000 and 2001.  The records from 2000, the year 2000, indicated
that he had earned approximately $5,164.02.

        The earnings from 2001 reported by the social security
records indicated that he earned $11,309.75.

        Ihad IRS records, Internal Revenue Service Records
which indicated no federal tax records for the years 2000, 2001,
and 2002.  Those were the only records I had at the time.

Q.    And my understanding is that you conducted a vocational
test of Mr. Smith?

A.    I did.  I conducted, after the interview and getting the
background which included his age, which he was 25 years of age,
had a ninth grade education, could read, write and handle money
in his report.  Did not have a driver's license, which was of
concern to me.  He had a Kentucky driver's license which was
expired.

        One of the things we have access is not only whether or

1    not someone can work, or whether or not they can get there.  So

2    his license expired as he reported me approximately May 12th,

3    2004, remembering that I met with him or July 8, 2004.

4    Q.    As well -- I'm sorry.  Did I cut you off, doctor?

5    A.    Well, I was just going to go on and give more of the

6    background of what I was looking for.

7          The work history indicated working within the horse

8    race industry.  He was a stable attendant for a year a

9    year-and-a-half or so, part times on weekends.  Horse exerciser

10    for about a year.  A groomer for about three years.  He had

11    managed a stable in Ocola, Florida for some period of time.  He

12    wasn't really sure how long that was.  He had worked as a truck

13    driver for a couple of months transporting horses, and up to

14    about six months transporting horses as a truck driver.

15          At the time of the injury he indicated he was a horse

16    exerciser and assistant trainer working four to 12 horses per

17    day, approximately 20 minutes each earning about $600 per week.

18          He said he had a second job hauling shavings for stalls

19    for his father.  He earned about $100 per load and shared that

20    with another person who had helped him, which would he earn

21    about $50 per load.

22          He stated that in 1999 he started working full time.

23    Before that, he worked about 10 months per year earning about

24    $125 to $300 per week.

25          He stated that he worked about seven days per week,

1    four to eight hours per day during racing season, which he

2    indicated was late March.  Beginning Thanksgiving through late

3    March.

4            He also reported that he had earned approximately 40 to

5    $50,000 in the year 2002, and 2003, but I didn't have any

6    records to that effect.

7    Q.    Let me get you to go ahead up to when you conducted

8    vocational tests of Mr. Smith.  Explain what those are and what

9    the results of those were?

10   A.    Right.

11   Q.    What results of those vocational tests were significant to

12   what in making your assessment?

13   A.    Right.  And I know that was the question that you about

14   asked me about, and I said all the other stuff, but all the

15   other stuff leads to how I choose testing and whether or not I

16   do testing.

17           I found that testing was appropriate.  I was laying a

18   foundation for the testing.

19           I did the testing, found out through the Kaufman Brief

20   Intelligence Test, he scored in the voluntary -- in the -- hold

21   on one second, I'm sorry.  I want to check some scores.

22           Okay.  In vocabulary he scored a total standard score

23   of 86, which was below average in the matrices, which is -- I'm

24   looking at Intelligence here.  Reasoning Ability, that sort of

25   thing.  He scored a score of 82, which was in the below average

1  range, and composite score of 82, which is in the below average

2  range.

3       On the Kaufman Functional Academic Skills Test, where

4  I'm testing him in terms of reading and arithmetic according to

5  his grade attained.  He scored in arithmetic a standard score of

6  93, which was in the average range.

7       Reading, a standard score of 88, which was in the below

8  average range, and a composite score of 89, which was in the

9  below average range.

10      I also gave him a Vocational Preference Inventory where

11  he scored highest on the infrequency scale, which means that he

12  either has a low aspiration or a very narrow range of interests,

13  which is not unusual.

14      I didn't think the intelligence testing was unusual,

15  and I also didn't think that the Academic Skills Test was

16  unusual.  In other words, given his educational attainment and

17  the work experiences that he's had, I didn't find that these

18  were unusual scores.

19  Q.   Doctor, let me interrupt you right there, we're talking

20  about education.  Based upon the testing that you did of

21  academics and education, you didn't find any learning disability

22  of Mr. Smith, did you?

23  A.   No, sir.

24  Q.   You didn't find anything that would prevent Mr. Smith from

25  obtaining a GED, did you?

1    A.    No, sir.

2    Q.    Following your vocational testing, did you find that Mr.

3    Smith had transferrable skills?

4    A.    I did.

5    Q.    Can you explain what transferrable skills are?

6    A.    Skills are abilities that are demonstrated through work

7    experiences and/or training that we can take to another job

8    basically, and I did give him two other tests of work

9    orientation and value survey, and a job search attitude

10   inventory, and basically on that he scored an average in both of

11   those areas.  His values are in supervisor relations and

12   earnings and benefits, whereas in the job search he's pretty

13   much self directed.  In other words, it shows me that he's going

14   to be able to go out and get his own job.  He really doesn't

15   need a lot of help doing that or won't need a lot of help doing

16   that according to the test scores.

17        According to the Transferrable Skills Analysis, he'd

18   worked in medium to heavy jobs and non-skilled to semiskilled

19   capacity, meaning that he is -- he's only worked primarily in

20   the horse racing industry, so his skills are fairly narrow in

21   the sense that the skills that he's demonstrated, most of them,

22   are related to horse racing and horse training, those sorts of

23   things.

24        He did some truck driving and delivery which gives me

25   the information that he can drive and transport and collect

1    receipts, those sorts of things.

2          Now, I took a look at this aptitude.  Those are his

3    abilities to learn, and found that he had shown above average

4    aptitude in special perception and average aptitude in general

5    intelligence, form perception, clerical ability, motor

6    coordination, manual dexterity and eye/hand coordination.

7          All workers work in relationship to information, people

8    and objects, and in those regards he can compare, copy, compute,

9    compile information.   He can take instructions, help others.

10   He can handle feed, off bear, tend to manipulate, drive, and

11   operate regard to things.

12         His temperaments or personal traits indicated that he

13   could make judgments and perform a variety of duties.  He can

14   communicate information.  He can deal with people.  He can

15   perform routine or organized work with others, mostly that is

16   tangible and measurable outcomes.

17         He'd worked in the fields of accommodating,

18   transporting, and horse training.  So given that, that gives me

19   the information to discuss further what his rehabilitation

20   potential would be.

21   Q.   Based upon your meeting with Mr. Smith, the vocational test

22   results, the records you reviewed, did you find that Mr. Smith

23   maybe capable of returning to work in alternate jobs requiring

24   sedentary to light level of physical strength demands?

25   A.   Yes.  He was still in active medical treatment at the time.

1    Dr. Hamsa had indicated in July that he was not able to

2 perform his prior occupation at that time, July 2nd of 2004, so

3 at the time that I met him he was not able to perform that job.

4    Dr. Olson didn't comment on physical ability and

5 ability to work in his reports that I had.  It was reasonable I

6 felt that he was not currently employable in his prior work

7 activity, that he may be able to do other alternative jobs that

8 are less physically demanding, primarily at the sedentary to

9 light levels.  So I'm looked then to alternate work knowing full

10 well that he had not reached the point of completely getting to

11 a point of maximum medical improvement.  He was still improving,

12 and I followed that up later to find out that he was improving

13 as of August of 2004.  He was still improving, so that we don't

14 know what the final outcome is going to be physically, but on

15 the assumptions that he could do sedentary to light, I outlined

16 alternative forms of work, and the wages associated with those

17 jobs and the number of openings expected.

18 Q.   Did you conduct any research to determine if there are

19 alternate jobs available to Mr. Smith?

20 A.   Yes.  What I did was I took a look, because he was staying

21 in Metairie at the time, the New Orleans area for labor market,

22 and he had also lived in Hot Springs.  I actually did research

23 in both areas and found jobs such as cashier or parimutuel clerk

24 available, gate guard, like a security guard at a gate checking

25 people in and out of yards.  Hand packaging, which is more bench

1  work, table work.  Bench assembly, which is putting together

2  things with his hands.  Retail sales, which is light.  Kitchen

3  prep work, and inventory selection work.

4         Those jobs ranged in pay given the location from $6.50

5  per hour to $11.91 per hour.  The difference in Hot Springs,

6  Arkansas and New Orleans in the same jobs -- what I did was I

7  used the same jobs to get the comparative wages -- Hot Springs,

8  Arkansas for those jobs the wages were $7.32 to $11.87.  In New

9  Orleans the wages were $6.55 to $11.91 per hour.  So, New

10 Orleans earnings were a  little bit lower on the low end but a

11 little bit higher on the high end as well, and I found them to

12 be comparative.

13 Q.  In your opinion would those earnings increase with time and

14 experience?

15 A.  Yes, these were average earnings.  Average earnings

16 indicates that some people earn a little bit less, some people

17 earn more, therefore he would the capacity to earn more with

18 time and experience on the job since these are jobs he would be

19 entering.

20 Q.  Assume that Dr. Hamsa testified here in trial the other day

21 that Mr. Smith is physically capable of performing a job

22 requiring him to stand for about a half a day.  Assuming that,

23 how, if anyway, does that affect your opinions that you just

24 testified to?

25 A.  Well, what it would say to me is that he can stand a little

1    more than I thought he could at the time that I did the

2    assessment, but maybe not as much as some of these jobs might

3    require.

4        For example, a retail sales person might have to stand

5    more than four hours per day, so therefore that job may be

6    adjusted.  It's not saying that he couldn't do some retail sales

7    persons jobs but not all of them.

8    Q.    I don't mean to interrupt you.  I'm sorry.  But could he do

9    it a part time basis?

10   A.    Sure.  In fact, even more than part time.  Part time is

11   usually considered about 20 hours per week, whereas based on

12   that, if he can stand four hours per day and sit for some

13   amount, then certainly he can do more than part time?

14   Q.    I apologize for interrupting you.  Do you have anything

15   further to say on that?

16   A.    No, sir.

17   Q.    Thank you.  You were here yesterday, weren't you when Bobby

18   Roberts testified, correct?

19   A.    Yes, I was.

20   Q.    Mr. Roberts is a Vocational Evaluation Specialist?

21   A.    Yes.

22   Q.    Can you explain to us the difference between what you do

23   and what Mr. Roberts does?

24   A.    Yes.  Basically, a vocational evaluation specialist gives

25   tests to find out what kinds of jobs people can be qualified for

1  given the information they have.  They're limited to giving

2  tests and interpreting tests.

3          A rehabilitation counselor can do those same things.

4  He can also take that farther in terms of determining alterative

5  work, conducting labor market research.  We go out and actually

6  analyze jobs on site.  We do job placement.  We look for jobs.

7  We find jobs.  We help people  get jobs.  We counsel them

8  through the process.  We actually go out and do the labor market

9  research to conduct survey research regarding wage earning

10 capacity, so we take it quite a bit farther than the test.  The

11 tests is a kind of a beginning whereas rehabilitation counseling

12 is taking them entirely through the process.

13 Q.   And after you met with Mr. Smith and conducted these tests

14 and what not, did you speak with Mr. Smith and talk to him about

15 his situation and make recommendations?

16 A.   Yes.  Sure.  For almost two hours.

17 Q.   You make recommendations or suggestions to him?

18 A.   No, because my capacity wasn't as his rehabilitation

19 counselor.  The only suggestions I made to him when we met was

20 that there were two areas that were of concern to me at the time

21 primarily.  The driver's license, which the only recommendation

22 I gave him was, you know, it would be helpful if he had a

23 driver's license that was valid so he that could get to work,

24 and the other was about the GED.  I didn't recommend that he go

25 back because I wasn't his counselor, it wasn't my role, but that

1  I did inform him that a GED would be helpful, getting that high

2  school equivalency would be helpful in getting access to jobs in

3  the labor market.

4  Q.    Having heard Mr. Roberts' testimony yesterday, do you

5  disagree with Mr. Roberts' assessment regarding the probability

6  of Mr. Smith returning to his previous work?

7  A.    I do.  One of the things I disagreed with was his

8  assessment of horse trainer being a heavy job.  I have the

9  printed DOT here that shows it's a medium job.  We don't know

10  that Mr. Smith will be able to do medium work, but we don't know

11  that he won't either.  We're not to that point yet, so you have

12  to make certain assumptions in these cases and hopefully those

13  assumptions will be correct, so I disagree with his assessment

14  that a horse trainer is heavy.  It's actually medium according

15  to the Department of Labor.

16        The other thing I disagree with on the five chances out

17  of a hundred, I don't think there's any basis for that

18  assessment at all that he would have five chances out of a

19  hundred to return to work in management capacity.  I don't think

20  that his testing would allow that kind of a prediction, so I

21  disagree with that.

22  Q.    Regarding Mr. Smith's return to his previous work, have you

23  conducted any research or analyses relative to people returning

24  -- that is, injured people returning back to their previous

25  employment after an injury?

1  A.   Yes, I have.

2  Q.   And what has that research shown?

3  A.   Well, in summary there's a lot of information, but in

4  summary I found that about in terms of physical injury

5  regardless of how it happens involved in litigation in the

6  research that I've conducted it shows that half the people --

7         MR CASHIO:   Objection, Your Honor.

8         Can we approach bench?

9         THE COURT:   Yes.

10          (BENCH CONFERENCE, AS FOLLOWS):

11    MR. CASHIO:  I think it's completely prejudicial for

12  him to make a comment on how litigation affects a man's job

13  analysis.

14         THE COURT:   Was this even included in his report?

15         MR. CASHIO:   No.

16         MR. BALLINA:   It's part of -- I'm sorry, Judge.

17  Excuse me.

18        I don't think that the reference to the litigation

19  analysis is prejudicial.  It's part of the research that he's

20  done as part of his qualifications.

21         THE COURT:   Was this included in his report?

22         MR. CASHIO:   No, not this specific information.

23         THE COURT:   Then I'm going to sustain the objection.

24         MR. BALLINA:   All right.

25         MR. CASHIO:   Please, can you admonish the witness the

 1  last time we did that --

 2        THE COURT:   Yes.

 3              (BENCH CONFERENCE CONCLUDED)

 4        THE COURT:   Counsel, under rules of evidence what can

 5  be elicited under direct examination by an expert is limited to

 6  what is included in his report.  All right.

 7        Thank you.

 8        THE WITNESS:   I'm sorry, were you talking to me?

 9        THE COURT:   Well, I was talking to counsel.  But under

10  the rules of evidence you are limited to what your testimony is

11  under direct examination as to what you stated in your expert

12  report.  All right, sir.

13                        EXAMINATION

14  BY MR. BALLINA:

15  Q.   If Dr. Hamsa testified that he believes Mr. Smith in the

16  future will be physically able to return to some form of work

17  with horses on perhaps a part time basis, would you disagree

18  with that or would that be inconsistent with any of your testing

19  and your assessment?

20  A.   No, sir, it wouldn't be.  I would expect that given the

21  nature of his career pattern, it's likely that he would stay in

22  this pattern.

23        MR. BALLINA:   Thank you, doctor.

24        I don't have any other questions.

25        Answer Mr. Cashio.

1          THE COURT:

2          Thank you.

3          Mr. Cashio, your witness under cross-examination.

4          MR. CASHIO:    Thank you.

5          Thank you, Judge.

6                          CROSS-EXAMINATION

7   BY MR. CASHIO:

8   Q.   Good afternoon, doctor?

9   A.   Good afternoon.

10  Q.   Let's see, what is your charge to Mr. Ballina and Harrah's

11  per hour for being here in court?

12          MR. BALLINA:    Your Honor, objection.

13          THE COURT:    Overruled.

14          THE WITNESS:    I charge $110 per hour for professional

15  services.

16                          EXAMINATION

17  BY MR. CASHIO:

18  Q.   In court?

19  A.   Yes, sir.  It doesn't change whether it's in court or I'm

20  doing an evaluation, my charge is the same.

21  Q.   And how many hours have you put into this case so far, you

22  know?

23  A.   I don't know.

24  Q.   Would it be over 10?

25  A.   I'm sure.

1    Q.    Over 20?

2    A.    Probably, because of the research done in Arkansas and in

3    New Orleans, yes, I would expect that it would it be.

4    Q.    Thank you.  Now, let's talk about a couple of things.  At

5    the time you interviewed Mr. Smith, did you find out where he

6    was living?

7    A.    He was staying in -- he told me that his address was on

8    Britt Lane in Hot Springs, Arkansas, but that he had been

9    staying in New Orleans for a couple of weeks.

10    Q.    Okay.  Isn't it true that with that information you put in

11    your report "Mr. Smith's permanent place of residence was not

12    clear during our interview?"?

13    A.    Right, because he moved around.  He traveled with the horse

14    raising industry.  He lived in Kentucky.  He lived in Louisiana.

15    He lived in Arkansas.  He went to other places, so he gave me an

16    address but it wasn't clear to me, that's why I recommended

17    doing research in both New Orleans and in Arkansas, and many

18    times when I have cases like this I do that, I recommend that.

19    Q.    But you said it wasn't clear.  Yet he gave you an address

20    in Hot Springs and said he was only staying here for a couple of

21    weeks, is that right?

22    A.    Right.

23    Q.    Okay.  Are you familiar with the horse industry?

24    A.    Somewhat.  I mean, not in anyway that I've been involved in

25    it.

1    Q.    Tell me what a trainer does that is a medium skill rather

2    than a medium to heavy or heavy?

3    A.    The DOT definition of a horse trainer, and the Department

4    of Labor analyzes jobs to determine the physical demands is a

5    general definition of horse trainer, and I can read the entire

6    definition for you, but the parts that are appropriate for Mr.

7    Smith include "May train horses for racing utilizing knowledge

8    of training methods to plan training according to peculiarities

9    of each horse and instructs the jockey on how to handle a

10   specific horse during race and maybe designated race horse

11   trainer may train horses or other equines," and it goes on.

12   "May arrange for a meeting of stallions and mares and assist

13   mares during foaling.  May train horses as independent operators

14   and advise owners on purchase of horses".

15   Q.    Okay.  Do you know how you assist mares during foaling?

16   A.    Yes.

17   Q.    Tell the jury what you do there.

18   A.    Well, you help the mare give birth.

19   Q.    And how do you do that?

20   A.    It depends on what's needed.  Sometimes they do it on

21   their own and I'm in no way going to him sit here and pretend to

22   be an expert in horse birth.  But my understanding in having

23   horses as well, you assist them by -- sometimes they do it on

24   their own.  Sometimes you have to go in and get the foal?

25   Q.    When you go in and get the foal, the mare may be kicking,

1  is that correct?

2  A.   Sure.

3  Q.   And --

4       MR. BALLINA:   Your Honor, if I can enter an objection,

5  now after this witness has been presented as an expert in horses

6  or horse case racing, but in rehabilitation counseling.

7       THE COURT:   Overruled.  Go ahead.

8                           EXAMINATION

9  BY MR. CASHIO:

10 Q.   Okay.  Now getting to horse training on the racetrack.

11 Have you ever been out to the Fair Grounds in the morning hours

12 when the horses are working out?

13 A.   No.

14 Q.   Did you know whether or not trainers ride horses on the

15 racetrack during workout hours?

16 A.   I don't have that information.  I didn't conduct an

17 analysis of that.  What I was saying was that I disagree with

18 the Dictionary of Occupational Titles definition.  Mr. Roberts

19 said it was heavy to very heavy, and some of it may be, but the

20 definition is actually medium.

21 Q.   And did you know that Mr. Roberts had been around races

22 horses and horses for about 30 years.  Do you remember when he

23 said that?

24 A.   I know he said that he had some horses in his stall in St.

25 Charles Parish.  I don't believe he said anything about having

1    race horses for 30 years.

2    Q.    But been around horses and stalls, etcetera?

3    A.    Being around the horse doesn't necessarily make you an

4    expert on the horse racing industry, I don't think.

5    Q.    Do you know what mucking out a stall means?

6    A.    Yes.

7    Q.    What is that?

8    A.    Cleaning it out.  Changing the stall.  Taking out the old

9    and putting in the new.  Cleaning it out.

10   Q.    What type of instrument do you use to do that with?

11   A.    Usually a hay rake.

12   Q.    A hay rake?

13   A.    Right.

14   Q.    So what are you saying, you take the rake and do what with

15   it?

16   A.    No, it's more like a shovel.  A hay rake is more like a

17   shovel, but it's tongs.  Have I ever done it, yes.  I've owned

18   horses myself.

19   Q.    Have you ever heard of a pitchfork being used for that?

20   A.    Sure.

21   Q.    So that's --

22   A.    A hay rake and a pitchfork are the same thing in my mind.

23   Q.    Mucking out stalls, would you consider that a medium job?

24   A.    No, I would think that it would be heavy.

25   Q.    Okay.  Are you familiar with the activities and

1  propensities of two-year old thoroughbreds?

2  A.    In what way, activities and propensities?

3  Q.    In other words, do you know what walking a two-year old

4  means?

5  A.    Yes.

6  Q.    Okay.  Well, tell the jury what it is.

7  A.    Exercise, walking, cool down, hot walking.

8  Q.    So when you're walking a two-year old, where do you usually

9  walk that horse, if you're at the racetrack?

10  A.    From what I've observed -- I haven't done this.  I'm not an

11  expert in this field, but from what I've observed, if you're

12  willing to let me do that, in a hot walking ring.

13  Q.    It's in a ring?

14  A.    Well, some of them are in a ring that I've seen.

15  Q.    Are you sure that they're not done in the barns themselves?

16  A.    Well, I don't know.  It could vary, I'm sure, but, you

17  know, you're getting way beyond what I know about horse racing.

18  Q.    Okay.  Right.  How about picking up horses legs and

19  checking for physical problems and assisting with blacksmith

20  work while the blacksmith is doing that, are you familiar with

21  that?

22  A.    Yes.

23  Q.    Does a trainer do that?

24  A.    I'm sure they can.  I'm sure not all of them do.  Some of

25  them do.

1  Q.    And what would you classify that as?

2  A.    Well, you're not actually picking up the leg.  You're

3  manipulating the leg so that the horse raises the leg, but, you

4  know, and it could be heavy.

5  Q.    Are you familiar with the dangerous natures of

6  thoroughbreds, especially young ones who can actually kill you

7  when they kick?

8  A.    Yes.

9  Q.    And do you have to be nimble on your feet usually to work

10  around thoroughbreds?

11  A.    Yes.

12  Q.    Now, I saw you had jobs in New Orleans and Hot Springs.

13  Let's assume that Mr. Smith lives in Hot Springs and that's his

14  domicile, okay?

15  A.    Yes, sir.

16  Q.    Do you know how many people are in Hot Springs?

17  A.    Not offhand, no, sir.

18  Q.    Now, the first job you assigned to him at $7.32 an hour is

19  a cashier parimutuel clerk.  Can you tell us what that is?

20  A.    They work at the window at the racetrack taking bets and

21  paying out tickets.

22  Q.    Okay.  And have you ever made a wager with a parimutuel

23  clerk.

24  A.    Yes, rarely.  I've only been to -- I haven't done that very

25  much, but, yes.

1  Q.   If you give -- if you ask a parimutuel clerk to give you a

2  $16 exacta box on two horses, how much money would that be?

3  A.   I don't know.

4        MR. BALLINA:   Your Honor, let me enter an objection.

5  I think don't this witness has been qualified in connection with

6  his expertise has to have done or engaged in everyone of these

7  individual things.

8        THE COURT:   I understand.

9        Overruled.  Go ahead.

10                        EXAMINATION

11 BY MR. CASHIO:

12 Q.   If I give you a $50 bill and ordered a $16 exacta box on

13 two horses, how much money am I supposed to get in return?

14 A.   I have no idea.

15 Q.   And does that job require some pretty good math skills?

16 A.   It requires money handling skills.  My understanding of the

17 parimutuel clerk job though is that they have a cash register.

18 They have a computer that does that for them.  They put it in.

19 They put the numbers in.  So I don't know I don't think it takes

20 any more math than Mr. Smith has for counting money.

21 Q.   And did you hear Mr. Roberts testify that his math skills

22 were on the fourth grade level?

23 A.   On one test, yes, but overall on the eighth grade level.

24 And the cashier position in the labor market, typically the

25 benchmark is sixth grade level?

1    Q.    And isn't it true that the cashiers, the parimutuel clerk,

2    cashiers have to stand up all day?

3    A.    No, it's not true.

4    Q.    You've seen them sitting down?

5    A.    Yes, they have stools.  In fact, I have a job for a

6    parimutuel clerk in Arkansas seated, less than 10 pounds of

7    lifting.

8    Q.    Let's talk about a parimutuel clerk here in New Orleans.

9    Have you ever been to the off-track betting falicities?

10   A.    No.

11   Q.    So you wouldn't know if they sit down or standup, right?

12   A.    Not with any certainty.  I have had clients before who have

13   done that job, but I don't recall exactly how they described

14   that.

15   Q.    Do you know the name of the off-track betting facilities

16   here?

17   A.    I don't remember.

18   Q.    If I would tell you it was the finish line?

19   A.    Yeah, right.

20   Q.    Is that right?

21   A.    Yeah, I recognize that.

22   Q.    Also the retail sales person you had listed for him, he

23   can't really be a salesperson who can standup for eight hours a

24   day, right?

25   A.    We don't know that yet.  What I said was that I assume

1  sedentary to light work, because we didn't have a point of

2  maximum medical recovery and improvement, and we didn't have

3  specific physical limitations outlined by Dr. Hamsa or Dr.

4  Olson, and so assuming that he could do that, and as I said,

5  under examination Mr. Ballina, that if he could not stand that

6  amount, that I would adjust those numbers and not assume that he

7  could do that full time.

8  Q.   Okay.   Mr. Roberts stated that Shaun Smith's chances of

9  going back to work are five out of a hundred.   You disagree with

10 that.   What is your prediction percentage of him going back to

11 work?

12 A.   I don't think you can predict with any specificity any

13 percentage of number about him going back to work.   What we can

14 assess is his age, his education, his skills, his test scores.

15 We can look at alternative jobs and we can research if jobs are

16 out there that match the assumed or known physical capacities,

17 and I found them.

18 Q.   The cashier parimutuel clerk job that you found him in Hot

19 Springs, Arkansas, where is that located?

20 A.   It's at Oak Lawn racetrack in Hot Springs, Parimutuel

21 Clerk.   It pays $7.32 per hour, and it's sedentary.   Five to 10

22 pounds of lifting at a maxmium and sitting.

23 Q.   And that's the job I was questioning you about that you

24 said he could do earlier right, with the mathematics and

25 everything?

A.    Yes.

Q.    Do you know how many days a year Oak Lawn Park is opened?

A.    No.  Most of the racetracks I understand to be seasonable, but I don't know specifically.

        Now, the notes do indicate may be considered for full time year round position based on experience and performance if he gets on the job, so I don't know the days that they're open but the notes do say "Would consider for full time year round employment".

Q.    Do you know that Oak Lawn Park was only opened only four months a year?

A.    Well, I don't know why they would say they would consider him for full time year round then.  I don't know that.

Q.    But you didn't talk to them, right?

A.    No, one of job developers did, because I have job developers that help me contact employers because we have to do a lot of research in contacting employers everyday.

Q.    I thought you said you went out on the sites and found him the job?

A.    I said I do.  I didn't go Arkansas in this case.

Q.    And you also said cashier parimutuel clerk here.  You didn't go to any of the finish lines, did you?

A.    No, sir, I didn't.

        MR. CASHIO:    That's all that I have.

        Thank you.

1        THE COURT:    Redirect counsel.

2                    REDIRECT EXAMINATION

3    BY MR. BALLINA:

4    Q.    Dr. Stokes, the standards of your profession require that

5    you have personally done every job that you may believe that

6    somebody is capable of doing?

7    A.    That would be impossible.   There are over 20,000 types of

8    occupations in the United Sates, it would been impossible.   My

9    standards require me to test the skills and abilities of

10   someone.   To research and try to determine whether or not they

11   can do a job, and that's what I did.

12   Q.    And in doing so you can rely on information provided by the

13   Department of Labor as you made reference, the DOT?

14   A.    The DOT, which is the Dictionary of Occupational Titles,

15   it's a book about this thick with 20,000 titles and definitions

16   of the jobs in them that's conducted by onsite research from

17   researchers around the country.   It's a starting point.   It's a

18   tool, and it's not perfect.   I find that there's differences.

19   For example, a cashier.   Let's even say a parimutuel clerk

20   cashier.   The DOT may define it one way in its definition, but

21   if you look at different employers, the job can actually be

22   performed slightly differently, so we have to take that into

23   consideration, and that's why we contact employers to find out

24   what their requirements are.

25              It's also standard in my field to have researchers who

1  are under my direct control and supervision to contact employers

2  for me to prescreen these jobs because we contact a lot of

3  employers, and so there's no way that I could contact all of

4  them myself.

5  Q.    And that's what you did in Mr. Smith's case?

6  A.    Exactly.

7          MR. BALLINA:    Thank you, sir.

8          THE COURT:    Thank you, Dr. Stokes.    You may step down.

9  You're excused.

10         We're going to take our lunch break now.    Let's resume

11  at 1:15, and again I remind you not to discuss the testimony

12  with anybody.    Is hat going to give you all enough time.

13         MARLEY M. MARTEN (JUROR NO. 4):    No.

14         THE COURT:    1:30?

15         MARLEY M. MARTEN (JUROR NO. 4):    Yes, sir.

16         THE COURT:    We're going to try to conclude this for you

17  all today.    1:30.  Be back here at 1:30.

18         THE MARSHAL:    The jury follow me.

19         THE CLERK:    All rise.

20              (12:25 P.M  -   LUNCHEON RECESS)

21      *       *       *       *       *       *       *

22              (1:30 P.M.  -   AFTER RECESS)

23                  **P-R-O-C-E-E-D-I-N-G**

24              (COURT CALLED TO ORDER)

25         THE CLERK:    All rise.

1          Court's in session.

2          THE COURT:    Call in the jury, please.

3          THE MARSHAL:    All rise.

4               (THE JURY ENTERED THE COURTROOM)

5          THE COURT:    Thank you.

6          Please be seated.

7          Mr. Ballina, call your next witness, please.

8          MR. BALLINA:    Dr. Kenneth Boudreaux, please.

9          THE CLERK:    Your Honor, I believe that the parties

10 have entered into a stipulation that Dr. Boudreaux is an expert

11 in the field of Forensic Economics.

12          THE COURT:    Is that correct, Mr. Cashio?

13          MR. CASHIO:    Yes, Your Honor.

14          THE COURT:    Thank you.

15          All right.  Swear in the witness, please.

16                    DR. KENNETH J. BOUDREAUX

17          After having been first duly sworn did testify under

18 oath, as follows:

19          THE CLERK:    Have a seat, and state your name for the

20 record, please.

21                    DIRECT EXAMINATION

22 BY MR. BALLINA:

23 Q.    Good afternoon, Dr. Boudreaux.

24 A.    I have to state my name for the record.

25 Q.    Yes, I'm sorry, I'm a little jumpy.

1  A.    Kenneth J. Boudreaux.

2  Q.    How long have you been in the field of Forensic Economics,

3  doctor?

4  A.    I've been an economist since I joined the faculty at Tulane

5  in 1970, so it's about 35 years.  I have been doing litigation

6  oriented economics for about 29 years now.

7  Q.    Can you explain what Forensic Economics is to us, please?

8  A.    Well, in matters like this, what an economist does is

9  calculates economic loss.  Essentially, if there's an event

10 that's alleged to have caused a person to be able earn less than

11 they would have otherwise earned, we do a calculation of

12 essentially what their past loss is up to the date of the trial

13 and then something called a present value of a future loss.

14 Basically, how much money they would have to invest in a safe

15 investment so that the investment would makeup for their losses

16 from now on.

17         THE COURT:   Raise your microphone, please.

18         THE WITNESS:  I'm sorry.

19         THE COURT:   Thank you.

20                         EXAMINATION

21 BY MR. BALLINA:

22 Q.    Doctor, do you provide these services both to individuals

23 such as Mr. Smith, who has been injured as well as to my client

24 Harrah's who are defendants in a lawsuit?

25 A.    I do.

1  Q.   And, in fact, you were hired by me on behalf of my client

2  in connection with this matter, correct?

3  A.   Correct.

4  Q.   And you're charging for your services that you've rendered

5  and for your appearance today, correct?

6  A.   I am.

7  Q.   What were you specifically asked to do?

8  A.   I was asked to calculate economic losses that might have

9  been sustained by Mr. Smith due to an event that happened on

10  December the 10th the year 2003, and essentially to do a

11  calculation of the type I've described.  In order to do that,

12  I've got to estimate three or four things which I've done and

13  done calculations.

14  Q.   In connection with your calculations and opinions relative

15  to Mr. Smith's economic loss, what records or documents were you

16  provided that you reviewed that you believe to be significant to

17  you to render that opinion?

18  A.   I was provided social security earnings records as they

19  existed for Mr. Smith, and I have information that covers the

20  years 2000, and 2001.  That was what the social security records

21  covered.

22       In addition to that, there was one month's worth of

23  payroll records that I had.  That's the extent of the

24  information about earnings, documentation of earnings that I had

25  at the time of my analysis.

1  Q.    Weren't you also provided copies of 2002 and 2003 tax

2  returns that were signed and mailed last Friday?

3  A.    I was provided those after I did my analysis and report,

4  but, yes I was provided income tax returns.  The copies I have

5  aren't signed, but it's stamped copy for the years 2002 and

6  2003, they are -- on the date it's August 3rd, 2004.

7  Q.    Do you consider those tax returns to be valid documentation

8  for the purposes of what you do as a Forensic Economist?

9  A.    They don't, as documents, meet the standards that the field

10 of economics in my view would apply as documentation that we can

11 adopt without hesitation when we're asked to estimate a person's

12 capability of earning income.  In other words, there's a

13 hierarchy of things we use.  At the top of the list is income

14 tax returns, but those income tax returns are filed in the

15 normal course of earning and paying taxes.

16         Next to that is social security records below that, and

17 below that is payroll records of the type that I've mentioned.

18         These tax returns, having been filed substantially

19 after the earnings that they allegedly portray, and, of course,

20 after the institution of the litigation, is not something that

21 an economist can rely on as part of our normal documentation

22 basis.

23 Q.    That is, you as an economist, do not find tax returns that

24 created and mailed after the institution of litigation to be

25 valid for your rendering an opinion and making calculations as

1  to a person's economic loss?

2  A.    Right.   And just to explain that very briefly.   My decision

3  to adopt these, and say I think these are valid or for me to

4  reject them, and say they're invalid is not within my expertise

5  as an economist.   I'm not a private detective or an investigator

6  or someone that can go behind a document like this and say

7  whether it's accurate or inaccurate.   What I can do is if the

8  income tax return, for example, were filed in 2001 or 2002 or

9  even by the regular filing times in 2004, or 2004, well, then

10  fine, but they weren't, and so consequently given that, there's

11  no way I can give you an opinion based on these as a typical

12  document that I could use.

13  Q.    Were you also provided with copies of various checks

14  purportedly written by Mr. Smith's father payable to Mr. Smith

15  as well to other third parties, and payable to cash and also be

16  NSF checks?

17  A.    I was.

18  Q.    Is that documentation, or do you consider that

19  documentation valid within the standards of your profession for

20  the purposes of you rendering an opinion and making calculations

21  as to someone's economic loss?

22  A.    No, essentially partially for the same reason that I

23  described before, because there's no documentation surrounding

24  these that indicates that these were earned in the normal course

25  of a peron's work.   The checks are made, at least some of them,

1   to Mr. Smith by either his father and mother directly or by

2   someone called Kenny Smith Racing Stables, but there's no

3   indication on any of the checks what they were for other than

4   the amounts that were there.  And again, in order for me to take

5   a position with respect to having an opinion about these, I

6   would have to be able to sit here and say I've investigated this

7   and decided they're either valid or invalid and I can't do that,

8   that's not within my field.

9   Q.    But what can you do is you don't consider them valid within

10  the standards of your profession for rendering an opinion and

11  making calculations regarding someone's economic loss?

12  A.    Correct.  They are not the type of information that

13  economists could use to estimate what, for example, on an annual

14  ability to earn income on Mr. Smith's part.

15  Q.    Based upon the valid documentation within the standards of

16  your profession that you were you provided, did you make

17  calculations regarding Mr. Smith's economic losses?

18  A.    I did.

19  Q.    And in doing so did you estimate Mr. Smith's work life?

20  A.    I did.

21  Q.    Can you explain to us what work life is?

22  A.    Yes.  Work life is a technical term in the field of

23  economics or demographics.  Basically, it's the number of years

24  that a person is what's called active in the labor force, which

25  means either working or available to work, looking for work.

1          The U.S. Government collects information in regular

2    surveys about the extent to which people are active in the

3    labor force.  They produce something called labor force

4    participation rates.  That data, amongst some others, are used

5    to calculate statistically these work life tables.  They're

6    based on four dimensions, age, race, gender, and education, and

7    with those four pieces of information about an individual, I can

8    go to the tables and say an average person in the United States

9    with those characteristics would tend to work X more years.

10          Now, in Mr. Smith's case the information I have was

11   that he was 24 and two-thirds years old, a white male with less

12   than high school educations at the date of the accident.  An

13   average person with those characteristics in the United States

14   is active in the labor force another 31.84 years, and that's the

15   figure that I've used to do my calculations.

16   Q.    And in making your calculations, did you calculate Mr.

17   Smith's annual income base or earning capacity?

18   A.    I did.

19   Q.    What is income base or earning capacity?

20   A.    It's essentially a figure that attempts to reflect the

21   amount of money a person can earn over the course of a year

22   putting forth their normal effort to earn income in taking into

23   account the willingness and ability of the labor market to hire

24   them to do the work they do.  In other words, it's a two-sided

25   supply and demand thing.

Q.    And based upon your earlier testimony the best evidence of
a person's earning capacity is their past history of income up
to that point, would that be correct?

A.    Typically for workers that have been in the labor force for
a significant period of time usually a minimum of three to five
years you look to the record of what they've actually earned for
that period of time, and depending on what the pattern shows you
can take an average or you can take the most recent figure, or
something of that nature, but typically if a worker's wages go
up and down you take an average.  If they're steadily increasing
you take the most recent figure.  That's what economists
typically do with that kind of documentation.

Q.    And those would be valid records that you prioritized
several moments ago about tax returns, social security records,
etcetera?

A.    Right.  When documents that are developed in the normal
course of work and reporting.

Q.    Based upon your review of the valid documents,
documentation provided regarding Mr. Smith's past history of
income, what was Mr. Smith's income base for his earning
capacity on the date of this accident?

A.    I have two figures that I've calculated.  One is based on
the average of his reported social security earnings for the
years 2000, and 2001.  That's $8,236.89 per year.  That's what
was reported to the Social Security Administration as his

1  earnings over that two-year period on average.

2          As an alternative to that number, I mentioned that I

3  had payroll records that covered a one-month period of time.  If

4  I simply look at those records, they average about $440 a week.

5  If I assume, and this a much larger jump of faith, if I assume

6  that would have been steady weekly earnings, $440 a week over

7  the course of a year, it would produce earnings of $22,880 a

8  year.

9          I've done calculations based on both social security

10  average, the $8,236, and this snapshot period under what I would

11  call an annualization assumption of $22,880.

12  Q.    And that snapshot figure is from those records from

13  November 2003, do you recall?

14  A.    Right.  Right, November.  I think it might have gone into

15  December a little bit, but it was right around that period of

16  time.

17  Q.    Assuming an income base of the 8,236.89, did you calculate

18  Mr. Smith's past losses to the date of this trial?

19  A.    Assuming Mr. Smith could not have back to work, and using

20  the $8,236 wage base, his loss before any consideration of taxes

21  is 6,841 up to the trial date.

22  Q.    Based upon the other figure with the assumption that Mr.

23  Smith would have continued to earn the 440 average a week that

24  he was making for that month period that you extrapolated out to

25  a week year to come up with 22,880, what is Mr. Smith's past

1  loss to the date of trial?

2  A.    $19,003.

3  Q.    Okay.  Assuming the income base of $8,236.89.  If Mr. Smith

4  was able to earn $6.55 an hour, or $13,624 a year, would he

5  suffer any future loss?

6  A.    No, if you make that amount of money per hour, your annual

7  income would be well in access of $8,239 a year.  So if he can

8  do that, then he would been making more money than what his

9  average social security records were in the two years I

10 mentioned.

11 Q.    So if he earned anything at 6.55 or higher per hour, he

12 would not have any future loss?

13 A.    Use --

14 Q.    At the income base of $8,000 --

15 A.    8,236.

16 Q.    -- 89?

17 A.    Yes.

18 Q.    Assuming the income base of $2,880, what would be Mr.

19 Smith's future loss if he was able to earn $6.55 an hour?

20 A.    If he can earn $6.55 an hour, that is, as I mentioned, or

21 as you mentioned, that comes to an annual earning of -- let me

22 get the exact figure -- $13,624 a year.  There would be a

23 difference between the 22,880, and the 13,624, which is roughly

24 $9,000 or so a year.  He would have to invest, in my opinion,

25 $217,844 in a safe investment, and I use U.S. Treasury inflation

1  Index Bonds as the investment vehicle.  So that the interest and

2  the principal he would earn on those bonds for the rest of his

3  work life would make up the difference between earning 13,624 a

4  year, and the 22,880, and both of those increase gradually at

5  the rate of inflation over the remainder of work life?

6  Q.   Did you make similar calculations at higher per hour rates

7  for Mr. Smith?

8  A.   Yes, you asked that I do a number of different calculations

9  that go from 6.55 to 7.71 to 8.95 to 9.68, and to 10.05 per hour

10  and I have all of those numbers here.

11  Q.   Could you just quickly give those figures to us and give us

12  the hourly rates and what the loss would be, if any?

13  A.   Right.  If Mr. Smith can go back to work at 7.71 an hour,

14  he would have to invest $161,065 in a safe investment to make up

15  the difference between the 22,880 in there.  If he could go back

16  at 8.95 an hour, that's around 20,000 a year, he would have to

17  invest 64,621 -- let me make sure I'm reading it right.  Yeah,

18  64,621 to make up that difference.

19       At $10.05 an hour, that's a little less than 21,000 a

20  year, he would have to invest 46,508, so that the interest and

21  the principal would make up the difference.  I left one out.

22       If he could go back at -- oh, the one I gave you for

23  the 20,000 was 9.68 an hour.  The 8.95 an hour would be right at

24  $100,000 of loss.  I say just, and not to over burden it, any of

25  those numbers has some uncertainty around them because they're

1    projections over long periods of time.  My real opinion is that

2    the numbers could be as much as about 15 percent higher or lower

3    than the ones I gave you given the sorts of uncertainties that

4    are inherent in these calculations.

5    Q.    So would it be a fair statement that you kind of gave an

6    average between that 15 percent swing either way?

7    A.    Right.  Yes.

8    Q.    And if Mr. Smith is able to earn $22,880 a year, he would

9    not suffer any future loss, is that correct?

10   A.    Correct.  Using the higher income base, the 22,880, if

11   could go back to work making -- it's roughly between 10 an $11

12   an hour -- there would be no loss.

13            MR. BALLINA:    Thank you, doctor.

14            THE WITNESS:    Sure.

15            THE COURT:    You are witness under cross-examination,

16   Mr. Cashio.

17            MR. CASHIO:    Yes, Your Honor.

18                          CROSS-EXAMINATION

19   BY MR. CASHIO:

20   Q.    Dr. Boudreaux, you testify a lot in court, don't you?

21   A.    A reasonable amount, yes.  It depends on what you mean by

22   a lot?

23   Q.    And you testify more times for the defendant, the insurance

24   companies, and defendants like Harrah's than you do for the

25   plaintiff, don't you?

1   A.    Yes, in this kind of litigation, that's correct.

2   Q.    And Mr. Ballina from his law firm picked you out as his

3   economist, is that correct?

4   A.    He did hire me, yes.

5   Q.    Okay.  And what are you charging per hour for Court?

6   A.    I don't have an hourly rate.  My dollar billing for

7   preparation and court appearance, I think it's $850, right

8   around there.

9   Q.    Okay.  Now, you said you had a problem with believing that

10  those tax returns were proper?

11  A.    That's not exactly what I said.  I said that the field of

12  economics has a set of hierarchies of documents that we use to

13  do these calculations, and that tax returns that are filed the

14  way these were -- I assume they were filed, I'm not sure -- but

15  well after the event, and after the litigation has started is

16  not documentation that I can render an opinion about.  In other

17  words, I'm clearly not saying I think these are bogus or wrong,

18  but by the same token I'm clearly not saying I think they're

19  bogus or right.  It's not within my expertise to make a judgment

20  about whether those numbers mean anything at all.

21  Q.    You don't think Mr. Smith would come here in federal court

22  and sign -- first of all, have you seen the signed IRS returns?

23  A.    The ones I have simply have copy on it, and they're not

24  signed.

25  Q.    But if they were signed, would that give more credibility?

A.    It still would require me to make a judgment about whether the information on them is truthful or not, and that's not within my expertise.

Q.    Okay.  If they were -- well, you don't think Mr. Smith was going to sign a document, bring it here to federal court, owe thousands of dollars in income tax for those documents and those not be true, is that correct?

A.    I don't know.  That's what I'm saying.  If I thought -- if I agreed with you that I could give you an expert opinion in response to your question yes or know I'd give it to you, but that requires me to make judgments that I'm not trained as an economist to make.  If I was a juror, I'd probably have to make them, but I'm not, I'm an economist.

Q.    Okay.  I'm going to show you a document that's in evidence.  It's the certified receipt where the document was sent to the Internal Revenue Service.  Is that the right address for sending your taxes?

A.    I have no idea.

        MR. BALLINA:    Your Honor, let me lodge an objection as to relevance.

        There's a stipulation of the parties that it was mailed to the incorrect address.

        THE COURT:    Overruled.

                                EXAMINATION

BY MR. CASHIO:

1  Q.   Right, but my question is this:  If you mail something to

2  the Internal Revenue Service in Dallas, and it's intention is

3  it's supposed to go to Memphis, does that get sent back to the

4  person, or does it get sent on to Memphis?

5          MR. BALLINA:   Objection, Your Honor.  He's asking

6  beyond his expertise.

7          THE COURT:  Sustained.

8                         EXAMINATION

9  BY MR. CASHIO:

10  Q.   As an expert would you know?

11         MR. BALLINA:   Objection, Your Honor.  It's beyond his

12  expertise.

13         THE COURT:   Sustained.

14                        EXAMINATION

15  BY MR. CASHIO:

16  Q.   Have you ever even seen a document sent to one IRS form

17  that was forwarded to another IRS address?

18  A.   I could only answer from my personal experience that I've

19  had documents returned to me that I had filed and sent to the

20  wrong address, but I don't have any experience with the IRS

21  forwarding, but again, I need to say that that's one event that

22  happened over an old man's life.

23  Q.   Right.  But even you have sent them to one address and they

24  were incorrect, right?

25  A.   Yeah, I've sent filing documents to the wrong address.  It

1    came back to me.

2    Q.    Okay.  Now, according to your calculations, you have Shaun

3    working to the age of 55.  He's 24 at accident date.  You've got

4    him working until 55, right?

5    A.    Well, that's not an entirely correct interpretation of what

6    the work life tables say.  They do say that as of today, he has

7    25 and a half more years of work life expectancy.

8         The work life  expectancy is the number of years of

9    work that are not necessarily continuous, that statistically

10   people have what are called interim separations from the labor

11   force where you're out of the labor force for awhile, time

12   passes and then you go back in.  You still have 25.5 years.  So

13   depending on how many of those interruptions and how long they

14   are, that pushes back the final age that you would get by simply

15   adding the two number together.

16   Q.    Okay.  Now, according to your calculations, you said if

17   Shaun was only earning 23,000 as a pretax base, and $19,000 a

18   year after taxes, that if he was totally and permanently

19   disabled, he would have an income loss of 6,210,309.40, is that

20   correct?

21   A.    That's the upper end figure under the assumption that he

22   would have been making 23,088 a week year, which was an earlier

23   analysis that I did, and that he now can never go back to work

24   again, but in answer to your question, yes.

25   Q.    And that's only for 25 years you computed, that correct?

1    A.    Yes, that's correct, 25 and a half years of work life

2    expectancy.

3    Q.    Okay.  Good.  And how did you arrive at what they call a

4    discount figure?

5    A.    I used the interest rates that are available on inflation

6    Index U.S. Treasury Bonds which are securities that are sold by

7    the U.S. Treasury that if you buy those securities you get a

8    stated interest rate plus the rate of inflation, whatever it

9    happens to be.  For instance, the interest rates on those bonds

10   now are roughly two percent, between two and three percent.  If

11   inflation next year say is two and a half percent, you'd get the

12   two percent interest on the bond plus another two and a half

13   percent due to inflation, so the Treasury, in effect, insures

14   you against inflation when you buy those.  Most economists, in

15   my view, think those are the most appropriate securities for

16   this calculation.

17   Q.    Do you know the Treasury Bill rate today?

18   A.    I haven't looked it up this morning, but a Treasury Bill is

19   a security that matures in one year or less and those are

20   generally not appropriate securities for calculations like

21   these.

22   Q.    And do you know the rate of inflation last year?

23   A.    Yes, it was between two and three percent.

24   Q.    Do you know the rate of inflation for the first four

25   months of 2004?

1  A.    Oh, goodness.  I'm sure I saw that, but it's varied all the

2  way from, oh, pretty close to zero up to between four and five

3  percent.

4  Q.    Okay.  I want to show you a document, Exhibit P1, page 4.

5  Can you read to the jury what the inflation rate was for the

6  first four months of 2004.

7  A.    It says, "During the first four months of 2004, the CIPIU,

8  which is the most commonly quoted inflation statistic, rose at

9  4.4 percent seasonally adjusted annual rate SAAR".

10 Q.    So that inflation rate would actually eat into your money,

11 is that correct?

12 A.    Incorrect.  That's what I just said.  Suppose the inflation

13 rate next year is eight percent?  Then you'd get the two percent

14 interest on these bonds plus another eight percent.  That's the

15 nice part of these inflation index securities that the U.S.

16 Treasury guarantees that you will get the interest rate plus

17 whatever the rate of inflation is.  It's what economists call a

18 real rate of return.

19 Q.    But if you didn't want to put money in U.S. Treasury, and

20 something like that, and you wanted to put it in a bank -- I

21 just say the Omni Bank was paying 2.4 percent interest on a

22 two-year CD, Certificate of Deposit.  You would actually loose

23 money if the inflation rate was higher than the amount of money

24 you were getting from the bank, is that correct?

25 A.    Yes, if you chose to buy a two-year CD that paid 2 point

1   something percent interest, then if inflation over the next few
2   years was hirer than that, then your purchasing power would
3   effectively decline.  But again, for the purposes of my
4   calculation, that's not an appropriate investment to use as and
5   example of what a reasonable vehicle is to pay for the short
6   fall in a person's earnings over long periods of time.
7   Q.   But if Mr. Smith chose to put his money in a bank rather
8   than one of these bond -- I mean, a Treasury -- what's it
9   called?
10  A.    It's an Inflation Index U.S. Treasury Bond.  They're
11  available in any bank, any brokerage house, or you can buy them
12  from the Treasury itself.
13  Q.   But if you chose to put his money in a bank at a CD and the
14  inflation rate was equal to the amount of money he was getting
15  from the CD, in effect, he would be breaking even, is that
16  correct?
17  A.    Right.
18  Q.   And there would be no discount factor?
19  A.    Well, that's a little more complicated.  The increase rate,
20  if you assume his earnings would have increased at the rate of
21  inflation, would be equal to the discount rate, so the net rate
22  would be zero under your assumption.
23  Q.   Okay.  And that's possible, that can happen, right?
24  A.    Only if you use incorrect investment vehicles, and, you
25  know, Mr. Smith could put his money under a mattress and not

1    earn anything on it at all, but I can't use that as a reasonable
2    example in doing these calculations anymore than I could use a
3    Treasury Bill or a two-year CD.  Those just aren't reasonable.
4    Q.    So you're saying putting money in a bank at a CD is an
5    unreasonable vehicle?
6    A.    To compensate for short falls in earnings.  To make up the
7    different between two earnings rates over multiple decades it
8    would not be reasonable to use U.S. Treasury Bills or short term
9    corticates of deposit at banks.  You have to use securities of
10   the type that I'm talking about here.  There are other ways to
11   do it.  Insurance companies sell annuities that can do that can
12   of thing, but this is sold by the U.S. Treasury, and it's
13   typically the lowest risk investment available.
14   Q.    Let me ask you:  Did you get to see the 1099 forms that
15   were filed?
16   A.    I did.  I actually -- again, we may have different copies.
17   The two that I have, have a box at the top.  There's an X in it
18   that says "void".
19   Q.    You don't see a figure on there?
20   A.    I see a figure, yes, but you said these were filed, but --
21   I'm sorry.
22   Q.    I meant filed as exhibits here in federal court?
23   A.    Oh, I'm sorry, yes, I do have those.
24   Q.    And what do the 1099 forms say Shaun Smith made for 2002,
25   and 2003?

1          THE COURT:    What Exhibit number, counsel?

2                        EXAMINATION

3    BY MR. CASHIO:

4    Q.    Do you see that, Dr. Boudreaux?

5    A.    Yes, I'm looking at it.

6    Q.    Can you tell the jury those two figures?

7    A.    The 2002, 1099 shows $53,200 as non-employee compensation.

8    The 2003, 1099 forms shows $51,000 as non-employee compensation.

9    Q.    Okay.

10   A.    Not to over answer, but that figure isn't what someone

11   earns.  That would typically be revenue to a business of some

12   sort.

13   Q.    A business?

14   A.    Yeah.  A 1099 form is a form that's provided to an

15   independent contractor as opposed to an employee, and, you know,

16   typically the way that works is that the person has expenses

17   that they write off against that.

18   Q.    Do you know if exercise riders at racetracks are

19   independent contractors that would get 1099 forms?

20   A.    I have no idea.

21   Q.    And so the figure of $621,000 plus that you gave for his

22   lost wages was based on a $23,000 annual pretax base and a

23   $19,000 after tax income tax.  If his income were in the $50,000

24   range, it would be much, much higher than that 621,000, is that

25   correct?

1          MR. BALLINA:    I'm going to enter an objection.

2          THE COURT:    Sustained.

3          MR. CASHIO:    I'm not asking for any calculation, Your

4    Honor.

5          THE COURT:    Sustained.

6                              EXAMINATION

7    BY MR. CASHIO:

8    Q.    If you would have used the 1099s in your calcul -- well,

9    let me ask you:  You, you made all kinds of alternative

10   possibilities when you sent this report to Mr. Ballina, is that

11   correct?

12   A.    I did with respect to rehabilitation assumptions that he

13   asked me to do, yes.

14   Q.    So you had a lot of different numbers, but you didn't put

15   in any numbers possibly considering the 1099 forms or the tax

16   returns, is that correct?

17   A.    Well, yes, but I didn't have the tax returns when I did my

18   calculations.  My report was done before the tax returns were

19   produced.

20         Secondly, the 1099 forms, as I said, wouldn't be

21   earnings, they are revenues for business.  And the copies I have

22   a box above them where the word "void" is checked.

23   Q.    Okay.  Let me ask you this:  You say they wouldn't be

24   earnings but they would be revenues?  In other words, if I'm an

25   exercise rider at the racetrack and I work for different people

1  even, and I am paid $15 ahead for every horse I get on everyday,

2  and I get on six horses a week day, would you call that -- and

3  that at the end of the year I got 1099 forms from those people,

4  would that be revenues or would that be earnings?

5  A.    That would be revenues.  It wouldn't be earnings.

6  Q.    So actually, though, the man made the money, you don't call

7  them earnings, is that right?

8  A.    No, I don't, because, 1099 receipts are revenues against

9  which expenses are typically claimed, and even in these income

10  tax returns that were produced there are significant expenses

11  that are listed in there as chargeable against the 1099 amounts.

12  Q.    So if you assume though that those earnings or those

13  revenues, as you called them on the 1099 form, were viable and

14  had made a calculation concerning them, it would be different

15  from what you put down, isn't that correct?

16        MR. BALLINA:    Objection, Your Honor.  I think he's

17  asking him to make a calculation.

18        THE COURT:    Overruled.

19        Can you just answer that question without making

20  specific calculations?

21        THE WITNESS:    Yes, it would be different.

22                        EXAMINATION

23  BY MR. CASHIO:

24  Q.    And it would it be different in an upward fashion, isn't

25  that correct?

1          MR. BALLINA:   Objection, Your Honor.

2          THE COURT:   Sustained.

3          MR. CASHIO:   That's all that I have.

4     Thank you.

5          THE COURT:   Any redirect, counsel?

6          MR. BALLINA:   No, Your Honor.

7          THE COURT:   Thank you, doctor.

8          THE WITNESS:   Thank you, Judge.

9     You can step down.

10     Any further need for Dr. Boudreaux?

11          MR. BALLINA:   No, sir.

12          THE COURT:   Call your next witness, Mr. Ballina.

13          MR. BALLINA:   The defendant rests, Your Honor.

14          THE COURT:   Okay.  Let me see both counsel.

15               (BENCH CONFERENCE, AS FOLLOWS):

16          THE COURT:   You now rested.  Do you have any motions?

17          MR. BALLINA:   No, sir, no more than a directed verdict

18     now.

19          THE COURT:   Okay.  Denied.

20     Do you have any rebuttal witnesses?

21          MR. CASHIO:   No, Your Honor.

22          THE COURT:   As we discussed in the past, what we'll

23     now do is I would ask if you have any further witnesses.  You'll

24     say no, you rest, and then you do the same, and then what we'll

25     do is we'll show the jury the tape, then we'll take just a

1    five-minute break and we'll start with closing argument, which

2    will be 25 minutes apiece.  You can break it up anyway you want

3    to.

4            MR. CASHIO:   Do you have a warning device?

5            THE COURT:   James.

6            In the jury charges, as you all have already approved,

7    they had stipulations A through F.  We've gone ahead and added

8    the stipulation that you all made in open court, which was G

9    which was that Mr. Smith filed his 2002, and 2003 tax returns on

10   Friday.  However, he mailed them to wrong the address.

11   Remember, that's what I told the jury, and so we're just merely

12   putting that as a stipulation.

13           MR. BALLINA:   I'm not sure we used the word filed.  He

14   mailed his 2002.

15           THE COURT:   Correct.  We need to change that word,

16   because mailing doesn't mean filing.

17           MR. BALLINA:   No, it doesn't.

18           THE COURT:   So we have to change that to mailed his

19   2002.

20           Did you all come up with a calculation yet for --

21           MR. CASHIO:   23,006.03.

22           THE COURT:   So you all agree that $23,006.03 will be

23   written in the interrogatory on the second page where it states

24   past medical expenses, correct?

25           MR. CASHIO:   Yes, sir.

1          MR. BALLINA:   Yes.

2          THE COURT:   All right.   Thank.

3          MR. CASHIO:   Thank you, judge.

4                     (BENCH CONFERENCE CONCLUDED)

5          THE COURT:   Mr. Ballina, do you have any other

6    witnesses, sir?

7          MR. BALLINA:   No, Your Honor.   The defendant rests.

8          THE COURT:   Thank you.

9          Any rebuttal witnesses, Mr. Cashio?

10          MR. CASHIO:   No, Your Honor.

11          THE COURT:   Does the plaintiff rest?

12          MR. CASHIO:   Yes, Your Honor.

13          THE COURT:   And defense rests?

14          MR. BALLINA:   Yes.

15          THE COURT:   All right.   Ladies and gentlemen that's

16    all the testimony for this trial.

17          Here's how we're going to proceed.

18          I'm going to allow to been shown the videotape in its

19    entirety.   There's not going to be any interruptions.   We'll

20    just go from the beginning to the end.   No one's going to make

21    any comments about it, so just pay close a attention it.   It's

22    already been admitted into evidence.   There's not going to be

23    any highlighting, there's not going to be anything.   This is

24    going to be the original video tape, is that correct, Mr.

25    Cashio?

1          MR. CASHIO:   Yes, Your Honor.

2          MR. BALLINA:   Yes, Your Honor.

3          THE COURT:   And that is Exhibit 14.

4          It's going to last about how long?

5          MR. CASHIO:   I think it's 45 minutes or so.

6          THE COURT:   45.

7          MR. CASHIO:   I think so.

8          THE COURT:   That long?

9          MR CASHIO:   I don't know.  I'm really not sure.

10         THE COURT:   Do you all need to take a break?  Because

11    I don't want to stop in the middle of it.

12                    (NO RESPONSE)

13         THE COURT:   You're ready to go?

14         All right.  We're going to go ahead and show the video

15    from beginning to end without any interruption whatsoever,

16    without any remarks, comments from anybody, and at the end of

17    that we will take a short break, and then we'll have the closing

18    arguments by the lawyers, okay.

19         Thank you very much.

20       (WHEREUPON, THE VIDEO TAPE WAS PLAYED FOR THE JURY)

21         THE COURT:   How much more, counsel?

22         MR. CASHIO:   That's fine with me

23         THE COURT:   That's fine with you?

24         MR. BALLINA:   I don't think but a few minutes, Your

25    Honor, but it's hard for me to say.

1    I think it's just a couple of minutes, perhaps.  That's

2  it.

3                    (THE TAPE WAS STOPPED)

4    THE COURT:  We're going to take a five-mintue recess

5  and then we're going to start closing arguments.

6    THE CLERK:  All rise.

7                    (3:15 P.M.  -  RECESS)

8    *      *      *      *      *      *      *      *      *

9                (3:20 P.M.  -  AFTER RECESS)

10                    **P-R-O-C-E-E-D-I-N-G-S**

11    THE CLERK:  All rise.

12    Court's in session.

13    THE COURT:  Before the jury comes back, you each have

14  the jury charges and we've had a charge conference.  Does any

15  one have any objections to these charges?

16    BY MR. CASHIO:  No, Your Honor.

17    MR. BALLINA:  No, Your Honor.

18    THE COURT:  Okay.  Great.

19    One last thing before the jury comes out.

20    It's now 3:30.  I've given each of you guys 25 minutes

21  to argue your case.  It's going to take me about 20 minutes or

22  so to give them the final instructions.  That's going to take us

23  close to 4:30, maybe even a few minutes after that.

24    I have to be out of town tonight for 6:30.  I can be a

25  little bit late, so I won't have to leave here no later than

1    quarter to 6:00.  We can do one of two things with the jury,

2    assuming they have not come up with a verdict.  Either sequester

3    them, which I hope you don't think is a good idea.

4              MR. BALLINA:    No.

5              THE COURT:    Or I have to secure your consent on the

6    record to allow them to go home for the evening.  Of course,

7    I'll give them a cautionary instruction not to discuss anything

8    with their family members.

9              What is your preference, Mr. Cashio?

10             MR. CASHIO:    Let me see if I can get the time, correct

11   Your Honor.

12             25 minutes, and 25 minutes, that will put us at about

13   4:40, then your --

14             THE COURT:    No, that will put us about 4:20.

15             MR. BALLINA:    I'm not going to take 25 minutes, I can

16   tell you that.

17             THE COURT:    I didn't think you would.

18             MR. CASHIO:    20 minutes would be 4:40.  If he takes

19   15, 4:35.  Your instructions will be 5:00 o'clock -- no, no --

20   4:45

21             THE COURT:    No, no.  No, we'll be through my

22   instructions no later than 4:35.

23             MR. CASHIO:    And what time do you leave, quarter to

24   6:00?  So that's only an hour they have to deliberate.  You

25   think it's possible that you could tell them that and see what

1    they want to do?  If they want to come back in the morning.

2            THE COURT:    It doesn't matter to me.

3            MR. CASHIO:    Leave now?

4            THE COURT:    You mean, let them just leave early and

5    come back tomorrow morning?  That's fine with me.

6            Do you care one way or the other, Mr. Ballina?

7            MR. BALLINA:    Have closing tomorrow morning?

8            MR. CASHIO:    Yeah.

9            THE COURT:    Oh, no, no.  I have to give a speech out

10   of town tomorrow at noon.  No, we're not going to close

11   tomorrow.

12           MR. BALLINA:    No, no.

13           THE COURT:    Oh, I thought you meant after closing,

14   after I give the instructions.

15           MR. CASHIO:    That's fine.  That will be okay.  Let

16   them come in the morning if they want rather than in an hour.

17           THE COURT:    After the closing and after my

18   instructions, you want me to give them the option, whatever time

19   it is, say, ladies and gentlemen, we can stay for another hour

20   to begin your deliberations or we can come back fresh tomorrow.

21           MR. CASHIO:    Personally my total preference is to do

22   everything fresh in the morning, but if you have to leave at

23   noon tomorrow, we may run into another problem.

24           THE COURT:    Well, even if I didn't have to leave

25   tomorrow, I mean, I'll cancel that.  I have to give a CLE out of

1  town.  I'll cancel that.  This is more important, but we're not

2  going to shut down at 4:30.

3          MR. CASHIO:   No.  What I'm saying --

4          THE COURT:   Actually, we can shut down at 3:30, if you

5  all didn't give your closing argument now, but that's entirely

6  to early.

7          MR. CASHIO:   Okay.

8          MR. BALLINA:   To answer the Court's original question,

9  I have no request that these people be sequestered if that

10  happens tonight.  They can go home.

11          THE COURT:   So I have each of your consent to allow

12  them to go home for the evening, and I will give them the

13  cautionary instruction not to discuss this case with anybody.

14          MR. BALLINA:   Yes, Your Honor.

15          MR. CASHIO:   Yes, Your Honor.

16          THE COURT:   Thank you.

17              (BENCH CONFERENCE CONCLUDED)

18      (AT 3:25 P.M.  -  THE COURT RETURNED TO THE COURTROOM)

19          THE COURT:   Call in the jury, please.

20          THE MARSHAL:   All rise.

21              (THE JURY ENTERED THE COURTROOM)

22          THE COURT:   Thank you very much.

23          Please be seated.

24          Ladies and gentlemen as I state earlier we're now going

25  to begin closing argument.  Each party is given 25 minutes.

1    Since the plaintiff has the burden of proof in this

2  case he gets to go first and he gets to go last, but for a total

3  of 25 minutes.

4    I understand plaintiff's counsel is going to break it

5  up into, what 19 and 6?

6    BY MR. CASHIO:  19 minutes and 6 minutes, Your Honor.

7  And defense counsel gets the total same amount of time that I

8  do, is that correct?

9    THE COURT:  Right.  And if you, of course, don't use

10  your 19 up at the beginning and you shut down, you can certainly

11  have the balance up to 25 minutes at the end.

12    All right.  Go ahead and proceed.

13    (CLOSING ARGUMENT BY MR. CASHIO)

14    BY MR. CASHIO:  Ladies and gentlemen, Shaun and I, we

15  both would like to thank you for giving up all these days of

16  your valuable time to come here for this very important case in

17  federal court.

18    The case is only 10 months or 11 months after the

19  accident, and the Court the orders us to come at that time.  We

20  don't have a choice where we can wait five years and then come

21  in and say, "This is what has happened in the last five years".

22  We don't have a choice to come back after this time and say,

23  "Next year Shaun couldn't work.  He lost $30,000 or so in

24  working and he's had pain and suffering, so he should be awarded

25  that 35,000.  We have to do everything today, and that's why

1    when the Court tells you that the plaintiff's claim only has to

2    be more likely true than not true, all we have to prove is a

3    feather's weight, as I told you in the opening statement, and

4    that's why you don't to be -- the Court's jury charges will

5    tell you, you don't have to be exactly sure on a lot of these

6    things, just as long as you think that we have a feather's

7    weight of evidence.

8         This case, as the Judge also told you, is an automobile

9    accident case.  It's not a case of blacks against whites.  It's

10   a case of pedestrian against truck.  Shaun Smith against

11   Harrah's Casino.  He didn't sue anybody else, although he had

12   the option in here.  He didn't sue Mr. Dorsey, Mr. Augustine,

13   the driver, or anybody else.  The only one sued is Harrah's

14   Casino.  That's what I'd like you to focus on in the case, and I

15   think you told us that when we were interviewing you.

16        This is a case purely of was Harrah's at fault at all

17   in this case?  And I think it's overwhelming the fault.  Even by

18   their own rules that were violated so many times, they were at

19   fault.

20        Shaun has had to -- actually, instead of getting

21   better, he's actually getting worse despite what one of the job

22   guys said.  He's now on a cancer drug called -- a lot of cancer

23   people take -- called morphine which he originally was on, and

24   that's a very difficult thing.  He's also on antidepressants.

25   He has nightmares.  His whole livelihood has been destroyed.

1   The dreams of his life have been destroyed.  He only has a five

2   in 100 chance of ever getting a week job, Mr. Roberts said.  He

3   has a fourth grade math level.  A sixth grade reading level.

4       The defendant's Harrah's person that came here said,

5   "Oh, he can handle all these jobs".  When I asked him about the

6   calculations, he didn't even know himself what the calculations

7   were.  And Mr. Roberts -- if you remember Dr. Hamsa, the only

8   physician in the case says he defers to Mr. Roberts on

9   vocational evaluation.  Mr. Roberts said, "Five in a hundred

10  chances on ever getting a job".

11      Well, anyway, let me show something to you now if you

12  don't mind concerning what we need to project out over the next

13  54 years.  The Judge is going to show you it's 53.2 years, but

14  another 10 months from the accident date, and what we're going

15  to do is project Shaun Smith my estimate.  You can give more or

16  less, if you want.  It's completely up to you, but my estimates

17  of what Shaun Smith could get for 54 years of pain and

18  suffering.  A rod in his leg, taking these drugs.  All the

19  things that happened to him, and remember it's not for one year,

20  it's not for two years, it's not for 10 years, it's 54 years, so

21  the money look large to you, but if you break it down -- if we

22  could come back every year, it is really not that much.

23      These are what his lifetime injuries indicate.

24      Okay.  This is loss of enjoyment of life.  All the

25  things that he can't enjoy anymore with his children.  With all

1   the other aspects of life that we went over, I'm going to trust

2   you to remember these because only I have 19 minutes.  I've got

3   to talk real fast, and I can't go over everything, I'm going to

4   trust your memory.

5           So for loss of enjoyment of life for 54 years, which is

6   the same as 463,040 hours, we're asking $463,040.

7           The next thing is his permanent disability.  Loss of

8   function in his leg.  20 percent permanent disability, and rod

9   and screws in his body for life, we're asking the same thing.

10  For 463,040 hours, which is the same as 54 years, we think he

11  deserves $463,040 for that also.

12          For physical pain and suffering.  The aches that come

13  with weather changes.  The fact that he has to take morphine for

14  pain and walk around in a daze.  We're asking the same thing for

15  that.  463,040 hours, he's got to suffer?  We think he should

16  get  $463,040.

17          His mental pain and suffering, the same thing.  The

18  nightmares.  The fact that he's lost all his dreams in his life.

19  We're asking the same thing for that, 463,040 hours or 54 years,

20  we're asking for $463,040, for 54 years.

21          For the pain and suffering and the risk that he had to

22  take for this dangerous operation had the accident not happened,

23  $200,000.  I don't think anybody would undergo and operation

24  like that for $200,000.

25          If this is his loss of earning capacity, and the Judge

1  is going to talk to you about that, even though his taxes say

2  $50,000 a year, I think $30,000 a year for the future is enough.

3  You can add more, if you think, but I think 30,000 is enough.

4  For 54 years, that adds up to $1,620,000.

5        Remember, even there economist, with his projections

6  that they paid him for, had him earning over $600,000 like

7  $19,000 per year, so we don't think that that figure is too

8  much.

9        In addition to that, he's had to spend for medication

10  $2,000 this year.  You project that over 54 years, that's a

11  $108,000.  He's tried to get physical therapy, but it cost

12  $30,000 a year.  He didn't have the money.  He wants to get

13  physical therapy for his leg, for his neck.  I mean, for his

14  other knee and for his back, that's $30,000.

15        Now, this is a total figure of $3,672,160.  Actually,

16  I'm wrong, because I didn't add the $1,008,000 and the 30,000 in

17  there, so that's like $3,780,000.  But anyway, that's over a

18  lifetime, that's for 54 years.  If it was for one year and you

19  broke it down, it wouldn't be that much, but we can't come back,

20  that's the law.  We're here in federal court and that's the law

21  of the land, that's what we have to live by.

22        Now, what problems did Harrah's do?  I'm going to go

23  over them real quickly.

24        First of all, they should have done what the airport at

25  O'Hare Airport did.  When the man didn't have enough money to

1    pay, they should have said, look, we'll take your license.

2    We'll do this.  You can go in and get a comp.  You can do all

3    kinds of things.  You'll see Shaun on the tape waiting patiently

4    all that time.  Was he causing a ruckus for the first 20 or 30

5    minutes?  No.  After they told him educate to pay and they got

6    in and argument with Mr. Stacey Dorsey, who by the way, is the

7    rep -- not only is he testifying here, but he's the

8    reprentative.  He's the soul of Harrah's.  Now, with all of the

9    mistakes he's made in this case, it's my opinion that he's got

10   to be related to somebody at Harrah's.  He's had arguments.  All

11   kinds of different arguments he admits himself before and after

12   the accident.  He's the customer's safety manager.  If that's

13   not and oxymoron, I've never heard one.  This is the most unsafe

14   practices I've ever seen.  They violate all of their own rules.

15        For example, the Court is going to tell you that every

16   driver of a vehicle -- this is the law -- must exercise due care

17   to avoid colliding with any pedestrian upon any roadway, and

18   must give a warning by sounding his horn when necessary and

19   must exercise proper precaution upon observing any child, any

20   confused, or incapacitated person on the roadway.

21        Well, let me say this:  They fed Shaun Smith three

22   beers, yet they're trying to claim that he was -- I think

23   they're claiming he's drunk, although Ms. Waugh said she didn't

24   smell alcohol.  Stacey Dorsey said he wasn't drunk, and if you

25   think he's drunk, if you're looking at the video tape with him

1    walking around like this conducting business, I don't know what

2    is, but anyway they should have sounded the horn.  The driver

3    should have pulled the window down and see what he was trying to

4    tell him.  The driver had stopped two or three times when Shaun

5    said, "Give me my truck.  I might have something in there".  And

6    every time he put his hands on the truck the driver stopped, the

7    tape shows.  Only when Mr. Dorsey stalked out of there, and, as

8    Mrs. Wilson herself said, Yield at him and said "Take off.  Take

9    off", did he gun it inside with all of those pedestrians there,

10   run over his leg, and what did the driver do after he ran over

11   him?  He committed a hit and run.  If it was it was on the

12   streets it would have been brought to the police, if you see

13   somebody run over somebody and just take off like that.  And

14   after that what happened?  They left him lying in the roadway

15   for minutes while other traffic was going through there.  The

16   carelessness is unbelievable.

17        Also there were a lot of strange things that happened

18   here, and I'm sure you're going to pick it up.

19        Now, this video was completely prepared by Harrah's.

20   They had their people put it together, spliced it together, and

21   there was a whole missing section right at the time of the

22   accident.  It's called "VD loss".  You'll see that.  You

23   probably have seen it already, and probably asked questions

24   about it.

25        Now, why did all the Harrah's employees tell me one

1  thing under oath and then change their stories when they got to

2  court?  Well, I think you could figure out what happened there.

3         Why didn't they bring Kevin Augustine to court, the

4  driver, to explain his actions of running over him and taking

5  off, gunning it inside the thing?  They brought a man down from

6  St. Louis, for $1600 Harrah's did, brought him up here to

7  testify for five minutes on what he did which was on the tape.

8         When Shaun asked them to pay for his medical bills,

9  what did they say?  They said, "No", but they spent all this

10 money for tape.

11        They also have -- Mr. Dorsey must have written this.

12 This is on Harrah's page.  Excuse me.  This is their book, page

13 46.  "Don't offer to pay medical expenses.  Don't admit

14 responsibilities.  Don't apologize for the accident".

15        This is their written rules, page 46.  Take a peek at

16 that.

17        Why didn't they have radios for their drivers?  They

18 had them all over.  Everybody else was talking about "I was on

19 the radio for this, for that, for this".  They didn't have

20 radios for the drivers.

21        Why did Mrs. Wilson move to another job?  Why was she

22 transferred?  Why did Mr. Augustine only last two months there?

23 And why is he gone?  Why didn't he come?  Why was the valet

24 booth changed, and all of these in the last 10 months, from

25 where it was to inside?  I'll tell you why.  I think that way,

1    Mr. Dorsey or whoever is in there can't go out and be yelling

2    and interfering with the traffic, and with the drivers that are

3    coming in, that way they're blocked off.

4         Where is the original ticket with Shaun's documentation

5    of the time and everything?  They brought some ticket that's not

6    the original.  They lost that, too?  They lost the video?  Where

7    is the video they have of Shaun playing Blackjack if he was so

8    drunk?  Let's see how many beers he had.  They lost that?  Why

9    did they take pictures during the daytime and showed those to

10   you when the accident happened at night?  Who do they think you

11   are?  It's unbelievable all the strange things that occurred

12   here.

13        On page 21 they have another rule.  You're suppose to

14   honk the horn to signal pedestrians.  He never did anything.  He

15   never honked the horn or anything.  Shaun had a right to rely on

16   that guy, because every time he touched the truck the driver

17   would stop.  He touches the trunk, the driver stops.  Here comes

18   Stacey Dorsey, he touches the trunk, the driver guns it, runs

19   over him.

20        And remember you only have to be convinced by a little

21   bit, just by a feather's weight that Harrah's was at fault.

22        He's also taking Elavil, a medication for depression.

23   He's living on food stamps.  He's trying to take care of his

24   fiancé.  He had to change his marriage plans.  He had a four or

25   five major operation with all the risks.  He has an extreme

1    sensitivity called RSD on the inside of his left leg.  He had

2    spiral fractures of both the tibia and the fibula, and those are

3    bad.  He's never sued anybody before.  He's not even suing Mr.

4    Dorsey or anybody now, he's just suing Harrah's.

5         Now, Mr. Dorsey, the face of Harrah's.  He doesn't

6    believe the customers are always right.  In fact, he believe in

7    what I just showed you, the Harrah's own rules.  Don't

8    apologize.  Don't pay for medical expenses.  Don't help the man

9    at all.

10         He admitted that the driver, at the time when he took

11   off, he couldn't take off in a straight line because of the

12   curvature of the porte cochere.

13         Look at his hand and arm gestures at 203759.  Is this a

14   calm guy who's talking to the customers and being nice to the

15   customers, especially when you've lost all your money?  Watch

16   him in all of those movements, but you can tell what

17   precipitated everything here.

18         He said that's the only time he's ever ordered a

19   vehicle impounded, and he had the right -- why didn't he just

20   give the man an option?  Look, I'll take your driver's license

21   you can go back come in the thing?

22         Also, Ms. Wilson admitted she violated, at least, two

23   of Harrah's policies, which if those weren't violated even just

24   one, there would have been know accident.

25         He said if he would have know Shaun lost all of his

1    money he would have given him free parking.  Why didn't he ask

2    him that?  Why didn't he ask him what were you playing?  Go back

3    in there.

4        And remember when I asked Ms. Wilson.  I said, "Why

5    didn't you give him the options that you're supposed do

6    according to your own rules?  Why didn't you give him that

7    option by giving him the free parking and everything?"  "He

8    never gave me a chance".  Look at the video.  He's talking

9    calmly for 15, 20 minutes the whole time.  She didn't have a

10   chance.  Was he just talking all the time?  Look at the video,

11   it's clear.

12       You take all of these exhibits, Shaun's boots, all the

13   drugs, everything.  The X-rays of the rods and the screws in his

14   leg and look at those back in the jury room.  I don't think you

15   even need to.  I think the case is so overwhelming.

16       THE CLERK:    Two minutes.

17       MR. CASHIO:    I'm going to go over the time line with

18   you real quick.

19       At 201857, Shaun who's the only customer -- I'm talking

20   fast, excuse me -- hands the ticket to Ms. Wilson.  43 sections

21   later, Ms. Wilson gets on a telephone call, after picking up

22   the ticket and then she talks to Shaun.  Since he was the only

23   customer, obviously he told her, "Yeah, I gave you the ticket".

24   You can see her up pick up the ticket.

25       Shaun, during this whole time is reentering and calmly.

1    When he finds out about the problem at 203758, they're not going

2    to pay him (sic) he calls Donna and tells her that he needs her

3    either pick up or bring him the $10.  Right after that, a second

4    after, Mr. Dorsey goes like this to the valet driver

5    (indicating), and the valet driver is arguing with him.  To me

6    he's saying, "You want to impound this man's car when it's

7    coming down?"  He says, "Yeah, yeah".  That's 203759.  While

8    Shaun's on the phone Dorsey starts yelling at him.

9          Now, if you read all the things that Harrah's said,

10   "Please be nice, empathetic with the customers", and everything.

11   They violated all the rules.

12         Even after this argument at 204045, Shaun just rests

13   comfortably against the valet booth, even after the argument

14   they had.  He's not continuing.  And then another argument

15   breaks out when the man say's, "You're not getting your F-ing

16   truck".  And at 204350, the moment of decision, Dorsey says,

17   "Take off.  Park it".  Kevin August takes off, runs over Shaun's

18   leg.  Ms. Wilson hears him, screamed "Park it".  She testified

19   to that.  And 204409, after everybody flees from Shaun to show

20   you the reactions and how Harrah's treated their customer, after

21   they took all his money, they all walk away except Dorsey who

22   looks at him in spite and says, "Serves you right", then he

23   walks away.

24         Mr. Turner and Mr. Stevenson both said, "Oh, he just

25   fell off the truck".  There was no accident.  I caught them in

1  so many lies.  They had to be programed, that's the only thing I
2  can think of.  I don't know if they all got together or what,
3  but was unbelievable.  In fact, Mr. Turner said he immediately
4  went to aid Shaun Smith until he saw the videotape, and then he
5  saw, "Oh, oh, no, I didn't do that".

6         He claimed there was a big windmill sign out there.
7  There isn't any big windmill sign.  And on page 33 of their own
8  documents it says, "Did employees insure the customer's receipt
9  of the valet service guarantee coupon".  They didn't give him
10  that either, so all and all, we think the case is overwhelming,
11  and I'll speak to you in about five minutes.  I mean, after Mr.
12  -- for about four or five minutes after Mr. Ballina speaks to
13  you.  And we want to thank you in advance.

14         THE COURT:   Thank you.

15         All right.  Mr. Ballina.

16              (CLOSING ARGUMENT BY MR. BALLINA)

17         Mr. BALLINA:   Good afternoon, ladies and gentlemen.

18         Just like the opening statements a few days ago,
19  there's one thing I agree with that Mr. Cashio just said.  This
20  is about an automobile accident.

21         And Mr. Smith's leg got rolled over and broken because
22  of Mr. Smith's fault in trying to grab and grabbing onto a
23  moving truck after it had started to move.

24         Now, I know you all have seen it.  I want to show you
25  just part of the accident again.

1                      (VIDEO PLAYED)

2            MR. BALLINA:   And what you're going to see, a real

3    close up version is the truck pulled up, stopped, Mr. Smith

4    walks towards the front of the truck it stops, he grabs onto it.

5    He jumps on the running board.  It moves.  It stops.  He grabs

6    it again.  The last time it moves, before the accident, he's not

7    holding onto the truck until it moves and its passing him and he

8    tries to grab back behind him and he grabs the side view

9    mirror.

10           Ya'll have seen this now a few times.  The first thing,

11   there's Mr. Smith's truck, Mr. Turner, Mr. Stevenson is talking

12   to the driver.

13           While we're on the driver, Kevin Augustine, if Mr.

14   Cashio and Mr. Smith wanted Mr. Augustine here, he can bring him

15   here, too.

16           There goes Mr. Smith walking towards it.  And now

17   before it moves again, Mr. Smith is not going to be holding onto

18   the truck.

19           Stop again.

20           Now, he tries to grab onto it and he gets rolled over.

21           Go ahead and stop.

22                     (VIDEO STOPPED)

23           MR. BALLINA:   The accident happened because of Mr.

24   Smith's fault, but he wants to push that fault on other people

25   or other things.  He admits that he was mad because he lost over

1    $300.  Well, but that's not Mr. Smith's fault, that's because he

2    went in the casino, and there's a casino, and he gambled his

3    money and he lost his money.

4         He admits that he had been drinking, but once again,

5    that's not Mr. Smith's fault, that's the casino's fault because

6    they provide free alcohol.

7         He always admits that he refused to pay the parking.

8    He was mad, he wasn't going to pay the parking.  Once again,

9    that's not his fault.  They shouldn't charge for parking.  It

10   should be free.  They should have let him go without paying.

11   Maybe Mr. Smith should have just paid it.

12        You heard the witnesses testify.  He never once said he

13   didn't have the money to pay.  He refused to pay, and I think

14   the images that you've seen on the video as well as the

15   witnesses testimony substantiates that.

16        Finally, the biggest thing is he admits that he grabbed

17   onto the truck that last time, he admits this morning.  You

18   heard it this morning, and read from deposition testimony, he

19   admits that he grabbed onto the truck after it started to move.

20   So how does he get out of that fault?  They shouldn't have

21   brought the truck down.  Ya'll messed up and you brought the

22   truck down, you shouldn't have done that.

23        Judge Zainey is going to tell you what the law is, and

24   what law is to be applied in this case, and I'm saying that now

25   because this is my last opportunity to speak to you all, and Mr.

1    Cashio, I think will make references as to what the law is and

2    what law you should apply, that's Judge Zainey's job.

3          When you look at the evidence, the testimony of the

4    witnesses, the videotape that you've seen, Mr. Smith's own

5    admissions, he's mad, he's upset.  He's drinking.  He grabs onto

6    a truck after it starts to move, he can come up with a thousand

7    reasons why all of those things aren't his fault, and the bottom

8    line is that it's an automobile accident, and what caused his

9    injuries?  What caused his leg to get rolled over?  Is because

10   he grabbed onto a moving truck after it started moving.

11         Now, I don't know if you remember from a few days ago

12   when I said in opening statement the one thing that I agreed

13   with that Mr. Cashio said was that he was going to ask you for a

14   lot of money.  Now, I was right.  He was right, and he asked you

15   for a lot of money.

16         The evidence shows that Mr. Smith's injuries, and it's

17   unfortunate that he has these injuries and that he suffered and

18   he has medical expenses and he has losses, but the reason that

19   it happened is his fault.  And sometimes it's hard to say to

20   someone who has been hurt and has damages, wants money, he wants

21   you to give him a lot of money, but, you know, what it was your

22   fault.

23         I have confidence in you that based upon the evidence

24   that you've seen and heard that you will find that this

25   accident, the automobile accident, that's what this is about,

1  was Mr. Smith's fault.  This isn't about who said what, you

2  know.  Who called who what first or second, or what policy of

3  Harrah's regarding whether or not they should bring the car

4  down, or whether or not they should tell the guests that you can

5  go in and get comped, it's not about any of that.  It's about

6  Mr. Smith being mad and upset, so made and upset and he wants

7  his truck, he's not going to pay parking, that he's going to

8  grab a moving truck.  That's what it's about.

9       As I told you a moment ago, I'm not going to have the

10  opportunity to speak to you all again.  If you decide to award

11  Mr. Smith or give Mr. Smith money, I would suggest to you that

12  the numbers that have been shown up there are not substantiated

13  by the evidence that you've heard here.  Certainly, certainly

14  not Mr. Smith's earnings.

15       There's another thing that's not his fault.  You know,

16  he doesn't pay taxes because he doesn't know about tax stuff,

17  and "Daddy didn't give me the forms I needed.  This guy didn't

18  give me the form I needed".  You know, we all pay taxes.  Then

19  has the audacity, the audacity to mail tax returns last Friday

20  to the  wrong address so he can come in here and talk about that

21  he made $50,000 a year.

22       Again, I think once you consider the evidence, the

23  testimony and the videotape, the accident, the cause of the

24  accident is real simple, once you get passed all this stuff that

25  we boys like to confuse you all with sometimes, Mr. Smith

1    grabbed onto a moving truck.

2          Again, I'm not going to have an opportunity to speak to

3    you all again.  On behalf of my client, Harrah's.  On behalf of

4    Mr. Dorsey, it's representative for this trial, I want to thank

5    you all.  You all have been very, very attentive.  I

6    appreciate your attention.  I appreciate your consideration.  I

7    know you'll render a fair and just verdict in this case.

8          Thank you all.

9          THE COURT:    Mr. Cashio, you have how much time, James?

10         THE CLERK:    Five minutes.

11         THE COURT:    Five minutes, sir.

12              (REBUTTAL ARGUMENT BY MR. CASHIO)

13         MR. CASHIO:    I only have five minutes.  I'm going to

14   speak fast again.

15         Harrah's attorney claims that he was mad.  Look at the

16   video tape for 20 or 30 minutes.  Even after their original

17   confrontation Shaun is doing this on the booth (indicating)

18   after the thing.  He was so mad that he was hanging on the booth

19   like that (indicating).  He was walking around, for 20 minutes?

20   He was calm as a cucumber.  He wasn't mad because he lost money.

21   He's lost money before.  I guess he expected to, he's too good

22   in math playing Blackjack, he didn't have much of a chance

23   against Harrah's.

24         In fact, at 203931, after the original confrontation,

25   Shaun gets on the phone and looks through his wallet.  You can

1   see that 203931.  He's trying to find some money to pay.

2   Originally he said "I'm not going to pay."  He thought some kind

3   of scam was being run on him.  Nobody that I know of has ever

4   heard of valet parking being charged.  So anyway, he's looking.

5   He thinks it's a scam, somebody's running a scam on him and he

6   says, "I'm not paying" at first, and then at 203931, you'll see

7   him look through his wallet.  Then later on he puts something on

8   the thing.  As he said, that was his driver's license, like the

9   airport did in Chicago when he didn't have enough money to pay.

10   All they did was take a copy of his license and sent him a bill.

11   That's all they had to do to squeeze $10 more dollars out of

12   Shaun after they took all his money, but, no, they hired a top

13   law firm to defend them here, and even, as good as, they are, I

14   don't think they can defend Harrah's in this case.  And please,

15   don't blame Shaun if he didn't select a top law firm to defend

16   him.

17         In the unlikely event you think that Shaun played a

18   part in this thing, which I don't think he did at all, because

19   every time he touched the truck the driver would stop.  The

20   driver only took off and ran over him when Mr. Dorsey ran out

21   there and started screaming at him to take off.  Shaun had every

22   reasonable right to think the driver was going to stop for the

23   third time when he touched the car.  He didn't this time it ran

24   over him.

25         Even in the unlikely event you think that Shaun

1   possibly played a minute part, then go ahead and deduct five or

2   10 percent from his award, but I don't think you're going to do

3   that.  I don't think you're going to give Harrah's that break

4   that they really don't deserve.

5       Anybody who has a do and don't list like this, really.

6   It says, "Don't offer to pay medical expense.  Don't admit

7   expansibility.  Don't apologize for the accident".  Anybody

8   whose got a whole procedure to that, I'm in shock that they

9   would even write that down rather than just telling the people.

10      And Mr. Augustine, the driver, they were able to bring

11  another guy from St. Louis.  Why didn't they bring Mr.

12  Augustine?  I'll give you my opinion.  He was not going to help

13  them.  That's the reason they didn't bring him down.

14      Tell me when I only have a minute, please.

15      THE CLERK:   You have two minutes.

16      MR. CASHIO:   Okay.  Mrs. Wilson admits that she

17  violated the casino policy.  It was a clear violation, she

18  admitted it under oath, by bringing the car down.  Harrah's

19  policy says, "You don't bring the car down?

20      Also she admitted violating policy on page 28 by not

21  explaining to Shaun, a cash customer, how to get a free parking

22  comp because she claims Shaun never gave her a chance.  Look at

23  the video.  She had all the chance in the world.

24      Mr. Dorsey again, he's been in racial arguments before

25  and after the accident.  Again, the race has nothing to with

1   this case.  It's who's at fault and who's not, and we think it's

2   overwhelming that Harrah's, even admitting their own fault by

3   breaking their own rules.  If she would have just not called the

4   car down there's a million ways Harrah's could have avoided this

5   accident but they didn't.

6           THE CLERK:   One minute.

7           MR. CASHIO:   Okay.

8           I just want to leave you with a quote from the

9   proverbs.  It's the 22nd Chapter from the New England National

10  version.  It says on the 22nd verse.  "Do not exploit the poor

11  because they are poor, and do not crush the needy in court for

12  the Lord will take up their case and plunder those who plundered

13  them".

14          Thank you.

15          THE COURT:   All right.  Thank you.

16          Al, go ahead and pass out the jury charges.

17          MR. BALLINA:   Your Honor, may we approach?

18          THE COURT:   Yes.

19              (BENCH CONFERENCE, AS FOLLOWS):

20          MR. BALLAIN:   Given counsel's argument to the jurors

21  that Mr. Augustine's not here, and was available to Harrah's..

22  that was a requested jury charge by the defendant, a witness

23  which is available to both parties.  That was not included, and

24  I think it should now be included in our jury charges.

25          MR. CAHSIO:   I'm sorry?

1    THE COURT:    With referring to Mr. Augustine.

2    Start over.    Say it again.

3    MR. BALLINA:    Given Mr. Cashio's argument to the

4    jurors to that Mr. Augustine's not here and he was available to

5    Harrah's.    This was a requested jury charge by the defendant,

6    the availability of witnesses.    That a witness that is available

7    to both parties should be a charge.    That if a witness is

8    available to both parties you can't hold it against one party

9    because he wasn't called.

10    MR. CASHIO:    Your Honor, can I say something?

11    You already approved the jury charges.    What counsel

12    says in closing argument -- and it was my jury charge, and I

13    didn't object.

14    THE COURT:    Let me look at the charge.    Okay.

15    The Plaintiff's Jury Charge Number 21.    This charge,

16    that no inferences or presumptions should be indulged in for a

17    party's failure to call an unavailable witness, if the witness

18    was equally unavailable to both sides.

19    MR. BALLINA:    Yes, sir.

20    MR. CASHIO:    Because it's after the jury conference,

21    but I didn't --

22    THE COURT:    You want to object?    That's your charge.

23    MR. CASHIO:    I know, but I didn't object at that time.

24    THE COURT:    Counsel, based on your argument, the jury

25    is going to get this charge.

1          MR. CASHIO:   All right.  End of conversation.  Amen.

2      James, get if back from everybody.

3              (BENCH CONFERENCE CONCLUDED)

4          THE COURT:  Ladies and gentlemen, we're going to take

5      those back from you for just one minute, please.

6              (BENCH CONFERENCE, AS FOLLOWS)

7          THE COURT:   I don't to bring any undue attention to

8      it.

9          Okay.  I'm going to put it as 5a.

10         Let's stick to the part L.  We're going to insert a

11     jury instruction after page 5.

12         MR. CASHIO:   Page 5?

13         THE COURT:   Page 5.

14         Any objection?

15         MR. BALLINA:   No, objection.

16         THE COURT:   Thank you.

17         MR. CASHIO:   Objection.  My previous objection, but

18     not a new one.

19         THE COURT:  Previous objection to your own charge?

20         MR. CASHIO:   Right.

21         THE COURT:   Okay.

22              (BENCH CONFERENCE CONCLUDED)

23              (CHARGE TO THE JURY)

24         THE COURT:   You can go ahead and follow along as I

25     read you the jury charges.

1    Members of the Jury:  You heard the evidence in this

2    case.  I will now instruct you on the law that you must apply.

3    It is your duty to follow the law as I give it to you.  On the

4    other hand, you the jury are the judges of the facts.  Do not

5    consider any statement that I may have made in the course of

6    trial or make in these instructions as an indication that I have

7    any opinion about the facts of this case.

8    You have heard the closing arguments of the attorneys.

9    Statements and arguments of the attorneys are not evidence and

10   are not instructions on the law.  They are intended only to

11   assist the jury in understanding the evidence and the parties'

12   contentions.

13   Answer each question on the verdict form from the facts

14   as you find them.  Do not decide who you think should win and

15   then answer the questions accordingly.  Your answers and your

16   verdict must be unanimous.

17   You must answer all questions from a preponderance of

18   the evidence, which is the greater weight and degree of credible

19   evidence before you.  In other words, a preponderance of the

20   evidence just means the amount of evidence that persuades you

21   that a claim is more likely so than not so.  In determining

22   whether any fact has been proved by a preponderance of the

23   evidence in the case, you may, unless otherwise instructed,

24   consider the testimony of all witnesses, regardless of who may

25   have called them, and all exhibits received in evidence,

1    regardless of who may have produced them.

2            In determining the weight to give to the testimony of a

3    witness, you should ask yourself whether there was evidence

4    tending to prove that the witness testified falsely concerning

5    some important fact, or whether there was evidence that at some

6    other time the witness said or did something, or failed to say

7    or do something, that was different from the testimony the

8    witness gave before you during the trial.

9            You should keep in mind, of course, that a simple

10   mistake by a witness does not necessarily mean that the witness

11   was not telling the truth as he or she remembers it, because

12   people may forget some things or remember other things

13   inaccurately.  So, if a witness has made a misstatement, you

14   need to consider whether that misstatement was an intentional

15   falsehood or simply an innocent lapse of memory; and the

16   significance of that may depend on whether it has to do with an

17   important fact or with only an unimportant detail.

18           While you should consider only the evidence in this

19   case, you are permitted to draw such reasonable inferences from

20   the testimony and exhibits as you feel are justified in the

21   light of common experience.  In other words, you may make

22   deductions and reach conclusions that reason and common sense

23   lead you to draw from the facts that have been established by

24   the testimony and evidence in the case.

25           The testimony of a single witness may be sufficient to

1    prove any fact, even if a greater number of witnesses may have

2    testified to the contrary, if after considering all the other

3    evidence you believe that single witness.

4          There are two types of evidence that you may consider

5    in properly finding the truth as to the facts in the case.  One

6    is direct evidence, such as testimony of an eyewitness.  The

7    other is indirect or circumstantial evidence, the proof of a

8    chain of circumstances that indicate the existence or

9    nonexistence of certain other facts.  As a general rule, the law

10   makes no distinction between direct and circumstantial evidence,

11   but simply requires that you find the facts from a preponderance

12   of all the evidence, both direct and circumstantial.

13         A "stipulated fact" or "stipulation" is a fact that the

14   attorneys agree is accurate.  Since there is no dispute about

15   certain facts, the attorneys may agree or "stipulate" those

16   facts to save all of us a lot of time in this trial.  Unless I

17   instruct you to the contrary, you must accept a stipulated fact

18   as evidence and treat the fact which is stipulated as having

19   been proven.

20         The parties have agreed or stipulated that:

21         On December 10th, 2003, at approximately 8:45 p.m.

22   Shaun Smith was involved in an accident as a pedestrian with

23   his father's truck driven by Kevin Augustine at Harrah's New

24   Orleans Casino.

25         At the time of the accident, Mr. Augustine was working

1    as a parking valet for Harrah's New Orleans Management

2    Company.

3         As a result of the accident, Mr. Smith has spiral

4    fractures of the left tibia and fibula.

5         Mr. Smith underwent an open reduction and internal

6    fixation of the left tibia at The Medical Center of

7    Louisiana at New Orleans and was hospitalized for three

8    days.

9         The Medical Center of Louisiana at New Orleans has

10   asserted a privilege for $19,362.63.

11        Let me see both counsel.

12             (BENCH CONFERENC, AS FOLLOWS):

13        THE COURT:   Let me go head and put in now the amount

14   of the past medicals that you have stipulated, since they are

15   going to see that, because I don't want them to get confused.

16        MR. BALLINA:   Right, and that will go in the record

17   that my client disputes the negligence?

18        THE COURT:   Yes.

19        MR. BALLINA:   Which kind of cornered me about that

20   just having it on there.

21        THE COURT:   There's going to be added an additional

22   stipulation that's not included in the written material, but the

23   lawyers have agreed to again, without the defendant admitting

24   any type of liability, both parties have stipulated that the

25   past medical expenses tota $23,006.03.

1          You're not going to have to remember that number.

2     We're going to be giving you a jury verdict form, and we've

3     already included that number in the jury verdict form with the

4     agreement of both counsel that that is the amount.  And again,

5     without addressing the issue of negligence, which I'll address

6     in a minute.

7          The past medical expenses themselves wewe 23,006.03

8     so that you can look at as being a correct thing.  You must

9     therefore remember these facts.

10          Is that correct, counsel for plaintiff?

11          MR. CASHIO:    Yes, Your Honor.

12          THE COURT:    Counsel for defendant?

13          MR. BALLINA:    Yes.

14               (BENCH CONFERENCE CONCLUDED)

15          THE COURT:    After gambling at the Casino for

16     approximately an hour, and losing all his money, Mr. Smith

17     left the Casino and to retrieve his truck from valet.

18          Mr. Smith mailed his 2002 and 2003 tax returns on

19     Friday, October 8; however, he mailed them to the wrong

20     address.

21          You must therefore treat these facts as having been

22     proved.  However, defendant disputes, or contests, that it was

23     negligent or that its negligence, if any, was a legal cause of

24     plaintiff's damages, if any.

25          In this case, the plaintiff must prove every essential

1    part of his claim by a preponderance of the evidence.

2         A preponderance of the evidence simply means evidence

3    that persuades you that the plaintiff's claim is more likely

4    true than not true.

5         In deciding whether any fact has been proved by a

6    preponderance of the evidence, you may, unless otherwise

7    instructed, consider the testimony of witnesses, regardless of

8    who may have called them, and all exhibits received in evidence,

9    regardless of who may have produced them.

10        If the proof fails to establish any essential part of

11   the plaintiff's claim by a preponderance of the evidence, you

12   should for the defendant as to that claim.

13        In judging the credibility of the witnesses which you

14   have heard, you should have in mind the rule that a witness is

15   presumed to speak the truth about facts within his knowledge.

16   This presumption, however, may be overcome by contradictory

17   evidence, by the manner in which the witness testifies, by the

18   character of his testimony, or by evidence that pertains to his

19   motives.

20        As I mentioned to you at the beginning of the trial,

21   when you weigh the credibility of a witness, you should consider

22   the interest, if any, which he or she may have in the outcome of

23   this case; the ability to know, remember and tell the facts to

24   you; his or her manner of testifying, as to his sincerity and

25   frankness; and the reasonableness or unreasonableness of the

1   testimony in the light of all other evidence.  You do not have
2   to accept all the testimony of a witness as being true or false.
3   You may accept and believe those parts of the testimony that you
4   consider logical and reasonable, and reject those parts that
5   seem impossible or unlikely.

6           You are not bound to decide any issue of fact in
7   accordance with the number of witnesses presented on that point.
8   Witnesses are weighed and not counted.  Your function is to
9   determine the facts and this is not done by counting noses.  The
10  test is not which side brings the greater number of witnesses
11  before you, or presents the greater quantity of evidence, but
12  rather which witnesses and which evidence appeals to your minds
13  as being the most accurate and the most convincing.

14          When knowledge of technical subject matter may be
15  helpful to the jury, a person who has special training or
16  experience in that technical field, he is called an expert
17  witness is permitted to state his opinion on those technical
18  matters.  However, you are not required to accept that opinion.
19  As with any other witness, it is up to you to decide whether to
20  rely upon it.

21          In deciding whether to accept or rely upon the opinion
22  of an expert witness, you may consider any bias of the witness,
23  including any bias you may infer from evidence that the expert
24  witness has been or will be paid for reviewing the case and
25  testifying, or from evidence that he testified regularly as an

1  expert witness and his income from such testimony represents a
2  significant portion of his income.

3       I charge you that no inferences or presumptions should
4  be indulged in for a party's failure to call an available
5  witness, if the witness was equally available to both sides.

6       The law applicable to plaintiff's claim depends upon
7  the nature of that claim.  This is a suit seeking damages for
8  injury caused by the act of another.  Under the Louisiana Civil
9  Code such an act is called an offense or quasi-offense and the
10 suit is generally known as a tort suit.  The basic law in
11 Louisiana in this type of suit is generally known as a tort
12 suit.  The basic law in Louisiana in this type of suit is found
13 in Article 2315 of the Louisiana Civil Code.

14       "Every act whatever of man that causes damage to
15        another obliges him by whose fault it happened to
16        repair it."

17       The word "fault" in that article is a key word.  While
18 the Civil Code does not further define the word, it may perhaps
19 best be explained by saying that it signifies the conduct that a
20 person should not have engaged in; i.e, that he has acted as he
21 should not have acted, or that he has failed to do something
22 that he should not have done.  It is thus conduct below the
23 standard which the law applies to his activities.

24       It should be immediately obvious to you that the
25 standard which we apply to the defendant's conduct will vary

1    according to the activity which he is engaged in, and the

2    circumstances surrounding that activity.  As you are well aware,

3    in our complex society, persons are engaged in all kinds of

4    activities, and understandably, different standards may apply to

5    those activities.  Those standards may be set down by the

6    legislature as statutes, or by local officials as ordinances, or

7    even by the courts themselves in instances in which the law does

8    not make a specific provision for the activity.  In a few

9    minutes I will tell you the standards which apply to the

10   defendant's conduct in this particular suit, and you must accept

11   the standards as I give them to you.  It will then be one of

12   your tasks to determine if the plaintiff has proved by a

13   preponderance of the evidence that the defendant has fallen

14   below the standard which the law expects of him in this

15   particular instance.  To put it briefly, you will have to

16   determine if the plaintiff has proved that the defendant has

17   engaged in substandard conduct and is thus, in legal terms, "at

18   fault."  In this particular case, the plaintiff alleges that the

19   defendant has committed the kind of fault which the law calls

20   "negligence".

21           But this is only one of the elements of plaintiff's

22   case, in order to be successful, the plaintiff must establish

23   all the essential elements of his case.  The other elements are

24   the following:

25           (1)  that the injury the plaintiff suffered was,

1            in fact, caused by the conduct of the defendant;

2            and

3            (2)  that there was actual damage to the

4            plaintiff's person or his property.

5            As to the requirement that plaintiff's injury be caused

6     by defendant's conduct, I do not mean that the law recognizes

7     only one cause of any injury, consisting of only one factor or

8     thing, or the conduct of only one person.  On the contrary, many

9     factors or things may operate at the same time, either

10    independently or together, to cause injury or damage.  You

11    should resolve this question by deciding whether plaintiff would

12    probably have suffered the claimed injuries in the absence of

13    defendant's conduct.  If plaintiff probably would have suffered

14    those injuries regardless of what the defendant did, then you

15    must conclude that the injuries were not caused by the

16    defendant, and render a verdict for that defendant.  If, on the

17    other hand, plaintiff probably would not have suffered the

18    claimed injuries in the absence of defendant's conduct, then you

19    must conclude that defendant's conduct did play a part in

20    plaintiff's injury and you must proceed to the next element.

21            The second element of the plaintiff's case which you

22    must consider is whether the defendant's conduct was below the

23    standard applicable to his activities.

24            In this case, the basic standard applicable is a

25    requirement that the defendant exercise that degree of care

1    which we might reasonably expect from an ordinarily prudent

2    person under the same or similar circumstances.  You will see

3    that this is a relative term; the care which we reasonably

4    expect from any ordinarily prudent person will vary according to

5    the circumstances facing him.  Notice also that the conduct we

6    set up as a standard is not that of the extraordinarily cautious

7    individual or the exceptionally skillful one, but that of a

8    person of ordinary prudence.  While unusual caution or skill is

9    to be admired and encouraged, the law does not demand it as a

10   standard of care in this case.

11          The ordinarily prudent person will avoid creating an

12   unreasonable risk of harm.  In determining whether the defendant

13   breached this standard, and created an unreasonable risk of

14   harm, you may weigh the likelihood that someone might have been

15   injured and the seriousness of that injury against the

16   importance to society of what the defendant was doing and the

17   advisability of the way in which he was doing it, under the

18   circumstances.

19          Normally one person is not responsible for the conduct

20   of another person who may have caused damage to someone.  But in

21   certain situations, the law imposes responsibility upon a person

22   or entity for the conduct of another, if they are in a

23   relationship which can serve as an appropriate basis for

24   imposing such a responsibility.  The law calls this "vicarious

25   liability", which simply means that one person may be liable for

1    the acts of another even though that first person is not himself

2    at fault.  You may also have heard the concept "respondeat

3    superior", which simply means "let the person higher up

4    respond".

5         An employer is liable for the damages caused by the

6    fault of his employee, if the incident occurs while the employee

7    is exercising the functions for which he was employed.

8    Sometimes we shorten this principle to the statement that the

9    employee must have been in the course and scope of his

10   employment.

11        In order to recover against the employer, plaintiff

12   must prove by a preponderance of the evidence:

13             (1)  the tortfeasor was an employee of the defendant.

14             (2)  the employee was at fault; and.

15             (3)  the tort occurred during the exercise of the

16             functions for which th employee was employed.

17        The basic standard applicable to a defendant is that he

18   exercise that degree of care that we might reasonably expect of

19   an ordinarily prudent person under the same or similar

20   circumstances.  Here, the defendant's employee was driving an

21   automobile.

22        Our law requires a motorist generally to keep his

23   vehicle under proper control and at a proper speed, and to

24   maintain a proper lookout for hazards, which by the use of

25   ordinary care and observation one should be able to see.

1          A pedestrian is charged with the duty of observing

2   approaching traffic when attempting to cross a street or

3   roadway.  Further, it is well established that a motorist may

4   rely on the assumption that a pedestrian will not damage himself

5   by stepping suddenly into the roadway or street into the path of

6   a moving vehicle.

7          Every driver of a vehicle must exercise due care to

8   avoid colliding with any pedestrian upon any roadway and must

9   give warning by sounding his horn when necessary, and must

10  exercise proper precaution upon observing any child or any

11  confused or incapacitated person on a roadway.

12         A motorist is not presumed to be liable in a collision

13  with a pedestrian.  The pedestrian still has the burden of

14  proving the negligence of the motorist.  Thus a motorist who

15  exercises reasonable care to protect a pedestrian who

16  nonetheless suffers injury is not at fault.

17         A pedestrian, as well as a motorist, is charged with

18  seeing what he could or should have seen in the exercise of due

19  care, and failure to do so is negligence.

20         In summary, in order to find the defendant's conduct

21  substandard, you must find that as an ordinarily prudent person

22  under all the circumstances surrounding his conduct, the

23  defendant should have reasonably foreseen that as a result of

24  his conduct, some such injury as to the plaintiff suffered would

25  occur, and you must find also that he failed to exercise

1    reasonable care to avoid the injury.  You may find it helpful to

2    phrase your inquiry this way: "How would an ordinarily prudent

3    person have acted or what precautions would he have taken if

4    faced with similar conditions or circumstances?"

5         If you conclude that the plaintiff has established the

6    other elements of his case, then you must determine whether the

7    defendant has proved that the plaintiff has failed to conduct

8    himself in accordance with the standard expected of him, and has

9    thereby contributed to his own injury.  It is the law of

10    Louisiana that the recovery of an injured person who has

11    contributed to his own injury by his own substandard conduct

12    must be reduced by the percentage of fault attributable to him.

13         In this case, the standard applicable to the

14    plaintiff's conduct is the requirement that he exercise that

15    degree of care which we might reasonably expect a person to

16    exercise for his own safety and protection.  On this issue the

17    defendant has the burden of proof.  In other words, the

18    defendant has the burden of establishing, by a preponderance of

19    the evidence, that the plaintiff in this case failed to conform

20    to that standard, and by that failure contributed to his injury.

21    If the defendant convinces you of that, then you must assign a

22    percentage of fault to the plaintiff's conduct according to the

23    instructions that I will give you.

24         In deciding the question of plaintiff's contributing

25    negligence, as it is called in the law, you may phrase your

1  inquiry in this way:  "Should the plaintiff as an ordinarily

2  prudent person, under all the circumstances surrounding his

3  conduct, have reasonably foreseen some such injury as he

4  suffered as a result of his conduct, and did he fail to exercise

5  reasonable care to avoid such injury to himself?"

6        If the defendant does not convince you that the

7  plaintiff was also at fault, and that person has otherwise

8  proven his case by a preponderance of the evidence, then you

9  should return a verdict for the plaintiff without assigning any

10 percentage of fault to him.

11       If you conclude that both the defendant and the

12 plaintiff were negligent, and that the negligence of each was a

13 proximate cause of the accident and plaintiff's injuries, then

14 you must assign percentages of fault to each one.  In

15 determining those percentages, you may consider both the nature

16 of the negligent conduct and the extent of the casual relation

17 between the conduct and plaintiff's injuries.

18       When I say "the nature of the negligent conduct", I

19 mean that you must consider (1) whether the conduct resulted

20 from inadvertence or rather involved an awareness of the danger

21 involved; (2) how great the risk created by the person's conduct

22 was; (3) the importance of what was sought by the conduct; (4)

23 the physical and mental capacities of the person, either

24 ordinary or perhaps superior or inferior; and (5) any

25 extenuating circumstances which might have required that party

1    to act in haste, without proper thought.

2        When I say "the extent of the causal relation", between

3    the conduct and the injuries, I mean that you may consider the

4    extent to which that party's conduct contributed to the

5    happening of the accident and plaintiff's injuries.

6        Louisiana Law requires that you divide the total

7    responsibility for this incident among all those who were

8    involved in it.  You should do this by assigning percentages of

9    fault to the various involved persons which will total 100

10   percent.  You are free to assign whatever percentage you feel

11   appropriate, and you should do so by answering the following

12   questions, which will be provided to you on a special verdict

13   form:

14        Was the defendant, Harrah's Casino, guilty of

15        substandard conduct which proximately caused

16        plaintiff's damages?

17        If the answer to Question 1 is "yes", what is the

18        degree of defendant, Harrah's Casino's fault, expressed

19        in a percentage?

20        Was the plaintiff, Shaun Lee Smith, guilty of

21        substandard conduct which proximately caused his own

22        damage?

23        If the answer to Question 3 is "yes", what is the

24        degree of plaintiff, Shaun Lee Smith's fault, expressed

25        in a percentage?

1          What is the total of damages suffered by plaintiff in

2          this case, without making any reduction for his own

3          substandard conduct?

4          If you conclude that the plaintiff has established the

5   other elements of his case, then you must determine whether the

6   defendant has proved that the plaintiff has failed to conduct

7   himself in accordance with the standard expected of him, and has

8   thereby contributed to his own injury.  It is the law of

9   Louisiana that the substandard conduct of an injured person

10  which contributes to his own injury will reduce his recovery,

11  but will not bar it entirely unless you believe that conduct was

12  the sole cause of the person's injury.

13          Cautionary instructions on damages.

14          You should not interpret the fact that I have given

15  instructions about the plaintiff's damages as an indication in

16  any way that I believe that the plaintiff should or should not,

17  win this case.

18          If you decide that the plaintiff has established the

19  other elements of his case by a preponderance of the evidence,

20  and the defendant has failed to establish a defense which would

21  prevent himself from recovering an award for his injuries, you

22  must decide the question of whether there has been damage to his

23  person or his property and if so, the amount of that damage.

24          In this regard, I call to your attention the words of

25  Article 2315 of our Civil Code:

1          "Every act whatever of man that causes damage to

2          another, obliges him by whose fault it happened to

3          repair it".

4          This article, and our law, suggests simple reparation,

5   a just and adequate compensation for injuries.  It suggests no

6   idea of revenge of punishment.  Accordingly, our law does permit

7   the awarding of damages to punish the defendant, or make an

8   example of him to prevent other accidents, and you should

9   include no such amount in your award.  Your award should be

10  designed to fully and fairly compensate the plaintiff for his

11  injury, if you find one has occurred, and should not go beyond

12  such reparation.

13          The law recognizes the difficulty of translating

14  personal injuries into a dollars and cents figure, but that is

15  what must be done.  You must arrive at a figure that will fairly

16  and adequately compensate the plaintiff for damages he has

17  already suffered, and that he will in all likelihood suffer in

18  the future.  In estimating such damages, you may take into

19  consideration the following elements:

20          Physical injured suffered;

21          Pain and suffering, both physical and mental;

22          Permanent disability, if any;

23          Loss of earnings, if any, both past and future;

24          Medical expenses, both past and future.

25          Like other parts of the plaintiff's case, these damages

1    must be established by a preponderance of the evidence.  This

2    means, on the one hand, that you are not entitled to award

3    speculative damages for injuries which you think the plaintiff

4    might have suffered or might suffer in the future.  On the other

5    hand, it means that you may make an effort to reasonably

6    approximate the damages which plaintiff has proved are more

7    probable than not, even though they cannot be computed with

8    mathematical certainty.  You may, if you wish, take into account

9    the decreasing value of the dollar in today's market.

10        In reaching a verdict on the question of damages, I

11   caution you not to include anything for the payment of court

12   costs and attorney fees; the law does not consider these as

13   damages suffered by the plaintiff.  I further inform you that

14   any amount you might award the plaintiff is not income within

15   the meaning of the tax laws.  If you decide to make an award,

16   follow the instructions I have given you and do not subtract

17   from that award on account of federal or state income taxes.  In

18   other words, if you find that the plaintiff is entitled to

19   damages, the amount which you award should be the sum that you

20   think will fully and fairly compensate the plaintiff for his

21   injuries, without regard to what he may pay his attorney or the

22   amount that you might think would be paid in income taxes.

23        Finally, let me say that the fact that I have given you

24   these statements about the law of damages does not in any way

25   imply or suggest that I feel or do not feel that any damages are

1  due in this case.  Whether or not damages are due is solely for

2  you to determine.

3          The law recognizes both general damages for the pain

4  and suffering which plaintiff may have faced because of this

5  incident and specific damages, sometimes called special damages,

6  which are intended to reimburse plaintiff for the actual or

7  anticipated out-of-pocket expenses which he has incurred to date

8  or will incur in the future.

9          If you decide to award plaintiff general damages, you

10  may consider his pain and suffering, inconvenience and mental

11  distress, both in the past and to be anticipated in the future.

12  If you decide to award plaintiff special damages, you should

13  consider the evidence that has been offered on these issues, and

14  you may award sums of money for:

15          Past medical expenses;

16          Future medical expenses, if any;

17          Past lost wages; and

18          Future lost wages.

19          As I have mentioned to you, there is no practical way

20  to introduce evidence as to the general damages which plaintiff

21  claims for pain and suffering and mental distress.  There is no

22  precise standard to fix these damages or assign some kind of

23  value to them.  Rather, your job is to determine an amount that

24  will be fair and just on the basis of evidence of plaintiff's

25  injury and treatment that you have heard, and that will fairly

1    compensate plaintiff for any damage he may have suffered.

2          In determining any award that you might make for past

3    or future medical expenses, you should consider the evidence,

4    and the opinions of expert witnesses, to decide the reasonable

5    value or expense of medical, nursing and hospital care and

6    treatment which was or will be reasonable and necessary for

7    plaintiff's condition.

8          In determining any award that you might make for past

9    wage loss, you should consider th evidence presented to you on

10   that issue.  Any award which you may make should be based on

11   plaintiff's gross income, that is his earnings before deductions

12   for income taxes, social security and so forth, not on what we

13   generally call his "take-home pay".

14         While lost earnings need not be proven in every case

15   with mathematical certainty, the law requires such proof as

16   reasonably establishes the claim.

17         The amount of damages for an item such as loss of

18   future wages is necessarily speculative and cannot be calculated

19   with mathematical certainty.  However, if you feel that such

20   damages should be awarded, you should exercise your discretion

21   in considering all the circumstances and award an amount that is

22   just to both litigants and not unduly oppressive to either.

23         An award for alleged loss of future income is

24   inherently speculative and is intrinsically unsusceptible of

25   being calculated with mathematical certainty.  Thus, you must

1    exercise sound discretion in determining whether any such award

2    is due and should only render such an award that is consistent

3    with the record and which does not work an injustice.

4            In determining such an award, you may consider

5    plaintiff's physical condition before and after this incident,

6    his work record, his earnings in prior years, the probability or

7    unprobability that he would have earned similar amounts in the

8    remainder of his work life, and whether and how much plaintiff's

9    current condition disadvantages him in the work force.  Since,

10   if you make such an award, plaintiff would be receiving today

11   sums of money that otherwise he would only receive over a number

12   of years in the future, the law requires that you "discount" or

13   reduce to its present value the amount of the future loss you

14   might otherwise award.  In simple terms, this is a reduction by

15   the amount of money, or interest, which this smaller sum of

16   money will earn for plaintiff over the period of time in which

17   he would have been earning these future wages.  You should list

18   this "discounted" figure as your award for future wage loss, if

19   you make such an award.

20           In determining this "discount" factor, you may consider

21   the evidence of the experts who have testified on this issue.

22           In the event that you find the plaintiff suffered

23   permanent injury as a result of the accident, you should

24   consider his life expectancy and work-life expectancy in

25   arriving at the amount of damages.

1          According to life tables which were introduced into

2      evidence which are part of the vital statistics of the United

3      States, the life expectancy in this country of males who are 25

4      years old is 51.2 years.

5              MR. CASHIO:    Your Honor.

6              THE COURT:    Yes.    Approach the bench.

7                  (BENCH CONFERENCE, AS FOLLOWS):

8              MR. CASHIO:    Your Honr, it's 53.

9              THE COURT:    53.2 is the total.

10             MR. CASHIO:    No, it can't.    A 25 year old male --

11             THE COURT:    There's male, white male, 51.2.

12             MR. CASHIO:    No, wait.    Let's see.

13             Can I see it.

14             His remaining amount of years, Your Honor is 53.2 for a

15     person who lives to 77, so he'll be 25, he's got to live more

16     than that.

17             THE COURT:    I'm reading from the vital statistics, and

18     what I'm going to read to the jury is where it says age 25.    I'm

19     going to read under white male 51.2 years.    I'll note your

20     objection for the record.

21             It's clear to court that 51.2 is proper, and that's

22     what I'm going to read to the jury, and I'll note your

23     objection.

24             MR. CASHIO:    Let me say it specifically.

25             I object.    The Court's in error in saying that a man

1  who's 25 years of age only lives to the age of 51.2.  I  think

2  the Court should say that a man 25 years of age will live 53.3

3  more years.

4          It's up to you, Judge, that's fine.

5          THE COURT:   This is how I'll read it.

6                  (BENCH CONFERENCE CONCLUDED)

7          THE COURT:   Life expectancy, as shown by a statistical

8  table is merely an estimate of the probable average remaining

9  length of life of all persons in the United States of a given

10  age and sex, and that estimate is based upon a limited record of

11  experience.  So, the inference which may reasonably be drawn

12  from life expectancy, as shown by the tables, applies only to

13  one who had the average health and exposure to danger of people

14  of that age and sex.  In determining the reasonably certain life

15  expectancy of a plaintiff, you should consider in addition to

16  what is shown by the tables, all other facts and circumstances

17  in evidence bearing upon the life expectancy of the plaintiff,

18  including occupation, habits, past health record and present

19  state of health.

20          Plaintiff has claimed as a part of his damages that he

21  has suffered loss of enjoyment of life in addition to the other

22  physical and mental damages that he asserts.  As with all other

23  aspects of damage claims, you have much discretion as to whether

24  any such damages should be awarded, and in what amounts.  In

25  this connection, you may take into account plaintiff's interests

1   and way of life and the extent to which he may have suffered

2   damage with respect to it which is separate from his other

3   physical and mental damages.

4          A person who claims damages resulting from the wrongful

5   act of another has a duty under the law to use reasonable

6   diligence to mitigate, to avoid or minimize those damages.

7          If you find the defendant is liable and the plaintiff

8   has suffered damages, the plaintiff may not recover for any item

9   of damage which he could have avoided through reasonable effort.

10  If you find by a preponderance of the evidence the plaintiff

11  unreasonably failed to take advantage of an opportunity to

12  lessen his damages, you should deny him recovery for those

13  damages which he would have avoided had he taken advantage of

14  the opportunity.

15         You are the sole judge of whether the plaintiff acted

16  reasonably in avoiding or minimizing his damages.  An injured

17  plaintiff may not sit idly when presented with an opportunity to

18  reduce his damages.  However, he is not required to exercise

19  unreasonable efforts or incur unreasonable expenses in

20  mitigating the damages.  The defendant has the burden of proving

21  the damages which the plaintiff could have mitigated.  In

22  deciding whether to reduce the plaintiff's damages because of

23  his failure to mitigate, you must weigh all the evidence in

24  light of the particular circumstances of the case, using sound

25  discretion in deciding whether the defendant has satisfied his

1  burden of proving that the plaintiff's conduct was not

2  reasonable.

3         Do not let prejudice or sympathy play any part in your

4  deliberation.  A corporation and all other persons are equal

5  before the law and must be treated as equals in a court of

6  justice.

7         It is your sworn duty as jurors to discuss the case

8  with one another in an effort to reach agreement if you can do

9  so.  Each of you must decide the case for yourself, but only

10  after full consideration of the evidence with the other members

11  of the jury.  While you are discussing the case, do not hesitate

12  to reexamine your own opinion and change your mind if you become

13  convinced that you are wrong.  However, do not give up your

14  honest beliefs solely because the others think differently, or

15  merely to finish the case.

16         Remember that in a very real way you are the judges,

17  judges of the facts.  Your only interest is to seek the truth

18  from the evidence in the case.

19         When you retire to the jury room to deliberate on your

20  verdict, you may take the charge with you as well as the

21  exhibits which the Court has admitted into evidence.  Please

22  leave your exhibit books on your chair.  The courtroom deputy

23  will bring you the exhibits.  Select your foreperson and conduct

24  your deliberations.  If you recess during your deliberations,

25  follow all of the instructions the Court has given you about on

1  your conduct during the trial.  After you have reached your

2  unanimous verdict, your Foreperson is to fill in on the form

3  your answers to the questions.  Do not reveal your answers until

4  such time as you are discharged, unless otherwise directed by

5  me.  You must never disclose to anyone, not even to me, your

6  numerical division on any question.

7        If you want to communicate with me at any time, please

8  give a written message or question to the bailiff, who will

9  bring it to me.  I will then respond as promptly as possible

10 either in writing or by having you brought into the courtroom so

11 that I could address you orally.  I will always first disclose

12 to the attorneys your question and my response before I answer

13 your question.

14       After you have reached a verdict, you are not to talk

15 with anyone about the case unless the Court orders otherwise.

16       You may now retire to the jury room to conduct your

17 deliberations.

18       I will tell you this.  It's about seven minutes to

19 5:00. I discussed this matter with the attorneys and you're

20 going to start your deliberations now.  You're going to continue

21 your deliberations until approximately quarter to 6:00, and then

22 we'll recess for the evening.

23       Thank you.

24       MARLEY M. MARTEN (JUROR NO. 4):   Excuse me, Your

25 Honor, is it because you think I Octave has to leave?

1          THE COURT:    No, no.

2          OCTAVE E. WOODS (JUROR NO. 7):    That was taken care

3    of.

4          THE COURT:    Thank you for being concerned about it.

5          THE MARSHAL:    All rise.

6          (WHEREUPON, AT 4:40 P.M. THE JURY RETIRED TO THE

7     DELIBERATION ROOM TO BEGIN DELIBERATIONS).

8     (PROCEEDINGS BETWEEN THE COURT AND COUNSEL, AS FOLLOWS):

9          THE COURT:    Do we need to put anything on the record

10    at this time, Mr. Cashio, on behalf of the plaintiff?

11          MR. CASHIO:    No, Your Honor.

12          THE COURT:    On behalf of the defendant, Mr. Ballina?

13          MR. BALLINA:    No, Your Honor.

14          THE COURT:    Thank you.

15          Everybody agreed to include that figure of $23,006.03

16    for past medical expenses.  I'm a little bit concerned, however,

17    the statement that's made, what amount in dollars and cents will

18    compensate Shaun Lee Smith for his damages without making any

19    reduction for his own substandard conduct, if any?  And there is

20    an amount put in there.

21          I don't want this jury to feel presupposed that they

22    will award him $23,000.  So this is what I would propose to do.

23          We have not given them this verdict form yet.  We're

24    not going to put in the amount of 23,006.03.  I would just as

25    soon delete past medical expenses completely knowing that if

1  there is a verdict for the plaintiff we will add past medical

2  expenses.

3          Do you have a problem with that?

4          MR. CASHIO:   Could I respond to that?

5          THE COURT:   Yes.   We can do one of three things.   Leave

6  it the way that it is --

7          MR. BALLINA:   I had a concern about it, Judge.

8          THE COURT:   Okay.   I think it's prejudicial, quite

9  frankly, the more that I look at it, the more that I think about

10 it.   So we can do of one of two things.   We're going to either

11 completely delete past medical expenses.   I've already told the

12 jury what I've told them.   If the jury comes back with a number,

13 we are going to add the past medical expenses to be $23,006.03,

14 because that is the amount that has been agreed to by both

15 parties.   We can do that, or what we can do is still have the

16 designation past medical expenses and instead of having the

17 figure, I just merely type in the word stipulated and leave it

18 like that.

19         MR. CASHIO:   I like stipulated.   It's a good

20 compromise.

21         MR. BALLINA:   The word stipulated may be somewhat less

22 prejudicial than the numbers.   Frankly, I had a concern about

23 it, and the fact that, you know, that the Court gave an

24 instruction that it was, you know, in agreement.

25         THE COURT:   I don't want this jury to be prejudiced

1  for or against either party.  We know that the plaintiff will be

2  protected in the event there is a verdict in favor of the

3  plaintiff for past medical expenses of $23,006.03.  That's a

4  given.  So I do not want the fact that a number is already

5  plugged in here in the list of damages that the plaintiff is

6  entitled to any amount of money.  It's only, if, of course, the

7  jury comes back and finds the defendant at fault.

8          Yes, Mr. Cashio.

9          MR. CASHIO:   Your Honor, I think it's really a moot

10  point because if the jury finds that the defendant is either not

11  negligent or the plaintiff is solely negligent, then they don't

12  ever address that point, so there's not a problem.

13          THE COURT:   So what you're saying is they don't get

14  down to 6, because if you look at Number 1 on the jury

15  interrogatories --

16          MR. CASHIO:   It says stop.

17          THE COURT:   -- it merely says, if you find him not

18  negligent, then just sign it and return it.

19          MR. CASHIO:   Right.

20          MR. BALLINA:   Well, I understand that, Judge, but we

21  think they're not going to turn that page?  And they're

22  certainly going to turn that page and see that, and I think it

23  is prejudicial that there's a dollar amount in there.

24          What I would suggest perhaps is have that line item and

25  put stipulated, but they don't get a blank to put anything.

1          THE COURT:    Okay.  I'm going to do that.

2          MR. CASHIO:    Okay.  I'll agree.

3          THE COURT:    We're going to change the jury verdict

4    form, and we're just going to type in the word stipulated there.

5          Okay.  Don't go far.

6          Off the record.

7                  (OFF-THE-RECORD DISCUSSION)

8                      (ON THE RECORD)

9      (WHEREUPON, AT 5:55 P.M. A QUESTION FROM THE JURY)

10          THE COURT:    I have a question from the jury.

11          The question is ask is Harrah's policy manual legally

12    binding?

13          All I'm going state is it's a part of the evidence for

14    them to consider.

15          Any objection to that by anybody?

16          MR. BALLINA:  I'm sorry, Your Honor.

17          THE COURT:    The question was is Harrah's policy manual

18    legally binding?

19          I'm going to respond by saying it is part of the

20    evidence, not that you have to consider it.  They don't have to

21    consider it.  They can consider whatever they want to consider.

22          MR. CASHIO:    It is part of the evidence.

23          THE COURT:    It is part of the evidence in this case.

24          MR. BALLINA:    That you may or may not consider.

25          MR. CASHIO:    No, I don't think we should give them --

1    THE COURT:    No, I'm just going to put it is part of

2  the evidence in this case.

3    MR. CASHIO:    Right.

4    THE COURT:    I've already said in my general statement

5  about they can consider whatever they chose to consider.

6    MR. CASHIO:    Right.

7    THE COURT:    Do either of you have any objection to my

8  responding that it is part of the evidence in this case?

9    MR. CASHIO:    No, Your Honor.

10    MR. BALLINA:    No.

11    THE COURT:    All right.

12    It's a few minutes before 6:00 o'clock.  I'm going to

13  call the jury in and excuse them for the evening.

14    I had mentioned to each you have before that we can do

15  one of two things, either sequestering them overnight or

16  allowing them to go home, but for the them to go home I would

17  need to get the consent of each party.

18    What is your position, Mr. Cashio?

19    MR. CASHIO:    No objection to going home, Your Honor

20    MR. BALLINA:    No objection, as previously stated.

21    THE COURT:    Great.

22    Why don't you call in the jury.

23    THE CLERK:    All rise.

24    (THE JURY ENTERED THE COURTROOM)

25    THE COURT:    Please have a seat.

1    I hated to interrupt you during your deliberations, but

2  we're going to have to recess now until tomorrow morning where

3  you can resume your deliberations.

4    I'm going to again instruct you do not discuss this

5  with anybody.  The case is now in your hands.  Do not discuss

6  this even amongst yourselves now because the only time I want

7  you to discuss this is when you all are together as a group and

8  in the jury room.

9    When you go home this evening do not discuss it with

10  any family members.  Do not discuss it with any friends.  As I

11  said, this case is in your hands right now.

12    Can we start at 9:00 tomorrow morning, or is that too

13  early?

14    JOSEPH M. CURRIER (JUROR NO. 5):  Juror perfect.

15    THE COURT:  That's a yes.  I'll start as early as

16  you'd like to start.  I know you come in from Hammond and this

17  gentlemen is from Amite.  I'm going to be here from about 7:30

18  on, so you tell me what time is convenient for you guys to

19  start.

20    (MARLEY M. MARTEN (JUROR NO. 4):  It's up to you all.

21    JOSEPH M. CURRIER (JUROR NO. 5):  9:00 sounds good.

22    THE COURT:  9:00 is okay with you, sir?

23    And the rest of you, nine's okay?

24    (AFFIRMATIVE RESPONSE)

25    THE COURT:  Great.  We'll see you all here at 9:00

1  o'clock.

2       James, where do they report, into the jury room?

3       THE CLERK:   They can report straight to the jury room.

4  Once the Court Security Officer confirms that they're all here,

5  I can instruct them to start deliberating again.

6       THE COURT:   Please, as soon as you come here tomorrow

7  morning, do not start deliberating until all seven of you are

8  present.  Now again, that's the law and you must follow it.

9       You must not talk about this case amongst yourselves

10  unless all seven of you are together.  So if you come in, hang

11  around waiting, eat your Doughnuts, and enjoy yourself, but

12  don't talk about this case.

13       Yes, ma'am, do you have a question.

14       LOLITA D. PAYRE (JUROR NO. 6):   Yes, I just wanted to

15  say I'm having problems at home with some contractors with my

16  house.  I wanted to maybe try to get here for 9:30 or some 10'00

17  o'clock.

18       THE COURT:   Well, again, we can't start until

19  everybody is here.  Can you resolve it by 9:30?  The sooner e

20  you get started the sooner you get finished.

21       LOLITA D. PAYRE (JUROR NO. 6):   Okey-dokey.

22       THE COURT:   You want me to make it for 9:30 then.  So

23  you're saying you can't be here for 9:00?

24       LOLITA D.PAYRE (JUROR NO. 6):   Right.

25       JOSEPH M. CURRIER (JUROR NO. 5):   That will help

1    everybody out.

2            THE COURT:    Then you all are going to resume

3    deliberations at 9:30 tomorrow Friday morning, which is tomorrow

4    morning, an again, you're not to resume deliberations until you

5    are instructed to by my office, okay.

6            Thank you very much.

7            Be careful, and if you need to be escorted to your car

8    just let you us know and the marshal do that for you.

9            See you tomorrow morning, and thank you very much.

10           THE CLERK:    All rise.

11           Court's in recess.

12               (WHEREUPON, AT 6:00 P.M. COURT RECESSED)

13        *        *        *        *        *        *        *        *

14                    C E R T I F I C A T E

15

16

17           I, Victor D. Di Giorgio, Official United States Court
     Reporter in and for the Eastern District of Louisiana, do hereby
     certify that the foregoing proceedings were taken down by me in
18   shorthand at the time and place aforesaid, transcribed under my
     personal direction and supervision, and that the preceding ^   ^
19   pages represent a true and correct transcription, to the best of
     my ability and understanding.

20

21

22                         _____
                           Victor D. Di Giorgio, CCR
23                         Official U.S. Court Reporter

24

25